Exhibit "A"

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

**LEAP MASTER AGREEMENT FOR PURCHASING AND SELLING OREGON CLEAN FUELS PROGRAM CREDITS**
*Version 1.0*

**Effective as of May 19, 2022**

## COVER SHEET

*This LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits Version 1.0* ("**LEAP Oregon Clean Fuels Program Agreement**") together with, and as amended by, this Cover Sheet and any annexes, schedules and written supplements hereto, and all Transactions (including any Confirmations) shall be referred to collectively as this "**Agreement**".

The parties to this Agreement are as follows:

| **Elbow River Marketing Ltd.** | | **Thompson Technical Services LLC** |
|---|---|---|
| | and | |
| ("**Party A**") | | ("**Party B**") |
| U.S. Federal Tax ID No.: 98 1086910 | | U.S. Federal Tax ID No.: 854255777 |
| Notices: | | Notices: |
| Mail address: 335 8 Ave SW #1600, Calgary, AB T2P 1C9 | | Mail address: 2424 NE HWY 101 Lincoln City Or 97367 |
| Email: Contracts@elbowriver.com | | Email:merlin@ttscharging.com |
| Attn: Contracts Management | | Attn: Merlin Thompson |
| Phone: 403-232-6868          Fax: 403-269-9576 | | Phone: 5413007268          Fax: |
| **Wire Transfer or ACH Numbers (if applicable):** | | **Wire Transfer or ACH Numbers (if applicable):** |
| BANK: JP Morgan Chase | | BANK: Arkansas Federal Credit Union |
| ABA: 021409169 | | ABA: 282075028 |
| ACCT: 9591009737 | | ACCT: 10002530110 |
| **Notices for Default:** | | **Notices for Default:** |
| Attn: Same as above | | Attn: Therese Gray |
| Phone: Same as above     Fax: Same as above | | Phone: 940-435-9185          Fax: |
| Other Details: | | Other Details: |

The Parties hereby agree that the General Terms and Conditions of this *LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits* set forth below are incorporated herein subject to the following elections and modifications:

**Section 8 – Events of Default**
THE FOLLOWING EVENTS OF DEFAULT ARE APPLICABLE UNDER THIS AGREEMENT (CHECK ALL PROVISIONS THAT ARE APPLICABLE):

8.1(d) Default Under Other Trading Agreements:
[ ] Applicable.   If not checked, inapplicable.
    "Aggregate Delinquency Amount" means for purposes of Section 8.1(d) (if applicable):
    With respect to Party A, Party A's Credit Support Provider and each applicable Specified Affiliate of Party A:_____

    With respect to Party B, Party B's Credit Support Provider and each applicable Specified Affiliate of Party B:_____

    "Specified Affiliate" means for purposes of Section 8.1(d) (if applicable):
    With respect to Party A: _____

    With respect to Party B: _____

8.1(e) Cross Default:
[ ] Applicable.   If not checked, inapplicable.
[ ] Cross Acceleration. If Section 8.1(e) is applicable, the words ", or becoming capable at such time of being declared," in Section 8.1(e) shall be deleted. If not checked, these words shall not be deleted.
    "Threshold Amount" means for purposes of Section 8.1(e) (if applicable):
    With respect to Party A: _____

    With respect to Party B: _____

ERM_ORG_000195

**EXHIBIT A**
**Page 1 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

**Section 9 – Termination and Liquidation**
9.3 Closeout Setoff:
For purposes of Section 9.3, the Parties agree that (select one):
    [x] Option A (Bilateral Setoff) is applicable. (Applicable if no other election is made.)
    [ ] Option B (Triangular Setoff) is applicable.
    [ ] Option C (Rectangular Setoff) is applicable.
    [ ] Option D (No Setoff) is applicable.

**Section 10 – Force Majeure**
10.5 Force Majeure Termination Payment:
[ ] Applicable. If not checked, inapplicable. If applicable, the following provisions will apply:
    Notwithstanding anything to the contrary in Section 10, a Termination Payment will be payable in respect of Term Transactions that are terminated due to Force Majeure pursuant to Section 10.5 within two (2) New York Banking Days of termination. The Termination Payment and the Party that owes such Termination Payment will be calculated and determined pursuant to the methodology set forth in   Section 9.2 by the Party that is not claiming Force Majeure (which Party will be deemed the "Performing Party" for purposes of applying the terms of Section 9.2 for purposes of this provision), except that only the Transactions being terminated pursuant to Section 10.5 will be taken into account in determining the amount of such payment and all other Transactions will remain outstanding and unaffected by such termination.

    If both Parties are claiming Force Majeure, then both Parties will calculate a Termination Payment, and the amount payable will equal one-half of the difference between the Termination Payment of the Party with the higher Termination Payment ("X") and the Termination Payment of the Party with the lower Termination Payment ("Y"). If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

**Section 19 – New or Changed Laws or Regulations**
19.1 Material Adverse Effect:
[ ] Applicable.  If not checked, inapplicable.

19.2 Disrupted Transactions:
[ ] Applicable.  If not checked, inapplicable.

**Section 18 – Written Confirmations**
Confirming Party:
    [x] Party A       [ ] Party B

**Other Modifications to the LEAP Oregon Clean Fuels Program Agreement**
Section 1.1 (bb) is deleted in its entirety.

Section 1.1 (g) is modified by adding the word "provincial" after the word "state".

Section 1.1 (hh) is modified by adding "or other country" after the word "U.S. and "provincial" after the word "state".

Section 4.1 is modified by deleting ", as set forth in the sample forms attached as Exhibit 2".

The following paragraph shall be added as a new Section:

20.7 Change of Banking Information
If, at any time, either Party sends notice of changed banking information or an invoice or net statement containing banking information different from that currently in the other Party's records, prior to making any payment then due, the paying Party shall require that the other Party provide confirmation of the new banking information via email or fax using company letterhead.  The paying Party will request, and other Party will provide such confirmation in a timely manner, and the payment shall not be due until the confirmation is provided. The paying Party shall update its records in a timely manner upon receipt of the confirmation in order to avoid unnecessary further requests for confirmation.

Exhibit 2 Sample Form of Invoice for CFP Credits Transaction is deleted in its entirety.

**Specify, if any: Schedule to the LEAP Oregon Clean Fuels Program Agreement**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first above written.
**ELBOW RIVER MARKETING LTD.**                                    and     **Thompson Technical Services LLC**

**("Party A")**                                                                            **("Party B")**
By: *Randy Richard*                                                          By: *Merlin Thompson*
Name: Randy Richard                                                      Name: Merlin Thompson
Title:  Trader                                                                       Title: CEO
Date:  5/20/2022                                                              Date: 5/20/2020

By:                                                                                       By:
Name:                                                                                  Name:

ERM_ORG_000196

**EXHIBIT A**
**Page 2 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

Title: _____          Title: _____
Date: _____          Date: _____

**DISCLAIMER**

THE OBJECTIVE OF THIS AGREEMENT IS TO FACILITATE THE ORDERLY AND PROMOTE THE EFFICIENT TRADING OF OREGON CLEAN FUELS PROGRAM CREDITS. USE OF THIS AGREEMENT OR ANY PROVISION THEREOF IS COMPLETELY VOLUNTARY. USE OF THIS AGREEMENT IS NOT RESTRICTED AND LEAP HEREBY AUTHORIZES ANYONE TO USE THIS AGREEMENT OR ANY PROVISION THEREOF.

NONE OF LEAP, ANY LEAP MEMBER COMPANY OR ANY OF THEIR AGENTS, REPRESENTATIVES OR ATTORNEYS SHALL BE RESPONSIBLE FOR THE USE OF THIS AGREEMENT, OR ANY DAMAGES OR LOSSES RESULTING THEREFROM. BY PROVIDING THIS AGREEMENT, LEAP DOES NOT OFFER LEGAL ADVICE AND ALL USERS ARE URGED TO CONSULT THEIR OWN LEGAL COUNSEL AND TAX ADVISORS TO ENSURE THAT THIS AGREEMENT WILL ACHIEVE THEIR COMMERCIAL OBJECTIVES AND THEIR LEGAL INTERESTS ARE ADEQUATELY PROTECTED.

ERM_ORG_000197

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

# GENERAL TERMS AND CONDITIONS

**In consideration of the mutual undertakings in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:**

1.  **DEFINITIONS AND INTERPRETATION**

1.1  **Definitions**

(a)  "Accepted" or "Acceptance" has the meaning specified in Section 2.2.2.

(b)  "Affected Party" has the meaning specified in Section 19.1.

(c)  "Affected Transaction" has the meaning specified in Section 19.1.

(d)  "Affiliate" means, in relation to any person, an entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

(e)  "Aggregate Delinquency Amount" means, with respect to a Party, the amount specified as the Aggregate Delinquency Amount for such Party in respect of Section 8.1(d) in the Cover Sheet.

(f)  "Agreement" has the meaning set out in the preamble to the Cover Sheet.

(g)  "Applicable Law" means any federal, national, state or local law, statute, regulation, code, ordinance, license, permit, compliance requirement, decision, order, writ, injunction, directive, judgment, policy, decree, including any judicial or administrative interpretations thereof, or any agreement, concession or arrangement with any Governmental Authority, applicable to either Party or either Party's performance under any Transaction, and any amendments or modifications to the foregoing.

(h)  "Alternative Settlement Amount" has the meaning specified in Section 19.1.

(i)  "Bankrupt" means, with respect to a Party, that such Party: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv)(A) institutes, or has instituted against it by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above; (v) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets; (viii) causes or is subject to any event with respect to it which, under the Applicable Law, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive); or (ix) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

(j)  "Bankruptcy Code" has the meaning specified in Section 9.7.

(k)  "Buyer" means the Party obligated to purchase or acquire CFP Credits under a Transaction.

(l)  "CFP Account" means the account of a Party showing the CFP Credits and CFP Deficits generated by the Party or transferred, purchased or acquired by the Party, as established with DEQ or another governmental authority pursuant to the Oregon Clean Fuels Program Regulations.

(m)  "Clean Fuels Program Credit" and "CFP Credit" means a credit as defined in the Oregon Clean Fuels Program Regulations.

(n)  "Clean Fuels Program Deficit" and "CFP Deficit" means a deficit as defined in the Oregon Clean Fuels Program Regulations.

(o)  "CFP Online System" has the meaning defined in the Oregon Clean Fuels Program Regulations.

(p)  "CFP Online Transfer Notification" has the meaning specified in Section 2.2.1.

(q)  "Confirmation" means (i) any electronic confirmation setting forth the trade details of a Transaction (and any special conditions) between the Parties and matched by the Parties on an electronic confirmation matching system, or (ii) the ability to

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

confirm a Transaction through an electronic confirmation matching system, any other written or electronic confirmation between the Parties that contains the relevant trade details (and any special conditions) of the Transaction, in either case based on those set forth in the sample form attached as Exhibit 1.

(r)    "Contract Price" means the price (expressed in U.S. Dollars) of a CFP Credit as specified in a Confirmation.

(s)    "Contract Value" means the number of the CFP Credits remaining to be delivered or purchased under a Transaction multiplied by the Contract Price.

(t)    "Credit Support Provider" means a Party's guarantor or other person providing Performance Assurance for such Party.

(u)    "Credit Transfer Form" means the Credit Transfer Form that is incorporated by reference into the Oregon Clean Fuels Program Regulations in OAR 340-253-1050(5) properly completed and executed by Seller in accordance with the Oregon Clean Fuels Program Regulations.

(v)    "Defaulting Party" has the meaning specified in Section 9.1.

(w)    "Deficient CFP Credit" has the meaning specified in Section 7.1.

(x)    "DEQ" means the Oregon Department of Environmental Quality or successor agency.

(y)    "Designated Event" means, with respect to a Party for purposes of Section 8.1(f): (i) the consolidation or amalgamation of a Party with, the merger of a Party with or into, or the transfer of all or substantially all of a Party's assets to, another entity; (ii) the reorganization, reincorporation or reconstitution of a Party into or as another entity; (iii) the acquisition by any person directly or indirectly of the majority of the beneficial ownership of the Party such that such person may exercise control of the Party; or (iv) a substantial change in the capital structure of a Party by means of the issuance or guaranty of debt.

(z)    "Disrupted Transaction" has the meaning specified in Section 19.2.

(aa)    "Early Termination Date" has the meaning specified in Section 9.1.

(bb)    "Eastern Prevailing Time" means the time prevailing on the East Coast of the U.S., taking into account daylight savings time if it is in effect.

(cc)    "Event of Default" has the meaning specified in Section 8.1.

(dd)  "Expert" means a person reasonably agreed upon by the Parties who shall be qualified by education, experience or training to resolve the applicable issue and who shall not be a current or former employee of either Party or otherwise have a stake in the outcome of the dispute.

(ee)    "Expert's Decision" has the meaning specified in Section 19.1.

(ff)    "Force Majeure" has the meaning specified in Section 10.1.

(gg)    "Force Majeure Termination Payment" has the meaning specified in Section 10.5.

(hh)  "Governmental Authority" means any U.S. federal, state, regional, local or municipal governmental body, agency, instrumentality, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative or judicial body, or any person acting on behalf thereof.

(ii)  "Independent Dealer" means a leading dealer in the relevant physical trading markets for the Affected Transactions that is not a Party or an Affiliate of a Party.

(jj)    "Inappropriate Payments" has the meaning specified in Section 20.4.

(kk)    "Initiate" means the submission of a sell transaction in the CFP Online System by Seller provided, however, that a Seller shall not be deemed to have submitted any CFP Credits where Seller cancels such sell transaction in the CFP Online System before Buyer accepts it in the CFP Online System.

(ll)  "Invalid" has the same meaning as "Illegitimate" as specified in the Oregon Clean Fuels Program Regulations OAR 340-253- 0040(49).

(mm)    "Invoice" has the meaning set forth in Section 4.1.

ERM_ORG_000199

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

(nn)    "LEAP" has the meaning specified in the disclaimer paragraph on the last page of the Cover Sheet.

(oo)    "LEAP Oregon Clean Fuels Program Agreement" has the meaning specified in the Cover Sheet.

(pp)    "Market Value" means the amount of the CFP Credits remaining to be Initiated under a Transaction multiplied by the market    price for an equivalent transaction for Qualified Replacement CFP Credits as determined by the Performing Party (or determining party, as the case may be) in a commercially reasonable manner. To ascertain the Market Value, the Performing Party may consider, among other valuations, quotations from leading dealers in swap contracts or physical trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term, relevant Payment Due Dates, Transfer Dates, and Transaction Volume. A Party shall not be required to enter into a replacement transaction in order to determine th e Market Value of a Transaction. For the avoidance of doubt, any option pursuant to which one Party has the right to extend the term of a Transaction shall be considered in determining Contract Value and Market Values.

(qq)    "New York Banking Day" means a day (other than a Saturday or Sunday or banking holiday) on which commercial banks are authorized to open for business in the State of New York.

(rr)    "Oregon Clean Fuels Program Regulations", "CFP Regulations" and "CFP" mean the regulations, orders, decrees and standards issued by a governmental authority implementing or otherwise applicable to the Oregon Clean Fuels Program as set forth in OAR chapter 340, division 253 as defined in OAR 340-253-0060(4) and each successor regulation, as may be subsequently amended, modified, or restated from time to time.

(ss)    "Original Index" has the meaning specified in Section 19.2.

(tt)    "Other Amounts" has the meaning specified in Section 9.3.

(uu)    "Other Trading Agreement" has the meaning specified in Section 8.1(d).

(vv)    "Party" means Party A or Party B, individually, and "Parties" means Party A and Party B, collectively.

(ww)    "Party A" is the party designated as such in the introduction on page 1 of the Cover Sheet.

(xx)    "Party B" is the party designated as such in the introduction on page 1 of the Cover Sheet.

(yy)    "Payment Due Date" means the payment due date specified in the Confirmation (or otherwise agreed in writing by the Parties), provided that if the Payment Due Date is not so specified or agreed, then it shall be five (5) New York Banking Days after the later of (A) the Transfer Date or (B) the payer's receipt of the payee's Invoice.

(zz)    "Pending Credits" has the meaning specified in Section 7.3.

(aaa)    "Performance Assurance" has the meaning specified in Section 6.1.

(bbb)    "Performing Party" has the meaning specified in Section 9.1.

(ccc)    "Posting Party" has the meaning specified in Section 6.1.

(ddd)    "Prepayment" has the meaning specified in Section 6.2.

(eee)    "Prepayment Amount" has the meaning specified in Section 6.2.

(fff)    "Prepayment Due Date" has the meaning specified in Section 6.2.

(ggg)    "Qualified Institution" has the meaning specified in Section 6.1(b).

(hhh)    "Qualified Replacement CFP Credit" means a valid CFP Credit meeting the specifications set forth in the relevant Confirmation.

(iii)    "Quantity" means, with respect to a Transfer Date, the number of CFP Credits to be purchased and sold pursuant to a Transaction as specified in the Confirmation.

(jjj)    "Reference Price" means a price that is determined by reference to a specified pricing source.

(kkk)    "Renegotiation Notice" has the meaning specified in Section 19.1.

(lll)    "Renegotiation Option" has the meaning specified in Section 19.1.

(mmm)    "Secured Party" has the meaning specified in Section 6.1.

(nnn)    "Seller" means the Party obligated to sell or Transfer CFP Credits under a Transaction.

ERM_ORG_000200

**EXHIBIT A**
**Page 6 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

(ooo)   "Specified Affiliate" means, with respect to a Party, the entity or entities specified as the Specified Affiliate(s) with respect to such Party in respect of Section 8.1(d) in the Cover Sheet.

(ppp)   "Termination Date" has the meaning specified in Section 19.1.

(qqq)   "Termination Payment" has the meaning specified in Section 9.2.

(rrr)   "Termination Value" means the aggregate value of all Affected Transactions determined by valuing each Affected Transaction at its Market Value as reasonably determined by the determining party as of the Termination Date and then determining the amount by which such then prevailing Market Value differs from the Contract Value (it being understood that (i) in the event the prevailing Market Value of an Affected Transaction exceeds the Contract Value, the difference in value shall be due from Seller to Buyer, and (ii) in the event that the prevailing Market Value of an Affected Transaction is less than the Contract Value, the difference in value shall be due from Buyer to Seller) and adding to such value, without duplication, any amounts then payable under the Affected Transaction (including amounts due in respect of CFP Credits Initiated and Accepted hereunder). The terms "Market Value" and "Contract Value" as used in this definition shall have the meanings specified in Section 1, provided that each reference to "Performing Party" shall be replaced by "determining party".

(sss)   "Term Transaction" means a Transaction contemplating multiple Transfers with a delivery period the duration of which is one (1) calendar month or more.

(ttt)   "Threshold Amount" has the meaning specified in the Cover Sheet in respect of Section 8.1(e).

(uuu)   "Trade Date" means the date a Transaction is entered into between the Parties.

(vvv)   "Transaction" has the meaning specified in Section 1.3.

(www)   "Transfer" or "Transferred" has the meaning specified in Section 2.3.

(xxx)   "Transfer Date" has the meaning specified in Section 2.3(b)

(yyy)   "Transfer Obligations" has the meaning specified in Section 2.2.1.

(zzz)   "Transfer Period" means, for a Transaction, the date range as specified in the Confirmation during which Seller must Initiate the Quantity of CFP Credits specified in the Confirmation, all in accordance with the Seller's obligations under the Oregon Clean Fuels Program Regulations, and any subsequent guidance from DEQ.

(aaaa)   "U.S." means United States of America, and every reference to money, price, or Contract Price pertains to U.S. Dollars.

## 1.2   Interpretation

Unless otherwise specified, all section references in this Agreement are to the Sections of this Agreement. All headings in this Agreement are intended solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement. Unless expressly provided otherwise, the word "including" as used herein does not limit the preceding words or terms and shall be read to be followed by the words "without limitation" or words having similar import and the words "other" and "otherwise" shall not be construed as being limited by the context in which they appear or the words that precede them. The word "or" is not exclusive. Unless otherwise expressly stated, the words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "will" and "shall" are expressions of command, not merely expressions of future intent or expectation. Unless expressly provided otherwise, references to "consent" mean the prior written consent of the Party at issue. Unless provided otherwise, when a Party's response is required hereunder within a specific time period following receipt of notice or documentation, as applicable, the day of receipt thereof by such Party shall be considered day zero. The Parties acknowledge that they and their counsel have reviewed and revised this Agreement and that no presumption of contract interpretation or construction shall apply to the advantage or disadvantage of the drafter of this Agreement. Any specific references to laws, statutes, or regulations will include any amendments, replacements, or modifications thereto.

## 1.3   Scope; Single Agreement

This Agreement is intended to apply exclusively to transactions for the purchase and sale of CFP Credits between Seller and Buyer, the details of which are set forth in a Confirmation (a "Transaction"). All Transactions are entered into in reliance on the fact that this Agreement and all Transactions hereunder form a single agreement between the Parties.

## 1.4   Inconsistency

In the event of any inconsistency between the provisions of any Confirmation and this Agreement, such Confirmation will prevail for the purposes of the relevant Transaction; provided however, any changes which conflict with any provisions of this Agreement regarding Section 6: Credit, Section 8: Events of Default, and Section 9: Termination and Liquidation must be agreed in writing by both Parties. For the avoidance of doubt, any repetition in a Confirmation of any section or any part of such section of this LEAP Oregon Clean Fuels Program Agreement shall be for emphasis only and shall not by reason of such repetition exclude any other part of such section or any

ERM_ORG_000201

**EXHIBIT A**
**Page 7 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

other section or any part thereof of this LEAP Oregon Clean Fuels Program Agreement unless such intention to override the LEAP Oregon Clean Fuels Program Agreement is explicitly expressed in the Confirmation.

**2.  GENERAL PURCHASE AND SALE OBLIGATIONS; TITLE TRANSFER**

**2.1  Purchase**

Pursuant to each Transaction, and subject to the terms and conditions of the Confirmation governing such Transaction and this LEAP Oregon Clean Fuels Program Agreement, Seller agrees to sell and Initiate to Buyer the Quantity of CFP Credits at the Contract Price during the Transfer Period, all as specified in the Confirmation, and Buyer agrees to purchase and Accept the CFP Credits from Seller, subject to its rights under Section 2.4, within the specified number of days required by the Oregon Clean Fuels Program Regulations.

**2.2.1  Initiation**

Each Party shall take all actions required by the Oregon Clean Fuels Program Regulations to effect a transfer of the CFP Credits from Seller to Buyer during the Transfer Period (the "Transfer Obligations"). The CFP Credits shall be deemed initiated ("Initiated") by Seller to Buyer upon:

(a)  Buyer's receipt from Seller of a Credit Transfer Form or a notification of an electronic transfer of CFP Credits via the CFP Online System (each such notification, a "CFP Online Transfer Notification"); and

(b)  Seller's satisfaction of all other Transfer Obligations applicable to Seller, if any.

Seller shall Initiate CFP Credits on or before the end of the Transfer Period as indicated on the Confirmation.

**2.2.2  Acceptance**

CFP Credits that are Initiated by Seller shall be deemed accepted ("Accepted") by Buyer upon:

(a)  Buyer's confirmation of the accuracy of the information on the Credit Transfer Form by signing and dating the form using the CFP Online System.

(b)  Buyer's satisfaction of all other Transfer Obligations applicable to Buyer, if any; and Buyer's submission of the Credit Transfer Form or Buyer's acceptance of a CFP Online Transfer Notification, together with the satisfaction of all other Buyer Transfer Obligations, if any, shall constitute the acceptance (the "Acceptance") by Buyer of the CFP Credits.

**2.3  Title Transfer**

Title to the CFP Credits shall be deemed to transfer from Seller to Buyer after

(a)  Initiation and Acceptance of the CFP Credits; and

(b)  upon the recordation of the addition of the CFP Credits to the CFP Account balance of Buyer and the subtraction of the CFP Credits from the CFP Account balance of Seller by DEQ (the title transfer of CFP Credits as set forth above hereafter referred to as the "Transfer" of the CFP Credits and the date on which the Transfer occurs is the "Transfer Date").

**2.4  Buyer Right to Reject**

Buyer shall have the right, at its reasonable discretion, to reject any CFP Credits Initiated by Seller upon notice to Seller within the specified number of days required by the Oregon Clean Fuels Program Regulations. For the avoidance of doubt, and without limitation, Buyer shall be conclusively deemed to have reasonably exercised its discretion to reject where:

(a)  Buyer reasonably believes that the Credit Transfer Form or the information in a CFP Online Transfer Notification does not reflect the terms of the Transaction;

(b)  the CFP Credits are Invalid under the Oregon Clean Fuels Program Regulations or are subject to a proceeding by a governmental authority or are otherwise encumbered;

(c)  there is a reasonable prospect that the CFP Credits will be Invalid under the CFP Regulations; or

(d)  Buyer does not have information sufficient to verify that any of the CFP Credits are valid and that there is no reasonable prospect of such CFP Credits becoming Invalid under the Oregon Clean Fuels Program Regulations.

For purposes of making its assessment it shall be reasonable for Buyer to disregard the benefit of any warranties given to it under this Agreement.

ERM_ORG_000202

**EXHIBIT A**
**Page 8 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

Without prejudice to the application of Section 10, it is not a reasonable exercise of discretion for Buyer to reject CFP Credits solely on the basis of market conditions and/or the market price of, CFP Credits.

**2.5    CFP Credits Not Recorded By DEQ**

Upon notification from the DEQ that any transfer of all or a portion of the CFP Credits will not be recorded, the Parties shall promptly confer and shall cooperate in taking all reasonable actions necessary to cure any defects in the proposed transfer, so that the Transfer of such CFP Credits can be recorded.  Each Party shall notify the other Party and the DEQ of any errors in the Credit Transfer Form within five (5) business days of the discovery of such an error.  If a Transaction with Transfer Date that is greater than twenty (20) days after Trade Date is voided pursuant to OAR 340-253-1005(5), then Buyer and Seller agree to initiate a new Transaction under the same terms as the voided Transaction, with pricing identical to the voided Transaction.

**3.    REPRESENTATIONS AND WARRANTIES**

**3.1    Representations and Warranties by Both Parties**

Each Party represents, warrants and covenants to the other Party as of the date of this Agreement (which representations and warranties are deemed to be repeated by each Party on each Transfer Date with respect to a Transaction) that:

(a)    it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)    it has, and at all times during the term of this Agreement, will have, all necessary power and authority to execute, deliver, and perform its obligations hereunder;

(c)    the execution, delivery, and performance of this Agreement by such Party has been duly authorized by all necessary action and do not violate any of the terms or conditions of its governing documents, any contract to which it is a party, or any Applicable Law;

(d)    there is no pending or, to such Party's knowledge, threatened litigation or administrative proceeding that may materially adversely affect its ability to perform this Agreement;

(e)    this Agreement constitutes a legal, valid and binding obligation of such Party, except as the enforceability of this Agreement may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity; and

(f)    Seller and Buyer shall comply with Applicable Law in the performance of their respective obligations under this Agreement and each Transaction.

**3.2    Representations and Warranties by Seller**

Seller represents and warrants to Buyer that on each Transfer Date:

(a)    Seller conveys good title to all CFP Credits it sells hereunder, free and clear of any liens, security interests, and encumbrances or any interest in or to them by any third party;

(b)    each CFP Credit transferred to Buyer hereunder is valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a "Credit" as defined by the Oregon Clean Fuels Program Regulations;

(c)    each CFP Credit was deposited into Seller's CFP Account, or otherwise transferred and recorded by the DEQ in Seller's CFP Account, prior to Initiation hereunder and Seller has good title to each CFP Credit prior to Initiation hereunder;

(d)    the Quantity of CFP Credits Initiated does not exceed the number of total CFP Credits in the Seller's CFP Account as determined in accordance with OAR 240-253-1050(1) of the Oregon Clean Fuels Program Regulations;

(e)    upon Transfer and recordation of the CFP Credits in Buyer's CFP Account, the CFP Credits shall be available for Buyer's use for retirement, transfer to a third party or otherwise;

(f)    Seller has not sold, transferred or encumbered (nor become legally obligated to do the same) any rights, title, or interest in the CFP Credits to any person other than Buyer; and

(g)    neither the Seller, nor any of its associated or parent organizations or affiliates or its customers or the party that owns the project(s) producing the fuel that is the basis for the generation of the CFP Credits, has claimed (or will be entitled to claim) directly or indirectly, including on any voluntary or mandatory greenhouse gas registry program, any of the CFP Credits as anything other than sold to Buyer.

**OTHER THAN THE WARRANTIES AND REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL,**

ERM_ORG_000203

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

**EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.**

**4.**   **PAYMENTS AND INVOICES**

**4.1**   **Trade Documentation**

Payee (generally Seller) shall promptly send payer (generally Buyer) a written invoice ("Invoice") showing sufficient detail to determine the amount due, how such amount was calculated, and the Payment Due Date for the Transaction in question, as set forth in the sample forms attached as Exhibit 2.

**4.2**   **Making Payment**

All payments shall be made in U.S. Dollars by the Payment Due Date via wire transfer in same day funds.  Except as provided herein or as otherwise agreed by the Parties, payment shall be made without deduction, withholding or setoff. If a Payment Due Date falls on a Saturday or a day that is neither a New York Banking Day nor a Monday, payment shall be made on the preceding New York Banking Day. If a Payment Due Date falls on a Sunday or Monday that is not a New York Banking Day, payment shall be made on the following New York Banking Day.

**4.3**   **Price Rounding**

All U.S. dollar amounts shall be rounded to the nearest cent (and half cents shall be rounded upward).

**4.4**   **Interest**

Any amount payable hereunder, if not paid when due, and any amount payable as a refund as a result of an overpayment, shall bear interest from the Payment Due Date or the date of overpayment (as applicable) until the date payment is received at an annual rate (based upon the actual number of days in the relevant calendar year) equal to the rate of two (2) percentage points above the prime rate of interest effective for the Payment Due Date as published in the *Wall Street Journal* under "Money Rates".  If there is no publication on the Payment Due Date, then the preceding day's publication will be used. The relevant Party shall pay any interest due within three (3) New York Banking Days following receipt of the interest invoice.

**4.5**   **Payment Dispute**

If a Party, in good faith, disputes the accuracy of the amount due in respect of a Transaction, such Party will timely pay such amount as it believes to be correct and provide written notice stating the reasons why the remaining disputed amount is incorrect, along with supporting documentation acceptable in industry practice. Payment of the disputed amount shall not be required until the dispute is resolved. In the event the Parties are unable to resolve such dispute, either Party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Agreement. In the event that it is determined that the Party that is disputing the amount due must pay the disputed amount, then such Party shall pay interest in accordance with Section 4.4 on such disputed amount from and including the originally scheduled Payment Due Date to, but excluding the date paid.

**5.**   **CONCURRENT TRANSACTIONS – PAYMENT NETTING**

**5.1**   **Payment Netting**

The Parties agree to net amounts that are due to each other on the same Payment Due Date in respect of purchases and sales of CFP Credits, and the Parties shall confirm at least two (2) New York Banking Days prior to the Payment Due Date, orally or in writing, the payment obligations owed in respect of purchases and sales of CFP Credits and any and all amounts remaining due after net-out. Any remaining balance after net-out shall be paid by the Party owing such amount to the other Party on the applicable Payment Due Date.  The owing Party's payment of a net amount shall satisfy each Party's payment obligations under the relevant Transactions in respect of the payment obligations in respect of purchases and sales of CFP Credits included in the settlement on a Payment Due Date. The Parties understand and agree that such netting of payment obligations is expressly limited to amounts owed from purchases and sales of CFP Credits between the Parties and that netting out any other amounts due in respect of any Transaction or any Other Trading Agreement or any other agreement, instrument or undertaking, for any reason whatsoever, including amounts due in respect of interest payments, is strictly prohibited unless otherwise agreed in writing.

**6.**   **CREDIT**

**6.1**   Notwithstanding any other Applicable Law, including the Uniform Commercial Code, if a Party (the "Secured Party") has commercially reasonable grounds for insecurity with respect to the other Party's (the "Posting Party") creditworthiness or performance under this Agreement, the Secured Party shall provide the Posting Party with written notice requesting an amount of Performance Assurance determined by the Secured Party in a commercially reasonable manner. "Performance Assurance" means            either:

(a)    prepayment, received by the Secured Party no later than two (2) New York Banking Days after such notice, and    in   any   event prior to commencing the delivery period; or

(b)    establishing, at the Posting Party's cost, no later than two (2) New York Banking Days after such notice, an irrevocable      standby

LRM1_ORIG_000204

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

letter of credit in a form and term acceptable to the Secured Party, opened by a Qualified Institution. "Qualified Institution" means either:

    (i)    a commercial bank, unaffiliated with either Party, organized in a jurisdiction reasonably acceptable to the Secured Party, that has:

        (A)    at least an A- Long Term Rating issued by Standard & Poor's Ratings Group ("S&P") and at least an A3 Deposit Rating issued by Moody's Investor Services, Inc. ("Moody's"); and

        (B)    total equity of at least ten billion U.S. dollars ($10,000,000,000);

        (C)    not exceeded any internal credit limits as established by the Secured Party at the time of the establishment of the letter of credit; or

    (i)    a bank acceptable to the Secured Party in its sole discretion; or

    (c)    other Performance Assurance acceptable to the Secured Party in its sole discretion.

**6.2**    Notwithstanding anything to the contrary in this Agreement, if required by Seller, pursuant to Section 6.1 or as a result of a failure to pay or Event of Default, Buyer shall make advance payment in U.S. Dollars by electronic funds transfer to Seller for CFP Credits purchased by Buyer pursuant to one or more Transactions under this Agreement ("Prepayment"). Specifically, for each Transaction pursuant to which Seller is obligated to transfer CFP Credits to Buyer and for which Seller requires Buyer to make a Prepayment, Seller shall issue an invoice to Buyer and Buyer shall make the Prepayment to Seller by the date specified on Seller's invoice ("Prepayment Due Date"). All Prepayments shall be in an amount equal to the price (or estimated price if the price is based on an index and is not known at the time the invoice is issued) multiplied by the total quantity (or estimated quantity if the actual quantity is not known at the time the invoice is issued) of CFP Credits to be purchased for each outstanding Transaction for which Prepayment is required (each a "Prepayment Amount"). Each Prepayment Amount shall be paid by electronic funds transfer, in same day funds (without setoff, counterclaim or deduction), to the account specified by Seller. If, pursuant to a Transaction, the actual quantity of CFP Credits transferred differs from the contract quantity or the price differs from the estimated price upon which Prepayment was made or other amounts are owing by or to Buyer (including, without limitation, other charges related to the Transaction(s) or amounts arising from any overpayments or underpayments for prior periods), the Party owing such amounts shall pay such amounts owing by it within two (2) Business Days of receipt of request by the Party to whom the payment is owed. In the event Buyer fails to timely make the Prepayment, Seller shall have the right to immediately withhold or suspend transfer of CFP Credits until such time as the required payment is received. Such suspension of transfer of CFP Credits shall not relieve Buyer of its obligation to purchase CFP Credits pursuant to any Transaction and shall be in addition to, and not in replacement of, any other right or remedy available to Seller under this Agreement.

**7.**    **REMEDIES FOR FAILURE TO INITIATE OR ACCEPT CFP CREDITS, AND DEFICIENT CFP CREDITS**

**7.1**    In the event that, in relation to a Transaction:

    (a)    Seller fails to Initiate all or a part of the CFP Credits by the end of the Transfer Period;

    (b)    Buyer exercises its right to reject all or part of a Quantity of CFP Credits pursuant to Section 2.4 that Seller Initiated;

    (c)    Seller breaches any of its representations or warranties in Section 3.2, or any representation or warranty specified as subject to this Section 7 in the applicable Confirmation;

    (d)    CFP Credits that have been Accepted by Buyer are or become Invalid for purposes of the CFP Regulations; or

    (e)    the DEQ invalidates a Transfer of CFP Credits from Seller to Buyer, for any reason, and Buyer and Seller, cooperating in good faith, are unable to remedy the invalidated Transfer.

(each such affected CFP Credit, a "Deficient CFP Credit"), then, Seller shall, at Seller's sole cost and expense, Initiate a quantity of Qualified Replacement CFP Credits equal to the quantity of Deficient CFP Credits that satisfy the requirements under the applicable Transaction within (i) in the case of Sections 7.1(a) or (b), three (3) Business Days after Seller receives notice from Buyer that the circumstances in Section 7.1(a) or (b) apply, or (ii) in the case of Sections 7.1(c), (d) or (e), ten (10) Business Days after the earlier of (A) Seller's receipt of notice from Buyer that the circumstances in Sections 7.1(c), (d) or (e) apply and (B) Seller's becoming aware that the circumstances in Sections 7.1(c), (d) or (e) apply.

**7.2**    Except where Section 7.3 applies, if Seller fails to timely or fully comply with its Initiation obligation in Section 7.1, then Seller shall, at Buyer's election by notice either (i) Initiate replacement CFP Credits equal to the quantity of Deficient CFP Credits that satisfy the requirements under the applicable Transaction in accordance with Section 7.1 above, or (ii) pay to Buyer, within five (5) Business Days of receipt of Buyer's invoice, unless otherwise mutually agreed between the Parties, the positive difference, if any, between (1) the Market Value of the Qualified Replacement CFP Credits and (2) the product of the quantity of Deficient CFP Credits and the Contract Price specified in the Confirmation for the applicable CFP Credits, with such sum increased by any amount already paid by Buyer to Seller on account of the Deficient CFP Credits. Seller shall also reimburse Buyer for all reasonable broker costs associated with Buyer obtaining Qualified Replacement CFP Credits in a quantity equal to the Deficient CFP Credits.

ERM_ORG_000205

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

For purposes of this Section 7.2, (i) the phrase "the quantity of CFP Credits that remain to be Initiated under that Transaction" as used in the defined terms "Market Value" shall refer to and mean the quantity of Deficient CFP Credits; and (ii) the Market Value shall be determined by Buyer as of the Business Day notified by Buyer that falls no sooner than the last day for performance of Seller's obligations under Section 7.1 and no later than three (3) Business Days after the date Buyer gives notice of its election.

7.3     In the event that Buyer fails to Accept, or provide notice of its rejection of, all or part of a Quantity of CFP Credits Delivered by Seller or any replacement CFP Credits as contemplated under Section 2.4, Seller shall provide written notice of such failure to Buyer. If Buyer fails to Accept or reject any portion of those CFP Credits (the "Pending Credits") within two (2) Business Days of receiving such notice, then Seller's obligation to sell and Initiate and Buyer's obligation to purchase and Accept shall be reduced to the extent of such Pending Credits, and Buyer shall pay Seller an amount equal to the positive difference, if any, between (i) the product of the quantity of Pending Credits and the Contract Price specified in the Confirmation for the applicable CFP Credits and (ii)the Market Value of the Pending Credits. The Transaction in respect of the Pending Credits shall be deemed to be cancelled and the related Credit Transfer Form or CFP Online Transfer Notification, as applicable, shall be deemed ineffective. For purposes of this Section 7.3, Market Value shall be determined by Seller in a commercially reasonable manner with the date of determination as of the date of cancellation.

7.4     In the event the provisions of this Section 7 are invoked, Seller and Buyer agree to work together in good faith to pursue an efficient, commercial and practical resolution consistent with the foregoing options (or any combination thereof) in order to cure any breach of transfer obligations resulting in Deficient CFP Credits or Pending Credits, provided, however, any replacement CFP Credits must satisfy all of the requirements that the Parties originally agreed to for the applicable Transaction unless otherwise mutually agreed.

7.5     Seller shall deliver to Buyer a Credit Transfer Form or CFP Online Transfer Notification accurately describing any Qualified Replacement CFP Credits. Buyer and Seller shall otherwise be subject to the general obligations set forth in Section 2.

7.6     Section 7.1(b), (c), (d), (e) and, for the avoidance of doubt, Section 2.4 shall apply equally to any Qualified Replacement CFP Credits.

7.7     Except in respect of a failure to pay any amount due under Section 7.2 or Section 7.3, the remedies set out in this Section 7 are exclusive remedies for the occurrence of the events described in Section 7.

## 8.     EVENTS OF DEFAULT

8.1     An "Event of Default" shall mean the occurrence with respect to a Party of one of the following events:

(a)     Failure to Pay.  A Party fails to make payment of any amount due when required under this Agreement or any Transaction, within two (2) New York Banking Days following receipt of a written notice of such failure from the other Party.

(b)     Failure to Provide Performance Assurance. A Party fails to provide acceptable Performance Assurance support as requested by the Secured Party pursuant to Section 6.

(c)     Breach of Agreement. Except for any breach or event described in Section 7.1(a) through (e) (the exclusive remedies for which are specified in Section 7.2) or Section 7.3, and except for any event described in Section 8.1(a) and (b) above, a Party fails to perform or repudiates any material obligation to the other Party under this Agreement or breaches any representation, covenant or warranty in any material respect under this Agreement and, in each case, if capable of being cured, is not cured to the satisfaction of the other Party in its sole discretion, within two (2) New York Banking Days following receipt of written notice to such Party that corrective action is needed.

(d)     Default Under Other Trading Agreements. If specified as applicable in the Cover Sheet, a Party, any Credit Support Provider of such Party, or any applicable Specified Affiliate of such Party:

(i)     fails to make payment when due under any trading agreement (that is not a Transaction under this Agreement) with the other Party, any Credit Support Provider of such other Party or any Specified Affiliate of such other Party, including any agreement to purchase, sell or exchange CFP Credits or any other commodities or any agreement in respect of an interest rate transaction, equity transaction, bond transaction, foreign exchange transaction, credit protection transaction, repurchase transaction, buy/sell-back transaction, securities lending transaction, forward transaction, any transaction similar to the foregoing, any swap, forward, future, option or other derivative transaction with respect to the foregoing or any combination of these transactions (each, an "Other Trading Agreement") within the cure period for payment defaults specified therein, or if no period is provided, within two (2) New York Banking Days following receipt of a demand for payment by the other Party; or

(i)     commits or suffers an Event of Default or other similar event or condition, fails to perform or repudiates any obligation to the other Party, any Credit Support Provider of such other Party or any Specified Affiliate of such other Party under any Other Trading Agreement, or breaches any representation, covenant or warranty in any material respect under any Other Trading Agreement;

and, in the case of either of subclauses (i) or (ii) above, (1) such failure, breach or default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to such Other Trading Agreement; and (2) the aggregate amount owed by the Defaulting Party in respect of the liquidation, of acceleration of obligations under or early termination of all transactions outstanding under the documentation applicable to such Other Trading Agreement(s) is not less than the Aggregate Delinquency Amount applicable to such Party (it being agreed that the failure to make a payment or delivery the value of which exceeds the Aggregate Delinquency Amount on the last payment or delivery date of an Other Trading Agreement transaction where that transaction is the only transaction outstanding under the applicable documentation will satisfy conditions (1) and (2)). ERM_ORC_000206

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

(e) <u>Cross Default.</u> A default, Event of Default or other similar condition or event occurs and is continuing in respect of a Party or its Credit Support Provider (if any) under one or more agreements or instruments, individually or collectively, relating to indebtedness for borrowed money in an aggregate amount of not less than the Threshold Amount applicable to such Party and which results in such indebtedness becoming, or becoming capable at such time of being declared, immediately due and payable; or (ii) a Party or its Credit Support Provider (if any) fails to make on the due date thereof one or more payments, individually or collectively, in an aggregate amount of not less than the Threshold Amount applicable to such Party.

(f) <u>Designated Event.</u> A Designated Event occurs with respect to a Party or its Credit Support Provider (if any), and the creditworthiness of the Party or its Credit Support Provider or, if applicable, the successor, surviving or transferee entity of the Party or its Credit Support Provider (as applicable) is materially weaker than that of the Party or its Credit Support Provider immediately prior to such Designated Event.

(g) <u>Credit Support Failure.</u> A Party's guarantor or other provider of credit support for such Party (a "<u>Credit Support Provider</u>") with respect to the Party, if any, (i) fails to satisfy, perform or comply with any agreement or obligation to be complied with or performed by it in accordance with the credit support document and such failure continues after any applicable grace or notice period, (ii) makes any representation or warranty that proves to be incorrect or misleading in any material respect when made in connection with such Performance Assurance and/or credit support document, or (iii) repudiates, disclaims, disaffirms or rejects, in whole or part, any obligation under, or challenges the validity of, its Performance Assurance and/or credit support document.

(h) <u>Bankruptcy.</u> A Party or its Credit Support Provider, if any, is or becomes Bankrupt.

(i) <u>Merger Without Assumption.</u> If a Designated Event (as such term is defined in 1.1(u) and notwithstanding the reference to Section 8.1(f) therein) occurs with respect to a Party or any Credit Support Provider of such Party and:

(i) the resulting, surviving or transferee entity fails to assume all the obligations of such Party or such Credit Support Provider under this Agreement or any credit support document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other Party to this Agreement; or

(i) the benefits of any credit support document fail to extend (without the consent of the other Party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

## 9. **TERMINATION AND LIQUIDATION**

**9.1** Notwithstanding any other provision of this Agreement or the existence of any Performance Assurance, if at any time an Event of Default has occurred and is continuing with respect to a Party (such Party, the "<u>Defaulting Party</u>"), the other Party (the "<u>Performing Party</u>") may, in its sole discretion, designate a date (not earlier than the date of such notice and not later than twenty (20) days after the date of such notice (an "<u>Early Termination Date</u>")) on which to terminate, liquidate and accelerate all outstanding Transactions and calculate a Termination Payment (as defined below) in the manner set forth in Section 9.2 and Section 9.3. To the extent that, in the reasonable opinion of the Performing Party, certain Transactions may not be liquidated and terminated under Applicable Law on the Early Termination Date, such Transactions shall be terminated as soon thereafter as is reasonably practicable, in which case the actual termination date for such Transactions will be the Early Termination Date in respect thereof for purposes of Section 9.2. Notwithstanding the foregoing, if the Defaulting Party is governed by a system of law that does not permit termination to take place after the occurrence of an Event of Default described in Section 8.1(h), then no prior notice shall be required upon the occurrence of such Event of Default, in which case the Early Termination Date shall be deemed designated immediately preceding the occurrence of such event.

**9.2** On or as soon as reasonably practicable following the Early Termination Date, the Performing Party shall determine the final amount payable between the Parties under this Agreement as provided in this Section 9.2 (the "<u>Termination Payment</u>") and shall provide notice of the Termination Payment to the Defaulting Party. The Performing Party shall calculate the Termination Payment by (a) valuing each Transaction at its Market Value as reasonably determined by the Performing Party as of the Early Termination Date and then determining the amount by which such then prevailing Market Value differs from the Contract Value (it being understood that (i) in the event the prevailing Market Value of a Transaction exceeds the Contract Value, the difference in value shall be due from Seller to Buyer, and (ii) in the event that the prevailing Market Value of a Transaction is less than the Contract Value, the difference in value shall be due from Buyer to Seller), (b) determining any other damages, costs or expenses incurred by the Performing Party as a result of the early termination of such Transactions including those contemplated by Section 9.4 (without duplication and subject always to Section 13.1), (c) determining any other amounts payable from one Party to the other Party under this Agreement (including amounts due in respect of CFP Credits Initiated and Accepted hereunder) and (d) netting or aggregating the foregoing amounts into a single liquidated amount. If the Defaulting Party owes the Termination Payment to the Performing Party, then, within one (1) New York Banking Day of the date upon which the Performing Party's notice of the Termination Payment is effective, the Defaulting Party shall pay the Termination Payment, less the value of any Performance Assurance or other collateral or credit support held by the Performing Party with respect to which the Performing Party has notified the Defaulting Party in writing of its election to exercise its setoff rights under Section 9.3. If the Performing Party owes the Termination Payment to the Defaulting Party, then, within one (1) New York Banking Day of the date upon which the Performing Party's notice of the Termination Payment is effective, the Performing Party shall pay the Termination Payment, less the value of any Performance Assurance or other collateral or credit support held and not returned by the Defaulting Party.

**9.3** **Closeout Setoff**

ERM_ORG_000207

**EXHIBIT A**
**Page 13 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

Option A (Bilateral Setoff)

If no option or Option A is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 9.1, and the Termination Payment is payable to the Defaulting Party, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment any amounts ("Other Amounts") payable by the Defaulting Party to the Performing Party under any other agreements, instruments or undertakings between the Defaulting Party and the Performing Party (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option B (Triangular Setoff)

If Option B is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 9.1, and the Termination Payment is payable to the Defaulting Party, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment any amounts ("Other Amounts") payable by the Defaulting Party to the Performing Party or any of the Performing Party's Affiliates under any other agreements, instruments or undertakings between the Defaulting Party and the Performing Party or any of its Affiliates (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option C (Rectangular Setoff)

If Option C is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 8.1, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment (whether such Termination Payment is payable to the Performing Party or to the Defaulting Party) any amounts ("Other Amounts") payable between the Defaulting Party or any of its Affiliates and the Performing Party or any of its Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or any of its Affiliates to the Performing Party or any of its Affiliates (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option D (No Setoff)

If Option D is specified as applicable in the Cover Sheet, then no setoff provisions shall apply.

9.4     No delay or failure on the part of a Performing Party to exercise any right or remedy shall constitute an abandonment of such right or remedy, and the Performing Party shall be entitled to exercise such right or remedy at any time after an Event of Default has occurred, so long as such Event of Default is continuing. The Defaulting Party shall indemnify and hold harmless the Performing Party for and against any and all reasonable out-of-pocket expenses incurred by the Performing Party by reason of the enforcement of and protection of its rights under this Agreement or as a result of the early termination of any Transactions, including reasonable attorney's fees and costs of collection.

9.5     **Grant of Security Interest/Remedies**

To the extent a Party requires Performance Assurance and/or has received a credit support document under this Agreement, then the Posting Party hereby grants to the Secured Party a present and continuing security interest in same. Upon or at any time after the designation or deemed designation of an Early Termination Date, the Defaulting Party must return all remaining Performance Assurance transferred to it pursuant to this Agreement, as applicable, and all proceeds resulting therefrom or the liquidation thereof.

9.6     **Suspension of Performance**

Notwithstanding any other provision of this Agreement, if (a) an Event of Default or (b) an event that, with the lapse of time or the giving of

ERM_ORG_000208

**EXHIBIT A**
**Page 14 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

notice or both, would constitute an Event of Default shall have occurred and be continuing, the Performing Party, upon written notice to the Defaulting Party, shall have the right (i) to suspend performance under any or all Transactions; provided, however, in no event shall any such suspension continue for longer than ten (10) New York Banking Days with respect to any single Transaction, unless an Early Termination Date shall have been declared and notice thereof given pursuant to Section 9.1, and (ii) to the extent an Event of Default shall have occurred and be continuing, to exercise any remedy available at law or in equity.

**9.7** **Bankruptcy Acknowledgements**

The Parties intend that each Transaction shall constitute a "forward contract" under § 101(25) and a swap agreement under § 101(53b) of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended from time to time (the "Bankruptcy Code"), and that this Agreement constitutes a "master netting agreement" under § 101(38a) of the Bankruptcy Code, and that the rights of the Performing Party in Section 9 include the rights referred to in § 561(a) of the Bankruptcy Code. Further, the Parties intend that each Party shall be a "forward contract merchant" under § 101(26) and a "master netting agreement participant" under § 101(38B), for purposes of the Bankruptcy Code.

**10.** **FORCE MAJEURE**

**10.1** Subject to Section 10.2, a Party shall be excused from the performance of its obligations with respect to a Transaction to the extent its performance of such obligations is prevented, in whole or in part, due to the occurrence of any event or circumstance, whether foreseeable or unforeseeable, that is reasonably beyond the control of such Party and which, by the exercise of due diligence, such Party could not have remedied, avoided or overcome (any such event, a "Force Majeure"), which may include, without limitation, any of the following events:

(a)   Compliance with Applicable Law, provided however, that Seller shall not be excused from performance where the CFP Credits it Initiates or intends to Initiate are Invalid under the CFP Regulations;

(b)   Hostilities of war (declared or undeclared), embargos, blockades, civil unrest, riots or disorders, acts of terrorism, or sabotage;

(c)   Fires, explosions, lightning, maritime peril, collisions, storms, landslides, earthquakes, floods, and other acts of nature;

(d)   Strikes, lockouts, or other labor difficulties (whether or not involving employees of Seller or Buyer); provided, however, that the decision to settle a strike or other labor difficulties shall be wholly within the discretion of the Party facing such difficulty; or

(e)   Disruption or breakdown of production or transportation facilities, equipment, labor or materials, including, without limitation, the closing of harbors, railroads orpipelines.

For purposes of this Agreement, the term "Force Majeure" expressly excludes (i) a failure of performance of any person other than the Parties, except to the extent that such failure was caused by an event that would otherwise satisfy the definition of a Force Majeure event as set forth in this Section 10, (ii) the loss of Buyer's market or any market conditions for any CFP Credits that are unfavorable for Buyer or Seller, (iii) the loss of Seller's intended supply of CFP Credits, (iv) the failure of Seller's intended supplier of CFP Credits to perform, (v) any failure by a Party to apply for, obtain or maintain any permit, license, approval or right of way necessary under Applicable Law for the performance of any obligation hereunder, and (vi) a Party's inability to economically perform its obligations under this Agreement.

CFP Online System Unavailability. In the event that the CFP Online System is disrupted or unavailable, the affected obligations of the parties will be suspended (but not discharged) until the CFP Online System is not disrupted and is available.

**10.2** Notwithstanding the provisions of Section 10.1, nothing contained in this Agreement shall relieve a Party of its obligation to make payments when due with respect to performance prior to the occurrence of a Force Majeure event, including Buyer's obligation to pay in full the purchase price or any other amounts due for the CFP Credits actually Initiated and Accepted hereunder.

**10.3** In the event that a Party believes a Force Majeure event has occurred that will require it to invoke the provisions in this Section 10, such Party shall use commercially reasonable efforts to give prompt oral notice to the other Party followed by written notice within two (2) New York Banking Days following the occurrence of such event, of the underlying circumstances of the particular causes of Force Majeure, the expected duration thereof and the volume of the CFP Credits affected. The Party claiming Force Majeure shall also use commercially reasonable efforts to give the other Party such notice of cessation of the Force Majeure event and the date when performance is expected to resume.

**10.4** Notwithstanding anything to the contrary in this Agreement, (a) if an event or circumstance which would otherwise constitute or give rise to a Force Majeure event under this Section 10 also constitutes an Event of Default other than an Event of Default under Section 8.1(h), it will be treated as a Force Majeure event and not as an Event of Default; and (b) if an event or circumstance which would otherwise constitute or give rise to a Force Majeure event under this Section 10 also constitutes an Event of Default under Section 8.1(h), it will be treated as an Event of Default and not as a Force Majeure event.

**10.5** If Initiations and Acceptances in respect of a Term Transaction are suspended pursuant to this Section 10 and said suspension continues for a period of thirty (30) days or more, such Term Transaction may be terminated at the option of (a) either Party, if the "Force Majeure Termination Payment" provision is specified as applicable in the Cover Sheet, or (b) the Party that is not claiming Force Majeure, if the Force Majeure Termination Payment provision is not specified as applicable in the Cover Sheet, in either case, by giving written notice to the other Party. If a Party terminates a Term Transaction pursuant to this Section 10.5, neither Party shall have any further liability to the

ERM_ORG_000209

**EXHIBIT A**
**Page 15 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

other Party hereunder with respect to such Term Transaction except for (a) any payment or indemnification obligations arising in respect of the performance of such Term Transaction prior to the date of termination and (b) if the Force Majeure Termination Payment provision is specified as applicable in the Cover Sheet, the obligation to make a Force Majeure Termination Payment, if any, pursuant to such provision.

## 11. GOVERNING LAW AND SETTLEMENT OF DISPUTES

11.1    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to its choice of law doctrine, but without prejudice to the provisions of § 5-1401 of the General Obligations Law of the State of New York. The Parties hereby submit to the exclusive jurisdiction of any federal court of competent jurisdiction, or, if any federal court declines to exercise or does not have jurisdiction, in any New York state court situated in New York City, Borough of Manhattan, and to service of process by certified mail delivered to the Party at its last designated address. Each Party waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any proceedings relating to this Agreement.

11.2    The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

## 12. TAXES

### 12.1    Tax Obligations Generally

Each Party shall be responsible for any taxes that may be imposed on it arising from the sale or purchase, respectively, of CFP Credits pursuant to any Transaction.

## 13. LIMITATION OF LIABILITY

13.1    NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES OR FOR LOST PROFITS OR ANY FINES OR PENALTIES ASSESSED BY ANY GOVERNMENTAL AUTHORITY INCLUDING, BUT NOT LIMITED TO, FINES OR PENALTIES UNDER THE CFP REGULATIONS (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY EXCEPT TO THE EXTENT THAT THE PAYMENTS REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT (INCLUDING PAYMENTS REQUIRED TO BE MADE PURSUANT TO SECTIONS 7, 9 AND 19) ARE DEEMED TO BE SUCH DAMAGES. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY. EACH PARTY SHALL TAKE REASONABLE STEPS TO MITIGATE DAMAGES FROM ANY BREACH HEREOF.

## 14. ASSIGNMENT

14.1    This Agreement shall not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, such consent not to be unreasonably withheld. Any assignment in violation of this provision shall be void and of no legal effect. Subject to this Section 14, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

14.2    Notwithstanding anything to the contrary in Section 14.1, either Party may, without the other Party's consent, transfer, sell, pledge, encumber or assign such Party's right and interest in and to the accounts, revenues, or proceeds of this Agreement in connection with any financing or other financial arrangement.  For the avoidance of doubt, all payment obligations under this Agreement will be satisfied if the relevant payment is made to the account of the other Party and the foregoing sentence shall not require a Party to make payments to any third party, unless otherwise agreed in writing.

## 15. NON-WAIVER

15.1    No waiver by either Party of any breach by the other Party of any of the representations, covenants, warranties, terms or conditions of this Agreement shall be construed as a waiver of any succeeding breach of the same or of any other covenant or condition hereof.

## 16. ENTIRE AGREEMENT; AMENDMENTS

16.1    No statement or agreement, oral or written, made prior to the signing of this Agreement, shall vary or modify the written terms hereof. Neither Party shall claim any amendment to, modification of, or release from any provisions of this Agreement, whether set out in an annex, schedule, supplement or Confirmation or otherwise, unless such amendment, modification or release is in writing, is signed by the Parties and specifically states that it is an amendment to, modification of, or release from this Agreement or one or more Transactions.

## 17. NOTICES

17.1    All notices and other communications under this Agreement shall be deemed given on the date of the addressee's receipt thereof and shall be given only in writing by letter, facsimile or electronic data transmission. Provided that if transmitted by facsimile or electronic data transmission and it is received after close of business on a New York Banking Day, it shall be deemed to have been received on the following New York Banking Day.

ERM_ORG_000210

**EXHIBIT A**
**Page 16 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

18.  **WRITTEN CONFIRMATIONS**

18.1   The Parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation may be generated electronically by an electronic confirmation matching service or be executed and delivered in counterparts (including by facsimile transmission or by other means agreed between the Parties), which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.

18.2   Absent the availability of an electronic confirmation matching service, the Confirming Party shall confirm a Transaction by forwarding a written Confirmation to the other Party (via facsimile or other means agreed between the Parties) within five (5) New York Banking Days after the Trade Date.  If the other Party objects to any term(s) of such written Confirmation, it shall notify the Confirming Party in writing of such objection within ten (10) calendar days of the Party's receipt thereof. If the other Party fails to object within ten (10) calendar days, such failure shall be deemed acceptance of the terms, absent manifest error.

19.  **NEW OR CHANGED LAWS OR REGULATIONS**

19.1   **Material Adverse Effect**

If this Section 19.1 is specified as applicable in the Cover Sheet, then the following provision shall apply to Transactions under this Agreement:

It is understood by the Parties that each Party is entering into this Agreement in reliance on the Applicable Laws in effect on the date hereof. In the event that at any time, and from time to time, during the term of this Agreement any Applicable Laws are changed or new Applicable Laws are promulgated and have a material adverse economic effect upon either Party (such Party being the "Affected Party"), and such event does not constitute a Force Majeure, the Affected Party shall have the option (the "Renegotiation Option") to request renegotiation of the Price or other terms of the affected transaction(s) (the "Affected Transactions"). The Renegotiation Option may be exercised by the Affected Party within a commercially reasonable period of time after such changed or new Applicable Law is promulgated, by written notice of the Affected Party's desire to renegotiate, such notice to contain specific information about the new or changed Applicable Law and how it has a material adverse economic effect upon the Affected Party and the new Price or terms desired by the Affected Party to remedy or reverse such material adverse economic effect (the "Renegotiation Notice").

The issue as to whether the changed or new Applicable Law has a material adverse economic effect on the Affected Party shall be submitted promptly for resolution to an Expert, provided that the other Party shall have the option to agree that there has been a material adverse economic effect and waive its right to an Expert resolution at any time.  The cost of the Expert shall be shared equally between the Parties. The Expert shall determine that the Applicable Law either has a material adverse economic effect or does not. The Expert's decision (the "Expert's Decision") shall be final and binding, absent fraud, and shall be provided to the Parties in the form of a report prepared by the Expert that contains facts and other data supporting the Expert's Decision. If the Expert's Decision concludes that the new or changed Applicable Law has a material adverse economic effect on the Affected Party, then the Parties shall in good faith renegotiate the Price or other terms in order to appropriately address the material adverse economic effects of the new or changed Applicable Laws.

If an Expert does not provide an Expert's Decision within thirty (30) days after receipt of the Renegotiation Notice by the other Party, or such other time period as agreed between the parties, the new or changed Applicable Law shall be deemed to have a material adverse economic effect on the Affected Party. If the Parties fail to agree upon a new Contract Price or terms satisfactory to both Parties within thirty (30) days after the other Party receives the Renegotiation Notice, or such other time period as agreed between the parties, the Affected Party shall have the right to terminate the Affected Transactions as of the end of the applicable thirty (30) day period (the "Termination Date") by giving written notice thereof to the other Party on or before such Termination Date in which case each Party shall make a determination of the Termination Value of the Affected Transactions within three (3) New York Banking Days of the Termination Date.  The amount payable in settlement of the termination of the Affected Transactions (the "Settlement Amount") shall equal the sum of (i) one-half of the difference between the Termination Values calculated by the two Parties, and (ii) the lesser of such two Termination Values.  If either Party disputes the resulting Settlement Amount as commercially unreasonable by written notice to the other Party within five (5) New York Banking Days of the Termination Date, each Party shall appoint one Independent Dealer to make a determination regarding whether the Settlement Amount is commercially reasonable. If both Independent Dealers agree that the Settlement Amount is commercially reasonable, then that value shall be final and binding and shall be paid promptly by the Party owing the Settlement Amount to the other Party.  If one or more of the Independent Dealers determines that the Settlement Amount is not commercially reasonable, then each Independent Dealer will make an alternative determination of the Termination Value, and the amount payable between the Parties with respect to Affected Transactions (the "Alternative Settlement Amount") will be an amount equal to the sum of (i) one-half of the difference between the alternative Termination Values calculated by the two Independent Dealers, and (ii) the lesser of such two alternative Termination Values.

Each Party's and, if applicable, each Independent Dealer's, determination of the Termination Value shall not take into account changes to the economics of the Affected Transactions that would result from the new or changed Applicable Laws.

In the event that the first Independent Dealer approached by a Party refuses to act as Independent Dealer for purposes of dispute resolution hereunder, the Party will approach at least one additional Independent Dealer to assess whether it would be willing to act as Independent Dealer for purposes of dispute resolution hereunder. If either Party is unable to find an Independent Dealer willing to make a determination of the Termination Value for purposes of dispute resolution after approaching at least two Independent Dealers, then the originally determined Settlement Amount shall be deemed final and binding.

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

Upon the successful appointment of an Independent Dealer, each of the Parties may submit written support for the Transaction Value determined by such Party to the Independent Dealer. Copies of all information submitted by a Party to any Independent Dealer shall be provided to the other Party.

Any CFP Credits Transferred within thirty (30) days of the Renegotiation Notice shall be provisionally invoiced and paid, but will be subject to adjustment based on the renegotiated price or terms, if agreement is reached on price or terms.

**19.2    Disrupted Transactions**

If this Section 19.2 is specified as applicable in the Schedule, then the following Provisions shall apply to Transactions under this Agreement:

If the price of a Transaction is based on an industry reference index (the "Original Index") that ceases to be published or is not published for any period applicable to calculation of the Reference Price of one or more Transactions (the "Disrupted Transactions"), the Parties shall in good faith (a) select an alternative index that reflects as nearly as possible the same information as published in the Original Index; or (b) negotiate an interim Reference Price for the Disrupted Transaction until the Original Index recommences publishing or an alternative index can be identified to replace the Original Index. In the event the Parties are unable to agree on an alternative index or otherwise agree on a price within ten (10) days after the Original Index ceases to be published or is not published for any period applicable to calculation of the Reference Price of a Disrupted Transaction, then the issue shall be promptly submitted to an Expert for resolution. The cost of the Expert shall be shared equally between the Parties. Upon appointment of the Expert, each Party shall submit to the Expert its determination of the Price for the Disrupted Transaction. The Expert shall select from the two submissions the Price that it determines best reflects the Price that would have applied to the Disrupted Transaction based on the Original Index in the absence of its disruption. The Expert's decision shall be final and binding, absent fraud, and shall be provided to the Parties in the form of a report that contains the facts and other data supporting the Expert's decision. The Expert's decision shall be provided to the Parties within thirty (30) days after the Original Index ceases to be published or is not published for any period applicable to calculation of the Reference Price of a Disrupted Transaction.

**20.    MISCELLANEOUS**

**20.1    Severability**

If any Governmental Authority of competent jurisdiction declares any provision of this Agreement unlawful, void or unenforceable, such provision will not invalidate, void or make unenforceable any other provision of this Agreement.  The remaining terms and conditions shall remain in full force and effect, and the Parties will negotiate in good faith to reform this Agreement in order to give effect to the original intention of the Parties.

**20.2    Recording of Conversations**

Each Party hereby acknowledges to the other Party and consents that such other Party from time to time and without further notice and to the extent permitted by law:

(a)    may record and retain electronic transmissions (including telephone conversations, e-mail and instant messaging) between the Parties' respective commercial marketing traders, marketers, schedulers and operations personnel in connection with this Agreement or any Transaction on central and local databases for their respective legitimate business purposes;

(b)    may monitor electronic transmissions through their internal and external networks for purposes of security and compliance with Applicable Laws, regulations and internal policies for their other legitimate business purposes; and

(c)    will comply with all Applicable Laws relating to the recording of electronic transmissions.

Without limiting the foregoing, each Party will notify all of its respective commercial marketing traders, marketers, schedulers and operations personnel who engage in these electronic transmissions of such recording and shall obtain their prior consent to such recording.

**20.3    No Third Party Beneficiaries**

Nothing expressed or implied in this Agreement is intended to create any rights, interests, obligations or benefits under this Agreement in any person other than the Parties and their respective successors and permitted assigns.

**20.4    Ethics**

Each Party warrants that neither the Party nor its directors, employees, agents, or subcontractors have given commissions, rebates, payments, kickbacks, or lavish or expensive gifts, entertainments or other things of value (individually and collectively referred to as "Inappropriate Payments") to any director, employee, agent, or subcontractor of the other Party in connection with the Agreement and acknowledges that the giving of Inappropriate Payments may result in the cancellation of this and all other future Agreements.  Each Party will notify the other Party of any such Inappropriate Payments by any of its directors, employees, agent or subcontractors.

**20.5    Counterparts**

ERM_ORG_000212

**EXHIBIT A**
**Page 18 of 21**

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

This Agreement (including any Confirmation) may be executed in any number of counterparts and by different Parties in separate counterparts, any of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

**20.6**    <u>**Confidentiality**</u>

The contents of this Agreement, any Transaction, and all other documents relating to this Agreement, and any information made available by one Party or its Credit Support Provider to the other Party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either Party), except for such information:

(a)    as may become generally available to the public;

(b)    as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard;

(c)    as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing Party or its Credit Support Provider;

(d)    to the extent necessary to comply with a Governmental Authority's request or reporting requirements, but both Parties shall submit all information to a Governmental Authority as confidential business information; or

(e)    as may be furnished to a Party's Affiliates, partners, directors, officers, employees, agents, consultants, auditors, banks, attorneys, or advisors who are required to keep the information in confidence.

Notwithstanding the foregoing, a Party may disclose any one or more of the commercial terms of a Transaction to any industry price source for the purpose of aggregating and reporting such information in the form of a published energy price index, provided that such information does not include the identity of the other Party to a Transaction.

With respect to information provided with respect to a Transaction, this obligation shall survive for a period of one (1) year following the expiration or termination of such Transaction. With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the termination of this Agreement.

**21.**    <u>**PRIOR TRANSACTIONS**</u>

Any transaction entered into between the parties, now existing or hereafter, identified as a Transaction in this Agreement or the relevant Confirmation, whether before, on or after the effective date of this Agreement, is incorporated into this Agreement by reference, shall be a Transaction hereunder and shall be subject to the terms herein

**22.**    <u>**TERMINATION**</u>

**22.1**    This Agreement may be terminated by either Party upon thirty (30) days' prior written notice of a Party's decision to terminate; provided however, that this Agreement shall remain in effect with respect to any Transactions entered into prior to such termination. The obligations of either Party to make payment hereunder or with respect to any Transactions entered into prior to the effective date of such termination, including any related adjustments, shall survive the termination of this Agreement.

ERM_ORG_000213

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

**EXHIBIT 1**
**SAMPLE FORM OF CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | *** |
| **Attention:** | *** |
| **Phone Number:** | *** |
| **Facsimile Number:** | *** |
| **Email Address:** | *** |
| **Date:** | *** |
| **Reference:** | *** |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *LEAP Master Agreement for the Purchase and Sale of CFP Credits* dated as of_____, as amended and supplemented by agreement in writing from time to time (the **"LEAP CFP Agreement"**) between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the LEAP CFP Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the LEAP CFP Agreement.

**TRADE DATE: ***

**SELLER:** [Name and Address]

**BUYER:** [Name and Address]

**QUANTITY: *** CFP Credits.

**TRANSFER PERIOD: ***

**CONTRACT PRICE: US$ ***/ CFP Credit

**CONTRACT AMOUNT: US$ ***

**PAYMENT DUE DATE: ***

**SPECIAL CONDITIONS:**

………………………………… (Seller)              …………………………………(Buyer)

By:                                                   By:

Name:                                               Name:

Title :                                              Title:

ERM_ORG_000214

DocuSign Envelope ID: FF4FED1A-BE76-44A9-859A-7D2B4F5418CD

**EXHIBIT 2**
**SAMPLE FORM OF INVOICE FOR CFP CREDITS TRANSACTION**

**To:**                    ***
**Attention:**             ***
**Phone Number:**          ***
**Facsimile Number:**      ***
**Email Address:**         ***
**Date:**                  ***
**Invoice Number**         ***
**Invoice Date:**          ***

**TRADE DATE: ***

**SELLER:** [Name and Address]

**SELLER'S FEIN NUMBER:**
**BUYER:** [Name and Address]

**BUYER'S FEIN NUMBER:**
**QUANTITY: *** CFP Credits.

**TRANSFER DATE: ***

**CONTRACT PRICE: ***

**CONTRACT AMOUNT: ***

**SELLER BANKING DETAILS: ***

**PAYMENT DUE DATE: ***

ERM_ORG_000215

**EXHIBIT A**
**Page 21 of 21**