**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

Case No.: 3:23-CV-00356-MO

ELBOW RIVER MARKETING, Ltd., a
Canadian corporation, et al.,

      Plaintiffs,

v.

THOMPSON TECHNICAL SERVICES,
LLC, et al.,

      Defendants.

_____/

**MOTION FOR ENTRY OF DEFAULT FINAL**
**JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Plaintiffs, Elbow River Marketing, Ltd., and Elbow River Marketing USA, Ltd. (collectively, "**Plaintiff**") through undersigned counsel and pursuant to Federal Rules of Civil Procedure 54(d) and 55(b)(2) and Local Rules 54-2, 54-3, and 55-1, hereby requests that this Court enter a Default Final Judgment against Defendants, Thompson Technical Services, LLC ("**TTS**"), and Merlin Thompson ("**Thompson**") (collectively, the "**Defendants**"), and states:

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

TTS made application to the Department of Environmental Quality ("**DEQ**") on June 14, 2021, to register as a net generator of Oregon Clean Fuels Program ("**CFP**") Credits ("**Credits**") at least in part to sell them (the "**Credit Generator Application**"). *See* Exhibit "A," attached hereto. As part of TTS' application submissions, TTS referenced three (3) Tellus 120 kW DC fast chargers (the "**Chargers**") that it claimed to be located at 23325 Hwy 18 in Sheridan, Oregon, to generate Credits. *See id.* Thompson signed the Credit Generator Application as the "owner" and "primary contact" for TTS. *See id.* When he signed the Credit Generator Application, Thompson

certified: "I understand that this information will be used by Oregon DEQ for purposes of compliance with OAR Chapter 340, Division 253." *Id.* TTS's Credit Generator Application was approved on December 29, 2021. *See id.*

On May 19, 2022, a broker that TTS had hired arranged for the sale of 12,000 Credits to Plaintiff at a price of $112 per Credit ($1,344,000.00 in total), for delivery in the fourth calendar quarter of 2022. *See* Declaration of Chelsea Erhardt ("**Erhardt Decl.**"), attached hereto as Exhibit "B" at ¶4. In connection therewith, Plaintiff and TTS executed a LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits that would govern the transaction (the "**LEAP Agreement**"). *See id.* at ¶5, Ex. 1. Thompson executed the LEAP Agreement on behalf of TTS in his capacity as CEO. *See id.* at Ex. 1.

The LEAP Agreement includes a representation and warranty by Defendants that "each CFP Credit transferred to Buyer hereunder is valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a 'Credit' as defined by the Oregon Clean Fuels Program Regulations." *Id.* at Ex. 1. In connection with his execution of the LEAP Agreement, on May 19, 2022, Thompson also executed a Confirmation for CFP Credits Transaction as TTS's CEO. *See id.* at Ex. 2.

On June 24, 2022, Thompson advised Plaintiff that TTS had 16,000 Credits available to transfer. *See id.* at ¶7. Plaintiff responded that it would buy the 12,000 Credits that Elbow River had previously agreed to purchase; as well as that they would buy an additional 4,000 available credits at $111 per Credit. *See id.* at ¶8. TTS and Plaintiff accordingly executed a second Confirmation for CFP Credits Transaction on June 27, 2022, reflecting the sale of an additional 4,000 Credits at the agreed-upon price of $111 per credit, which Thompson signed in his capacity as TTS's CEO. *See id.* at ¶9, Ex. 4.

On July 4, 2022, Plaintiff caused $1,784,000.00 to be transferred TTS for the purchase 16,000 Credits from TTS (the "**Initial Credits**"). *See id.* at ¶10. On July 19, 2022, Plaintiff agreed to purchase an additional 36,000 Credits from TTS for $3,636,000.00 with delivery to occur on or before August 25, 2022 (the "**Additional Credits**") based on Thompson's representation that TTS had such valid credits available for transfer. *See id.* at ¶11-12, Ex. 5.

On August 12, 2022, DEQ provided notice of its initial determination to impose an interim suspension on TTS's CFP account and to impose "an immediate administrative hold on 16,000 CFP credits in [ERM's] account that [it] acquired from TTS." *Id.* at ¶14, Ex. 6. DEQ ultimately suspended the Initial Credits on the grounds that they are illegitimate, invalid, and have no value; and provided notice of same on September 30, 2022. *See id.* at ¶15, Ex. 7. TTS was also unable to timely deliver the additional 36,000 Credits from TTS as a result. *See id.* at ¶15.

On October 7, 2022, Plaintiff demanded pursuant to Section 7.1 of the LEAP Agreement that TTS, at its sole cost and expense, initiate replacement credits to replace the 16,000 Initial Credits that had been suspended. *See* Declaration of Justin B. Kaplan ("**Kaplan Decl.**"), attached hereto as Exhibit "C" at ¶5, Ex. 4. TTS failed to comply. *See id.* at ¶6. On October 21, 2022, Plaintiff again demanded same pursuant to Section 7.2 of the LEAP Agreement. *Id.* at ¶8, Ex. 5. TTS again failed to comply. *See id.* at ¶9. Plaintiff declared TTS to be in breach of the LEAP Agreement pursuant to Section 8.1(c) of same as a result on November 17, 2022. *Id.* at ¶10, Ex. 6. TTS did not cure its breach of the LEAP Agreement within the period to have done so. *See id.* at ¶11.

On February 3, 2023, Plaintiff demanded that TTS initiate replacement Credits pursuant to Section 7.1 of the LEAP Agreement as a result of its failure to timely deliver the Additional Credits. *Id.* at ¶15, Ex. 8. TTS failed to comply. *See id.* at ¶16. On February 24, 2023, Plaintiff

accordingly provided notice to TTS of its election of the remedy of repayment in the amount of $351,175.00. *Id.* at ¶17, Ex. 9. TTS did not timely render payment. *See id.* at ¶18.

On March 13, 2023, Plaintiff accordingly filed its Complaint, wherein it alleges claims against TTS for breach of the LEAP Agreement, and against both Defendants for fraudulent inducement, negligent misrepresentation, and fraudulent transfer. [D.E. 1]. Undersigned counsel served a copy of the Complaint via email on Defendants on April 28, 2023. *See* Kaplan Decl. at ¶23, Ex "11." Defendants were both served with process on March 24, 2023. [D.E. 6, 7].

Having failed to plead or defend against this lawsuit, Plaintiff filed a Motion for Default on April 26, 2023. [D.E. 16]. Undersigned counsel emailed a copy of the foregoing to Defendants and their counsel in a related administrative proceeding on April 28, 2023. *See* Kaplan Decl. at ¶23, Ex "11." Undersigned counsel received no response; and Defendants failed to appear to defend this action. *See id.* at ¶24.

This Court entered a default against Defendants on May 22, 2023. [D.E. 17]. Undersigned counsel served a copy of the foregoing to the same persons in a similar manner on May 24, 2023. *See* Kaplan Decl. at ¶26, Ex "12." To date, he has received no response. *See id.* at ¶27. Nor have Defendants submitted an intent to appear to the Court or counsel for Plaintiff.[1] *See id.* at ¶28.

## II. ARGUMENT

### A. Plaintiff Has Conclusively Established Defendants' Liability.

"With respect to the determination of liability and the default judgment itself, the general rule is that well-pled allegations in the complaint regarding liability are deemed true." *Fair Hous.*

---

[1] The requirement to confer before filing a motion for entry of default only applies "[i]f the party against whom an order or judgment of default pursuant to Fed. R. Civ. P. 55 is sought has filed an appearance in the action, or has provided written notice of intent to file an appearance to the party seeking an order or judgment of default." *See* Local Rule 55-1. Accordingly, conferral is not required where, as here, Defendants have not filed an appearance or provided a written notice of intent to file an appearance.

*of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). Plaintiff has pled all elements of its claims for, among others, breach of contract, fraudulent inducement, and negligent misrepresentation.[2] *See, e.g., 34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52, 198 N.E.3d 1282, 1287 (2022) (elements of breach of contract claim); *Powers v. City of Geneva*, 67 Misc. 3d 1220(A), 127 N.Y.S.3d 249 (N.Y. Sup. Ct. 2020) (elements of negligent misrepresentation); *Garendean Realty Owner, LLC v. Lang*, 175 A.D.3d 653, 653, 107 N.Y.S.3d 416, 418 (2019) (elements of fraud). Entry of a Default Final Judgment is accordingly warranted.

### B. This Court Should Award Plaintiff $2,135,175.00 in Compensatory Damages Against TTS.

Plaintiff is entitled to $1,784,000.00 in damages arising from the suspension of the Initial Credits and an additional $351,175 arising from TTS's failure to timely deliver the Additional Credits. *See* Erhardt Decl. at ¶¶16-20. Thus, this Court should accordingly award Plaintiff a total of $2,135,175.00 in compensatory damages against TTS.

### C. Elbow River is Entitled to at Least $157,320.88 in Prejudgment Interest.

"Under New York law, pre-judgment interest "shall be recovered upon a sum awarded because of a breach of performance of a contract."" *Johnson v. Tennyson*, 2023 WL 2747025, at *8 (S.D.N.Y. Mar. 8, 2023). Similarly, "awarding pre-judgment interest on damages awarded for fraud is mandatory." *Sothebys, Inc. v. Thut*, No. 21CIV6574LJLSLC, 2022 WL 3351534, at *15 (S.D.N.Y. July 28, 2022).

Prejudgment interest accrues at the rate of nine per centum per annum (9%).[3] N.Y. C.P.L.R. § 5004(a). It runs "from the earliest ascertainable date on which the prevailing party's cause of

---

[2] The LEAP Agreement provides that it shall be governed and construed in accordance with the laws of the State of New York. *See* Erhardt Decl. at Ex. 1, p. 16. Accordingly, New York law applies to Plaintiffs' claims.

[3] Where, as here, a contract includes a choice-of-law provision, courts apply that state's law with respect to prejudgment interest. *See Serenity Lane v. Netsmart Techs., Inc.*, No. 6:14-CV-00038-TC, 2015 WL 3862527, at *7 (D. Or. June 22, 2015) (analyzing prejudgment interest under Illinois law where contract included Illinois choice-of-

action existed [or,] if that date cannot be ascertained with precision, ... from the earliest time at which it may be said the cause of action accrued." *O'Keefe v. Barra*, 186 N.Y.S.3d 717, 721 (2023) (cleaned up). Plaintiff's causes of action accrued related to the 16,000 Initial Credits on November 17, 2022, when Plaintiff declared TTS to be in breach of the LEAP Agreement. *See* Erhardt Decl. at ¶12. Plaintiff's causes of action accrued with respect to the 36,000 Additional Credits on March August 25, 2022, when TTS failed to deliver the Additional Credits *See id.* at ¶20. As of the date of filing this Motion, $125,368.77 in prejudgment interest has accrued related to the 16,000 Initial Credits and $31,952.11 in prejudgment interest has accrued related to the 36,000 Additional Credits, for a total of $157,320.88 in prejudgment interest to date. This Court should accordingly award Elbow River a total of at least $157,320.88 in prejudgment interest.

### D. <u>Thompson is Jointly and Severally Liable.</u>

"[A] corporate officer is individually liable for fraudulent acts or false representations of his own, or in which he participates, even though his actions in such respect may be in furtherance of the corporate business." *In re A.N. Frieda Diamonds, Inc.*, 633 B.R. 190, 204 (S.D.N.Y. 2021), appeal withdrawn, No. 21-2712, 2022 WL 16580104 (2d Cir. Sept. 21, 2022); *see also Neptune Ests., LLC v. Big Poll & Son Const., LLC*, 961 N.Y.S.2d 896, 908 (N.Y. Sup. Ct.), judgment entered, (N.Y. Sup. Ct. 2013) (granting judgment against corporation and individual officer jointly and severally where individual officer "personally orchestrated all aspects" of wrongful conduct against plaintiff).

Here, Thompson is the owner, founder, Registered Agent, sole Member, and CEO of TTS. *See* Erhardt Dep. at Exhibit 7. He also orchestrated TTS' wrongful conduct in all aspects and made the material misrepresentations upon which Plaintiff's claim for fraud is based. *See* Erhardt Decl.

---

law provision). Moreover, both New York and Oregon law provide for nine percent (9%) prejudgment interest. *See* N.Y. C.P.L.R. 5004(a); ORS 82.010(1)(a).

at ¶¶5-16, 20, Ex. 1-5. This Court should accordingly enter judgment against Thompson and TTS jointly and severally for a total of $2,135,175.00 in compensatory damages.

    **E.**  **Attorneys Fees & Costs.**

The LEAP Agreement provides that "[t]he Defaulting Party shall indemnify and hold harmless the Performing Party for and against any and all reasonable out-of-pocket expenses incurred by the Performing Party by reason of the enforcement of and protection of its rights under [the LEAP] Agreement or as a result of the early termination of any Transactions, including reasonable attorney's fees and costs of collection." *See id.* at Ex. 1, Section 9.4. Plaintiff is thus entitled to recover attorney's fees and costs incurred to enforce the LEAP Agreement.

Nelson Mullins Riley & Scarborough ("**Nelson Mullins**") expended a total of 165.2 hours and incurred $91,761.80 in attorneys' fees and $5,467.55 in costs in connection with this lawsuit to enforce the LEAP Agreement against TTS. Kaplan Decl. at ¶29, Composite Ex. 13. Parsons Farnell & Grein, LLP ("**PFG**") expended a total of 25.2 hours and incurred $10,875.00 in attorneys' fees and $905.75 in costs in connection with this lawsuit to enforce the LEAP Agreement against TTS. Declaration of Charles J. Paternoster ("**Paternoster Decl.**"), attached hereto as Exhibit "D" at ¶3, Composite Ex. 1. Accordingly, Plaintiff incurred $102,636.80 in attorneys' fees and $6,373.30 in costs to enforce its rights under the LEAP Agreement.[4]

"In evaluating what constitutes reasonable attorneys' fees, factors to be considered include the time and labor expended, the difficulty of the questions involved and the required skill to handle the problems presented, the attorney's experience, ability, and reputation, the amount of money involved, the customary fee charged for such services, and the results obtained." *McLearen*

---

[4] The fees and costs incurred include all fees and costs expended in furtherance of enforcement and are not limited to those expended in furtherance of pursuing this action.

*Square Shopping Ctr. Herndon, Va. Ltd. P'ship v. BadaNara*, LLC, 208 A.D.3d 1034, 1038, 173 N.Y.S.3d 800, 805 (2022) (internal ellipses and brackets omitted).

Here, the time and labor expended were reasonable inasmuch as Plaintiff attempted to avoid litigation by sending numerous pre-suit notices to Defendants before instituting this lawsuit. The questions presented in the case are relatively difficult inasmuch as it concerns Plaintiff's purchase of CFP Credits under the CFP, TTS' sale of CFP Credits and reporting under the CFP, and multiple counts of breach of contract, fraud, negligence, and fraudulent transfer. The amount at stake is significant at over $2,000,000.00 in compensatory damages. Lastly the results obtained were favorable to Plaintiffs inasmuch as a Clerk's Default was entered against Defendants. This Court should accordingly award Plaintiffs $102,636.80 in attorneys' fees and $6,373.30 in costs.

## III.    <u>CONCLUSION</u>

Based on the foregoing, this Court should enter a Default Final Judgment against Defendants, Thompson Technical Services, LLC, and Merlin Thompson, in the amount of no less than $2,401,505.98, which shall include compensatory damages in the amount of $2,135,175.00 and prejudgment interest at the rate of nine percent and an award of $102,636.80 in attorneys' fees and $6,373.30 in costs, as well as such other relief as this Court deems just and proper.

Dated: August 29, 2023.

Respectfully submitted,

**PARSONS FARNELL & GREIN, LLP**
*Counsel for Plaintiffs*
1030 S.W. Morrison St.
Portland, Oregon 97205
Telephone: 503.222.1812

By*:*    *Charles Paternoster*
Charles J. Paternoster
Oregon State Bar No. 024186
*cpaternoster@pfglaw.com*

**NELSON MULLINS RILEY & SCARBOROUGH**
*Admitted Pro Hac Vice*
2 S. Biscayne Boulevard
One Biscayne Tower, 21st Floor
Miami, Florida 33131
Telephone:  305.373.9436

By: */s/ Justin B. Kaplan*
Justin B. Kaplan
Florida Bar No.:  33725
*justin.kaplan@nelsonmullins.com*
Adam Safwat
District of Columbia Bar No. 1024043
*adam.safwat@nelsonmullins.com*

# EXHIBIT A



**Oregon**

Kate Brown, Governor

**Department of Environmental Quality**
**Office of Compliance and Enforcement**
700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100
(503) 229-5696
FAX (503) 229-5100
TTY 711

September 30, 2022

CERTIFIED MAIL: 7020 2450 0000 3349 5277

Elbow River Marketing USA Ltd
c/o CT Corporation System, Registered Agent
780 Commercial Street SE, Suite 100
Salem, OR 97301

Re:    Notice of Final Determination to Suspend Oregon Clean Fuels Program Credits, and Order
       Case No. AQ-CFP-HQ-2022-118

This letter is to inform you of DEQ's final determination and order to suspend Oregon Clean Fuels Program credits that were generated illegitimately by another registered party and purchased by you.

The credits were generated by Thompson Technical Services LLC (TTS), when TTS submitted false information to the Oregon Fuels Reporting System (OFRS) regarding the amount of electricity dispensed by TTS's electric vehicle chargers. In a separate action, DEQ is ordering TTS to purchase 16,000 legitimate credits by October 31, 2022. The order requires TTS to use an administrative process outside the OFRS to turn in those legitimate credits to replace the illegitimate credits that TTS generated and transferred to you. You are receiving the enclosed Notice of Final Determination to Suspend Oregon Clean Fuels Program Credits, and Order (Notice) because DEQ is suspending the 16,000 illegitimate credits currently held in your OFRS account, until TTS takes the action ordered by DEQ, or until DEQ determines that TTS is unlikely to replace the credits.

If DEQ determines that TTS is unlikely to replace the credits, then DEQ will initiate a new process under OAR 340-253-0670 to invalidate the 16,000 illegitimate credits in your OFRS account. You will have an opportunity to provide information to DEQ and a right to a contested case hearing regarding DEQ's determination and the removal of the credits from your OFRS account.

If you wish to appeal this matter, DEQ must receive a request for a hearing within 20 calendar days from your receipt of this letter. <u>The hearing request must be in writing</u>. Send your request to DEQ Office of Compliance and Enforcement:

> Via mail – 700 NE Multnomah Street, Suite 600, Portland, Oregon 97232
> Via email – DEQappeals@deq.oregon.gov
> Via fax – 503-229-6762

Once DEQ receives your request, we will arrange to meet with you to discuss this matter. If DEQ does not receive a timely written hearing request, the order will become final. The administrative hold on the 16,000 illegitimate credits in your OFRS account, communicated in DEQ's August 12, 2022, Initial Determination, will remain in effect until the order becomes final.

Elbow River Marketing USA Ltd
Case No. AQ-CFP-HQ-2022-118
Page 2


The attached Notice further details DEQ's reasons for issuing the final determination and order and provides further instructions on how to appeal. Please review and refer to it when discussing this case with DEQ.

DEQ's rules are available at http://www.oregon.gov/deq/Regulations/Pages/Statutes.aspx or by calling the number below.

If you have any questions, please contact Becka Puskas at 503-229-5058 or toll free in Oregon at 800-452-4011, extension 5058.

Sincerely,

Colin McConnaha, Manager
Office of Greenhouse Gas Programs

Enclosure

cc:    Tariq Remtulla, Attorney for Elbow River Marketing USA Ltd (Tariq.Remtulla@parkland.ca)
       Stephanie Summers, DEQ
       Bill Peters, DEQ
       Cory Ann Wind, DEQ
       Accounting, DEQ

1
2

BEFORE THE ENVIRONMENTAL QUALITY COMMISSION

OF THE STATE OF OREGON

3

4
5
6
7

IN THE MATTER OF:

ELBOW RIVER MARKETING USA LTD,
an Delaware corporation, and

Respondent.

)
)
)
)
)
)
)

NOTICE OF FINAL DETERMINATION
TO SUSPEND OREGON CLEAN FUELS
PROGRAM CREDITS, AND ORDER

CASE NO. AQ-CFP-HQ-2022-118

8

9

I.  AUTHORITY

10     The Department of Environmental Quality (DEQ) issues this Notice of Final Determination to

11   Suspend Oregon Clean Fuels Program Credits, and Order (Notice) pursuant to Oregon Revised Statutes

12   (ORS) 468.100, ORS 468.126 through 468.140, 468A.265 through 468A.277, ORS Chapter 183 and

13   Oregon Administrative Rules (OAR) Chapter 340, Divisions 011, 012, and 253.

14                                II. FINDINGS OF FACT

15     1.   Respondent Elbow River Marketing USA Ltd (Elbow River) is a registered party under the

16   Oregon Clean Fuels Program. Elbow River is a marketing branch of Parkland Corporation, a supplier

17   and marketer of fuels and petroleum products.

18     2.   Thompson Technical Services LLC (TTS) is a limited liability corporation registered to

19   conduct business in Oregon. TTS operates under the assumed business name TTS Charging.

20     3.   Merlin Thompson (Thompson) is the owner, founder, Registered Agent, sole Member, and

21   CEO of TTS.

22     4.   On June 14, 2021, TTS submitted to DEQ an application for registration as a credit generator

23   under the Oregon Clean Fuels Program under the electricity fuel type. Thompson signed the application as

24   the "Owner" and "Primary contact" for TTS. In the application, Thompson certified, "I understand that this

25   information will be used by Oregon DEQ for purposes of compliance with OAR Chapter 340, Division

26   253."

27   \\\

5.   On December 27 and 28, 2021, Thompson provided additional information to DEQ regarding three electric vehicle chargers located in Sheridan, Oregon.

6.   On December 29, 2021, DEQ approved the application, and registered TTS as a credit generator under the Oregon Clean Fuels Program. The approval letter issued by DEQ states:

> This registration covers fuel dispensed for transportation use at your electric chargers located in Oregon. Individual chargers will need to be entered into the Oregon Fuels Reporting System (OFRS) using the Fuel Supply Equipment registration form prior to the electricity they dispense being reported.

> Effective the date of this registration approval, you are required to comply with the requirements under OAR 340 Division 253. Specifically, the requirements for:
> - Providers of electricity under OAR 340-253-0330.
> - Recordkeeping under OAR 340-253-0600
> - Reporting under OAR 340-253-0620, 0630 and 0650.

7.   On February 6, 2022, TTS entered data regarding three non-residential electric vehicle chargers (the Three EV Chargers) into the Oregon Fuels Reporting System (OFRS) as follows:

    a.   Facility Name: Valley Market (TTS-2325 Hwy 18)

    b.   Address: 23325 HWY 18, Sheridan, OR, US 97378

    c.   Charging Type: Non-Residential (DCFC-CCS and -CHAdeMO)

    d.   Manufacturer: TPG 120KW

    e.   Serial Nos: 20211260182, 20211260183, 20211260184

8.   On May 19, 2022, a broker hired by TTS, and a broker for Elbow River arranged for the sale of 12,000 Oregon Clean Fuels program credits, at a price of $112 per credit, for delivery in the fourth calendar quarter of 2022.

9.   On or about May 20, 2022, Thompson, on behalf of TTS, signed an agreement with Elbow River for the purchase and sale of the 12,000 credits described in Section II, paragraph 7, above. The agreement, which had an effective date of May 19, 2022, set the total sale price for the 12,000 credits at $1,344,000 (12,000 credits at $112/credit). The agreement includes a representation and warranty by the seller (TTS) that "each CFP Credit transferred to Buyer hereunder is valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a 'Credit' as defined by the Oregon

Clean Fuels Program Regulations."

10. On June 10, 2022, TTS submitted a quarterly Clean Fuels Program report to DEQ via the OFRS for the time period from January 1, 2022, through March 31, 2022 (the Q1 2022 Report). In making that submittal, Thompson, on behalf of TTS, certified as follows:

> I, Merlin Thompson, as person with Signatory Authority, am submitting this report on behalf of Thompson Technical Services, LLC, with the understanding that the information contained in this report is considered an official submission to Oregon Department of Environmental Quality for purposes of compliance with the Clean Fuels Program (CFP) regulation.
>
> Furthermore, by submitting this report, I understand that I am bound by, and authenticate this record, and attest to the statements contained within. I also understand that submitting or attesting to false statements may constitute a serious crime, punishable under the Oregon Penal Code, or other criminal offenses punishable under state, municipal, or federal law. I certify that information supplied herein is correct and that I have the authority by the company identified herein to submit this report.

11. The Q1 2022 Report stated that TTS dispensed a total of 14,900,000 kilowatt hours (kWh) of electricity to vehicles from the Three EV Chargers during Q1 2022.

12. The Three EV Chargers were not installed and operational during Q1 2022; they dispensed zero kWh of electricity to vehicles during Q1 2022.

13. The amount of electricity reported by TTS for Q1 2022 exceeds what the Three EV Chargers could dispense during a calendar quarter, even if they were actively charging EVs for every hour of every day.

14. The Q1 2022 Report stated that the fuel pathway code for the Three EV Chargers is ORELCCP22 (16.77), which corresponds to electricity provided by Consumers Power, Inc., with a carbon intensity score of 16.77 grams of carbon dioxide equivalent per megajoule of energy (gCO2e/MJ).

15. Consumers Power, Inc. does not provide electricity to any customers in Sheridan, Oregon.

16. The electric utility serving Sheridan, Oregon, is PGE.

17. The correct fuel pathway code for electricity supplied by PGE is ORELC2002, with a carbon intensity score of 146.02 gCO2e/MJ.

18. TTS's submittal of the Q1 2022 Report in the OFRS generated 16,089 credits in the OFRS.

1       19. If TTS has used the PGE fuel pathway code described in Section II, paragraph 17, above, the

2   submittal of the Q1 2022 Report would have generated 9,156 credits.

3       20. On June 24, 2022, Thompson emailed Elbow River and stated that TTS had 16,000 credits

4   available to transfer. Elbow River responded that it would take 12,000 credits at the agreed to price of

5   $112/credit, and would take the remaining 4,000 available credits at a price of $111/credit.

6       21. On June 25, 2022, Thompson signed a CFP Credit Transfer Form which stated that 4,000

7   credits would be transferred from TTS to Elbow River, at a price of $112/credit, on a proposed transfer

8   date of June 26, 2022. Elbow River signed the CFP Credit Transfer Form and submitted it in the OFRS on

9   June 27, 2022, with a note that the actual price of the transaction was $111/credit. The transaction was

10   posted to the OFRS on June 27, 2022.

11       22. On June 26, 2022, Thompson signed a second CFP Credit Transfer Form which stated that

12   12,000 credits would be transferred from TTS to Elbow River, at a price of $112/credit, on a proposed

13   transfer date of June 26, 2022. Elbow River signed the second CFP Credit Transfer Form and submitted it

14   in the OFRS on June 27, 2022. The transaction was posted to the OFRS on June 27, 2022.

15       23. Both of the CFP Credit Transfer Forms described in Section II, paragraphs 21-22 above

16   include a statement on the first page in red type as follows:

17
18   **Important:** This form must be used each time a credit transfer agreement has been made, regardless of the number of credits transferred and the price per unit credit. Only credits that have been generated and recognized in the CFP Online System can be traded, and transfers must

19   be in compliance with the rules of OAR 340-253.

20

21       24. Both of the CFP Credit Transfer Forms described in Section II, paragraphs 21-22 above

22   include the following certification: "By signing, each person below declares that all information

23   provided herein are true and correct, and to the best of his/her knowledge and belief."

24       25. On or about June 27, 2022, Thompson, on behalf of TTS, and Elbow River signed a

25   supplemental agreement to the agreement described in Section II, paragraph 9, above, for the purchase and

26   sale of the 4,000 credits for a total sale price of $444,000 (4,000 credits at $111/credit).

27   \\\

1     26. On June 27, 2022, Thompson sent two invoices to Elbow River for the two transactions. The

2   first invoice, dated May 24, 2022, was in the amount of $1,344,000 for 12,000 Oregon CFP credits. The

3   second invoice, dated June 27, 2022, was in the amount of $444,000 for 4,000 Oregon CFP credits.

4     27. On July 4, 2022, Elbow River transferred $1,788,000 to TTS.

5     28. On August 12, 2022, pursuant to OAR 240-253-0670(3), DEQ issued a Notice of Initial

6   Determination and Placing of 16,000 credits on hold in your Clean Fuels Program Account (Notice of

7   Initial Determination) to Elbow River. The Notice of Initial Determination informed Elbow River that

8   DEQ was imposing a temporary administrative hold on the 16,000 credits that Elbow River had purchased

9   from TTS. The Notice of Initial Determination also requested information from Elbow River, to be

10   provided by no later than September 1, 2022.

11     29. On August 26, 2022, and September 27, 2022, Elbow River provided additional information in

12   response to DEQ's information request.

13               III. CONCLUSIONS

14     1.  TTS and Thompson submitted an inaccurate Clean Fuels Program quarterly report that

15   generated 16,089 illegitimate credits in violation of OAR 340-253-0330(9), OAR 340-253-0640(2)(b)

16   and OAR 340-253-1005(7)(a), as described in Section II, paragraphs 1-19, above. OAR 340-253-

17   0330(9) requires that credit generators, including owners or service providers of electric-charging

18   equipment, may generate clean fuel credits by complying with the registration, recordkeeping and

19   reporting requirements of OAR Chapter 340, division 253. OAR 340-253-0640(2)(b) requires that for

20   electricity, each public access charging station must report the amount of electricity dispensed in

21   kilowatt hours to vehicles. OAR 340-253-1005(7) requires registered parties to report accurately when

22   submitting information to the OFRS. In the Q1 2022 Report, TTS and Thompson reported to DEQ via

23   the OFRS that the Three EV Chargers had dispensed a total of 14,900,000 kWh of electricity to

24   vehicles in Q1 2022, when in fact the Three EV Chargers were not installed and operational and had

25   dispensed zero kWh of electricity to vehicles in Q1 2022. As described in Section II, paragraph 13,

26   above, the amount of electricity reported by TTS exceeds the physical capacity of the Three EV

27   Chargers. In addition, TTS and Thompson included an inaccurate fuel pathway code in the Q1 2022

1  Report. This inaccurate reporting resulted in the generation of 16,089 illegitimate credits, which are

2  invalid according to OAR 340-253-1005(7)(a).

3      2.   TTS and Thompson transferred 16,000 credits in violation of OAR 340-253-1005(8), as

4  described above in Section II, paragraphs 1-27, above. Specifically, TTS and Thompson used fraud to

5  transfer 16,000 credits to Elbow River in exchange for a total of $1,788,000, in violation of OAR 340-253-

6  1005(8)(a). On May 19, 2022, TTS and Thompson entered into an agreement with Elbow River to sell

7  12,000 credits to Elbow River in Q4 2022 for $112 per credit. After generating illegitimate credits in the

8  OFRS, on June 24, 2022, TTS and Thompson represented to the Elbow River that TTS had 16,000 credits

9  available to transfer, and that those credits were generated in compliance with the Clean Fuels Program

10  rules. In exchange for the two credit transfers on June 27, 2022, Elbow River paid TTS and Thompson

11  $1,788,000 on July 4, 2022. In fact, as described in Section III, paragraph 1 above, all of the credits

12  transferred to Elbow River on June 27, 2022, were illegitimate, invalid, and had no value. Alternatively,

13  TTS and Thompson completed two credit transfers involving a false report and untrue statements of

14  material fact related to the price of the credits, in violation of OAR 340-253-1005(8)(c). TTS and

15  Thompson represented to the Buyer that the credits in TTS's OFRS account were generated in compliance

16  with the Clean Fuels Program rules and presented Elbow River with two separate Credit Transfer Forms

17  listing the price of the credits as $112/credit, when in fact the credits sold to Elbow River were illegitimate,

18  invalid, and had no value.

19      3.   According to OAR 340-253-0670(1) and (5), DEQ hereby makes a final determination to

20  suspend the 16,000 illegitimate credits in the Elbow River OFRS account that were transferred from TTS

21  to Elbow River on June 27, 2022, until TTS replaces the credits as required under OAR 340-253-

22  1005(7)(a)(B) or DEQ determines, according to OAR 340-253-1005(7)(b)(A), that TTS is unlikely to

23  retire 16,000 legitimate credits to replace the 16,000 illegitimate credits that TTS transferred to Elbow

24  River.

25  \\\

26  \\\

27  \\\

4.  The bases for the final determination in Section III, paragraph 3, above are follows:

   a.  As described in Section III, paragraph 1, above, TTS reported incorrect fuel transaction data to the OFRS, which was used to calculate credits. According to OAR 340-253-0670(2)(d), this is a basis for the actions described in Section III, paragraph 3, above.

   b.  As described in Section III, paragraphs 1 and 2, above, TTS generated and transferred credits to Elbow River in violation of the Oregon Clean Fuels Program Rules. According to OAR 340-253-0670(2)(e), this is a basis for the actions described in Section III, paragraph 3, above.

   c.  As described in Section III, paragraphs 1 and 2, above, TTS submitted material information to DEQ and to Elbow River that was incorrect, in connection with a credit transaction. According to OAR 340-253-0670(2)(b), this is a basis for the actions described in Section III, paragraph 3, above.

## IV.  ORDER SUSPENDING OREGON CLEAN FUELS PROGRAM CREDITS

Based upon the foregoing FINDINGS OF FACT AND CONCLUSIONS, it is hereby ORDERED that:

1.  Effective on the date this Order becomes final by operation of law or on appeal, the 16,000 illegitimate credits in the Elbow River Marketing USA Ltd. OFRS account that were transferred from TTS to Elbow River on June 27, 2022, are suspended until TTS replaces the credits as required under OAR 340-253-1005(7)(a)(B) or DEQ determines, according to OAR 340-253-1005(7)(b)(A), that TTS is unlikely to retire 16,000 legitimate credits to replace the 16,000 illegitimate credits that TTS transferred to Elbow River.

## V.  NOTICE OF RIGHT TO REQUEST A CONTESTED CASE HEARING

You have a right to a contested case hearing on this Notice, if you request one in writing. DEQ must receive your request for hearing **within 20 calendar days** from the date you receive this Notice. If you have any affirmative defenses or wish to dispute any allegations of fact in this Notice, you must do so in your request for hearing, as factual matters not denied will be considered admitted, and failure to

1  raise a defense will be a waiver of the defense.  (See OAR 340-011-0530 for further information about

2  requests for hearing.) You must send your request to:  **DEQ, Office of Compliance and Enforcement,**

3  **700 NE Multnomah Street, Suite 600, Portland, Oregon 97232**, fax it to **503-229-6762** or email it to

4  **DEQappeals@deq.oregon.gov**. An administrative law judge employed by the Office of

5  Administrative Hearings will conduct the hearing, according to ORS Chapter 183, OAR Chapter 340,

6  Division 011 and OAR 137-003-0501 to 0700. You have a right to be

7  represented by an attorney at the hearing, however you are not required to be.  If you are an individual,

8  you may represent yourself.  If you are a corporation, partnership, limited liability company,

9  unincorporated association, trust or government body, you must be represented by an attorney or a duly

10  authorized representative, as set forth in OAR 137-003-0555.

11  　　　Active duty Service members have a right to stay proceedings under the federal Service

12  Members Civil Relief Act. For more information contact the Oregon State Bar at 1-800-

13  452-8260, the Oregon Military Department at 503-584-3571, or the nearest United States Armed

14  Forces Legal Assistance Office through http://legalassistance.law.af.mil. The Oregon Military

15  Department does not have a toll free telephone number.

16  　　　If you fail to file a timely request for hearing, the Notice will become a final order by default

17  without further action by DEQ, as per OAR 340-011-0535(1). If you do request a hearing but later

18  withdraw your request, fail to attend the hearing or notify DEQ that you will not be attending the

19  hearing, DEQ will issue a final order by default pursuant to OAR 340-011-0535(3). DEQ designates

20  the relevant portions of its files, including information submitted by you, as the record for purposes of

21  proving a prima facie case.

22

23  ____9/30/2022____                    _____

24  Date                                          Colin McConnaha, Manager

25                                                  Office of Greenhouse Gas Programs

26

27

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

Case No.: 3:23-CV-00356-MO

ELBOW RIVER MARKETING, Ltd., a
Canadian corporation, ELBOW RIVER
MARKETING USA, LTD., a Delaware
corporation,

       Plaintiffs,

v.

THOMPSON TECHNICAL SERVICES,
LLC, an Oregon limited liability
company, and MERLIN THOMPSON, an
individual,

       Defendants.

_____/

**DECLARATION OF CHELSEA ERHARDT IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT**

I, Chelsea Erhardt, hereby declare as follows:

1.     I am an Environmental Products Trader for Elbow River Marketing, Ltd. ("**ERM**").

I am familiar with the facts and circumstances of the above-captioned lawsuit; I have personal

knowledge of the facts set forth herein; and the facts set forth below are based thereupon or upon.

2.     I submit this declaration in support of Plaintiffs' Motion for Entry of Default Final

Judgment Against Defendants, Thompson Technical Services, LLC ("**TTS**"), and Merlin

Thompson (collectively, the "**Defendants**").

3.     ERM and Elbow River Marketing USA Ltd. (collectively, the "**Elbow River**")

manage an integrated system of railcars, trucks, and pipelines that transport liquid petroleum gas,

crude oil, gasoline, diesel, and other energy products derived from natural gas and hydrocarbons.

4.    On May 19, 2022, a broker that TTS had hired arranged for the sale of 12,000 Credits to Elbow River at a price of $112 per Credit ($1,344,000.00 in total), for delivery in the fourth calendar quarter of 2022.

5.    In connection therewith, Elbow River and TTS entered into a LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits ("**LEAP Agreement**"), that would govern the transaction (the "**LEAP Agreement**"). *See* Exhibit "1."

6.    TTS and Elbow River also executed a Confirmation for CFP Credits Transaction reflecting the foregoing transaction, which Thompson signed in his capacity as TTS's CEO. *See* Exhibit "2."

7.    On June 24, 2022, Thompson sent an email to Elbow River stating that TTS had 16,000 Credits available to transfer. *See* Exhibit "3."

8.    Elbow River responded that it would buy the 12,000 Credits that Elbow River had previously agreed to purchase; as well as that they would buy an additional 4,000 available credits at $111 per Credit.

9.    TTS and Elbow River accordingly executed a second Confirmation for CFP Credits Transaction on June 27, 2022, reflecting the sale of an additional 4,000 Credits at the agreed-upon price of $111 per credit, which Thompson signed in his capacity as TTS's CEO. *See* Exhibit "4."

10.    On July 4, 2022, Elbow River caused $1,784,000.00 to be transferred to TTS for the purchase of 16,000 Credits from TTS (the "**Initial Credits**"), in reliance on Thompson's representation that valid Initial Credits were available to be transferred.

11.    On July 19, 2022, Thompson represented to Elbow River that TTS had an additional 36,000 valid credits available to transfer to Elbow River on or before August 25, 2022.

12.     In reliance on the foregoing, Elbow River agreed to purchase 36,000 Credits from TTS for $3,636,000.00 with delivery to occur on or before August 25, 2022 (the "**Additional Credits**"). *See* Exhibit "5."

13.     In doing so, Elbow River forewent the opportunity to purchase 36,000 Credits from other sources.

14.     On August 12, 2022, DEQ provided notice to Elbow River of its initial determination to impose an interim suspension on TTS's CFP account and to impose "an immediate administrative hold on 16,000 CFP credits in [Elbow River's] account that [it] acquired from TTS." *See* Exhibit "6."

15.     DEQ ultimately suspended the Credits that Elbow River had purchased from TTS on the grounds that they are illegitimate, invalid, and have no value; and provided notice of same to Elbow River on September 30, 2022. *See* Exhibit "7." TTS also failed to deliver the Additional Credits, presumably as a result of same.

16.     As a result of the foregoing, as well as Thompson's misrepresentation regarding the 16,000 Initial Credits and the 36,000 Additional Credits, Elbow River was damaged in the amount of $1,784,000.00 arising from the suspension of the 16,000 Initial Credits and was also unable to take delivery of the 36,000 Additional Credits from TTS.

17.     Plaintiffs purchased 35,000 replacement Credits for $3,867,925.00 and paid $8,750.00 in broker fees, for a total cost of $3,876,675.00 to purchase the 35,000 replacement Credits. At that time, the Market Value of an additional 1,000 replacement Credits was $110,500.00.

18.     Section 7.2 of the LEAP Agreement provides a calculation whereby TTS was required to pay Plaintiffs "the positive difference, if any, between (1) the Market Value of the

Qualified Replacement CFP Credits and (2) the product of the quantity of Deficient CFP Credits and the Contract Price specified in the Confirmation for the applicable CFP Credits, with such sum increased by any amount already paid by Buyer to Seller on account of the Deficient CFP Credits. Seller shall also reimburse Buyer for all reasonable broker costs associated with Buyer obtaining Qualified Replacement CFP Credits in a quantity equal to the Deficient CFP Credits." *See* Ex. "1."

19. Consistent with Section 7.2 of the LEAP Agreement, TTS is required to pay Plaintiffs $351,175.00 in damages arising from TTS' failure to timely deliver the Additional Credits:

| Item | Item Calculation | Item Total | LEAP Agreement, Section 7.2 Calculation |
|------|-----------------|-----------|------------------------------------------|
| Market Value of Qualified Replacement CFP Credits | 35,000 Credits purchased | $3,867,925.00 | $3,978,425.00 |
|  | 1,000 Credits x $110.50 | $110,500.00 |  |
| Contract Price | -- | $3,636,000.00 | ($3,636,000.00) |
| Amount already paid by Buyer to Seller on account of the Deficient CFP Credits | -- | $0.00 | $0.00 |
| Reasonable broker costs associated with Buyer obtaining Qualified CFP Credits in a quantity equal to Deficient CFP Credits | -- | $8,750.00 | $8,750.00 |
|  |  | **TOTAL** | $351,175.00 |

20.     As a result of Thompson's misrepresentation regarding the 36,000 Credits, Elbow River was damaged in the amount of $351,175.00.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 24, 2023.

CHELSEA ERHARDT

# EXHIBIT 1

# LEAP MASTER AGREEMENT FOR PURCHASING AND SELLING OREGON CLEAN FUELS PROGRAM CREDITS
## *Version 1.0*

### Effective as of May 19, 2022

## COVER SHEET

*This LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits Version 1.0* ("<u>LEAP Oregon Clean Fuels Program Agreement</u>") *together with, and as amended by, this Cover Sheet and any annexes, schedules and written supplements hereto, and all Transactions (including any Confirmations) shall be referred to collectively as this* "<u>Agreement</u>".

**The parties to this Agreement are as follows:**

**Elbow River Marketing Ltd.** _____ and  <u>Thompson Technical Services LLC</u>

**("Party A")**                                                                                      **("Party B")**

U.S. Federal Tax ID No.: 98 1086910 _____         U.S. Federal Tax ID No.: <u>854255777</u>

**Notices:**                                                                                          **Notices:**

Mail address: 335 8 Ave SW #1600, Calgary, AB T2P 1C9            Mail address: <u>2424 NE HWY 101 Lincoln City Or 97367</u>

Email: Contracts@elbowriver.com _____                  Email:<u>merlin@ttscharging.com</u>

Attn: <u>Contracts Management</u> _____                      Attn: <u>Merlin Thompson</u>

Phone: <u>403-232-6868</u> _____ Fax: <u>403-269-9576</u> ___          Phone: <u>5413007268</u> _____ Fax:_____

**Wire Transfer or ACH Numbers (if applicable):**                      **Wire Transfer or ACH Numbers (if applicable):**

BANK: <u>JP Morgan Chase</u> _____                         BANK: <u>Arkansas Federal Credit Union</u>

ABA: <u>021409169</u> _____                                   ABA: <u>282075028</u>

ACCT: <u>9591009737</u> _____                               ACCT: <u>10002530110</u>

**Notices for Default:**                                                           **Notices for Default:**

Attn: <u>Same as above</u> _____                              Attn: <u>Therese Gray</u>

Phone: <u>Same as above</u> _____ Fax: <u>Same as above</u> ___     Phone: <u>940-435-9185</u> _____ Fax:_____

Other Details:_____                                           Other Details:_____

_____

**The Parties hereby agree that the General Terms and Conditions of this** *LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits* **set forth below are incorporated herein subject to the following elections and modifications:**

<u>**Section 8 – Events of Default**</u>

THE FOLLOWING EVENTS OF DEFAULT ARE APPLICABLE UNDER THIS AGREEMENT (CHECK ALL PROVISIONS THAT ARE APPLICABLE):

<u>8.1(d) Default Under Other Trading Agreements:</u>

[ ] Applicable.   If not checked, inapplicable.

   "<u>Aggregate Delinquency Amount</u>" means for purposes of Section 8.1(d) (if applicable):
   With respect to Party A, Party A's Credit Support Provider and each applicable Specified Affiliate of Party A:_____

   With respect to Party B, Party B's Credit Support Provider and each applicable Specified Affiliate of Party B:_____

   "<u>Specified Affiliate</u>" means for purposes of Section 8.1(d) (if applicable):
   With respect to Party A: _____

   With respect to Party B: _____

<u>8.1(e) Cross Default:</u>

[ ] Applicable.   If not checked, inapplicable.

[ ] Cross Acceleration. If Section 8.1(e) is applicable, the words ", or becoming capable at such time of being declared," in Section 8.1(e) shall be deleted. If not checked, these words shall not be deleted.
   "<u>Threshold Amount</u>" means for purposes of Section 8.1(e) (if applicable):
   With respect to Party A: _____

   With respect to Party B: _____

## Section 9 – Termination and Liquidation

### 9.3 Closeout Setoff:
For purposes of Section 9.3, the Parties agree that (select one):
  [x] Option A (Bilateral Setoff) is applicable. (Applicable if no other election is made.)
  [ ] Option B (Triangular Setoff) is applicable.
  [ ] Option C (Rectangular Setoff) is applicable.
  [ ] Option D (No Setoff) is applicable.

## Section 10 – Force Majeure

### 10.5 Force Majeure Termination Payment:
[ ] Applicable. If not checked, inapplicable. If applicable, the following provisions will apply:
  Notwithstanding anything to the contrary in Section 10, a Termination Payment will be payable in respect of Term Transactions that are terminated due to Force Majeure pursuant to Section 10.5 within two (2) New York Banking Days of termination. The Termination Payment and the Party that owes such Termination Payment will be calculated and determined pursuant to the methodology set forth in   Section 9.2 by the Party that is not claiming Force Majeure (which Party will be deemed the "Performing Party" for purposes of applying the terms of Section 9.2 for purposes of this provision), except that only the Transactions being terminated pursuant to Section 10.5 will be taken into account in determining the amount of such payment and all other Transactions will remain outstanding and unaffected by such termination.

  If both Parties are claiming Force Majeure, then both Parties will calculate a Termination Payment, and the amount payable will equal one-half of the difference between the Termination Payment of the Party with the higher Termination Payment ("$\underline{X}$") and the Termination Payment of the Party with the lower Termination Payment ("$\underline{Y}$"). If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

## Section 19 – New or Changed Laws or Regulations

### 19.1 Material Adverse Effect:
[ ] Applicable.  If not checked, inapplicable.

### 19.2 Disrupted Transactions:
[ ] Applicable.  If not checked, inapplicable.

## Section 18 – Written Confirmations
Confirming Party:
  [x] Party A   [ ] Party B

## Other Modifications to the LEAP Oregon Clean Fuels Program Agreement
Section 1.1 (bb) is deleted in its entirety.

Section 1.1 (g) is modified by adding the word "provincial" after the word "state".

Section 1.1 (hh) is modified by adding "or other country" after the word "U.S. and "provincial" after the word "state".

Section 4.1 is modified by deleting ", as set forth in the sample forms attached as Exhibit 2".

The following paragraph shall be added as a new Section:

### 20.7 Change of Banking Information
If, at any time, either Party sends notice of changed banking information or an invoice or net statement containing banking information different from that currently in the other Party's records, prior to making any payment then due, the paying Party shall require that the other Party provide confirmation of the new banking information via email or fax using company letterhead.  The paying Party will request, and other Party will provide such confirmation in a timely manner, and the payment shall not be due until the confirmation is provided. The paying Party shall update its records in a timely manner upon receipt of the confirmation in order to avoid unnecessary further requests for confirmation.

Exhibit 2 Sample Form of Invoice for CFP Credits Transaction is deleted in its entirety.

## Specify, if any: Schedule to the LEAP Oregon Clean Fuels Program Agreement

**IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first above written.**

| ELBOW RIVER MARKETING LTD. | and | Thompson Technical Services LLC |
|---|---|---|
| ("Party A") | | ("Party B") |
| By: *Randy Richard* | | By: *Merlin Thompson* |
| Name: Randy Richard | | Name: Merlin Thompson |
| Title: Trader | | Title: CEO |
| Date: 5/20/2022 | | Date: 5/20/2020 |
| | | |
| By: | | By: |
| Name: | | Name: |

DocuSign Envelope ID: F434E1D1A-BE78-44A9-859A-7026B4F54180C

Title: _____          Title: _____

Date: _____          Date: _____

### **DISCLAIMER**

THE OBJECTIVE OF THIS AGREEMENT IS TO FACILITATE THE ORDERLY AND PROMOTE THE EFFICIENT TRADING OF OREGON CLEAN FUELS PROGRAM CREDITS. USE OF THIS AGREEMENT OR ANY PROVISION THEREOF IS COMPLETELY VOLUNTARY. USE OF THIS AGREEMENT IS NOT RESTRICTED AND LEAP HEREBY AUTHORIZES ANYONE TO USE THIS AGREEMENT OR ANY PROVISION THEREOF.

NONE OF LEAP, ANY LEAP MEMBER COMPANY OR ANY OF THEIR AGENTS, REPRESENTATIVES OR ATTORNEYS SHALL BE RESPONSIBLE FOR THE USE OF THIS AGREEMENT, OR ANY DAMAGES OR LOSSES RESULTING THEREFROM. BY PROVIDING THIS AGREEMENT, LEAP DOES NOT OFFER LEGAL ADVICE AND ALL USERS ARE URGED TO CONSULT THEIR OWN LEGAL COUNSEL AND TAX ADVISORS TO ENSURE THAT THIS AGREEMENT WILL ACHIEVE THEIR COMMERCIAL OBJECTIVES AND THEIR LEGAL INTERESTS ARE ADEQUATELY PROTECTED.

ERM_ORG_000197

# GENERAL TERMS AND CONDITIONS

In consideration of the mutual undertakings in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1.  **DEFINITIONS AND INTERPRETATION**

1.1 **Definitions**

(a)  "Accepted" or "Acceptance" has the meaning specified in Section 2.2.2.

(b)  "Affected Party" has the meaning specified in Section 19.1.

(c)  "Affected Transaction" has the meaning specified in Section 19.1.

(d)  "Affiliate" means, in relation to any person, an entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

(e)  "Aggregate Delinquency Amount" means, with respect to a Party, the amount specified as the Aggregate Delinquency Amount for such Party in respect of Section 8.1(d) in the Cover Sheet.

(f)  "Agreement" has the meaning set out in the preamble to the Cover Sheet.

(g)  "Applicable Law" means any federal, national, state or local law, statute, regulation, code, ordinance, license, permit, compliance requirement, decision, order, writ, injunction, directive, judgment, policy, decree, including any judicial or administrative interpretations thereof, or any agreement, concession or arrangement with any Governmental Authority, applicable to either Party or either Party's performance under any Transaction, and any amendments or modifications to the foregoing.

(h)  "Alternative Settlement Amount" has the meaning specified in Section 19.1.

(i)  "Bankrupt" means, with respect to a Party, that such Party: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv)(A) institutes, or has instituted against it by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above; (v) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets; (viii) causes or is subject to any event with respect to it which, under the Applicable Law, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive); or (ix) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

(j)  "Bankruptcy Code" has the meaning specified in Section 9.7.

(k)  "Buyer" means the Party obligated to purchase or acquire CFP Credits under a Transaction.

(l)  "CFP Account" means the account of a Party showing the CFP Credits and CFP Deficits generated by the Party or transferred, purchased or acquired by the Party, as established with DEQ or another governmental authority pursuant to the Oregon Clean Fuels Program Regulations.

(m)  "Clean Fuels Program Credit" and "CFP Credit" means a credit as defined in the Oregon Clean Fuels Program Regulations.

(n)  "Clean Fuels Program Deficit" and "CFP Deficit" means a deficit as defined in the Oregon Clean Fuels Program Regulations.

(o)  "CFP Online System" has the meaning defined in the Oregon Clean Fuels Program Regulations.

(p)  "CFP Online Transfer Notification" has the meaning specified in Section 2.2.1.

(q)  "Confirmation" means (i) any electronic confirmation setting forth the trade details of a Transaction (and any special conditions) between the Parties and matched by the Parties on an electronic confirmation matching system, or (iii) the ability to

confirm a Transaction through an electronic confirmation matching system, any other written or electronic confirmation between the Parties that contains the relevant trade details (and any special conditions) of the Transaction, in either case based on those set forth in the sample form attached as Exhibit 1.

(r) "<u>Contract Price</u>" means the price (expressed in U.S. Dollars) of a CFP Credit as specified in a Confirmation.

(s) "<u>Contract Value</u>" means the number of the CFP Credits remaining to be delivered or purchased under a Transaction multiplied by the Contract Price.

(t) "<u>Credit Support Provider</u>" means a Party's guarantor or other person providing Performance Assurance for such Party.

(u) "<u>Credit Transfer Form</u>" means the Credit Transfer Form that is incorporated by reference into the Oregon Clean Fuels Program Regulations in OAR 340-253-1050(5) properly completed and executed by Seller in accordance with the Oregon Clean Fuels Program Regulations.

(v) "<u>Defaulting Party</u>" has the meaning specified in Section 9.1.

(w) "<u>Deficient CFP Credit</u>" has the meaning specified in Section 7.1.

(x) "<u>DEQ</u>" means the Oregon Department of Environmental Quality or successor agency.

(y) "<u>Designated Event</u>" means, with respect to a Party for purposes of Section 8.1(f): (i) the consolidation or amalgamation of a Party with, the merger of a Party with or into, or the transfer of all or substantially all of a Party's assets to, another entity; (ii) the reorganization, reincorporation or reconstitution of a Party into or as another entity; (iii) the acquisition by any person directly or indirectly of the majority of the beneficial ownership of the Party such that such person may exercise control of the Party; or (iv) a substantial change in the capital structure of a Party by means of the issuance or guaranty of debt.

(z) "<u>Disrupted Transaction</u>" has the meaning specified in Section 19.2.

(aa) "<u>Early Termination Date</u>" has the meaning specified in Section 9.1.

(bb) "<u>Eastern Prevailing Time</u>" means the time prevailing on the East Coast of the U.S., taking into account daylight savings time if it is in effect.

(cc) "<u>Event of Default</u>" has the meaning specified in Section 8.1.

(dd) "<u>Expert</u>" means a person reasonably agreed upon by the Parties who shall be qualified by education, experience or training to resolve the applicable issue and who shall not be a current or former employee of either Party or otherwise have a stake in the outcome of the dispute.

(ee) "<u>Expert's Decision</u>" has the meaning specified in Section 19.1.

(ff) "<u>Force Majeure</u>" has the meaning specified in Section 10.1.

(gg) "<u>Force Majeure Termination Payment</u>" has the meaning specified in Section 10.5.

(hh) "<u>Governmental Authority</u>" means any U.S. federal, state, regional, local or municipal governmental body, agency, instrumentality, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative or judicial body, or any person acting on behalf thereof.

(ii) "<u>Independent Dealer</u>" means a leading dealer in the relevant physical trading markets for the Affected Transactions that is not a Party or an Affiliate of a Party.

(jj) "<u>Inappropriate Payments</u>" has the meaning specified in Section 20.4.

(kk) "<u>Initiate</u>" means the submission of a sell transaction in the CFP Online System by Seller provided, however, that a Seller shall not be deemed to have submitted any CFP Credits where Seller cancels such sell transaction in the CFP Online System before Buyer accepts it in the CFP Online System.

(ll) "Invalid" has the same meaning as "Illegitimate" as specified in the Oregon Clean Fuels Program Regulations OAR 340-253- 0040(49).

(mm) "<u>Invoice</u>" has the meaning set forth in Section 4.1.

ERM_ORG_000199

DocuSign Envelope ID: 4A3EE31A-BE7E-44A6-859A-702B4F541306

(nn)     "LEAP" has the meaning specified in the disclaimer paragraph on the last page of the Cover Sheet.

(oo)     "LEAP Oregon Clean Fuels Program Agreement" has the meaning specified in the Cover Sheet.

(pp)     "Market Value" means the amount of the CFP Credits remaining to be Initiated under a Transaction multiplied by the market price for an equivalent transaction for Qualified Replacement CFP Credits as determined by the Performing Party (or determining party, as the case may be) in a commercially reasonable manner. To ascertain the Market Value, the Performing Party may consider, among other valuations, quotations from leading dealers in swap contracts or physical trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term, relevant Payment Due Dates, Transfer Dates, and Transaction Volume. A Party shall not be required to enter into a replacement transaction in order to determine the Market Value of a Transaction. For the avoidance of doubt, any option pursuant to which one Party has the right to extend the term of a Transaction shall be considered in determining Contract Value and Market Values.

(qq)     "New York Banking Day" means a day (other than a Saturday or Sunday or banking holiday) on which commercial banks are authorized to open for business in the State of New York.

(rr)     "Oregon Clean Fuels Program Regulations", "CFP Regulations" and "CFP" mean the regulations, orders, decrees and standards issued by a governmental authority implementing or otherwise applicable to the Oregon Clean Fuels Program as set forth in OAR chapter 340, division 253 as defined in OAR 340-253-0060(4) and each successor regulation, as may be subsequently amended, modified, or restated from time to time.

(ss)     "Original Index" has the meaning specified in Section 19.2.

(tt)     "Other Amounts" has the meaning specified in Section 9.3.

(uu)     "Other Trading Agreement" has the meaning specified in Section 8.1(d).

(vv)     "Party" means Party A or Party B, individually, and "Parties" means Party A and Party B, collectively.

(ww)     "Party A" is the party designated as such in the introduction on page 1 of the Cover Sheet.

(xx)     "Party B" is the party designated as such in the introduction on page 1 of the Cover Sheet.

(yy)     "Payment Due Date" means the payment due date specified in the Confirmation (or otherwise agreed in writing by the Parties), provided that if the Payment Due Date is not so specified or agreed, then it shall be five (5) New York Banking Days after the later of (A) the Transfer Date or (B) the payer's receipt of the payee's Invoice.

(zz)     "Pending Credits" has the meaning specified in Section 7.3.

(aaa)    "Performance Assurance" has the meaning specified in Section 6.1.

(bbb)    "Performing Party" has the meaning specified in Section 9.1.

(ccc)    "Posting Party" has the meaning specified in Section 6.1.

(ddd)    "Prepayment" has the meaning specified in Section 6.2.

(eee)    "Prepayment Amount" has the meaning specified in Section 6.2.

(fff)    "Prepayment Due Date" has the meaning specified in Section 6.2.

(ggg)    "Qualified Institution" has the meaning specified in Section 6.1(b).

(hhh)    "Qualified Replacement CFP Credit" means a valid CFP Credit meeting the specifications set forth in the relevant Confirmation.

(iii)    "Quantity" means, with respect to a Transfer Date, the number of CFP Credits to be purchased and sold pursuant to a Transaction as specified in the Confirmation.

(jjj)    "Reference Price" means a price that is determined by reference to a specified pricing source.

(kkk)    "Renegotiation Notice" has the meaning specified in Section 19.1.

(lll)    "Renegotiation Option" has the meaning specified in Section 19.1.

(mmm)    "Secured Party" has the meaning specified in Section 6.1.

(nnn)    "Seller" means the Party obligated to sell or Transfer CFP Credits under a Transaction.

ERM_ORG_000200

(ooo)  "Specified Affiliate" means, with respect to a Party, the entity or entities specified as the Specified Affiliate(s) with respect to such Party in respect of Section 8.1(d) in the Cover Sheet.

(ppp)  "Termination Date" has the meaning specified in Section 19.1.

(qqq)  "Termination Payment" has the meaning specified in Section 9.2.

(rrr)  "Termination Value" means the aggregate value of all Affected Transactions determined by valuing each Affected Transaction  at its Market Value as reasonably determined by the determining party as of the Termination Date and then determining the amount by which such then prevailing Market Value differs from the Contract Value  (it being understood that (i) in the event the prevailing Market Value of an Affected Transaction exceeds the Contract Value, the difference in value shall be due from Seller to Buyer, and (ii) in the event that the prevailing Market Value of an Affected Transaction is less than the Contract Value, the difference in value shall be due from Buyer to Seller) and adding to such value, without duplication, any amounts then payable under the Affected Transaction (including amounts due in respect of CFP Credits Initiated and Accepted hereunder). The terms "Market Value" and "Contract Value" as used in this definition shall have the meanings specified in Section 1, provided that each reference to "Performing Party" shall be replaced by "determining party".

(sss)  "Term Transaction" means a Transaction contemplating multiple Transfers with a delivery period the duration of which is one (1) calendar month or more.

(ttt)  "Threshold Amount" has the meaning specified in the Cover Sheet in respect of Section 8.1(e).

(uuu)  "Trade Date" means the date a Transaction is entered into between the Parties.

(vvv)  "Transaction" has the meaning specified in Section 1.3.

(www)  "Transfer" or "Transferred" has the meaning specified in Section 2.3.

(xxx)  "Transfer Date" has the meaning specified in Section 2.3(b)

(yyy)  "Transfer Obligations" has the meaning specified in Section 2.2.1.

(zzz)  "Transfer Period" means, for a Transaction, the date range as specified in the Confirmation during which Seller must Initiate the Quantity of CFP Credits specified in the Confirmation, all in accordance with the Seller's obligations under the Oregon Clean Fuels Program Regulations, and any subsequent guidance from DEQ.

(aaaa)  "U.S." means United States of America, and every reference to money, price, or Contract Price pertains to U.S. Dollars.

## 1.2   Interpretation

Unless otherwise specified, all section references in this Agreement are to the Sections of this Agreement.  All headings in this Agreement are intended solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement. Unless expressly provided otherwise, the word "including" as used herein does not limit the preceding words or terms and shall be read to be followed by the words "without limitation" or words having similar import and the words "other" and "otherwise" shall not be construed as being limited by the context in which they appear or the words that precede them. The word "or" is not exclusive. Unless otherwise expressly stated, the words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "will" and "shall" are expressions of command, not merely expressions of future intent or expectation. Unless expressly provided otherwise, references to "consent" mean the prior written consent of the Party at issue. Unless provided otherwise, when a Party's response is required hereunder within a specific time period following receipt of notice or documentation, as applicable, the day of receipt thereof by such Party shall be considered day zero. The Parties acknowledge that they and their counsel have reviewed and revised this Agreement and that no presumption of contract interpretation or construction shall apply to the advantage or disadvantage of the drafter of this Agreement. Any specific references to laws, statutes, or regulations will include any amendments, replacements, or modifications thereto.

## 1.3   Scope; Single Agreement

This Agreement is intended to apply exclusively to transactions for the purchase and sale of CFP Credits between Seller and Buyer, the details of which are set forth in a Confirmation (a "Transaction"). All Transactions are entered into in reliance on the fact that this Agreement and all Transactions hereunder form a single agreement between the Parties.

## 1.4   Inconsistency

In the event of any inconsistency between the provisions of any Confirmation and this Agreement, such Confirmation will prevail for the purposes of the relevant Transaction; provided however, any changes which conflict with any provisions of this Agreement regarding Section 6: Credit, Section 8: Events of Default, and Section 9: Termination and Liquidation must be agreed in writing by both Parties.  For the avoidance of doubt, any repetition in a Confirmation of any section or any part of such section of this LEAP Oregon Clean Fuels Program Agreement shall be for emphasis only and shall not by reason of such repetition exclude any other part of such section or any

ERM_ORG_000201

DocuSign Envelope ID: F43FE3F1A-BE70-44A6-989A-7B2B4F54180D

other section or any part thereof of this LEAP Oregon Clean Fuels Program Agreement unless such intention to override the LEAP Oregon Clean Fuels Program Agreement is explicitly expressed in the Confirmation.

**2.**     **GENERAL PURCHASE AND SALE OBLIGATIONS; TITLE TRANSFER**

**2.1**     **Purchase**

Pursuant to each Transaction, and subject to the terms and conditions of the Confirmation governing such Transaction and this LEAP Oregon Clean Fuels Program Agreement, Seller agrees to sell and Initiate to Buyer the Quantity of CFP Credits at the Contract Price during the Transfer Period, all as specified in the Confirmation, and Buyer agrees to purchase and Accept the CFP Credits from Seller, subject to its rights under Section 2.4, within the specified number of days required by the Oregon Clean Fuels Program Regulations.

**2.2.1**     **Initiation**

Each Party shall take all actions required by the Oregon Clean Fuels Program Regulations to effect a transfer of the CFP Credits from Seller to Buyer during the Transfer Period (the "Transfer Obligations"). The CFP Credits shall be deemed initiated ("Initiated") by Seller to Buyer upon:

(a)     Buyer's receipt from Seller of a Credit Transfer Form or a notification of an electronic transfer of CFP Credits via the CFP Online System (each such notification, a "CFP Online Transfer Notification"); and

(b)     Seller's satisfaction of all other Transfer Obligations applicable to Seller, if any.

Seller shall Initiate CFP Credits on or before the end of the Transfer Period as indicated on the Confirmation.

**2.2.2**     **Acceptance**

CFP Credits that are Initiated by Seller shall be deemed accepted ("Accepted") by Buyer upon:

(a)     Buyer's confirmation of the accuracy of the information on the Credit Transfer Form by signing and dating the form using the CFP Online System.

(b)     Buyer's satisfaction of all other Transfer Obligations applicable to Buyer, if any; and Buyer's submission of the Credit Transfer Form or Buyer's acceptance of a CFP Online Transfer Notification, together with the satisfaction of all other Buyer Transfer Obligations, if any, shall constitute the acceptance (the "Acceptance") by Buyer of the CFP Credits.

**2.3**     **Title Transfer**

Title to the CFP Credits shall be deemed to transfer from Seller to Buyer after

(a)     Initiation and Acceptance of the CFP Credits; and

(b)     upon the recordation of the addition of the CFP Credits to the CFP Account balance of Buyer and the subtraction of the CFP Credits from the CFP Account balance of Seller by DEQ (the title transfer of CFP Credits as set forth above hereafter referred to as the "Transfer" of the CFP Credits and the date on which the Transfer occurs is the "Transfer Date").

**2.4**     **Buyer Right to Reject**

Buyer shall have the right, at its reasonable discretion, to reject any CFP Credits Initiated by Seller upon notice to Seller within the specified number of days required by the Oregon Clean Fuels Program Regulations. For the avoidance of doubt, and without limitation, Buyer shall be conclusively deemed to have reasonably exercised its discretion to reject where:

(a)     Buyer reasonably believes that the Credit Transfer Form or the information in a CFP Online Transfer Notification does not reflect the terms of the Transaction;

(b)     the CFP Credits are Invalid under the Oregon Clean Fuels Program Regulations or are subject to a proceeding by a governmental authority or are otherwise encumbered;

(c)     there is a reasonable prospect that the CFP Credits will be Invalid under the CFP Regulations; or

(d)     Buyer does not have information sufficient to verify that any of the CFP Credits are valid and that there is no reasonable prospect of such CFP Credits becoming Invalid under the Oregon Clean Fuels Program Regulations.

For purposes of making its assessment it shall be reasonable for Buyer to disregard the benefit of any warranties given to it under this Agreement.

ERM_ORG_000202

Without prejudice to the application of Section 10, it is not a reasonable exercise of discretion for Buyer to reject CFP Credits solely on the basis of market conditions and/or the market price of, CFP Credits.

**2.5**     **CFP Credits Not Recorded By DEQ**

Upon notification from the DEQ that any transfer of all or a portion of the CFP Credits will not be recorded, the Parties shall promptly confer and shall cooperate in taking all reasonable actions necessary to cure any defects in the proposed transfer, so that the Transfer of such CFP Credits can be recorded. Each Party shall notify the other Party and the DEQ of any errors in the Credit Transfer Form within five (5) business days of the discovery of such an error. If a Transaction with Transfer Date that is greater than twenty (20) days after Trade Date is voided pursuant to OAR 340-253-1005(5), then Buyer and Seller agree to initiate a new Transaction under the same terms as the voided Transaction, with pricing identical to the voided Transaction.

**3.**     **REPRESENTATIONS AND WARRANTIES**

**3.1**     **Representations and Warranties by Both Parties**

Each Party represents, warrants and covenants to the other Party as of the date of this Agreement (which representations and warranties are deemed to be repeated by each Party on each Transfer Date with respect to a Transaction) that:

(a)     it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)     it has, and at all times during the term of this Agreement, will have, all necessary power and authority to execute, deliver, and perform its obligations hereunder;

(c)     the execution, delivery, and performance of this Agreement by such Party has been duly authorized by all necessary action and do not violate any of the terms or conditions of its governing documents, any contract to which it is a party, or any Applicable Law;

(d)     there is no pending or, to such Party's knowledge, threatened litigation or administrative proceeding that may materially adversely affect its ability to perform this Agreement;

(e)     this Agreement constitutes a legal, valid and binding obligation of such Party, except as the enforceability of this Agreement may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity; and

(f)     Seller and Buyer shall comply with Applicable Law in the performance of their respective obligations under this Agreement and each Transaction.

**3.2**     **Representations and Warranties by Seller**

Seller represents and warrants to Buyer that on each Transfer Date:

(a)     Seller conveys good title to all CFP Credits it sells hereunder, free and clear of any liens, security interests, and encumbrances or any interest in or to them by any third party;

(b)     each CFP Credit transferred to Buyer hereunder is valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a "Credit" as defined by the Oregon Clean Fuels Program Regulations;

(c)     each CFP Credit was deposited into Seller's CFP Account, or otherwise transferred and recorded by the DEQ in Seller's CFP Account, prior to Initiation hereunder and Seller has good title to each CFP Credit prior to Initiation hereunder;

(d)     the Quantity of CFP Credits Initiated does not exceed the number of total CFP Credits in the Seller's CFP Account as determined in accordance with OAR 240-253-1050(1) of the Oregon Clean Fuels Program Regulations;

(e)     upon Transfer and recordation of the CFP Credits in Buyer's CFP Account, the CFP Credits shall be available for Buyer's use for retirement, transfer to a third party or otherwise;

(f)     Seller has not sold, transferred or encumbered (nor become legally obligated to do the same) any rights, title, or interest in the CFP Credits to any person other than Buyer; and

(g)     neither the Seller, nor any of its associated or parent organizations or affiliates or its customers or the party that owns the project(s) producing the fuel that is the basis for the generation of the CFP Credits, has claimed (or will be entitled to claim) directly or indirectly, including on any voluntary or mandatory greenhouse gas registry program, any of the CFP Credits as anything other than sold to Buyer.

**OTHER THAN THE WARRANTIES AND REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL,**

ERM_ORG_000203

**EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.**

## 4. PAYMENTS AND INVOICES

### 4.1 Trade Documentation

Payee (generally Seller) shall promptly send payer (generally Buyer) a written invoice ("Invoice") showing sufficient detail to determine the amount due, how such amount was calculated, and the Payment Due Date for the Transaction in question, as set forth in the sample forms attached as Exhibit 2.

### 4.2 Making Payment

All payments shall be made in U.S. Dollars by the Payment Due Date via wire transfer in same day funds.  Except as provided herein or as otherwise agreed by the Parties, payment shall be made without deduction, withholding or setoff. If a Payment Due Date falls on a Saturday or a day that is neither a New York Banking Day nor a Monday, payment shall be made on the preceding New York Banking Day. If a Payment Due Date falls on a Sunday or Monday that is not a New York Banking Day, payment shall be made on the following New York Banking Day.

### 4.3 Price Rounding

All U.S. dollar amounts shall be rounded to the nearest cent (and half cents shall be rounded upward).

### 4.4 Interest

Any amount payable hereunder, if not paid when due, and any amount payable as a refund as a result of an overpayment, shall bear interest from the Payment Due Date or the date of overpayment (as applicable) until the date payment is received at an annual rate (based upon the actual number of days in the relevant calendar year) equal to the rate of two (2) percentage points above the prime rate of interest effective for the Payment Due Date as published in the *Wall Street Journal* under "Money Rates".  If there is no publication on the Payment Due Date, then the preceding day's publication will be used. The relevant Party shall pay any interest due within three (3) New York Banking Days following receipt of the interest invoice.

### 4.5 Payment Dispute

If a Party, in good faith, disputes the accuracy of the amount due in respect of a Transaction, such Party will timely pay such amount as it believes to be correct and provide written notice stating the reasons why the remaining disputed amount is incorrect, along with supporting documentation acceptable in industry practice. Payment of the disputed amount shall not be required until the dispute is resolved. In the event the Parties are unable to resolve such dispute, either Party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Agreement. In the event that it is determined that the Party that is disputing the amount due must pay the disputed amount, then such Party shall pay interest in accordance with Section 4.4 on such disputed amount from and including the originally scheduled Payment Due Date to, but excluding the date paid.

## 5. CONCURRENT TRANSACTIONS – PAYMENT NETTING

### 5.1 Payment Netting

The Parties agree to net amounts that are due to each other on the same Payment Due Date in respect of purchases and sales of CFP Credits, and the Parties shall confirm at least two (2) New York Banking Days prior to the Payment Due Date, orally or in writing, the payment obligations owed in respect of purchases and sales of CFP Credits and any and all amounts remaining due after net-out. Any remaining balance after net-out shall be paid by the Party owing such amount to the other Party on the applicable Payment Due Date.  The owing Party's payment of a net amount shall satisfy each Party's payment obligations under the relevant Transactions in respect of the payment obligations in respect of purchases and sales of CFP Credits included in the settlement on a Payment Due Date. The Parties understand and agree that such netting of payment obligations is expressly limited to amounts owed from purchases and sales of CFP Credits between the Parties and that netting out any other amounts due in respect of any Transaction or any Other Trading Agreement or any other agreement, instrument or undertaking, for any reason whatsoever, including amounts due in respect of interest payments, is strictly prohibited unless otherwise agreed in writing.

## 6. CREDIT

### 6.1

Notwithstanding any other Applicable Law, including the Uniform Commercial Code, if a Party (the "Secured Party") has commercially reasonable grounds for insecurity with respect to the other Party's (the "Posting Party") creditworthiness or performance under this Agreement, the Secured Party shall provide the Posting Party with written notice requesting an amount of Performance Assurance determined by the Secured Party in a commercially reasonable manner. "Performance Assurance" means either:

(a)  prepayment, received by the Secured Party no later than two (2) New York Banking Days after such notice, and  in  any  event prior to commencing the delivery period; or

(b)  establishing, at the Posting Party's cost, no later than two (2) New York Banking Days after such notice an irrevocable  standby

ERM_ORG_000204

letter of credit in a form and term acceptable to the Secured Party, opened by a Qualified Institution. "Qualified Institution" means either:

    (i)    a commercial bank, unaffiliated with either Party, organized in a jurisdiction reasonably acceptable to the Secured Party, that has:

        (A)    at least an A- Long Term Rating issued by Standard & Poor's Ratings Group ("S&P") and at least an A3 Deposit Rating issued by Moody's Investor Services, Inc. ("Moody's"); and

        (B)    total equity of at least ten billion U.S. dollars ($10,000,000,000);

        (C)    not exceeded any internal credit limits as established by the Secured Party at the time of the establishment of the letter of credit; or

    (i)    a bank acceptable to the Secured Party in its sole discretion; or

    (c)    other Performance Assurance acceptable to the Secured Party in its sole discretion.

**6.2**    Notwithstanding anything to the contrary in this Agreement, if required by Seller, pursuant to Section 6.1 or as a result of a failure to pay or Event of Default, Buyer shall make advance payment in U.S. Dollars by electronic funds transfer to Seller for CFP Credits purchased by Buyer pursuant to one or more Transactions under this Agreement ("Prepayment"). Specifically, for each Transaction pursuant to which Seller is obligated to transfer CFP Credits to Buyer and for which Seller requires Buyer to make a Prepayment, Seller shall issue an invoice to Buyer and Buyer shall make the Prepayment to Seller by the date specified on Seller's invoice ("Prepayment Due Date"). All Prepayments shall be in an amount equal to the price (or estimated price if the price is based on an index and is not known at the time the invoice is issued) multiplied by the total quantity (or estimated quantity if the actual quantity is not known at the time the invoice is issued) of CFP Credits to be purchased for each outstanding Transaction for which Prepayment is required (each a "Prepayment Amount"). Each Prepayment Amount shall be paid by electronic funds transfer, in same day funds (without setoff, counterclaim or deduction), to the account specified by Seller. If, pursuant to a Transaction, the actual quantity of CFP Credits transferred differs from the contract quantity or the price differs from the estimated price upon which Prepayment was made or other amounts are owing by or to Buyer (including, without limitation, other charges related to the Transaction(s) or amounts arising from any overpayments or underpayments for prior periods), the Party owing such amounts shall pay such amounts owing by it within two (2) Business Days of receipt of request by the Party to whom the payment is owed. In the event Buyer fails to timely make the Prepayment, Seller shall have the right to immediately withhold or suspend transfer of CFP Credits until such time as the required payment is received. Such suspension of transfer of CFP Credits shall not relieve Buyer of its obligation to purchase CFP Credits pursuant to any Transaction and shall be in addition to, and not in replacement of, any other right or remedy available to Seller under this Agreement.

## 7.    REMEDIES FOR FAILURE TO INITIATE OR ACCEPT CFP CREDITS, AND DEFICIENT CFP CREDITS

**7.1**    In the event that, in relation to a Transaction:

    (a)    Seller fails to Initiate all or a part of the CFP Credits by the end of the Transfer Period;

    (b)    Buyer exercises its right to reject all or part of a Quantity of CFP Credits pursuant to Section 2.4 that Seller Initiated;

    (c)    Seller breaches any of its representations or warranties in Section 3.2, or any representation or warranty specified as subject to this Section 7 in the applicable Confirmation;

    (d)    CFP Credits that have been Accepted by Buyer are or become Invalid for purposes of the CFP Regulations; or

    (e)    the DEQ invalidates a Transfer of CFP Credits from Seller to Buyer, for any reason, and Buyer and Seller, cooperating in good faith, are unable to remedy the invalidated Transfer.

(each such affected CFP Credit, a "Deficient CFP Credit"), then, Seller shall, at Seller's sole cost and expense, Initiate a quantity of Qualified Replacement CFP Credits equal to the quantity of Deficient CFP Credits that satisfy the requirements under the applicable Transaction within (i) in the case of Sections 7.1(a) or (b), three (3) Business Days after Seller receives notice from Buyer that the circumstances in Section 7.1(a) or (b) apply, or (ii) in the case of Sections 7.1(c), (d) or (e), ten (10) Business Days after the earlier of (A) Seller's receipt of notice from Buyer that the circumstances in Sections 7.1(c), (d) or (e) apply and (B) Seller's becoming aware that the circumstances in Sections 7.1(c), (d) or (e) apply.

**7.2**    Except where Section 7.3 applies, if Seller fails to timely or fully comply with its Initiation obligation in Section 7.1, then Seller shall, at Buyer's election by notice either (i) Initiate replacement CFP Credits equal to the quantity of Deficient CFP Credits that satisfy the requirements under the applicable Transaction in accordance with Section 7.1 above, or (ii) pay to Buyer, within five (5) Business Days of receipt of Buyer's invoice, unless otherwise mutually agreed between the Parties, the positive difference, if any, between (1) the Market Value of the Qualified Replacement CFP Credits and (2) the product of the quantity of Deficient CFP Credits and the Contract Price specified in the Confirmation for the applicable CFP Credits, with such sum increased by any amount already paid by Buyer to Seller on account of the Deficient CFP Credits. Seller shall also reimburse Buyer for all reasonable broker costs associated with Buyer obtaining Qualified Replacement CFP Credits in a quantity equal to the Deficient CFP Credits.

ERM_ORG_000205

For purposes of this Section 7.2, (i) the phrase "the quantity of CFP Credits that remain to be Initiated under that Transaction" as used in the defined terms "Market Value" shall refer to and mean the quantity of Deficient CFP Credits; and (ii) the Market Value shall be determined by Buyer as of the Business Day notified by Buyer that falls no sooner than the last day for performance of Seller's obligations under Section 7.1 and no later than three (3) Business Days after the date Buyer gives notice of its election.

7.3     In the event that Buyer fails to Accept, or provide notice of its rejection of, all or part of a Quantity of CFP Credits Delivered by Seller or any replacement CFP Credits as contemplated under Section 2.4, Seller shall provide written notice of such failure to Buyer. If Buyer fails to Accept or reject any portion of those CFP Credits (the "Pending Credits") within two (2) Business Days of receiving such notice, then Seller's obligation to sell and Initiate and Buyer's obligation to purchase and Accept shall be reduced to the extent of such Pending Credits, and Buyer shall pay Seller an amount equal to the positive difference, if any, between (i) the product of the quantity of Pending Credits and the Contract Price specified in the Confirmation for the applicable CFP Credits and (ii)the Market Value of the Pending Credits. The Transaction in respect of the Pending Credits shall be deemed to be cancelled and the related Credit Transfer Form or CFP Online Transfer Notification, as applicable, shall be deemed ineffective. For purposes of this Section 7.3, Market Value shall be determined by Seller in a commercially reasonable manner with the date of determination as of the date of cancellation.

7.4     In the event the provisions of this Section 7 are invoked, Seller and Buyer agree to work together in good faith to pursue an efficient, commercial and practical resolution consistent with the foregoing options (or any combination thereof) in order to cure any breach of transfer obligations resulting in Deficient CFP Credits or Pending Credits, provided, however, any replacement CFP Credits must satisfy all of the requirements that the Parties originally agreed to for the applicable Transaction unless otherwise mutually agreed.

7.5     Seller shall deliver to Buyer a Credit Transfer Form or CFP Online Transfer Notification accurately describing any Qualified Replacement CFP Credits. Buyer and Seller shall otherwise be subject to the general obligations set forth in Section 2.

7.6     Section 7.1(b), (c), (d), (e) and, for the avoidance of doubt, Section 2.4 shall apply equally to any Qualified Replacement CFP Credits.

7.7     Except in respect of a failure to pay any amount due under Section 7.2 or Section 7.3, the remedies set out in this Section 7 are exclusive remedies for the occurrence of the events described in Section 7.

## 8.   EVENTS OF DEFAULT

8.1     An "Event of Default" shall mean the occurrence with respect to a Party of one of the following events:

(a)     Failure to Pay.  A Party fails to make payment of any amount due when required under this Agreement or any Transaction, within two (2) New York Banking Days following receipt of a written notice of such failure from the other Party.

(b)     Failure to Provide Performance Assurance. A Party fails to provide acceptable Performance Assurance support as requested by the Secured Party pursuant to Section 6.

(c)     Breach of Agreement. Except for any breach or event described in Section 7.1(a) through (e) (the exclusive remedies for which are specified in Section 7.2) or Section 7.3, and except for any event described in Section 8.1(a) and (b) above, a Party fails to perform or repudiates any material obligation to the other Party under this Agreement or breaches any representation, covenant or warranty in any material respect under this Agreement and, in each case, if capable of being cured, is not cured to the satisfaction of the other Party in its sole discretion, within two (2) New York Banking Days following receipt of written notice to such Party that corrective action is needed.

(d)     Default Under Other Trading Agreements. If specified as applicable in the Cover Sheet, a Party, any Credit Support Provider of such Party, or any applicable Specified Affiliate of such Party:

(i)     fails to make payment when due under any trading agreement (that is not a Transaction under this Agreement) with the other Party, any Credit Support Provider of such other Party or any Specified Affiliate of such other Party, including any agreement to purchase, sell or exchange CFP Credits or any other commodities or any agreement in respect of an interest rate transaction, equity transaction, bond transaction, foreign exchange transaction, credit protection transaction, repurchase transaction, buy/sell-back transaction, securities lending transaction, forward transaction, any transaction similar to the foregoing, any swap, forward, future, option or other derivative transaction with respect to the foregoing or any combination of these transactions (each, an "Other Trading Agreement") within the cure period for payment defaults specified therein, or if no period is provided, within two (2) New York Banking Days following receipt of a demand for payment by the other Party; or

(i)     commits or suffers an Event of Default or other similar event or condition, fails to perform or repudiates any obligation to the other Party, any Credit Support Provider of such other Party or any Specified Affiliate of such other Party under any Other Trading Agreement, or breaches any representation, covenant or warranty in any material respect under any Other Trading Agreement;

and, in the case of either of subclauses (i) or (ii) above, (1) such failure, breach or default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to such Other Trading Agreement; and (2) the aggregate amount owed by the Defaulting Party in respect of the liquidation of, acceleration of obligations under or early termination of all transactions outstanding under the documentation applicable to such Other Trading Agreement(s) is not less than the Aggregate Delinquency Amount applicable to such Party (it being agreed that the failure to make a payment or delivery the value of which exceeds the Aggregate Delinquency Amount on the last payment or delivery date of an Other Trading Agreement transaction where that transaction is the only transaction outstanding under the applicable documentation will satisfy conditions (1) and (2));

ERM_ORe_000206

(e)  Cross Default. A default, Event of Default or other similar condition or event occurs and is continuing in respect of a Party or its Credit Support Provider (if any) under one or more agreements or instruments, individually or collectively, relating to indebtedness for borrowed money in an aggregate amount of not less than the Threshold Amount applicable to such Party and which results in such indebtedness becoming, or becoming capable at such time of being declared, immediately due and payable; or (ii) a Party or its Credit Support Provider (if any) fails to make on the due date thereof one or more payments, individually or collectively, in an aggregate amount of not less than the Threshold Amount applicable to such Party.

(f)  Designated Event. A Designated Event occurs with respect to a Party or its Credit Support Provider (if any), and the creditworthiness of the Party or its Credit Support Provider or, if applicable, the successor, surviving or transferee entity of the Party or its Credit Support Provider (as applicable) is materially weaker than that of the Party or its Credit Support Provider immediately prior to such Designated Event.

(g)  Credit Support Failure. A Party's guarantor or other provider of credit support for such Party (a "Credit Support Provider") with respect to the Party, if any, (i) fails to satisfy, perform or comply with any agreement or obligation to be complied with or performed by it in accordance with the credit support document and such failure continues after any applicable grace or notice period, (ii) makes any representation or warranty that proves to be incorrect or misleading in any material respect when made in connection with such Performance Assurance and/or credit support document, or (iii) repudiates, disclaims, disaffirms or rejects, in whole or part, any obligation under, or challenges the validity of, its Performance Assurance and/or credit support document.

(h)  Bankruptcy. A Party or its Credit Support Provider, if any, is or becomes Bankrupt.

(i)  Merger Without Assumption. If a Designated Event (as such term is defined in 1.1(u) and notwithstanding the reference to Section 8.1(f) therein)  occurs with respect to a Party or any Credit Support Provider of such Party and:

(i)  the resulting, surviving or transferee entity fails to assume all the obligations of such Party or such Credit Support Provider under this Agreement or any credit support document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other Party to this Agreement; or

(i)  the benefits of any credit support document fail to extend (without the consent of the other Party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

## 9.  TERMINATION AND LIQUIDATION

9.1  Notwithstanding any other provision of this Agreement or the existence of any Performance Assurance, if at any time an Event of Default has occurred and is continuing with respect to a Party (such Party, the "Defaulting Party"), the other Party (the "Performing Party") may, in its sole discretion, designate a date (not earlier than the date of such notice and not later than twenty (20) days after the date of such notice (an "Early Termination Date")) on which to terminate, liquidate and accelerate all outstanding Transactions and calculate a Termination Payment (as defined below) in the manner set forth in Section 9.2 and Section 9.3. To the extent that, in the reasonable opinion of the Performing Party, certain Transactions may not be liquidated and terminated under Applicable Law on the Early Termination Date, such Transactions shall be terminated as soon thereafter as is reasonably practicable, in which case the actual termination date for such Transactions will be the Early Termination Date in respect thereof for purposes of Section 9.2.  Notwithstanding the foregoing, if the Defaulting Party is governed by a system of law that does not permit termination to take place after the occurrence of an Event of Default described in Section 8.1(h), then no prior notice shall be required upon the occurrence of such Event of Default, in which case the Early Termination Date shall be deemed designated immediately preceding the occurrence of such event.

9.2  On or as soon as reasonably practicable following the Early Termination Date, the Performing Party shall determine the final amount payable between the Parties under this Agreement as provided in this Section 9.2 (the "Termination Payment") and shall provide notice of the Termination Payment to the Defaulting Party. The Performing Party shall calculate the Termination Payment by (a) valuing each Transaction at its Market Value as reasonably determined by the Performing Party as of the Early Termination Date and then determining the amount by which such then prevailing Market Value differs from the Contract Value (it being understood that (i) in the event the prevailing Market Value of a Transaction exceeds the Contract Value, the difference in value shall be due from Seller to Buyer, and (ii) in the event that the prevailing Market Value of a Transaction is less than the Contract Value, the difference in value shall be due from Buyer to Seller), (b) determining any other damages, costs or expenses incurred by the Performing Party as a result of the early termination of such Transactions including those contemplated by Section 9.4 (without duplication and subject always to Section 13.1), (c) determining any other amounts payable from one Party to the other Party under this Agreement (including amounts due in respect of CFP Credits Initiated and Accepted hereunder) and (d) netting or aggregating the foregoing amounts into a single liquidated amount.  If the Defaulting Party owes the Termination Payment to the Performing Party, then, within one (1) New York Banking Day of the date upon which the Performing Party's notice of the Termination Payment is effective, the Defaulting Party shall pay the Termination Payment, less the value of any Performance Assurance or other collateral or credit support held by the Performing Party with respect to which the Performing Party has notified the Defaulting Party in writing of its election to exercise its setoff rights under Section 9.3. If the Performing Party owes the Termination Payment to the Defaulting Party, then, within one (1) New York Banking Day of the date upon which the Performing Party's notice of the Termination Payment is effective, the Performing Party shall pay the Termination Payment, less the value of any Performance Assurance or other collateral or credit support held and not returned by the Defaulting Party.

9.3  **Closeout Setoff**

ERM_ORG_000207

Option A (Bilateral Setoff)

If no option or Option A is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 9.1, and the Termination Payment is payable to the Defaulting Party, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment any amounts ("Other Amounts") payable by the Defaulting Party to the Performing Party under any other agreements, instruments or undertakings between the Defaulting Party and the Performing Party (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option B (Triangular Setoff)

If Option B is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 9.1, and the Termination Payment is payable to the Defaulting Party, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment any amounts ("Other Amounts") payable by the Defaulting Party to the Performing Party or any of the Performing Party's Affiliates under any other agreements, instruments or undertakings between the Defaulting Party and the Performing Party or any of its Affiliates (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option C (Rectangular Setoff)

If Option C is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 8.1, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment (whether such Termination Payment is payable to the Performing Party or to the Defaulting Party) any amounts ("Other Amounts") payable between the Defaulting Party or any of its Affiliates and the Performing Party or any of its Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or any of its Affiliates to the Performing Party or any of its Affiliates (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option D (No Setoff)

If Option D is specified as applicable in the Cover Sheet, then no setoff provisions shall apply.

9.4     No delay or failure on the part of a Performing Party to exercise any right or remedy shall constitute an abandonment of such right or remedy, and the Performing Party shall be entitled to exercise such right or remedy at any time after an Event of Default has occurred, so long as such Event of Default is continuing.  The Defaulting Party shall indemnify and hold harmless the Performing Party for and against any and all reasonable out-of-pocket expenses incurred by the Performing Party by reason of the enforcement of and protection of its rights under this Agreement or as a result of the early termination of any Transactions, including reasonable attorney's fees and costs of collection.

9.5     **Grant of Security Interest/Remedies**

To the extent a Party requires Performance Assurance and/or has received a credit support document under this Agreement, then the Posting Party hereby grants to the Secured Party a present and continuing security interest in same. Upon or at any time after the designation or deemed designation of an Early Termination Date, the Defaulting Party must return all remaining Performance Assurance transferred to it pursuant to this Agreement, as applicable, and all proceeds resulting therefrom or the liquidation thereof.

9.6     **Suspension of Performance**

Notwithstanding any other provision of this Agreement, if (a) an Event of Default or (b) an event that, with the lapse of time or the giving of

ERM_ORG_000208

notice or both, would constitute an Event of Default shall have occurred and be continuing, the Performing Party, upon written notice to the Defaulting Party, shall have the right (i) to suspend performance under any or all Transactions; provided, however, in no event shall any such suspension continue for longer than ten (10) New York Banking Days with respect to any single Transaction, unless an Early Termination Date shall have been declared and notice thereof given pursuant to Section 9.1, and (ii) to the extent an Event of Default shall have occurred and be continuing, to exercise any remedy available at law or in equity.

**9.7**   **Bankruptcy Acknowledgements**

The Parties intend that each Transaction shall constitute a "forward contract" under § 101(25) and a swap agreement under § 101(53b) of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended from time to time (the "Bankruptcy Code"), and that this Agreement constitutes a "master netting agreement" under § 101(38a) of the Bankruptcy Code, and that the rights of the Performing Party in Section 9 include the rights referred to in § 561(a) of the Bankruptcy Code. Further, the Parties intend that each Party shall be a "forward contract merchant" under § 101(26) and a "master netting agreement participant" under § 101(38B), for purposes of the Bankruptcy Code.

**10.**   **FORCE MAJEURE**

**10.1**   Subject to Section 10.2, a Party shall be excused from the performance of its obligations with respect to a Transaction to the extent its performance of such obligations is prevented, in whole or in part, due to the occurrence of any event or circumstance, whether foreseeable or unforeseeable, that is reasonably beyond the control of such Party and which, by the exercise of due diligence, such Party could not have remedied, avoided or overcome (any such event, a "Force Majeure"), which may include, without limitation, any of the following events:

(a)   Compliance with Applicable Law, provided however, that Seller shall not be excused from performance where the CFP Credits it Initiates or intends to Initiate are Invalid under the CFP Regulations;

(b)   Hostilities of war (declared or undeclared), embargoes, blockades, civil unrest, riots or disorders, acts of terrorism, or sabotage;

(c)   Fires, explosions, lightning, maritime peril, collisions, storms, landslides, earthquakes, floods, and other acts of nature;

(d)   Strikes, lockouts, or other labor difficulties (whether or not involving employees of Seller or Buyer); provided, however, that the decision to settle a strike or other labor difficulties shall be wholly within the discretion of the Party facing such difficulty; or

(e)   Disruption or breakdown of production or transportation facilities, equipment, labor or materials, including, without limitation, the closing of harbors, railroads or pipelines.

For purposes of this Agreement, the term "Force Majeure" expressly excludes (i) a failure of performance of any person other than the Parties, except to the extent that such failure was caused by an event that would otherwise satisfy the definition of a Force Majeure event as set forth in this Section 10, (ii) the loss of Buyer's market or any market conditions for any CFP Credits that are unfavorable for Buyer or Seller, (iii) the loss of Seller's intended supply of CFP Credits, (iv) the failure of Seller's intended supplier of CFP Credits to perform, (v) any failure by a Party to apply for, obtain or maintain any permit, license, approval or right of way necessary under Applicable Law for the performance of any obligation hereunder, and (vi) a Party's inability to economically perform its obligations under this Agreement.

CFP Online System Unavailability. In the event that the CFP Online System is disrupted or unavailable, the affected obligations of the parties will be suspended (but not discharged) until the CFP Online System is not disrupted and is available.

**10.2**   Notwithstanding the provisions of Section 10.1, nothing contained in this Agreement shall relieve a Party of its obligation to make payments when due with respect to performance prior to the occurrence of a Force Majeure event, including Buyer's obligation to pay in full the purchase price or any other amounts due for the CFP Credits actually Initiated and Accepted hereunder.

**10.3**   In the event that a Party believes a Force Majeure event has occurred that will require it to invoke the provisions in this Section 10, such Party shall use commercially reasonable efforts to give prompt oral notice to the other Party followed by written notice within two (2) New York Banking Days following the occurrence of such event, of the underlying circumstances of the particular causes of Force Majeure, the expected duration thereof and the volume of the CFP Credits affected. The Party claiming Force Majeure shall also use commercially reasonable efforts to give the other Party such notice of cessation of the Force Majeure event and the date when performance is expected to resume.

**10.4**   Notwithstanding anything to the contrary in this Agreement, (a) if an event or circumstance which would otherwise constitute or give rise to a Force Majeure event under this Section 10 also constitutes an Event of Default other than an Event of Default under Section 8.1(h), it will be treated as a Force Majeure event and not as an Event of Default; and (b) if an event or circumstance which would otherwise constitute or give rise to a Force Majeure event under this Section 10 also constitutes an Event of Default under Section 8.1(h), it will be treated as an Event of Default and not as a Force Majeure event.

**10.5**   If Initiations and Acceptances in respect of a Term Transaction are suspended pursuant to this Section 10 and said suspension continues for a period of thirty (30) days or more, such Term Transaction may be terminated at the option of (a) either Party, if the "Force Majeure Termination Payment" provision is specified as applicable in the Cover Sheet, or (b) the Party that is not claiming Force Majeure, if the Force Majeure Termination Payment provision is not specified as applicable in the Cover Sheet, in either case, by giving written notice to the other Party. If a Party terminates a Term Transaction pursuant to this Section 10.5, neither Party shall have any further liability to the

ERM_ORG_000209

other Party hereunder with respect to such Term Transaction except for (a) any payment or indemnification obligations arising in respect of the performance of such Term Transaction prior to the date of termination and (b) if the Force Majeure Termination Payment provision is specified as applicable in the Cover Sheet, the obligation to make a Force Majeure Termination Payment, if any, pursuant to such provision.

## 11. GOVERNING LAW AND SETTLEMENT OF DISPUTES

11.1 This Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to its choice of law doctrine, but without prejudice to the provisions of § 5-1401 of the General Obligations Law of the State of New York. The Parties hereby submit to the exclusive jurisdiction of any federal court of competent jurisdiction, or, if any federal court declines to exercise or does not have jurisdiction, in any New York state court situated in New York City, Borough of Manhattan, and to service of process by certified mail delivered to the Party at its last designated address. Each Party waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any proceedings relating to this Agreement.

11.2 The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

## 12. TAXES

12.1 **Tax Obligations Generally**

Each Party shall be responsible for any taxes that may be imposed on it arising from the sale or purchase, respectively, of CFP Credits pursuant to any Transaction.

## 13. LIMITATION OF LIABILITY

13.1 NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES OR FOR LOST PROFITS OR ANY FINES OR PENALTIES ASSESSED BY ANY GOVERNMENTAL AUTHORITY INCLUDING, BUT NOT LIMITED TO, FINES OR PENALTIES UNDER THE CFP REGULATIONS (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY EXCEPT TO THE EXTENT THAT THE PAYMENTS REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT (INCLUDING PAYMENTS REQUIRED TO BE MADE PURSUANT TO SECTIONS 7, 9 AND 19) ARE DEEMED TO BE SUCH DAMAGES. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY. EACH PARTY SHALL TAKE REASONABLE STEPS TO MITIGATE DAMAGES FROM ANY BREACH HEREOF.

## 14. ASSIGNMENT

14.1 This Agreement shall not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, such consent not to be unreasonably withheld. Any assignment in violation of this provision shall be void and of no legal effect. Subject to this Section 14, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

14.2 Notwithstanding anything to the contrary in Section 14.1, either Party may, without the other Party's consent, transfer, sell, pledge, encumber or assign such Party's right and interest in and to the accounts, revenues, or proceeds of this Agreement in connection with any financing or other financial arrangement.  For the avoidance of doubt, all payment obligations under this Agreement will be satisfied if the relevant payment is made to the account of the other Party and the foregoing sentence shall not require a Party to make payments to any third party, unless otherwise agreed in writing.

## 15. NON-WAIVER

15.1 No waiver by either Party of any breach by the other Party of any of the representations, covenants, warranties, terms or conditions of this Agreement shall be construed as a waiver of any succeeding breach of the same or of any other covenant or condition hereof.

## 16. ENTIRE AGREEMENT; AMENDMENTS

16.1 No statement or agreement, oral or written, made prior to the signing of this Agreement, shall vary or modify the written terms hereof. Neither Party shall claim any amendment to, modification of, or release from any provisions of this Agreement, whether set out in an annex, schedule, supplement or Confirmation or otherwise, unless such amendment, modification or release is in writing, is signed by the Parties and specifically states that it is an amendment to, modification of, or release from this Agreement or one or more Transactions.

## 17. NOTICES

17.1 All notices and other communications under this Agreement shall be deemed given on the date of the addressee's receipt thereof and shall be given only in writing by letter, facsimile or electronic data transmission. Provided that if transmitted by facsimile or electronic data transmission and it is received after close of business on a New York Banking Day, it shall be deemed to have been received on the following New York Banking Day.

ERM_ORG_000210

## 18. **WRITTEN CONFIRMATIONS**

18.1    The Parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation may be generated electronically by an electronic confirmation matching service or be executed and delivered in counterparts (including by facsimile transmission or by other means agreed between the Parties), which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.

18.2    Absent the availability of an electronic confirmation matching service, the Confirming Party shall confirm a Transaction by forwarding a written Confirmation to the other Party (via facsimile or other means agreed between the Parties) within five (5) New York Banking Days after the Trade Date.  If the other Party objects to any term(s) of such written Confirmation, it shall notify the Confirming Party in writing of such objection within ten (10) calendar days of the Party's receipt thereof. If the other Party fails to object within ten (10) calendar days, such failure shall be deemed acceptance of the terms, absent manifest error.

## 19. **NEW OR CHANGED LAWS OR REGULATIONS**

### 19.1    **Material Adverse Effect**

If this Section 19.1 is specified as applicable in the Cover Sheet, then the following provision shall apply to Transactions under this Agreement:

It is understood by the Parties that each Party is entering into this Agreement in reliance on the Applicable Laws in effect on the date hereof. In the event that at any time, and from time to time, during the term of this Agreement any Applicable Laws are changed or new Applicable Laws are promulgated and have a material adverse economic effect upon either Party (such Party being the "Affected Party"), and such event does not constitute a Force Majeure, the Affected Party shall have the option (the "Renegotiation Option") to request renegotiation of the Price or other terms of the affected transaction(s) (the "Affected Transactions"). The Renegotiation Option may be exercised by the Affected Party within a commercially reasonable period of time after such changed or new Applicable Law is promulgated, by written notice of the Affected Party's desire to renegotiate, such notice to contain specific information about the new or changed Applicable Law and how it has a material adverse economic effect upon the Affected Party and the new Price or terms desired by the Affected Party to remedy or reverse such material adverse economic effect (the "Renegotiation Notice").

The issue as to whether the changed or new Applicable Law has a material adverse economic effect on the Affected Party shall be submitted promptly for resolution to an Expert, provided that the other Party shall have the option to agree that there has been a material adverse economic effect and waive its right to an Expert resolution at any time. The cost of the Expert shall be shared equally between the Parties. The Expert shall determine that the Applicable Law either has a material adverse economic effect or does not. The Expert's decision (the "Expert's Decision") shall be final and binding, absent fraud, and shall be provided to the Parties in the form of a report prepared by the Expert that contains facts and other data supporting the Expert's Decision. If the Expert's Decision concludes that the new or changed Applicable Law has a material adverse economic effect on the Affected Party, then the Parties shall in good faith renegotiate the Price or other terms in order to appropriately address the material adverse economic effects of the new or changed Applicable Laws.

If an Expert does not provide an Expert's Decision within thirty (30) days after receipt of the Renegotiation Notice by the other Party, or such other time period as agreed between the parties, the new or changed Applicable Law shall be deemed to have a material adverse economic effect on the Affected Party. If the Parties fail to agree upon a new Contract Price or terms satisfactory to both Parties within thirty (30) days after the other Party receives the Renegotiation Notice, or such other time period as agreed between the parties, the Affected Party shall have the right to terminate the Affected Transactions as of the end of the applicable thirty (30) day period (the "Termination Date") by giving written notice thereof to the other Party on or before such Termination Date in which case each Party shall make a determination of the Termination Value of the Affected Transactions within three (3) New York Banking Days of the Termination Date.  The amount payable in settlement of the termination of the Affected Transactions (the "Settlement Amount") shall equal the sum of (i) one-half of the difference between the Termination Values calculated by the two Parties, and (ii) the lesser of such two Termination Values.  If either Party disputes the resulting Settlement Amount as commercially unreasonable by written notice to the other Party within five (5) New York Banking Days of the Termination Date, each Party shall appoint one Independent Dealer to make a determination regarding whether the Settlement Amount is commercially reasonable. If both Independent Dealers agree that the Settlement Amount is commercially reasonable, then that value shall be final and binding and shall be paid promptly by the Party owing the Settlement Amount to the other Party.  If one or more of the Independent Dealers determines that the Settlement Amount is not commercially reasonable, then each Independent Dealer will make an alternative determination of the Termination Value, and the amount payable between the Parties with respect to Affected Transactions (the "Alternative Settlement Amount") will be an amount equal to the sum of (i) one-half of the difference between the alternative Termination Values calculated by the two Independent Dealers, and (ii) the lesser of such two alternative Termination Values.

Each Party's and, if applicable, each Independent Dealer's, determination of the Termination Value shall not take into account changes to the economics of the Affected Transactions that would result from the new or changed Applicable Laws.

In the event that the first Independent Dealer approached by a Party refuses to act as Independent Dealer for purposes of dispute resolution hereunder, the Party will approach at least one additional Independent Dealer to assess whether it would be willing to act as Independent Dealer for purposes of dispute resolution hereunder. If either Party is unable to find an Independent Dealer willing to make a determination of the Termination Value for purposes of dispute resolution after approaching at least two Independent Dealers, then the originally determined Settlement Amount shall be deemed final and binding.

ERM_ORG_000211

Upon the successful appointment of an Independent Dealer, each of the Parties may submit written support for the Transaction Value determined by such Party to the Independent Dealer. Copies of all information submitted by a Party to any Independent Dealer shall be provided to the other Party.

Any CFP Credits Transferred within thirty (30) days of the Renegotiation Notice shall be provisionally invoiced and paid, but will be subject to adjustment based on the renegotiated price or terms, if agreement is reached on price or terms.

**19.2    Disrupted Transactions**

If this Section 19.2 is specified as applicable in the Schedule, then the following Provisions shall apply to Transactions under this Agreement:

If the price of a Transaction is based on an industry reference index (the "Original Index") that ceases to be published or is not published for any period applicable to calculation of the Reference Price of one or more Transactions (the "Disrupted Transactions"), the Parties shall in good faith (a) select an alternative index that reflects as nearly as possible the same information as published in the Original Index; or (b) negotiate an interim Reference Price for the Disrupted Transaction until the Original Index recommences publishing or an alternative index can be identified to replace the Original Index. In the event the Parties are unable to agree on an alternative index or otherwise agree on a price within ten (10) days after the Original Index ceases to be published or is not published for any period applicable to calculation of the Reference Price of a Disrupted Transaction, then the issue shall be promptly submitted to an Expert for resolution. The cost of the Expert shall be shared equally between the Parties.  Upon appointment of the Expert, each Party shall submit to the Expert its determination of the Price for the Disrupted Transaction. The Expert shall select from the two submissions the Price that it determines best reflects the Price that would have applied to the Disrupted Transaction based on the Original Index in the absence of its disruption. The Expert's decision shall be final and binding, absent fraud, and shall be provided to the Parties in the form of a report that contains the facts and other data supporting the Expert's decision. The Expert's decision shall be provided to the Parties within thirty (30) days after the Original Index ceases to be published or is not published for any period applicable to calculation of the Reference Price of a Disrupted Transaction.

**20.    MISCELLANEOUS**

**20.1    Severability**

If any Governmental Authority of competent jurisdiction declares any provision of this Agreement unlawful, void or unenforceable, such provision will not invalidate, void or make unenforceable any other provision of this Agreement.  The remaining terms and conditions shall remain in full force and effect, and the Parties will negotiate in good faith to reform this Agreement in order to give effect to the original intention of the Parties.

**20.2    Recording of Conversations**

Each Party hereby acknowledges to the other Party and consents that such other Party from time to time and without further notice and to the extent permitted by law:

(a)    may record and retain electronic transmissions (including telephone conversations, e-mail and instant messaging) between the Parties' respective commercial marketing traders, marketers, schedulers and operations personnel in connection with this Agreement or any Transaction on central and local databases for their respective legitimate business purposes;

(b)    may monitor electronic transmissions through their internal and external networks for purposes of security and compliance with Applicable Laws, regulations and internal policies for their other legitimate business purposes; and

(c)    will comply with all Applicable Laws relating to the recording of electronic transmissions.

Without limiting the foregoing, each Party will notify all of its respective commercial marketing traders, marketers, schedulers and operations personnel who engage in these electronic transmissions of such recording and shall obtain their prior consent to such recording.

**20.3    No Third Party Beneficiaries**

Nothing expressed or implied in this Agreement is intended to create any rights, interests, obligations or benefits under this Agreement in any person other than the Parties and their respective successors and permitted assigns.

**20.4    Ethics**

Each Party warrants that neither the Party nor its directors, employees, agents, or subcontractors have given commissions, rebates, payments, kickbacks, or lavish or expensive gifts, entertainments or other things of value (individually and collectively referred to as "Inappropriate Payments") to any director, employee, agent, or subcontractor of the other Party in connection with the Agreement and acknowledges that the giving of Inappropriate Payments may result in the cancellation of this and all other future Agreements. Each Party will notify the other Party of any such Inappropriate Payments by any of its directors, employees, agent or subcontractors.

**20.5    Counterparts**

ERM_ORG_000212

This Agreement (including any Confirmation) may be executed in any number of counterparts and by different Parties in separate counterparts, any of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

**20.6**   **Confidentiality**

The contents of this Agreement, any Transaction, and all other documents relating to this Agreement, and any information made available by one Party or its Credit Support Provider to the other Party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either Party), except for such information:

(a)   as may become generally available to the public;

(b)   as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard;

(c)   as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing Party or its Credit Support Provider;

(d)   to the extent necessary to comply with a Governmental Authority's request or reporting requirements, but both Parties shall submit all information to a Governmental Authority as confidential business information; or

(e)   as may be furnished to a Party's Affiliates, partners, directors, officers, employees, agents, consultants, auditors, banks, attorneys, or advisors who are required to keep the information in confidence.

Notwithstanding the foregoing, a Party may disclose any one or more of the commercial terms of a Transaction to any industry price source for the purpose of aggregating and reporting such information in the form of a published energy price index, provided that such information does not include the identity of the other Party to a Transaction.

With respect to information provided with respect to a Transaction, this obligation shall survive for a period of one (1) year following the expiration or termination of such Transaction. With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the termination of this Agreement.

**21.**   **PRIOR TRANSACTIONS**

Any transaction entered into between the parties, now existing or hereafter, identified as a Transaction in this Agreement or the relevant Confirmation, whether before, on or after the effective date of this Agreement, is incorporated into this Agreement by reference, shall be a Transaction hereunder and shall be subject to the terms herein

**22.**   **TERMINATION**

**22.1**   This Agreement may be terminated by either Party upon thirty (30) days' prior written notice of a Party's decision to terminate; provided however, that this Agreement shall remain in effect with respect to any Transactions entered into prior to such termination. The obligations of either Party to make payment hereunder or with respect to any Transactions entered into prior to the effective date of such termination, including any related adjustments, shall survive the termination of this Agreement.

ERM_ORG_000213

**EXHIBIT 1**
**SAMPLE FORM OF CONFIRMATION FOR CFP CREDITS TRANSACTION**

**To:**                        ***
**Attention:**                 ***
**Phone Number:**              ***
**Facsimile Number:**          ***
**Email Address:**             ***
**Date:**                      ***
**Reference:**                 ***

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *LEAP Master Agreement for the Purchase and Sale of CFP Credits* dated as of_____, as amended and supplemented by agreement in writing from time to time (the **"LEAP CFP Agreement"**) between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the LEAP CFP Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the LEAP CFP Agreement.

**TRADE DATE: ***

**SELLER:** [Name and Address]

**BUYER:** [Name and Address]

**QUANTITY: *** CFP Credits.

**TRANSFER PERIOD: ***

**CONTRACT PRICE: US$ ***/ CFP Credit

**CONTRACT AMOUNT: US$ ***

**PAYMENT DUE DATE: ***

**SPECIAL CONDITIONS:**


………………………………… (Seller)                    …………………………………(Buyer)


By:                                                     By:


Name:                                                   Name:


Title :                                                 Title:


ERM_ORG_000214

DocuSign Envelope ID: FF4FED1A-BE78-44A9-869A-7D2B4F54180D

**EXHIBIT 2**
**SAMPLE FORM OF INVOICE FOR CFP CREDITS TRANSACTION**

**To:**                              \*\*\*
**Attention:**                       \*\*\*
**Phone Number:**                    \*\*\*
**Facsimile Number:**                \*\*\*
**Email Address:**                   \*\*\*
**Date:**                            \*\*\*
**Invoice Number**                   \*\*\*
**Invoice Date:**                    \*\*\*

**TRADE DATE: \*\*\***

**SELLER:** [Name and Address]

**SELLER'S FEIN NUMBER:**
**BUYER:** [Name and Address]

**BUYER'S FEIN NUMBER:**
**QUANTITY:** \*\*\* CFP Credits.

**TRANSFER DATE: \*\*\***


**CONTRACT PRICE: \*\*\***

**CONTRACT AMOUNT: \*\*\***


**SELLER BANKING DETAILS: \*\*\***

**PAYMENT DUE DATE: \*\*\***

ERM_ORG_000215

# EXHIBIT 2

**EXHIBIT 1**
**CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | Thompson Technical Services LLC |
| **Attention:** | Merlin Thompson |
| **Phone Number:** | 541-300-7268 |
| **Facsimile Number:** | *** |
| **Email Address:** | merlin@ttscharging.com |
| **Date:** | May 19, 2022 |
| **Reference:** | ERM 130723 |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *LEAP Master Agreement for the Purchase and Sale of CFP Credits* dated as of May 19, 2022, as amended and supplemented by agreement in writing from time to time (the "**LEAP CFP Agreement**") between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the LEAP CFP Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the LEAP CFP Agreement.

**TRADE DATE:** May 19, 2022

**SELLER:** Thompson Technical Services dba TTS Charging 2424 NE HWY 101 Lincoln City Or 97367

**BUYER:** Elbow River Marketing LTD 1500, 335-8th AVE SW, Calgary, AB T2P1C9

**QUANTITY:** 12,000 CFP Credits.

**TRANSFER PERIOD:** Q4 2022

**CONTRACT PRICE:** US$ 112.00/ CFP Credit

**CONTRACT AMOUNT:** US$1,344,000.00

**PAYMENT DUE DATE:** Net Five (5) Business Days from receipt of invoice

Payment terms are subject to financial review and credit approval by Seller. Buyer agrees to prepay or post a letter of credit if reasonably quested by Seller. Failure to do so may result in Seller suspending deliveries.

**SPECIAL CONDITIONS:**

| | |
|---|---|
| Thompson Technical Services LLC | Elbow River Marketing LTD (Buyer) |
| By: *Merlin Thompson* | By: *Randy Richard* |
| Name: Merlin Thompson | Name: Randy Richard |
| Title : CEO | Title: Trader |

ERM_ORG_000193

# EXHIBIT 3

**Kelly Hogan**

| | |
|---|---|
| **From:** | Chelsea Erhardt <chelsea@elbowriver.com> |
| **Sent:** | Friday, June 24, 2022 8:22 PM |
| **To:** | Merlin Thompson; Shannon Kuffley |
| **Subject:** | Re: ERM Thompson Technical Services LLC-ERM 130723 -Fully signed contracts |

Okay we will
Go ahead and send you an updated confirm - is the incremental 4,000? Or is the whole 16k incremental?

Get Outlook for iOS

---

**From:** Merlin Thompson <merlin@ttscharging.com>
**Sent:** Friday, June 24, 2022 5:50:44 PM
**To:** Chelsea Erhardt <chelsea@elbowriver.com>
**Subject:** Re: ERM Thompson Technical Services LLC-ERM 130723 -Fully signed contracts

Sounds good

On Fri, Jun 24, 2022, 2:37 PM Chelsea Erhardt <chelsea@elbowriver.com> wrote:

> Hi Merlin!
>
>
> It looks like we bought 12,000 credits from you – we can probably take the balance for $111 if that works for you.
>
>
> Feel free to call me at 403-479-9790 to discuss.
>
>
> THANKS!
>
>
> 
> Chelsea Erhardt / Environmental Products Trader
> chelsea@elbowriver.com / 403-479-9790
>
> **Elbow River Marketing Ltd.**
> Office: 403-695-5459 / Fax: 403-269-9576
> 1500, 335 - 8th Ave SW
> Calgary, AB T2P 1C9
> elbowriver.com

ERM_ORG_000227



**NOTICE OF CONFIDENTIALITY**

This e-mail is confidential and may contain privileged information. If you have received this e-mail in error: (i) contact the sender; (ii) delete the e-mail; and (iii) you are hereby notified that your receipt of this e-mail is not intended to waive privilege or the confidentiality of the communication. Any unauthorized use or disclosure is prohibited.

**From:** Merlin Thompson <merlin@ttscharging.com>
**Sent:** Friday, June 24, 2022 2:21 PM
**To:** Maureen McCall <Maureen.McCall@parkland.ca>
**Cc:** Contracts - ERM <contracts@elbowriver.com>; DL ERM carbon <carbon@parkland.ca>
**Subject:** Re: ERM Thompson Technical Services LLC-ERM 130723 -Fully signed contracts

Hi Maureen I have 16000 to transfer just trying to get my security code again to have them transferred over

On Thu, May 26, 2022 at 11:56 AM Maureen McCall <Maureen.McCall@parkland.ca> wrote:

Hi Merlin,

Happy to resend- please find attached, the fully executed subject agreements for your records.

Thank you for sending us banking info.

Best regards,

Maureen McCall | Contracts Coordinator

Maureen.mccall@parkland.ca

**Elbow River Marketing Ltd.**
1500, 335 - 8th Ave SW
Calgary, AB T2P 1C9

825-413-0640

2

ERM_ORG_000228

# EXHIBIT 4

**EXHIBIT 1**
**CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | Thompson Technical Services LLC |
| **Attention:** | Merlin Thompson |
| **Phone Number:** | 541-300-7268 |
| **Email Address:** | merlin@ttscharging.com |
| **Date:** | June 27, 2022 |
| **Reference:** | ERM 131443 |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *LEAP Master Agreement for the Purchase and Sale of CFP Credits* dated as of May 19, 2022, as amended and supplemented by agreement in writing from time to time (the **"LEAP LCFS Agreement"**) between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the LEAP CFP Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the LEAP LCFS Agreement.

**TRADE DATE:** June 27, 2022

**SELLER:** Thompson Technical Services LLC, dba TTS Charging, 2424 NE HWY 101, Lincoln City, OR 97367, USA

**BUYER:** Elbow River Marketing LTD, 1500, 335-8th AVE SW, Calgary, AB T2P1C9, Canada

**QUANTITY:** 4,000 LCFS Credits

**TRANSFER PERIOD:** June 2022

**CONTRACT PRICE:** US$ 111.00 / LCFS Credit

**CONTRACT AMOUNT:** US$ 444,000.00

**PAYMENT DUE DATE:** Net five (5) Business Days from receipt of invoice

Payment terms are subject to financial review and credit approval by Seller.

**SPECIAL CONDITIONS:**

| **Thompson Technical Services LLC (Seller)** | **Elbow River Marketing LTD (Buyer)** |
|---|---|
| **By:** *Merlin Thompson* | **By:** *Chelsea Erhardt* |
| **Name:** Merlin Thompson | **Name:** Chelsea Erhardt |
| **Title:** CEO | **Title:** Trader, Compliance & Renewable Fuels |

ERM_ORG_000245

# EXHIBIT 5

**EXHIBIT 1**
**CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | Thompson Technical Services LLC |
| **Attention:** | Merlin Thompson |
| **Phone Number:** | 541-300-7268 |
| **Email Address:** | merlin@ttscharging.com |
| **Date:** | July 19, 2022 |
| **Reference:** | ERM 131756 |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *Leap Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits* dated as of May 19, 2022, as amended and supplemented by agreement in writing from time to time (the **"OR LCFS Agreement"**) between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the OR LCFS Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the OR LCFS Agreement.

**TRADE DATE:** July 19, 2022

**SELLER:** Thompson Technical Services LLC, dba TTS Charging, 2424 NE HWY 101, Lincoln City, OR 97367, USA

**BUYER:** Elbow River Marketing LTD, 1500, 335-8th AVE SW, Calgary, AB T2P1C9, Canada

**QUANTITY:** 36,000 LCFS Credits

**TRANSFER PERIOD:** On or before August 25, 2022

**CONTRACT PRICE:** US$ 101.00 / LCFS Credit

**CONTRACT AMOUNT:** US$ 3,636,000.00

**PAYMENT DUE DATE:** Net five (5) Business Days from receipt of invoice

Payment terms are subject to financial review and credit approval by Seller.

**SPECIAL CONDITIONS:**

| **Thompson Technical Services LLC (Seller)** | **Elbow River Marketing LTD (Buyer)** |
|---|---|
| By: *Merlin Thompson* | By: *Chelsea Erhardt* |
| **Name:** Merlin Thompson | **Name:** Chelsea Erhardt |
| **Title:** CEO | **Title:** Trader |

ERM_ORG_000249

# EXHIBIT 6

**Oregon**

Kate Brown, Governor

**Department of Environmental Quality**
**Office of Greenhouse Gas Programs**
700 NE Multnomah Street, Suite 600
Portland, OR 97232
(503) 229-5696
FAX (503) 229-6124
TTY 711

August 12, 2022

Sent Via Email to: matt.noel-bentley@parkland.ca, shannon@elbowriver.com, and chelsea@elbowriver.com

Matt Noel-Bentley, Regulatory Director
Elbow River Marketing USA Ltd., CFP-139
818 West Seventh Street, Suite 9
Los Angeles, CA 90017

Cc:     Shannon Kuffley, Trade Analyst
        Chelsea Erhardt, Environmental Products Trader

Re: Notice of Initial Determination and placing of 16,000 credits on hold in your Clean Fuels Program Account

This Notice of Initial Determination is to inform you of DEQ's initial determination, under OAR 340-253-0670, to impose an interim suspension on the Clean Fuels Program (CFP) account of Thompson Technical Services LLC (TTS), and to impose an immediate administrative hold on 16,000 CFP credits in your account that you acquired from TTS.

According to the procedure set forth in OAR 340-253-0670, DEQ may place a hold on credits in the Oregon Fuels Reporting System if DEQ determines that submitted fuel transaction data was incorrect or credits were generated in violation of the Clean Fuels Program rules. This Notice begins an investigative process and requests documents from you, described below, that are due in 20 calendar days (Thursday, September 1, 2022). You must provide any additional information that you believe is relevant to DEQ's investigation by this deadline. You are being provided with the same information that we have provided to TTS, as required by OAR 340-253-0670(3).

This Notice is not a final agency action. DEQ will issue a final determination within 50 days according to OAR 340-253-0670(5).

**Background**

TTS submitted a registration form to be a Credit Generator in the CFP on June 14, 2021. The approval letter was signed on December 29, 2021. According to those submissions, TTS registered three Tellus 120 kW DC fast chargers to generate credits – Serial Numbers 20211260182, 20211260183, and 20211260184 – at 23325 Hwy 18 in Sheridan, Oregon. TTS did not identify any other means of generating credits.

## CFP Reporting

DEQ received an email on August 2, 2022 from Mr. Danny Takhar, a carbon credit broker, who stated that TTS had failed to pay him for work Mr. Takhar did in connection with a transaction of CFP credits.

This caused DEQ to check the Q1 2022 report filed by TTS and DEQ discovered that the company reported 14,900,000 kWh of electricity used to charge electric vehicles (EVs) between January 1, 2022 through March 31, 2022.

Based on the information in the registration application, the registered chargers each have a capacity of 120 kW which translates into a maximum design capacity of 777,600 kWh if each charger were operated for the entirety of Q1 2022, or a total of 2,232,800 kWh, calling into question the veracity of the 14,900,000 kWh reported by TTS. For context, this amount of electricity is greater than the amount consumed by the entire Trimet-operated MAX light rail system in a calendar quarter. It is also roughly 3 times as much electricity that has been reported from 3,250 other non-residential EV chargers that are currently registered with and reporting to the program in the same quarter. As a comparison, a well-trafficked EV charger typically reports several thousand kWh of charging in a calendar quarter as opposed to the several million kWh reported by TTS.

Based on the information above, DEQ has determined that TTS's Q1 2022 report is inaccurate.

## Additional Information

On August 2, 2022, DEQ staff accessed the website Plugshare, which is commonly used by EV drivers to find places to charge and let other EV drivers know if they are operational. On August 2, 2022, Plugshare listed the TTS EV chargers at the Valley Market and gas station located at 23325 Hwy 18, in Sheridan, Oregon, as "Coming Soon" and multiple users reported that the chargers at that gas station were still under construction in May and June. The screenshot below was taken August 2, 2022, of the following webpage: https://www.plugshare.com/location/364775



On March 5, 2022, a user by the name of Merlin Thompson posted this message on that same webpage:



This seems to indicate that the chargers in question were not operational as of March 5, 2022, over two-thirds of the way through Q1 2022.

On August 3, 2022, DEQ staff visited the site. DEQ staff found the chargers covered in plastic wrap with orange cones and warning tape in front of them. The chargers were not visibly connected to electrical service and were not operable. The serial numbers for the three chargers correspond to the serial numbers used by TTS for the Fuel Supply Equipment registration.



On August 5, 2022, DEQ staff contacted Consumers Power, a consumer-owned electric utility, to determine whether TTS was a customer, providing electricity to the EV chargers. Consumers responded that they were not the utility in that area, but rather Portland General Electric was.

<u>Generation of Illegitimate Credits</u>

The Q1 2022 report submitted by TTS stated that 14,900,000 kWh of electricity was dispensed to EVs in that quarter, supplied by Consumers. This generated 16,089 Clean Fuels Program credits for TTS as depicted in the screenshot below.

The selection of Consumers is significant because electricity provided by Consumers has a lower carbon intensity score in the CFP than does electricity provided by PGE, resulting in more credits being generated. The selection of Consumers Power's carbon intensity is shown in the below screenshot by the fuel pathway code in the top right: ORELCCP22 is Consumer Power's fuel pathway code with a carbon intensity score of 16.77gCO2e/MJ. The correct fuel pathway code to use for electricity supplied by Portland General Electric is the statewide mix's, ORELC2022, which has a score of 146.02gCO2e/MJ.



## Transfer of Illegitimate Credits

After submitting the Q1 2022 report on June 10, 2022, TTS then transacted 16,000 CFP credits (12,000 credits in one transaction and 4,000 in a second transaction, both initiated on June 26 and accepted on June 27) it generated to another CFP participant, Elbow River Marketing USA Ltd., for $112 per credit, for a total sale price of $1,792,000 as depicted in the screenshot below.



Based on the information above, DEQ concludes that TTS generated illegitimate credits and then sold those illegitimate credits to Elbow River Marketing USA Ltd.

## Additional Correspondence

As a result of reviewing the Q1 2022 report, DEQ emailed Mr. Merlin Thompson of TTS on August 2, 2022, asking for the underlying data for his Q1 2022 reporting. This is a standard procedure as DEQ audits quarterly reports. As of the date of this letter, DEQ has not received the documents it requested from Mr. Thompson.

On the same day, DEQ also called Mr. Takhar to confirm the details in his August 2, 2022, email to DEQ. In that phone conversation, Mr. Takhar told DEQ staff that Mr. Thompson conveyed to him that Mr. Thompson had already promised to sell another 32,000 credits later in August to another party. This timing is significant because the OFRS does not allow reporting entities to file their quarterly reports until 45 days into a quarterly reporting period which, for Q2 reports is August 15, 2022.

Upon investigating the OFRS, DEQ staff discovered that Mr. Thompson has already entered into his Q2 report (but not yet submitted) 30,000,000 kWh of electricity used to charge electric vehicles by two of the TTS electric vehicle chargers, as depicted in the screenshot below.



**Request for information**

Pursuant to OAR 340-253-0670(3)(b), DEQ requests that Elbow River Marketing USA submit the following information to DEQ by no later than 5pm Pacific Time on September 1, 2022:

1. All records, including correspondence and financial records, related to the two credit transfers shown above from TTS; and

2. Any other records or information that you would like DEQ to consider before it makes a final determination in this matter.

The requested information described above must be emailed to OregonCleanFuels@deq.oregon.gov

**Interim administrative hold on credits**

Pursuant to OAR 340-253-0670 (4)(b), DEQ is imposing a temporary administrative hold on the 16,000 credits that you purchased from TTS while we conduct this investigation.

Sincerely,

*/s/Bill Peters*

p
Bill Peters
Market Analyst, Clean Fuels Program
DEQ Office of Greenhouse Gas Programs

cc:    Colin McConnaha, Manager, Office of GHG Programs
        Kieran O'Donnell, Manager, Office of Compliance and Enforcement

# EXHIBIT 7



Kate Brown, Governor

**Department of Environmental Quality**
**Office of Compliance and Enforcement**
700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100
(503) 229-5696
FAX (503) 229-5100
TTY 711

September 30, 2022

CERTIFIED MAIL: 7020 2450 0000 3349 5277

Elbow River Marketing USA Ltd
c/o CT Corporation System, Registered Agent
780 Commercial Street SE, Suite 100
Salem, OR 97301

Re:    Notice of Final Determination to Suspend Oregon Clean Fuels Program Credits, and Order
       Case No. AQ-CFP-HQ-2022-118

This letter is to inform you of DEQ's final determination and order to suspend Oregon Clean Fuels Program credits that were generated illegitimately by another registered party and purchased by you.

The credits were generated by Thompson Technical Services LLC (TTS), when TTS submitted false information to the Oregon Fuels Reporting System (OFRS) regarding the amount of electricity dispensed by TTS's electric vehicle chargers. In a separate action, DEQ is ordering TTS to purchase 16,000 legitimate credits by October 31, 2022. The order requires TTS to use an administrative process outside the OFRS to turn in those legitimate credits to replace the illegitimate credits that TTS generated and transferred to you. You are receiving the enclosed Notice of Final Determination to Suspend Oregon Clean Fuels Program Credits, and Order (Notice) because DEQ is suspending the 16,000 illegitimate credits currently held in your OFRS account, until TTS takes the action ordered by DEQ, or until DEQ determines that TTS is unlikely to replace the credits.

If DEQ determines that TTS is unlikely to replace the credits, then DEQ will initiate a new process under OAR 340-253-0670 to invalidate the 16,000 illegitimate credits in your OFRS account. You will have an opportunity to provide information to DEQ and a right to a contested case hearing regarding DEQ's determination and the removal of the credits from your OFRS account.

If you wish to appeal this matter, DEQ must receive a request for a hearing within 20 calendar days from your receipt of this letter. <u>The hearing request must be in writing</u>. Send your request to DEQ Office of Compliance and Enforcement:

                    Via mail – 700 NE Multnomah Street, Suite 600, Portland, Oregon 97232
                    Via email – DEQappeals@deq.oregon.gov
                    Via fax – 503-229-6762

Once DEQ receives your request, we will arrange to meet with you to discuss this matter. If DEQ does not receive a timely written hearing request, the order will become final. The administrative hold on the 16,000 illegitimate credits in your OFRS account, communicated in DEQ's August 12, 2022, Initial Determination, will remain in effect until the order becomes final.

Elbow River Marketing USA Ltd
Case No. AQ-CFP-HQ-2022-118
Page 2


The attached Notice further details DEQ's reasons for issuing the final determination and order and provides further instructions on how to appeal. <u>Please review and refer to it when discussing this case with DEQ</u>.

DEQ's rules are available at http://www.oregon.gov/deq/Regulations/Pages/Statutes.aspx or by calling the number below.

If you have any questions, please contact Becka Puskas at 503-229-5058 or toll free in Oregon at 800-452-4011, extension 5058.

Sincerely,

Colin McConnaha, Manager
Office of Greenhouse Gas Programs

Enclosure

cc:    Tariq Remtulla, Attorney for Elbow River Marketing USA Ltd (Tariq.Remtulla@parkland.ca)
       Stephanie Summers, DEQ
       Bill Peters, DEQ
       Cory Ann Wind, DEQ
       Accounting, DEQ

1

BEFORE THE ENVIRONMENTAL QUALITY COMMISSION

2

OF THE STATE OF OREGON

3

4

IN THE MATTER OF:                    )      NOTICE OF FINAL DETERMINATION
                                     )      TO SUSPEND OREGON CLEAN FUELS
5                                    )      PROGRAM CREDITS, AND ORDER
ELBOW RIVER MARKETING USA LTD,       )
6   an Delaware corporation, and     )
                                     )
7                    Respondent.     )      CASE NO. AQ-CFP-HQ-2022-118

8

9                            I.  AUTHORITY

10          The Department of Environmental Quality (DEQ) issues this Notice of Final Determination to

11   Suspend Oregon Clean Fuels Program Credits, and Order (Notice) pursuant to Oregon Revised Statutes

12   (ORS) 468.100, ORS 468.126 through 468.140, 468A.265 through 468A.277, ORS Chapter 183 and

13   Oregon Administrative Rules (OAR) Chapter 340, Divisions 011, 012, and 253.

14                         II. FINDINGS OF FACT

15          1.   Respondent Elbow River Marketing USA Ltd (Elbow River) is a registered party under the

16   Oregon Clean Fuels Program. Elbow River is a marketing branch of Parkland Corporation, a supplier

17   and marketer of fuels and petroleum products.

18          2.   Thompson Technical Services LLC (TTS) is a limited liability corporation registered to

19   conduct business in Oregon. TTS operates under the assumed business name TTS Charging.

20          3.   Merlin Thompson (Thompson) is the owner, founder, Registered Agent, sole Member, and

21   CEO of TTS.

22          4.   On June 14, 2021, TTS submitted to DEQ an application for registration as a credit generator

23   under the Oregon Clean Fuels Program under the electricity fuel type. Thompson signed the application as

24   the "Owner" and "Primary contact" for TTS. In the application, Thompson certified, "I understand that this

25   information will be used by Oregon DEQ for purposes of compliance with OAR Chapter 340, Division

26   253."

27   \\\

5.  On December 27 and 28, 2021, Thompson provided additional information to DEQ regarding three electric vehicle chargers located in Sheridan, Oregon.

6.  On December 29, 2021, DEQ approved the application, and registered TTS as a credit generator under the Oregon Clean Fuels Program. The approval letter issued by DEQ states:

> This registration covers fuel dispensed for transportation use at your electric chargers located in Oregon. Individual chargers will need to be entered into the Oregon Fuels Reporting System (OFRS) using the Fuel Supply Equipment registration form prior to the electricity they dispense being reported.

> Effective the date of this registration approval, you are required to comply with the requirements under OAR 340 Division 253. Specifically, the requirements for:
> - Providers of electricity under OAR 340-253-0330.
> - Recordkeeping under OAR 340-253-0600
> - Reporting under OAR 340-253-0620, 0630 and 0650.

7.  On February 6, 2022, TTS entered data regarding three non-residential electric vehicle chargers (the Three EV Chargers) into the Oregon Fuels Reporting System (OFRS) as follows:

    a.  Facility Name: Valley Market (TTS-2325 Hwy 18)

    b.  Address: 23325 HWY 18, Sheridan, OR, US 97378

    c.  Charging Type: Non-Residential (DCFC-CCS and -CHAdeMO)

    d.  Manufacturer: TPG 120KW

    e.  Serial Nos: 20211260182, 20211260183, 20211260184

8.  On May 19, 2022, a broker hired by TTS, and a broker for Elbow River arranged for the sale of 12,000 Oregon Clean Fuels program credits, at a price of $112 per credit, for delivery in the fourth calendar quarter of 2022.

9.  On or about May 20, 2022, Thompson, on behalf of TTS, signed an agreement with Elbow River for the purchase and sale of the 12,000 credits described in Section II, paragraph 7, above. The agreement, which had an effective date of May 19, 2022, set the total sale price for the 12,000 credits at $1,344,000 (12,000 credits at $112/credit). The agreement includes a representation and warranty by the seller (TTS) that "each CFP Credit transferred to Buyer hereunder is valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a 'Credit' as defined by the Oregon

1  Clean Fuels Program Regulations."

2       10. On June 10, 2022, TTS submitted a quarterly Clean Fuels Program report to DEQ via the

3  OFRS for the time period from January 1, 2022, through March 31, 2022 (the Q1 2022 Report). In making

4  that submittal, Thompson, on behalf of TTS, certified as follows:

5

6       I, Merlin Thompson, as person with Signatory Authority, am submitting this report on behalf of
        Thompson Technical Services, LLC, with the understanding that the information contained in

7       this report is considered an official submission to Oregon Department of Environmental Quality
        for purposes of compliance with the Clean Fuels Program (CFP) regulation.

8
        Furthermore, by submitting this report, I understand that I am bound by, and authenticate this

9       record, and attest to the statements contained within. I also understand that submitting or
        attesting to false statements may constitute a serious crime, punishable under the Oregon Penal

10      Code, or other criminal offenses punishable under state, municipal, or federal law. I certify that
        information supplied herein is correct and that I have the authority by the company identified

11      herein to submit this report.

12

13      11. The Q1 2022 Report stated that TTS dispensed a total of 14,900,000 kilowatt hours (kWh) of

14  electricity to vehicles from the Three EV Chargers during Q1 2022.

15      12. The Three EV Chargers were not installed and operational during Q1 2022; they dispensed

16  zero kWh of electricity to vehicles during Q1 2022.

17      13. The amount of electricity reported by TTS for Q1 2022 exceeds what the Three EV

18  Chargers could dispense during a calendar quarter, even if they were actively charging EVs for every

19  hour of every day.

20      14. The Q1 2022 Report stated that the fuel pathway code for the Three EV Chargers is

21  ORELCCP22 (16.77), which corresponds to electricity provided by Consumers Power, Inc., with a carbon

22  intensity score of 16.77 grams of carbon dioxide equivalent per megajoule of energy (gCO2e/MJ).

23      15. Consumers Power, Inc. does not provide electricity to any customers in Sheridan, Oregon.

24      16. The electric utility serving Sheridan, Oregon, is PGE.

25      17. The correct fuel pathway code for electricity supplied by PGE is ORELC2002, with a carbon

26  intensity score of 146.02 gCO2e/MJ.

27      18.  TTS's submittal of the Q1 2022 Report in the OFRS generated 16,089 credits in the OFRS.

19. If TTS has used the PGE fuel pathway code described in Section II, paragraph 17, above, the submittal of the Q1 2022 Report would have generated 9,156 credits.

20. On June 24, 2022, Thompson emailed Elbow River and stated that TTS had 16,000 credits available to transfer. Elbow River responded that it would take 12,000 credits at the agreed to price of $112/credit, and would take the remaining 4,000 available credits at a price of $111/credit.

21. On June 25, 2022, Thompson signed a CFP Credit Transfer Form which stated that 4,000 credits would be transferred from TTS to Elbow River, at a price of $112/credit, on a proposed transfer date of June 26, 2022. Elbow River signed the CFP Credit Transfer Form and submitted it in the OFRS on June 27, 2022, with a note that the actual price of the transaction was $111/credit. The transaction was posted to the OFRS on June 27, 2022.

22. On June 26, 2022, Thompson signed a second CFP Credit Transfer Form which stated that 12,000 credits would be transferred from TTS to Elbow River, at a price of $112/credit, on a proposed transfer date of June 26, 2022. Elbow River signed the second CFP Credit Transfer Form and submitted it in the OFRS on June 27, 2022. The transaction was posted to the OFRS on June 27, 2022.

23. Both of the CFP Credit Transfer Forms described in Section II, paragraphs 21-22 above include a statement on the first page in red type as follows:

**Important:** This form must be used each time a credit transfer agreement has been made, regardless of the number of credits transferred and the price per unit credit. Only credits that have been generated and recognized in the CFP Online System can be traded, and transfers must be in compliance with the rules of OAR 340-253.

24. Both of the CFP Credit Transfer Forms described in Section II, paragraphs 21-22 above include the following certification: "By signing, each person below declares that all information provided herein are true and correct, and to the best of his/her knowledge and belief."

25. On or about June 27, 2022, Thompson, on behalf of TTS, and Elbow River signed a supplemental agreement to the agreement described in Section II, paragraph 9, above, for the purchase and sale of the 4,000 credits for a total sale price of $444,000 (4,000 credits at $111/credit).

\\\

26. On June 27, 2022, Thompson sent two invoices to Elbow River for the two transactions. The first invoice, dated May 24, 2022, was in the amount of $1,344,000 for 12,000 Oregon CFP credits. The second invoice, dated June 27, 2022, was in the amount of $444,000 for 4,000 Oregon CFP credits.

27. On July 4, 2022, Elbow River transferred $1,788,000 to TTS.

28. On August 12, 2022, pursuant to OAR 240-253-0670(3), DEQ issued a Notice of Initial Determination and Placing of 16,000 credits on hold in your Clean Fuels Program Account (Notice of Initial Determination) to Elbow River. The Notice of Initial Determination informed Elbow River that DEQ was imposing a temporary administrative hold on the 16,000 credits that Elbow River had purchased from TTS. The Notice of Initial Determination also requested information from Elbow River, to be provided by no later than September 1, 2022.

29. On August 26, 2022, and September 27, 2022, Elbow River provided additional information in response to DEQ's information request.

### III. CONCLUSIONS

1. TTS and Thompson submitted an inaccurate Clean Fuels Program quarterly report that generated 16,089 illegitimate credits in violation of OAR 340-253-0330(9), OAR 340-253-0640(2)(b) and OAR 340-253-1005(7)(a), as described in Section II, paragraphs 1-19, above. OAR 340-253-0330(9) requires that credit generators, including owners or service providers of electric-charging equipment, may generate clean fuel credits by complying with the registration, recordkeeping and reporting requirements of OAR Chapter 340, division 253. OAR 340-253-0640(2)(b) requires that for electricity, each public access charging station must report the amount of electricity dispensed in kilowatt hours to vehicles. OAR 340-253-1005(7) requires registered parties to report accurately when submitting information to the OFRS. In the Q1 2022 Report, TTS and Thompson reported to DEQ via the OFRS that the Three EV Chargers had dispensed a total of 14,900,000 kWh of electricity to vehicles in Q1 2022, when in fact the Three EV Chargers were not installed and operational and had dispensed zero kWh of electricity to vehicles in Q1 2022. As described in Section II, paragraph 13, above, the amount of electricity reported by TTS exceeds the physical capacity of the Three EV Chargers. In addition, TTS and Thompson included an inaccurate fuel pathway code in the Q1 2022

1    Report. This inaccurate reporting resulted in the generation of 16,089 illegitimate credits, which are

2    invalid according to OAR 340-253-1005(7)(a).

3        2.  TTS and Thompson transferred 16,000 credits in violation of OAR 340-253-1005(8), as

4    described above in Section II, paragraphs 1-27, above. Specifically, TTS and Thompson used fraud to

5    transfer 16,000 credits to Elbow River in exchange for a total of $1,788,000, in violation of OAR 340-253-

6    1005(8)(a). On May 19, 2022, TTS and Thompson entered into an agreement with Elbow River to sell

7    12,000 credits to Elbow River in Q4 2022 for $112 per credit. After generating illegitimate credits in the

8    OFRS, on June 24, 2022, TTS and Thompson represented to the Elbow River that TTS had 16,000 credits

9    available to transfer, and that those credits were generated in compliance with the Clean Fuels Program

10    rules. In exchange for the two credit transfers on June 27, 2022, Elbow River paid TTS and Thompson

11    $1,788,000 on July 4, 2022. In fact, as described in Section III, paragraph 1 above, all of the credits

12    transferred to Elbow River on June 27, 2022, were illegitimate, invalid, and had no value. Alternatively,

13    TTS and Thompson completed two credit transfers involving a false report and untrue statements of

14    material fact related to the price of the credits, in violation of OAR 340-253-1005(8)(c). TTS and

15    Thompson represented to the Buyer that the credits in TTS's OFRS account were generated in compliance

16    with the Clean Fuels Program rules and presented Elbow River with two separate Credit Transfer Forms

17    listing the price of the credits as $112/credit, when in fact the credits sold to Elbow River were illegitimate,

18    invalid, and had no value.

19        3.  According to OAR 340-253-0670(1) and (5), DEQ hereby makes a final determination to

20    suspend the 16,000 illegitimate credits in the Elbow River OFRS account that were transferred from TTS

21    to Elbow River on June 27, 2022, until TTS replaces the credits as required under OAR 340-253-

22    1005(7)(a)(B) or DEQ determines, according to OAR 340-253-1005(7)(b)(A), that TTS is unlikely to

23    retire 16,000 legitimate credits to replace the 16,000 illegitimate credits that TTS transferred to Elbow

24    River.

25    \\\

26    \\\

27    \\\

4.  The bases for the final determination in Section III, paragraph 3, above are follows:

    a.  As described in Section III, paragraph 1, above, TTS reported incorrect fuel transaction data to the OFRS, which was used to calculate credits. According to OAR 340-253-0670(2)(d), this is a basis for the actions described in Section III, paragraph 3, above.

    b.  As described in Section III, paragraphs 1 and 2, above, TTS generated and transferred credits to Elbow River in violation of the Oregon Clean Fuels Program Rules. According to OAR 340-253-0670(2)(e), this is a basis for the actions described in Section III, paragraph 3, above.

    c.  As described in Section III, paragraphs 1 and 2, above, TTS submitted material information to DEQ and to Elbow River that was incorrect, in connection with a credit transaction. According to OAR 340-253-0670(2)(b), this is a basis for the actions described in Section III, paragraph 3, above.

## IV.  ORDER SUSPENDING OREGON CLEAN FUELS PROGRAM CREDITS

Based upon the foregoing FINDINGS OF FACT AND CONCLUSIONS, it is hereby ORDERED that:

1.  Effective on the date this Order becomes final by operation of law or on appeal, the 16,000 illegitimate credits in the Elbow River Marketing USA Ltd. OFRS account that were transferred from TTS to Elbow River on June 27, 2022, are suspended until TTS replaces the credits as required under OAR 340-253-1005(7)(a)(B) or DEQ determines, according to OAR 340-253-1005(7)(b)(A), that TTS is unlikely to retire 16,000 legitimate credits to replace the 16,000 illegitimate credits that TTS transferred to Elbow River.

## V.  NOTICE OF RIGHT TO REQUEST A CONTESTED CASE HEARING

You have a right to a contested case hearing on this Notice, if you request one in writing. DEQ must receive your request for hearing **within 20 calendar days** from the date you receive this Notice. If you have any affirmative defenses or wish to dispute any allegations of fact in this Notice, you must do so in your request for hearing, as factual matters not denied will be considered admitted, and failure to

1   raise a defense will be a waiver of the defense.  (See OAR 340-011-0530 for further information about

2   requests for hearing.) You must send your request to:  **DEQ, Office of Compliance and Enforcement,**

3   **700 NE Multnomah Street, Suite 600, Portland, Oregon 97232**, fax it to **503-229-6762** or email it to

4   **DEQappeals@deq.oregon.gov**. An administrative law judge employed by the Office of

5   Administrative Hearings will conduct the hearing, according to ORS Chapter 183, OAR Chapter 340,

6   Division 011 and OAR 137-003-0501 to 0700. You have a right to be

7   represented by an attorney at the hearing, however you are not required to be.  If you are an individual,

8   you may represent yourself.  If you are a corporation, partnership, limited liability company,

9   unincorporated association, trust or government body, you must be represented by an attorney or a duly

10  authorized representative, as set forth in OAR 137-003-0555.

11          Active duty Service members have a right to stay proceedings under the federal Service

12  Members Civil Relief Act. For more information contact the Oregon State Bar at 1-800-

13  452-8260, the Oregon Military Department at 503-584-3571, or the nearest United States Armed

14  Forces Legal Assistance Office through http://legalassistance.law.af.mil. The Oregon Military

15  Department does not have a toll free telephone number.

16          If you fail to file a timely request for hearing, the Notice will become a final order by default

17  without further action by DEQ, as per OAR 340-011-0535(1). If you do request a hearing but later

18  withdraw your request, fail to attend the hearing or notify DEQ that you will not be attending the

19  hearing, DEQ will issue a final order by default pursuant to OAR 340-011-0535(3). DEQ designates

20  the relevant portions of its files, including information submitted by you, as the record for purposes of

21  proving a prima facie case.

22

23

24  ___9/30/2022___                          _Colin McConnaha_____
    Date                                     Colin McConnaha, Manager

25                                           Office of Greenhouse Gas Programs

26

27

# EXHIBIT C

**UNITED STATES DISTRICT COURT
DISTRICT OF OREGON**

Case No.: 3:23-CV-00356-MO

ELBOW RIVER MARKETING, Ltd., a
Canadian corporation, ELBOW RIVER
MARKETING USA, LTD., a Delaware
corporation,

       Plaintiffs,

v.

THOMPSON TECHNICAL SERVICES,
LLC, an Oregon limited liability
company, and MERLIN THOMPSON, an
individual,

       Defendants.

_____/

**DECLARATION OF JUSTIN B. KAPLAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT**

I, Justin B. Kaplan, hereby declare as follows:

1.      I am an attorney with the law firm of Nelson Mullins Riley & Scarborough

("**Nelson Mullins**"), attorneys for Plaintiffs, Elbow River Marketing, Ltd., and Elbow River

Marketing USA Ltd. (collectively, the "**Plaintiffs**"). I am familiar with the facts and circumstances

of this case; and I have personal knowledge of the facts set forth herein.

2.      I submit this declaration in support of Plaintiffs' Motion for Entry of Default

Judgment Against Defendants, Thompson Technical Services, LLC, and Merlin Thompson

(collectively, the "**Defendants**").

3.      Elbow River and TTS entered into a LEAP Master Agreement for Purchasing and

Selling Oregon Clean Fuels Program Credits ("**LEAP Agreement**"), which governed Elbow

River's purchase of Clean Fuels Program Credits ("**Credits**") from TTS. *See* Exhibit 1. Thereafter,

Plaintiffs purchased 16,000 Credits (the "**Initial Credits**") from TTS in an aggregate amount of $1,784,000. *See* Composite Exhibit 2.

4.      On September 30, 2022, DEQ invalidated the Initial Credits. *See* Exhibit 3.

5.      On October 7, 2022, Elbow River demanded pursuant to Section 7.1 of the LEAP Agreement that TTS, at its sole cost and expense, initiate replacement credits to replace the 16,000 Initial Credits that had been suspended. *See* Exhibit 4.

6.      TTS did not deliver replacement Credits.

7.      Section 7.2 of the LEAP Agreement provides that if TTS failed to timely or fully comply with its obligation set forth in Section 7.1 to initiate replacement Credits upon invalidation, Plaintiffs could elect certain remedies contractually available to it, including demand that TTS provide replacement Credits. *See* Exhibit 1.

8.      Thus, on October 21, 2022, Elbow River again demanded same pursuant to Section 7.2 of the LEAP Agreement. *See* Exhibit 5.

9.      Again, TTS failed to comply.

10.      On November 15, 2022, Elbow River declared TTS to be in breach of the LEAP Agreement pursuant to Section 8.1(c) of same as a result. *See* Exhibit 6.

11.      TTS did not cure its breach of the LEAP Agreement within the period to have done so.

12.      Plaintiffs' cause of action accordingly accrued with respect to TTS' breach of contract related to the 16,000 Initial Credits on November 17, 2022.

13.      In July 2022, Plaintiffs agreed to purchase an additional 36,000 Credits from TTS for $3,636,000.00, with delivery to occur on or before August 25, 2022. *See* Exhibit 7.

14.      However, TTS did not deliver the 36,000 Credits.

15.     On February 3, 2023, Elbow River demanded that TTS initiate replacement Credits pursuant to Section 7.1 of the LEAP Agreement as a result of its failure to timely deliver the Second Credits. *See* Exhibit 8.

16.     TTS failed to comply.

17.     On February 24, 2023, Elbow River accordingly provided notice to TTS of its election of the remedy of repayment in the amount of $351,175.00. *See* Exhibit 9.

18.     TTS failed to do so within five (5) business days.

19.     On March 6, 2023, Plaintiffs provided TTS one last written notice of its breach and requested that TTS take corrective measures by March 8, 2023. *See* Exhibit 10.

20.     Plaintiffs' cause of action accordingly accrued with respect to TTS' breach of contract related to the 36,000 Additional Credits on August 25, 2022.

21.     Thereafter, Plaintiffs initiated this lawsuit.

22.     On April 26, 2023, Plaintiffs filed the Motion for Clerk's Entry of Default and Incorporated Memorandum of Law, a Declaration in Support of same, and a Proposed Order of Default (collectively the "**Motion**"). [D.E. 16].

23.     On April 28, 2023, counsel for Plaintiffs sent courtesy copies of the Motion to Defendants and to an attorney who previously represented Defendants in a related matter. *See* Exhibit 11.

24.     Undersigned counsel received no response; and Defendants failed to appear to defend this action.

25.     On May 22, 2023, the court granted the Motion and default was entered against Defendants ("**Order of Default**"). [D.E. 17].

26.     On May 24, 2023, counsel for Plaintiffs sent a courtesy copy of the Order of Default to Defendants and to an attorney who previously represented Defendants in a related matter. *See* Exhibit 12.

27.     As of the date of this declaration, Defendants have not responded.

28.     Nor have Defendants submitted an intent to appear to the Court or counsel for Plaintiffs.

29.     Nelson Mullins expended a total of 165.2 hours and incurred $91,761.80 in attorneys' fees and $5,467.55 in costs in connection with enforcing the LEAP Agreement. *See* Composite Exhibit 13.[1]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 29, 2023.

_____
JUSTIN KAPLAN

---

[1] Redacted portions of the invoices included in Composite Exhibit 13 involve $38,061 in fees resultant from time incurred related to other matters and have not been included in Plaintiffs' calculations.

EXHIBIT 1

# LEAP MASTER AGREEMENT FOR PURCHASING AND SELLING OREGON CLEAN FUELS PROGRAM CREDITS
## Version 1.0

**Effective as of May 19, 2022**

## COVER SHEET

*This LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits Version 1.0 ("*<u>LEAP Oregon Clean Fuels Program Agreement</u>*") together with, and as amended by, this Cover Sheet and any annexes, schedules and written supplements hereto, and all Transactions (including any Confirmations) shall be referred to collectively as this "*<u>Agreement</u>*".*

**The parties to this Agreement are as follows:**

**Elbow River Marketing Ltd.**
_____ and

**("Party A")**

U.S. Federal Tax ID No.: 98 1086910_____

**Notices:**

Mail address: 335 8 Ave SW #1600, Calgary, AB T2P 1C9

_____

Email: Contracts@elbowriver.com

Attn: Contracts Management

Phone: 403-232-6868_____ Fax: 403-269-9576_____

**Wire Transfer or ACH Numbers (if applicable):**

BANK: JP Morgan Chase_____

ABA: 021409169_____

ACCT: 9591009737_____

**Notices for Default:**

Attn: Same as above_____

Phone: Same as above_____ Fax: Same as above_____

Other Details:_____

_____

---

<u>Thompson Technical Services LLC</u>

**("Party B")**

U.S. Federal Tax ID No.: 854255777

**Notices:**

Mail address: 2424 NE HWY 101 Lincoln City Or 97367

Email:merlin@ttscharging.com

Attn: Merlin Thompson

Phone: 5413007268_____ Fax:_____

**Wire Transfer or ACH Numbers (if applicable):**

BANK: Arkansas Federal Credit Union_____

ABA: 282075028_____

ACCT: 10002530110_____

**Notices for Default:**

Attn: Therese Gray_____

Phone: 940-435-9185_____ Fax:_____

Other Details:_____

---

**The Parties hereby agree that the General Terms and Conditions of this** *LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits* **set forth below are incorporated herein subject to the following elections and modifications:**

<u>**Section 8 – Events of Default**</u>
THE FOLLOWING EVENTS OF DEFAULT ARE APPLICABLE UNDER THIS AGREEMENT (CHECK ALL PROVISIONS THAT ARE APPLICABLE):

<u>8.1(d) Default Under Other Trading Agreements:</u>
[ ] Applicable. If not checked, inapplicable.
      "<u>Aggregate Delinquency Amount</u>" means for purposes of Section 8.1(d) (if applicable):
      With respect to Party A, Party A's Credit Support Provider and each applicable Specified Affiliate of Party
      A:_____

      With respect to Party B, Party B's Credit Support Provider and each applicable Specified Affiliate of
      Party B:_____

      "<u>Specified Affiliate</u>" means for purposes of Section 8.1(d) (if applicable):
      With respect to Party A: _____

      With respect to Party B: _____

<u>8.1(e) Cross Default:</u>
[ ] Applicable. If not checked, inapplicable.
[ ] Cross Acceleration. If Section 8.1(e) is applicable, the words ", or becoming capable at such time of being declared," in Section 8.1(e) shall be deleted. If not checked, these words shall not be deleted.
      "<u>Threshold Amount</u>" means for purposes of Section 8.1(e) (if applicable):
      With respect to Party A: _____

      With respect to Party B: _____

## Section 9 – Termination and Liquidation

9.3 Closeout Setoff:

For purposes of Section 9.3, the Parties agree that (select one):

[x] Option A (Bilateral Setoff) is applicable. (Applicable if no other election is made.)
[ ] Option B (Triangular Setoff) is applicable.
[ ] Option C (Rectangular Setoff) is applicable.
[ ] Option D (No Setoff) is applicable.

## Section 10 – Force Majeure

10.5 Force Majeure Termination Payment:

[ ] Applicable. If not checked, inapplicable. If applicable, the following provisions will apply:

Notwithstanding anything to the contrary in Section 10, a Termination Payment will be payable in respect of Term Transactions that are terminated due to Force Majeure pursuant to Section 10.5 within two (2) New York Banking Days of termination. The Termination Payment and the Party that owes such Termination Payment will be calculated and determined pursuant to the methodology set forth in Section 9.2 by the Party that is not claiming Force Majeure (which Party will be deemed the "Performing Party" for purposes of applying the terms of Section 9.2 for purposes of this provision), except that only the Transactions being terminated pursuant to Section 10.5 will be taken into account in determining the amount of such payment and all other Transactions will remain outstanding and unaffected by such termination.

If both Parties are claiming Force Majeure, then both Parties will calculate a Termination Payment, and the amount payable will equal one-half of the difference between the Termination Payment of the Party with the higher Termination Payment ("$X$") and the Termination Payment of the Party with the lower Termination Payment ("$Y$"). If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

## Section 19 – New or Changed Laws or Regulations

19.1 Material Adverse Effect:

[ ] Applicable. If not checked, inapplicable.

19.2 Disrupted Transactions:

[ ] Applicable. If not checked, inapplicable.

## Section 18 – Written Confirmations

Confirming Party:

[x] Party A          [ ] Party B

## Other Modifications to the LEAP Oregon Clean Fuels Program Agreement

Section 1.1 (bb) is deleted in its entirety.

Section 1.1 (g) is modified by adding the word "provincial" after the word "state".

Section 1.1 (hh) is modified by adding "or other country" after the word "U.S. and "provincial" after the word "state".

Section 4.1 is modified by deleting ", as set forth in the sample forms attached as Exhibit 2".

The following paragraph shall be added as a new Section:

20.7 Change of Banking Information

If, at any time, either Party sends notice of changed banking information or an invoice or net statement containing banking information different from that currently in the other Party's records, prior to making any payment then due, the paying Party shall require that the other Party provide confirmation of the new banking information via email or fax using company letterhead. The paying Party will request, and other Party will provide such confirmation in a timely manner, and the payment shall not be due until the confirmation is provided. The paying Party shall update its records in a timely manner upon receipt of the confirmation in order to avoid unnecessary further requests for confirmation.

Exhibit 2 Sample Form of Invoice for CFP Credits Transaction is deleted in its entirety.

## Specify, if any: Schedule to the LEAP Oregon Clean Fuels Program Agreement

**IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first above written.**

**ELBOW RIVER MARKETING LTD.** _____ and   **Thompson Technical Services LLC**

**("Party A")**

By: _Randy Richard_

Name: Randy Richard

Title: Trader

Date: 5/20/2022

**("Party B")**

By: _Merlin Thompson_

Name: Merlin Thompson

Title: CEO

Date: 5/20/2020

By: _

Name: _

By: _____

Name: _____

ERM_ORG_000196

Title: _____    Title: _____

Date: _____    Date: _____

**DISCLAIMER**

THE OBJECTIVE OF THIS AGREEMENT IS TO FACILITATE THE ORDERLY AND PROMOTE THE EFFICIENT TRADING OF OREGON CLEAN FUELS PROGRAM CREDITS. USE OF THIS AGREEMENT OR ANY PROVISION THEREOF IS COMPLETELY VOLUNTARY. USE OF THIS AGREEMENT IS NOT RESTRICTED AND LEAP HEREBY AUTHORIZES ANYONE TO USE THIS AGREEMENT OR ANY PROVISION THEREOF.

NONE OF LEAP, ANY LEAP MEMBER COMPANY OR ANY OF THEIR AGENTS, REPRESENTATIVES OR ATTORNEYS SHALL BE RESPONSIBLE FOR THE USE OF THIS AGREEMENT, OR ANY DAMAGES OR LOSSES RESULTING THEREFROM. BY PROVIDING THIS AGREEMENT, LEAP DOES NOT OFFER LEGAL ADVICE AND ALL USERS ARE URGED TO CONSULT THEIR OWN LEGAL COUNSEL AND TAX ADVISORS TO ENSURE THAT THIS AGREEMENT WILL ACHIEVE THEIR COMMERCIAL OBJECTIVES AND THEIR LEGAL INTERESTS ARE ADEQUATELY PROTECTED.

ERM_ORG_000197

# GENERAL TERMS AND CONDITIONS

In consideration of the mutual undertakings in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

1. **DEFINITIONS AND INTERPRETATION**

1.1  **Definitions**

(a)  "Accepted" or "Acceptance" has the meaning specified in Section 2.2.2.

(b)  "Affected Party" has the meaning specified in Section 19.1.

(c)  "Affected Transaction" has the meaning specified in Section 19.1.

(d)  "Affiliate" means, in relation to any person, an entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

(e)  "Aggregate Delinquency Amount" means, with respect to a Party, the amount specified as the Aggregate Delinquency Amount for such Party in respect of Section 8.1(d) in the Cover Sheet.

(f)  "Agreement" has the meaning set out in the preamble to the Cover Sheet.

(g)  "Applicable Law" means any federal, national, state or local law, statute, regulation, code, ordinance, license, permit, compliance requirement, decision, order, writ, injunction, directive, judgment, policy, decree, including any judicial or administrative interpretations thereof, or any agreement, concession or arrangement with any Governmental Authority, applicable to either Party or either Party's performance under any Transaction, and any amendments or modifications to the foregoing.

(h)  "Alternative Settlement Amount" has the meaning specified in Section 19.1.

(i)  "Bankrupt" means, with respect to a Party, that such Party: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv)(A) institutes, or has instituted against it by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above; (v) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets; (viii) causes or is subject to any event with respect to it which, under the Applicable Law, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive); or (ix) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

(j)  "Bankruptcy Code" has the meaning specified in Section 9.7.

(k)  "Buyer" means the Party obligated to purchase or acquire CFP Credits under a Transaction.

(l)  "CFP Account" means the account of a Party showing the CFP Credits and CFP Deficits generated by the Party or transferred, purchased or acquired by the Party, as established with DEQ or another governmental authority pursuant to the Oregon Clean Fuels Program Regulations.

(m)  "Clean Fuels Program Credit" and "CFP Credit" means a credit as defined in the Oregon Clean Fuels Program Regulations.

(n)  "Clean Fuels Program Deficit" and "CFP Deficit" means a deficit as defined in the Oregon Clean Fuels Program Regulations.

(o)  "CFP Online System" has the meaning defined in the Oregon Clean Fuels Program Regulations.

(p)  "CFP Online Transfer Notification" has the meaning specified in Section 2.2.1.

(q)  "Confirmation" means (i) any electronic confirmation setting forth the trade details of a Transaction (and any special conditions) between the Parties and matched by the Parties on an electronic confirmation matching system, or (ii) the ability to

confirm a Transaction through an electronic confirmation matching system, any other written or electronic confirmation between the Parties that contains the relevant trade details (and any special conditions) of the Transaction, in either case based on those set forth in the sample form attached as Exhibit 1.

(r)     "<u>Contract Price</u>" means the price (expressed in U.S. Dollars) of a CFP Credit as specified in a Confirmation.

(s)     "<u>Contract Value</u>" means the number of the CFP Credits remaining to be delivered or purchased under a Transaction multiplied by the Contract Price.

(t)     "<u>Credit Support Provider</u>" means a Party's guarantor or other person providing Performance Assurance for such Party.

(u)     "<u>Credit Transfer Form</u>" means the Credit Transfer Form that is incorporated by reference into the Oregon Clean Fuels Program Regulations in OAR 340-253-1050(5) properly completed and executed by Seller in accordance with the Oregon Clean Fuels Program Regulations.

(v)     "<u>Defaulting Party</u>" has the meaning specified in Section 9.1.

(w)     "<u>Deficient CFP Credit</u>" has the meaning specified in Section 7.1.

(x)     "<u>DEQ</u>" means the Oregon Department of Environmental Quality or successor agency.

(y)     "<u>Designated Event</u>" means, with respect to a Party for purposes of Section 8.1(f): (i) the consolidation or amalgamation of a Party with, the merger of a Party with or into, or the transfer of all or substantially all of a Party's assets to, another entity; (ii) the reorganization, reincorporation or reconstitution of a Party into or as another entity; (iii) the acquisition by any person directly or indirectly of the majority of the beneficial ownership of the Party such that such person may exercise control of the Party; or (iv) a substantial change in the capital structure of a Party by means of the issuance or guaranty of debt.

(z)     "<u>Disrupted Transaction</u>" has the meaning specified in Section 19.2.

(aa)    "<u>Early Termination Date</u>" has the meaning specified in Section 9.1.

(bb)    "<u>Eastern Prevailing Time</u>" means the time prevailing on the East Coast of the U.S., taking into account daylight savings time if it is in effect.

(cc)    "<u>Event of Default</u>" has the meaning specified in Section 8.1.

(dd)    "<u>Expert</u>" means a person reasonably agreed upon by the Parties who shall be qualified by education, experience or training to resolve the applicable issue and who shall not be a current or former employee of either Party or otherwise have a stake in the outcome of the dispute.

(ee)    "<u>Expert's Decision</u>" has the meaning specified in Section 19.1.

(ff)    "<u>Force Majeure</u>" has the meaning specified in Section 10.1.

(gg)    "<u>Force Majeure Termination Payment</u>" has the meaning specified in Section 10.5.

(hh)    "<u>Governmental Authority</u>" means any U.S. federal, state, regional, local or municipal governmental body, agency, instrumentality, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative or judicial body, or any person acting on behalf thereof.

(ii)    "<u>Independent Dealer</u>" means a leading dealer in the relevant physical trading markets for the Affected Transactions that is not a Party or an Affiliate of a Party.

(jj)    "<u>Inappropriate Payments</u>" has the meaning specified in Section 20.4.

(kk)    "<u>Initiate</u>" means the submission of a sell transaction in the CFP Online System by Seller provided, however, that a Seller shall not be deemed to have submitted any CFP Credits where Seller cancels such sell transaction in the CFP Online System before Buyer accepts it in the CFP Online System.

(ll)    "Invalid" has the same meaning as "Illegitimate" as specified in the Oregon Clean Fuels Program Regulations OAR 340-253- 0040(49).

(mm)    "<u>Invoice</u>" has the meaning set forth in Section 4.1.

ERM_ORG_000199

(nn)     "LEAP" has the meaning specified in the disclaimer paragraph on the last page of the Cover Sheet.

(oo)     "LEAP Oregon Clean Fuels Program Agreement" has the meaning specified in the Cover Sheet.

(pp)     "Market Value" means the amount of the CFP Credits remaining to be Initiated under a Transaction multiplied by the market   price for an equivalent transaction for Qualified Replacement CFP Credits as determined by the Performing Party (or determining party, as the case may be) in a commercially reasonable manner. To ascertain the Market Value, the Performing Party may consider, among other valuations, quotations from leading dealers in swap contracts or physical trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term, relevant Payment Due Dates, Transfer Dates, and Transaction Volume. A Party shall not be required to enter into a replacement transaction in order to determine th e Market Value of a Transaction. For the avoidance of doubt, any option pursuant to which one Party has the right to extend the term of a Transaction shall be considered in determining Contract Value and Market Values.

(qq)     "New York Banking Day" means a day (other than a Saturday or Sunday or banking holiday) on which commercial banks are authorized to open for business in the State of New York.

(rr)     "Oregon Clean Fuels Program Regulations", "CFP Regulations" and "CFP" mean the regulations, orders, decrees and standards issued by a governmental authority implementing or otherwise applicable to the Oregon Clean Fuels Program as set forth in OAR chapter 340, division 253 as defined in OAR 340-253-0060(4) and each successor regulation, as may be subsequently amended, modified, or restated from time to time.

(ss)      "Original Index" has the meaning specified in Section 19.2.

(tt)      "Other Amounts" has the meaning specified in Section 9.3.

(uu)     "Other Trading Agreement" has the meaning specified in Section 8.1(d).

(vv)     "Party" means Party A or Party B, individually, and "Parties" means Party A and Party B, collectively.

(ww)    "Party A" is the party designated as such in the introduction on page 1 of the Cover Sheet.

(xx)     "Party B" is the party designated as such in the introduction on page 1 of the Cover Sheet.

(yy)     "Payment Due Date" means the payment due date specified in the Confirmation (or otherwise agreed in writing by the Parties), provided that if the Payment Due Date is not so specified or agreed, then it shall be five (5) New York Banking Days after the later of (A) the Transfer Date or (B) the payer's receipt of the payee's Invoice.

(zz)     "Pending Credits" has the meaning specified in Section 7.3.

(aaa)    "Performance Assurance" has the meaning specified in Section 6.1.

(bbb)    "Performing Party" has the meaning specified in Section 9.1.

(ccc)    "Posting Party" has the meaning specified in Section 6.1.

(ddd)    "Prepayment" has the meaning specified in Section 6.2.

(eee)    "Prepayment Amount" has the meaning specified in Section 6.2.

(fff)     "Prepayment Due Date" has the meaning specified in Section 6.2.

(ggg)    "Qualified Institution" has the meaning specified in Section 6.1(b).

(hhh)    "Qualified Replacement CFP Credit" means a valid CFP Credit meeting the specifications set forth in the relevant Confirmation.

(iii)     "Quantity" means, with respect to a Transfer Date, the number of CFP Credits to be purchased and sold pursuant to a Transaction as specified in the Confirmation.

(jjj)     "Reference Price" means a price that is determined by reference to a specified pricing source.

(kkk)    "Renegotiation Notice" has the meaning specified in Section 19.1.

(lll)     "Renegotiation Option" has the meaning specified in Section 19.1.

(mmm)  "Secured Party" has the meaning specified in Section 6.1.

(nnn)    "Seller" means the Party obligated to sell or Transfer CFP Credits under a Transaction.

ERM_ORG_000200

(ooo)   "<u>Specified Affiliate</u>" means, with respect to a Party, the entity or entities specified as the Specified Affiliate(s) with respect to such Party in respect of Section 8.1(d) in the Cover Sheet.

(ppp)   "<u>Termination Date</u>" has the meaning specified in Section 19.1.

(qqq)   "<u>Termination Payment</u>" has the meaning specified in Section 9.2.

(rrr)   "<u>Termination Value</u>" means the aggregate value of all Affected Transactions determined by valuing each Affected Transaction at its Market Value as reasonably determined by the determining party as of the Termination Date and then determining the amount by which such then prevailing Market Value differs from the Contract Value (it being understood that (i) in the event the prevailing Market Value of an Affected Transaction exceeds the Contract Value, the difference in value shall be due from Seller to Buyer, and (ii) in the event that the prevailing Market Value of an Affected Transaction is less than the Contract Value, the difference in value shall be due from Buyer to Seller) and adding to such value, without duplication, any amounts then payable under the Affected Transaction (including amounts due in respect of CFP Credits Initiated and Accepted hereunder). The terms "Market Value" and "Contract Value" as used in this definition shall have the meanings specified in Section 1, provided that each reference to "Performing Party" shall be replaced by "determining party".

(sss)   "<u>Term Transaction</u>" means a Transaction contemplating multiple Transfers with a delivery period the duration of which is one (1) calendar month or more.

(ttt)   "<u>Threshold Amount</u>" has the meaning specified in the Cover Sheet in respect of Section 8.1(e).

(uuu)   "<u>Trade Date</u>" means the date a Transaction is entered into between the Parties.

(vvv)   "<u>Transaction</u>" has the meaning specified in Section 1.3.

(www)   "<u>Transfer</u>" or "<u>Transferred</u>" has the meaning specified in Section 2.3.

(xxx)   "<u>Transfer Date</u>" has the meaning specified in Section 2.3(b)

(yyy)   "<u>Transfer Obligations</u>" has the meaning specified in Section 2.2.1.

(zzz)   "<u>Transfer Period</u>" means, for a Transaction, the date range as specified in the Confirmation during which Seller must Initiate the Quantity of CFP Credits specified in the Confirmation, all in accordance with the Seller's obligations under the Oregon Clean Fuels Program Regulations, and any subsequent guidance from DEQ.

(aaaa)  "<u>U.S.</u>" means United States of America, and every reference to money, price, or Contract Price pertains to U.S. Dollars.

**1.2    Interpretation**

Unless otherwise specified, all section references in this Agreement are to the Sections of this Agreement. All headings in this Agreement are intended solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement. Unless expressly provided otherwise, the word "including" as used herein does not limit the preceding words or terms and shall be read to be followed by the words "without limitation" or words having similar import and the words "other" and "otherwise" shall not be construed as being limited by the context in which they appear or the words that precede them. The word "or" is not exclusive. Unless otherwise expressly stated, the words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "will" and "shall" are expressions of command, not merely expressions of future intent or expectation. Unless expressly provided otherwise, references to "consent" mean the prior written consent of the Party at issue. Unless provided otherwise, when a Party's response is required hereunder within a specific time period following receipt of notice or documentation, as applicable, the day of receipt thereof by such Party shall be considered day zero. The Parties acknowledge that they and their counsel have reviewed and revised this Agreement and that no presumption of contract interpretation or construction shall apply to the advantage or disadvantage of the drafter of this Agreement. Any specific references to laws, statutes, or regulations will include any amendments, replacements, or modifications thereto.

**1.3    Scope; Single Agreement**

This Agreement is intended to apply exclusively to transactions for the purchase and sale of CFP Credits between Seller and Buyer, the details of which are set forth in a Confirmation (a "<u>Transaction</u>"). All Transactions are entered into in reliance on the fact that this Agreement and all Transactions hereunder form a single agreement between the Parties.

**1.4    Inconsistency**

In the event of any inconsistency between the provisions of any Confirmation and this Agreement, such Confirmation will prevail for the purposes of the relevant Transaction; provided however, any changes which conflict with any provisions of this Agreement regarding Section 6: Credit, Section 8: Events of Default, and Section 9: Termination and Liquidation must be agreed in writing by both Parties. For the avoidance of doubt, any repetition in a Confirmation of any section or any part of such section of this LEAP Oregon Clean Fuels Program Agreement shall be for emphasis only and shall not by reason of such repetition exclude any other part of such section or any

ERM_ORG_000201

DocuSign Envelope ID: FF3FED1A-BE70-44A6-989A-70254F541806

other section or any part thereof of this LEAP Oregon Clean Fuels Program Agreement unless such intention to override the LEAP Oregon Clean Fuels Program Agreement is explicitly expressed in the Confirmation.

**2.    GENERAL PURCHASE AND SALE OBLIGATIONS; TITLE TRANSFER**

**2.1    Purchase**

Pursuant to each Transaction, and subject to the terms and conditions of the Confirmation governing such Transaction and this LEAP Oregon Clean Fuels Program Agreement, Seller agrees to sell and Initiate to Buyer the Quantity of CFP Credits at the Contract Price during the Transfer Period, all as specified in the Confirmation, and Buyer agrees to purchase and Accept the CFP Credits from Seller, subject to its rights under Section 2.4, within the specified number of days required by the Oregon Clean Fuels Program Regulations.

**2.2.1    Initiation**

Each Party shall take all actions required by the Oregon Clean Fuels Program Regulations to effect a transfer of the CFP Credits from Seller to Buyer during the Transfer Period (the "Transfer Obligations"). The CFP Credits shall be deemed initiated ("Initiated") by Seller to Buyer upon:

(a)    Buyer's receipt from Seller of a Credit Transfer Form or a notification of an electronic transfer of CFP Credits via the CFP Online System (each such notification, a "CFP Online Transfer Notification"); and

(b)    Seller's satisfaction of all other Transfer Obligations applicable to Seller, if any.

Seller shall Initiate CFP Credits on or before the end of the Transfer Period as indicated on the Confirmation.

**2.2.2    Acceptance**

CFP Credits that are Initiated by Seller shall be deemed accepted ("Accepted") by Buyer upon:

(a)    Buyer's confirmation of the accuracy of the information on the Credit Transfer Form by signing and dating the form using the CFP Online System.

(b)    Buyer's satisfaction of all other Transfer Obligations applicable to Buyer, if any; and Buyer's submission of the Credit Transfer Form or Buyer's acceptance of a CFP Online Transfer Notification, together with the satisfaction of all other Buyer Transfer Obligations, if any, shall constitute the acceptance (the "Acceptance") by Buyer of the CFP Credits.

**2.3    Title Transfer**

Title to the CFP Credits shall be deemed to transfer from Seller to Buyer after

(a)    Initiation and Acceptance of the CFP Credits; and

(b)    upon the recordation of the addition of the CFP Credits to the CFP Account balance of Buyer and the subtraction of the CFP Credits from the CFP Account balance of Seller by DEQ (the title transfer of CFP Credits as set forth above hereafter referred to as the "Transfer" of the CFP Credits and the date on which the Transfer occurs is the "Transfer Date").

**2.4    Buyer Right to Reject**

Buyer shall have the right, at its reasonable discretion, to reject any CFP Credits Initiated by Seller upon notice to Seller within the specified number of days required by the Oregon Clean Fuels Program Regulations. For the avoidance of doubt, and without limitation, Buyer shall be conclusively deemed to have reasonably exercised its discretion to reject where:

(a)    Buyer reasonably believes that the Credit Transfer Form or the information in a CFP Online Transfer Notification does not reflect the terms of the Transaction;

(b)    the CFP Credits are Invalid under the Oregon Clean Fuels Program Regulations or are subject to a proceeding by a governmental authority or are otherwise encumbered;

(c)    there is a reasonable prospect that the CFP Credits will be Invalid under the CFP Regulations; or

(d)    Buyer does not have information sufficient to verify that any of the CFP Credits are valid and that there is no reasonable prospect of such CFP Credits becoming Invalid under the Oregon Clean Fuels Program Regulations.

For purposes of making its assessment it shall be reasonable for Buyer to disregard the benefit of any warranties given to it under this Agreement.

ERM_ORG_000202

Without prejudice to the application of Section 10, it is not a reasonable exercise of discretion for Buyer to reject CFP Credits solely on the basis of market conditions and/or the market price of, CFP Credits.

**2.5**   **CFP Credits Not Recorded By DEQ**

Upon notification from the DEQ that any transfer of all or a portion of the CFP Credits will not be recorded, the Parties shall promptly confer and shall cooperate in taking all reasonable actions necessary to cure any defects in the proposed transfer, so that the Transfer of such CFP Credits can be recorded. Each Party shall notify the other Party and the DEQ of any errors in the Credit Transfer Form within five (5) business days of the discovery of such an error. If a Transaction with Transfer Date that is greater than twenty (20) days after Trade Date is voided pursuant to OAR 340-253-1005(5), then Buyer and Seller agree to initiate a new Transaction under the same terms as the voided Transaction, with pricing identical to the voided Transaction.

**3.**   **REPRESENTATIONS AND WARRANTIES**

**3.1**   **Representations and Warranties by Both Parties**

Each Party represents, warrants and covenants to the other Party as of the date of this Agreement (which representations and warranties are deemed to be repeated by each Party on each Transfer Date with respect to a Transaction) that:

(a)   it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)   it has, and at all times during the term of this Agreement, will have, all necessary power and authority to execute, deliver, and perform its obligations hereunder;

(c)   the execution, delivery, and performance of this Agreement by such Party has been duly authorized by all necessary action and do not violate any of the terms or conditions of its governing documents, any contract to which it is a party, or any Applicable Law;

(d)   there is no pending or, to such Party's knowledge, threatened litigation or administrative proceeding that may materially adversely affect its ability to perform this Agreement;

(e)   this Agreement constitutes a legal, valid and binding obligation of such Party, except as the enforceability of this Agreement may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity; and

(f)   Seller and Buyer shall comply with Applicable Law in the performance of their respective obligations under this Agreement and each Transaction.

**3.2**   **Representations and Warranties by Seller**

Seller represents and warrants to Buyer that on each Transfer Date:

(a)   Seller conveys good title to all CFP Credits it sells hereunder, free and clear of any liens, security interests, and encumbrances or any interest in or to them by any third party;

(b)   each CFP Credit transferred to Buyer hereunder is valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a "Credit" as defined by the Oregon Clean Fuels Program Regulations;

(c)   each CFP Credit was deposited into Seller's CFP Account, or otherwise transferred and recorded by the DEQ in Seller's CFP Account, prior to Initiation hereunder and Seller has good title to each CFP Credit prior to Initiation hereunder;

(d)   the Quantity of CFP Credits Initiated does not exceed the number of total CFP Credits in the Seller's CFP Account as determined in accordance with OAR 240-253-1050(1) of the Oregon Clean Fuels Program Regulations;

(e)   upon Transfer and recordation of the CFP Credits in Buyer's CFP Account, the CFP Credits shall be available for Buyer's use for retirement, transfer to a third party or otherwise;

(f)   Seller has not sold, transferred or encumbered (nor become legally obligated to do the same) any rights, title, or interest in the CFP Credits to any person other than Buyer; and

(g)   neither the Seller, nor any of its associated or parent organizations or affiliates or its customers or the party that owns the project(s) producing the fuel that is the basis for the generation of the CFP Credits, has claimed (or will be entitled to claim) directly or indirectly, including on any voluntary or mandatory greenhouse gas registry program, any of the CFP Credits as anything other than sold to Buyer.

**OTHER THAN THE WARRANTIES AND REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, SELLER MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL,**

ERM_ORG_000203

DocuSign Envelope ID: FF4FED1A-BE78-44A9-899A-7D2B4F54180G

**EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.**

## 4.    PAYMENTS AND INVOICES

### 4.1    Trade Documentation

Payee (generally Seller) shall promptly send payer (generally Buyer) a written invoice ("Invoice") showing sufficient detail to determine the amount due, how such amount was calculated, and the Payment Due Date for the Transaction in question, as set forth in the sample forms attached as Exhibit 2.

### 4.2    Making Payment

All payments shall be made in U.S. Dollars by the Payment Due Date via wire transfer in same day funds.  Except as provided herein or as otherwise agreed by the Parties, payment shall be made without deduction, withholding or setoff. If a Payment Due Date falls on a Saturday or a day that is neither a New York Banking Day nor a Monday, payment shall be made on the preceding New York Banking Day. If a Payment Due Date falls on a Sunday or Monday that is not a New York Banking Day, payment shall be made on the following New York Banking Day.

### 4.3    Price Rounding

All U.S. dollar amounts shall be rounded to the nearest cent (and half cents shall be rounded upward).

### 4.4    Interest

Any amount payable hereunder, if not paid when due, and any amount payable as a refund as a result of an overpayment, shall bear interest from the Payment Due Date or the date of overpayment (as applicable) until the date payment is received at an annual rate (based upon the actual number of days in the relevant calendar year) equal to the rate of two (2) percentage points above the prime rate of interest effective for the Payment Due Date as published in the *Wall Street Journal* under "Money Rates".  If there is no publication on the Payment Due Date, then the preceding day's publication will be used. The relevant Party shall pay any interest due within three (3) New York Banking Days following receipt of the interest invoice.

### 4.5    Payment Dispute

If a Party, in good faith, disputes the accuracy of the amount due in respect of a Transaction, such Party will timely pay such amount as it believes to be correct and provide written notice stating the reasons why the remaining disputed amount is incorrect, along with supporting documentation acceptable in industry practice. Payment of the disputed amount shall not be required until the dispute is resolved. In the event the Parties are unable to resolve such dispute, either Party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Agreement. In the event that it is determined that the Party that is disputing the amount due must pay the disputed amount, then such Party shall pay interest in accordance with Section 4.4 on such disputed amount from and including the originally scheduled Payment Due Date to, but excluding the date paid.

## 5.    CONCURRENT TRANSACTIONS – PAYMENT NETTING

### 5.1    Payment Netting

The Parties agree to net amounts that are due to each other on the same Payment Due Date in respect of purchases and sales of CFP Credits, and the Parties shall confirm at least two (2) New York Banking Days prior to the Payment Due Date, orally or in writing, the payment obligations owed in respect of purchases and sales of CFP Credits and any and all amounts remaining due after net-out. Any remaining balance after net-out shall be paid by the Party owing such amount to the other Party on the applicable Payment Due Date.  The owing Party's payment of a net amount shall satisfy each Party's payment obligations under the relevant Transactions in respect of the payment obligations in respect of purchases and sales of CFP Credits included in the settlement on a Payment Due Date. The Parties understand and agree that such netting of payment obligations is expressly limited to amounts owed from purchases and sales of CFP Credits between the Parties and that netting out any other amounts due in respect of any Transaction or any Other Trading Agreement or any other agreement, instrument or undertaking, for any reason whatsoever, including amounts due in respect of interest payments, is strictly prohibited unless otherwise agreed in writing.

## 6.    CREDIT

### 6.1

Notwithstanding any other Applicable Law, including the Uniform Commercial Code, if a Party (the "Secured Party") has commercially reasonable grounds for insecurity with respect to the other Party's (the "Posting Party") creditworthiness or performance under this Agreement, the Secured Party shall provide the Posting Party with written notice requesting an amount of Performance Assurance determined by the Secured Party in a commercially reasonable manner. "Performance Assurance" means    either:

(a)    prepayment, received by the Secured Party no later than two (2) New York Banking Days after such notice, and    in    any    event    prior to commencing the delivery period; or

(b)    establishing, at the Posting Party's cost, no later than two (2) New York Banking Days after such notice, an irrevocable    standby

LRM_ORG_000204

DocuSign Envelope ID: FF4FED1A-BE78-44A9-899A-7D2B4F5418BD

letter of credit in a form and term acceptable to the Secured Party, opened by a Qualified Institution. "Qualified Institution" means either:

    (i)    a commercial bank, unaffiliated with either Party, organized in a jurisdiction reasonably acceptable to the Secured Party, that has:

        (A)    at least an A- Long Term Rating issued by Standard & Poor's Ratings Group ("S&P") and at least an A3 Deposit Rating issued by Moody's Investor Services, Inc. ("Moody's"); and

        (B)    total equity of at least ten billion U.S. dollars ($10,000,000,000);

        (C)    not exceeded any internal credit limits as established by the Secured Party at the time of the establishment of the letter of credit; or

    (i)    a bank acceptable to the Secured Party in its sole discretion; or

    (c)    other Performance Assurance acceptable to the Secured Party in its sole discretion.

**6.2**    Notwithstanding anything to the contrary in this Agreement, if required by Seller, pursuant to Section 6.1 or as a result of a failure to pay or Event of Default, Buyer shall make advance payment in U.S. Dollars by electronic funds transfer to Seller for CFP Credits purchased by Buyer pursuant to one or more Transactions under this Agreement ("Prepayment"). Specifically, for each Transaction pursuant to which Seller is obligated to transfer CFP Credits to Buyer and for which Seller requires Buyer to make a Prepayment, Seller shall issue an invoice to Buyer and Buyer shall make the Prepayment to Seller by the date specified on Seller's invoice ("Prepayment Due Date"). All Prepayments shall be in an amount equal to the price (or estimated price if the price is based on an index and is not known at the time the invoice is issued) multiplied by the total quantity (or estimated quantity if the actual quantity is not known at the time the invoice is issued) of CFP Credits to be purchased for each outstanding Transaction for which Prepayment is required (each a "Prepayment Amount"). Each Prepayment Amount shall be paid by electronic funds transfer, in same day funds (without setoff, counterclaim or deduction), to the account specified by Seller. If, pursuant to a Transaction, the actual quantity of CFP Credits transferred differs from the contract quantity or the price differs from the estimated price upon which Prepayment was made or other amounts are owing by or to Buyer (including, without limitation, other charges related to the Transaction(s) or amounts arising from any overpayments or underpayments for prior periods), the Party owing such amounts shall pay such amounts owing by it within two (2) Business Days of receipt of request by the Party to whom the payment is owed. In the event Buyer fails to timely make the Prepayment, Seller shall have the right to immediately withhold or suspend transfer of CFP Credits until such time as the required payment is received. Such suspension of transfer of CFP Credits shall not relieve Buyer of its obligation to purchase CFP Credits pursuant to any Transaction and shall be in addition to, and not in replacement of, any other right or remedy available to Seller under this Agreement.

## 7.    REMEDIES FOR FAILURE TO INITIATE OR ACCEPT CFP CREDITS, AND DEFICIENT CFP CREDITS

**7.1**    In the event that, in relation to a Transaction:

    (a)    Seller fails to Initiate all or a part of the CFP Credits by the end of the Transfer Period;

    (b)    Buyer exercises its right to reject all or part of a Quantity of CFP Credits pursuant to Section 2.4 that Seller Initiated;

    (c)    Seller breaches any of its representations or warranties in Section 3.2, or any representation or warranty specified as subject to this Section 7 in the applicable Confirmation;

    (d)    CFP Credits that have been Accepted by Buyer are or become Invalid for purposes of the CFP Regulations; or

    (e)    the DEQ invalidates a Transfer of CFP Credits from Seller to Buyer, for any reason, and Buyer and Seller, cooperating in good faith, are unable to remedy the invalidated Transfer.

(each such affected CFP Credit, a "Deficient CFP Credit"), then, Seller shall, at Seller's sole cost and expense, Initiate a quantity of Qualified Replacement CFP Credits equal to the quantity of Deficient CFP Credits that satisfy the requirements under the applicable Transaction within (i) in the case of Sections 7.1(a) or (b), three (3) Business Days after Seller receives notice from Buyer that the circumstances in Section 7.1(a) or (b) apply, or (ii) in the case of Sections 7.1(c), (d) or (e), ten (10) Business Days after the earlier of (A) Seller's receipt of notice from Buyer that the circumstances in Sections 7.1(c), (d) or (e) apply and (B) Seller's becoming aware that the circumstances in Sections 7.1(c), (d) or (e) apply.

**7.2**    Except where Section 7.3 applies, if Seller fails to timely or fully comply with its Initiation obligation in Section 7.1, then Seller shall, at Buyer's election by notice either (i) Initiate replacement CFP Credits equal to the quantity of Deficient CFP Credits that satisfy the requirements under the applicable Transaction in accordance with Section 7.1 above, or (ii) pay to Buyer, within five (5) Business Days of receipt of Buyer's invoice, unless otherwise mutually agreed between the Parties, the positive difference, if any, between (1) the Market Value of the Qualified Replacement CFP Credits and (2) the product of the quantity of Deficient CFP Credits and the Contract Price specified in the Confirmation for the applicable CFP Credits, with such sum increased by any amount already paid by Buyer to Seller on account of the Deficient CFP Credits. Seller shall also reimburse Buyer for all reasonable broker costs associated with Buyer obtaining Qualified Replacement CFP Credits in a quantity equal to the Deficient CFP Credits.

ERM_ORG_000205

For purposes of this Section 7.2, (i) the phrase "the quantity of CFP Credits that remain to be Initiated under that Transaction" as used in the defined terms "Market Value" shall refer to and mean the quantity of Deficient CFP Credits; and (ii) the Market Value shall be determined by Buyer as of the Business Day notified by Buyer that falls no sooner than the last day for performance of Seller's obligations under Section 7.1 and no later than three (3) Business Days after the date Buyer gives notice of its election.

7.3    In the event that Buyer fails to Accept, or provide notice of its rejection of, all or part of a Quantity of CFP Credits Delivered by Seller or any replacement CFP Credits as contemplated under Section 2.4, Seller shall provide written notice of such failure to Buyer. If Buyer fails to Accept or reject any portion of those CFP Credits (the "Pending Credits") within two (2) Business Days of receiving such notice, then Seller's obligation to sell and Initiate and Buyer's obligation to purchase and Accept shall be reduced to the extent of such Pending Credits, and Buyer shall pay Seller an amount equal to the positive difference, if any, between (i) the product of the quantity of Pending Credits and the Contract Price specified in the Confirmation for the applicable CFP Credits and (ii) the Market Value of the Pending Credits. The Transaction in respect of the Pending Credits shall be deemed to be cancelled and the related Credit Transfer Form or CFP Online Transfer Notification, as applicable, shall be deemed ineffective. For purposes of this Section 7.3, Market Value shall be determined by Seller in a commercially reasonable manner with the date of determination as of the date of cancellation.

7.4    In the event the provisions of this Section 7 are invoked, Seller and Buyer agree to work together in good faith to pursue an efficient, commercial and practical resolution consistent with the foregoing options (or any combination thereof) in order to cure any breach of transfer obligations resulting in Deficient CFP Credits or Pending Credits, provided, however, any replacement CFP Credits must satisfy all of the requirements that the Parties originally agreed to for the applicable Transaction unless otherwise mutually agreed.

7.5    Seller shall deliver to Buyer a Credit Transfer Form or CFP Online Transfer Notification accurately describing any Qualified Replacement CFP Credits. Buyer and Seller shall otherwise be subject to the general obligations set forth in Section 2.

7.6    Section 7.1(b), (c), (d), (e) and, for the avoidance of doubt, Section 2.4 shall apply equally to any Qualified Replacement CFP Credits.

7.7    Except in respect of a failure to pay any amount due under Section 7.2 or Section 7.3, the remedies set out in this Section 7 are exclusive remedies for the occurrence of the events described in Section 7.

## 8.    EVENTS OF DEFAULT

8.1    An "Event of Default" shall mean the occurrence with respect to a Party of one of the following events:

(a)    Failure to Pay. A Party fails to make payment of any amount due when required under this Agreement or any Transaction, within two (2) New York Banking Days following receipt of a written notice of such failure from the other Party.

(b)    Failure to Provide Performance Assurance. A Party fails to provide acceptable Performance Assurance support as requested by the Secured Party pursuant to Section 6.

(c)    Breach of Agreement. Except for any breach or event described in Section 7.1(a) through (e) (the exclusive remedies for which are specified in Section 7.2) or Section 7.3, and except for any event described in Section 8.1(a) and (b) above, a Party fails to perform or repudiates any material obligation to the other Party under this Agreement or breaches any representation, covenant or warranty in any material respect under this Agreement and, in each case, if capable of being cured, is not cured to the satisfaction of the other Party in its sole discretion, within two (2) New York Banking Days following receipt of written notice to such Party that corrective action is needed.

(d)    Default Under Other Trading Agreements. If specified as applicable in the Cover Sheet, a Party, any Credit Support Provider of such Party, or any applicable Specified Affiliate of such Party:

(i)    fails to make payment when due under any trading agreement (that is not a Transaction under this Agreement) with the other Party, any Credit Support Provider of such other Party or any Specified Affiliate of such other Party, including any agreement to purchase, sell or exchange CFP Credits or any other commodities or any agreement in respect of an interest rate transaction, equity transaction, bond transaction, foreign exchange transaction, credit protection transaction, repurchase transaction, buy/sell-back transaction, securities lending transaction, forward transaction, any transaction similar to the foregoing, any swap, forward, future, option or other derivative transaction with respect to the foregoing or any combination of these transactions (each, an "Other Trading Agreement") within the cure period for payment defaults specified therein, or if no period is provided, within two (2) New York Banking Days following receipt of a demand for payment by the other Party; or

(i)    commits or suffers an Event of Default or other similar event or condition, fails to perform or repudiates any obligation to the other Party, any Credit Support Provider of such other Party or any Specified Affiliate of such other Party under any Other Trading Agreement, or breaches any representation, covenant or warranty in any material respect under any Other Trading Agreement;

and, in the case of either of subclauses (i) or (ii) above, (1) such failure, breach or default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to such Other Trading Agreement; and (2) the aggregate amount owed by the Defaulting Party in respect of the liquidation of, acceleration of obligations under or early termination of all transactions outstanding under the documentation applicable to such Other Trading Agreement(s) is not less than the Aggregate Delinquency Amount applicable to such Party (it being agreed that the failure to make a payment or delivery the value of which exceeds the Aggregate Delinquency Amount on the last payment or delivery date of an Other Trading Agreement transaction where that transaction is the only transaction outstanding under the applicable documentation will satisfy conditions (1) and (2));

(e)   Cross Default. A default, Event of Default or other similar condition or event occurs and is continuing in respect of a Party or its Credit Support Provider (if any) under one or more agreements or instruments, individually or collectively, relating to indebtedness for borrowed money in an aggregate amount of not less than the Threshold Amount applicable to such Party and which results in such indebtedness becoming, or becoming capable at such time of being declared, immediately due and payable; or (ii) a Party or its Credit Support Provider (if any) fails to make on the due date thereof one or more payments, individually or collectively, in an aggregate amount of not less than the Threshold Amount applicable to such Party.

(f)   Designated Event. A Designated Event occurs with respect to a Party or its Credit Support Provider (if any), and the creditworthiness of the Party or its Credit Support Provider or, if applicable, the successor, surviving or transferee entity of the Party or its Credit Support Provider (as applicable) is materially weaker than that of the Party or its Credit Support Provider immediately prior to such Designated Event.

(g)   Credit Support Failure. A Party's guarantor or other provider of credit support for such Party (a "Credit Support Provider") with respect to the Party, if any, (i) fails to satisfy, perform or comply with any agreement or obligation to be complied with or performed by it in accordance with the credit support document and such failure continues after any applicable grace or notice period, (ii) makes any representation or warranty that proves to be incorrect or misleading in any material respect when made in connection with such Performance Assurance and/or credit support document, or (iii) repudiates, disclaims, disaffirms or rejects, in whole or in part, any obligation under, or challenges the validity of, its Performance Assurance and/or credit support document.

(h)   Bankruptcy. A Party or its Credit Support Provider, if any, is or becomes Bankrupt.

(i)   Merger Without Assumption. If a Designated Event (as such term is defined in 1.1(u) and notwithstanding the reference to Section 8.1(f) therein)  occurs with respect to a Party or any Credit Support Provider of such Party and:

(i)   the resulting, surviving or transferee entity fails to assume all the obligations of such Party or such Credit Support Provider under this Agreement or any credit support document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other Party to this Agreement; or

(i)   the benefits of any credit support document fail to extend (without the consent of the other Party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

## 9.   TERMINATION AND LIQUIDATION

9.1   Notwithstanding any other provision of this Agreement or the existence of any Performance Assurance, if at any time an Event of Default has occurred and is continuing with respect to a Party (such Party, the "Defaulting Party"), the other Party (the "Performing Party") may, in its sole discretion, designate a date (not earlier than the date of such notice and not later than twenty (20) days after the date of such notice (an "Early Termination Date")) on which to terminate, liquidate and accelerate all outstanding Transactions and calculate a Termination Payment (as defined below) in the manner set forth in Section 9.2 and Section 9.3. To the extent that, in the reasonable opinion of the Performing Party, certain Transactions may not be liquidated and terminated under Applicable Law on the Early Termination Date, such Transactions shall be terminated as soon thereafter as is reasonably practicable, in which case the actual termination date for such Transactions will be the Early Termination Date in respect thereof for purposes of Section 9.2.  Notwithstanding the foregoing, if the Defaulting Party is governed by a system of law that does not permit termination to take place after the occurrence of an Event of Default described in Section 8.1(h), then no prior notice shall be required upon the occurrence of such Event of Default, in which case the Early Termination Date shall be deemed designated immediately preceding the occurrence of such event.

9.2   On or as soon as reasonably practicable following the Early Termination Date, the Performing Party shall determine the final amount payable between the Parties under this Agreement as provided in this Section 9.2 (the "Termination Payment") and shall provide notice of the Termination Payment to the Defaulting Party. The Performing Party shall calculate the Termination Payment by (a) valuing each Transaction at its Market Value as reasonably determined by the Performing Party as of the Early Termination Date and then determining the amount by which such then prevailing Market Value differs from the Contract Value (it being understood that (i) in the event the prevailing Market Value of a Transaction exceeds the Contract Value, the difference in value shall be due from Seller to Buyer, and (ii) in the event that the prevailing Market Value of a Transaction is less than the Contract Value, the difference in value shall be due from Buyer to Seller), (b) determining any other damages, costs or expenses incurred by the Performing Party as a result of the early termination of such Transactions including those contemplated by Section 9.4 (without duplication and subject always to Section 13.1), (c) determining any other amounts payable from one Party to the other Party under this Agreement (including amounts due in respect of CFP Credits Initiated and Accepted hereunder) and (d) netting or aggregating the foregoing amounts into a single liquidated amount.  If the Defaulting Party owes the Termination Payment to the Performing Party, then, within one (1) New York Banking Day of the date upon which the Performing Party's notice of the Termination Payment is effective, the Defaulting Party shall pay the Termination Payment, less the value of any Performance Assurance or other collateral or credit support held by the Performing Party with respect to which the Performing Party has notified the Defaulting Party in writing of its election to exercise its setoff rights under Section 9.3. If the Performing Party owes the Termination Payment to the Defaulting Party, then, within one (1) New York Banking Day of the date upon which the Performing Party's notice of the Termination Payment is effective, the Performing Party shall pay the Termination Payment, less the value of any Performance Assurance or other collateral or credit support held and not returned by the Defaulting Party.

9.3   **Closeout Setoff**

Option A (Bilateral Setoff)

If no option or Option A is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 9.1, and the Termination Payment is payable to the Defaulting Party, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment any amounts ("Other Amounts") payable by the Defaulting Party to the Performing Party under any other agreements, instruments or undertakings between the Defaulting Party and the Performing Party (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option B (Triangular Setoff)

If Option B is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 9.1, and the Termination Payment is payable to the Defaulting Party, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment any amounts ("Other Amounts") payable by the Defaulting Party to the Performing Party or any of the Performing Party's Affiliates under any other agreements, instruments or undertakings between the Defaulting Party and the Performing Party or any of its Affiliates (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option C (Rectangular Setoff)

If Option C is specified as applicable in the Cover Sheet, then the following provision shall apply:

If the Performing Party elects to designate an Early Termination Date under Section 8.1, the Performing Party shall be entitled, at its option and in its discretion (and without prior notice to the Defaulting Party), to setoff against such Termination Payment (whether such Termination Payment is payable to the Performing Party or to the Defaulting Party) any amounts ("Other Amounts") payable between the Defaulting Party or any of its Affiliates and the Performing Party or any of its Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or any of its Affiliates to the Performing Party or any of its Affiliates (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so setoff, those Other Amounts will be discharged promptly and in all respects. The Performing Party will give notice to the other Party of any setoff effected under this Section 9.3. For this purpose, either the Termination Payment or the Other Amounts (or the relevant portion of such amounts) may be converted by the Performing Party into the currency in which the other is denominated at the rate of exchange at which the Performing Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Option D (No Setoff)

If Option D is specified as applicable in the Cover Sheet, then no setoff provisions shall apply.

9.4     No delay or failure on the part of a Performing Party to exercise any right or remedy shall constitute an abandonment of such right or remedy, and the Performing Party shall be entitled to exercise such right or remedy at any time after an Event of Default has occurred, so long as such Event of Default is continuing. The Defaulting Party shall indemnify and hold harmless the Performing Party for and against any and all reasonable out-of-pocket expenses incurred by the Performing Party by reason of the enforcement of and protection of its rights under this Agreement or as a result of the early termination of any Transactions, including reasonable attorney's fees and costs of collection.

9.5     **Grant of Security Interest/Remedies**

To the extent a Party requires Performance Assurance and/or has received a credit support document under this Agreement, then the Posting Party hereby grants to the Secured Party a present and continuing security interest in same. Upon or at any time after the designation or deemed designation of an Early Termination Date, the Defaulting Party must return all remaining Performance Assurance transferred to it pursuant to this Agreement, as applicable, and all proceeds resulting therefrom or the liquidation thereof.

9.6     **Suspension of Performance**

Notwithstanding any other provision of this Agreement, if (a) an Event of Default or (b) an event that, with the lapse of time or the giving of

ERM_ORG_000208

notice or both, would constitute an Event of Default shall have occurred and be continuing, the Performing Party, upon written notice to the Defaulting Party, shall have the right (i) to suspend performance under any or all Transactions; provided, however, in no event shall any such suspension continue for longer than ten (10) New York Banking Days with respect to any single Transaction, unless an Early Termination Date shall have been declared and notice thereof given pursuant to Section 9.1, and (ii) to the extent an Event of Default shall have occurred and be continuing, to exercise any remedy available at law or in equity.

**9.7**    **Bankruptcy Acknowledgements**

The Parties intend that each Transaction shall constitute a "forward contract" under § 101(25) and a swap agreement under § 101(53b) of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended from time to time (the "Bankruptcy Code"), and that this Agreement constitutes a "master netting agreement" under § 101(38a) of the Bankruptcy Code, and that the rights of the Performing Party in Section 9 include the rights referred to in § 561(a) of the Bankruptcy Code. Further, the Parties intend that each Party shall be a "forward contract merchant" under § 101(26) and a "master netting agreement participant" under § 101(38B), for purposes of the Bankruptcy Code.

**10.**    **FORCE MAJEURE**

**10.1**    Subject to Section 10.2, a Party shall be excused from the performance of its obligations with respect to a Transaction to the extent its performance of such obligations is prevented, in whole or in part, due to the occurrence of any event or circumstance, whether foreseeable or unforeseeable, that is reasonably beyond the control of such Party and which, by the exercise of due diligence, such Party could not have remedied, avoided or overcome (any such event, a "Force Majeure"), which may include, without limitation, any of the following events:

(a)    Compliance with Applicable Law, provided however, that Seller shall not be excused from performance where the CFP Credits it Initiates or intends to Initiate are Invalid under the CFP Regulations;

(b)    Hostilities of war (declared or undeclared), embargoes, blockades, civil unrest, riots or disorders, acts of terrorism, or sabotage;

(c)    Fires, explosions, lightning, maritime peril, collisions, storms, landslides, earthquakes, floods, and other acts of nature;

(d)    Strikes, lockouts, or other labor difficulties (whether or not involving employees of Seller or Buyer); provided, however, that the decision to settle a strike or other labor difficulties shall be wholly within the discretion of the Party facing such difficulty; or

(e)    Disruption or breakdown of production or transportation facilities, equipment, labor or materials, including, without limitation, the closing of harbors, railroads orpipelines.

For purposes of this Agreement, the term "Force Majeure" expressly excludes (i) a failure of performance of any person other than the Parties, except to the extent that such failure was caused by an event that would otherwise satisfy the definition of a Force Majeure event as set forth in this Section 10, (ii) the loss of Buyer's market or any market conditions for any CFP Credits that are unfavorable for Buyer or Seller, (iii) the loss of Seller's intended supply of CFP Credits, (iv) the failure of Seller's intended supplier of CFP Credits to perform, (v) any failure by a Party to apply for, obtain or maintain any permit, license, approval or right of way necessary under Applicable Law for the performance of any obligation hereunder, and (vi) a Party's inability to economically perform its obligations under this Agreement.

CFP Online System Unavailability. In the event that the CFP Online System is disrupted or unavailable, the affected obligations of the parties will be suspended (but not discharged) until the CFP Online System is not disrupted and is available.

**10.2**    Notwithstanding the provisions of Section 10.1, nothing contained in this Agreement shall relieve a Party of its obligation to make payments when due with respect to performance prior to the occurrence of a Force Majeure event, including Buyer's obligation to pay in full the purchase price or any other amounts due for the CFP Credits actually Initiated and Accepted hereunder.

**10.3**    In the event that a Party believes a Force Majeure event has occurred that will require it to invoke the provisions in this Section 10, such Party shall use commercially reasonable efforts to give prompt oral notice to the other Party followed by written notice within two (2) New York Banking Days following the occurrence of such event, of the underlying circumstances of the particular causes of Force Majeure, the expected duration thereof and the volume of the CFP Credits affected. The Party claiming Force Majeure shall also use commercially reasonable efforts to give the other Party such notice of cessation of the Force Majeure event and the date when performance is expected to resume.

**10.4**    Notwithstanding anything to the contrary in this Agreement, (a) if an event or circumstance which would otherwise constitute or give rise to a Force Majeure event under this Section 10 also constitutes an Event of Default other than an Event of Default under Section 8.1(h), it will be treated as a Force Majeure event and not as an Event of Default; and (b) if an event or circumstance which would otherwise constitute or give rise to a Force Majeure event under this Section 10 also constitutes an Event of Default under Section 8.1(h), it will be treated as an Event of Default and not as a Force Majeure event.

**10.5**    If Initiations and Acceptances in respect of a Term Transaction are suspended pursuant to this Section 10 and said suspension continues for a period of thirty (30) days or more, such Term Transaction may be terminated at the option of (a) either Party, if the "Force Majeure Termination Payment" provision is specified as applicable in the Cover Sheet, or (b) the Party that is not claiming Force Majeure, if the Force Majeure Termination Payment provision is not specified as applicable in the Cover Sheet, in either case, by giving written notice to the other Party.  If a Party terminates a Term Transaction pursuant to this Section 10.5, neither Party shall have any further liability to the

ERM_ORG_000209

other Party hereunder with respect to such Term Transaction except for (a) any payment or indemnification obligations arising in respect of the performance of such Term Transaction prior to the date of termination and (b) if the Force Majeure Termination Payment provision is specified as applicable in the Cover Sheet, the obligation to make a Force Majeure Termination Payment, if any, pursuant to such provision.

## 11.    GOVERNING LAW AND SETTLEMENT OF DISPUTES

11.1    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to its choice of law doctrine, but without prejudice to the provisions of § 5-1401 of the General Obligations Law of the State of New York. The Parties hereby submit to the exclusive jurisdiction of any federal court of competent jurisdiction, or, if any federal court declines to exercise or does not have jurisdiction, in any New York state court situated in New York City, Borough of Manhattan, and to service of process by certified mail delivered to the Party at its last designated address. Each Party waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any proceedings relating to this Agreement.

11.2    The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

## 12.    TAXES

12.1    **Tax Obligations Generally**

Each Party shall be responsible for any taxes that may be imposed on it arising from the sale or purchase, respectively, of CFP Credits pursuant to any Transaction.

## 13.    LIMITATION OF LIABILITY

13.1    NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES OR FOR LOST PROFITS OR ANY FINES OR PENALTIES ASSESSED BY ANY GOVERNMENTAL AUTHORITY INCLUDING, BUT NOT LIMITED TO, FINES OR PENALTIES UNDER THE CFP REGULATIONS (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY EXCEPT TO THE EXTENT THAT THE PAYMENTS REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT (INCLUDING PAYMENTS REQUIRED TO BE MADE PURSUANT TO SECTIONS 7, 9 AND 19) ARE DEEMED TO BE SUCH DAMAGES. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY. EACH PARTY SHALL TAKE REASONABLE STEPS TO MITIGATE DAMAGES FROM ANY BREACH HEREOF.

## 14.    ASSIGNMENT

14.1    This Agreement shall not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, such consent not to be unreasonably withheld. Any assignment in violation of this provision shall be void and of no legal effect. Subject to this Section 14, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

14.2    Notwithstanding anything to the contrary in Section 14.1, either Party may, without the other Party's consent, transfer, sell, pledge, encumber or assign such Party's right and interest in and to the accounts, revenues, or proceeds of this Agreement in connection with any financing or other financial arrangement.  For the avoidance of doubt, all payment obligations under this Agreement will be satisfied if the relevant payment is made to the account of the other Party and the foregoing sentence shall not require a Party to make payments to any third party, unless otherwise agreed in writing.

## 15.    NON-WAIVER

15.1    No waiver by either Party of any breach by the other Party of any of the representations, covenants, warranties, terms or conditions of this Agreement shall be construed as a waiver of any succeeding breach of the same or of any other covenant or condition hereof.

## 16.    ENTIRE AGREEMENT; AMENDMENTS

16.1    No statement or agreement, oral or written, made prior to the signing of this Agreement, shall vary or modify the written terms hereof. Neither Party shall claim any amendment to, modification of, or release from any provisions of this Agreement, whether set out in an annex, schedule, supplement or Confirmation or otherwise, unless such amendment, modification or release is in writing, is signed by the Parties and specifically states that it is an amendment to, modification of, or release from this Agreement or one or more Transactions.

## 17.    NOTICES

17.1    All notices and other communications under this Agreement shall be deemed given on the date of the addressee's receipt thereof and shall be given only in writing by letter, facsimile or electronic data transmission. Provided that if transmitted by facsimile or electronic data transmission and it is received after close of business on a New York Banking Day, it shall be deemed to have been received on the following New York Banking Day.

ERM_ORG_000210

**18.**     **WRITTEN CONFIRMATIONS**

**18.1**    The Parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation may be generated electronically by an electronic confirmation matching service or be executed and delivered in counterparts (including by facsimile transmission or by other means agreed between the Parties), which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.

**18.2**    Absent the availability of an electronic confirmation matching service, the Confirming Party shall confirm a Transaction by forwarding a written Confirmation to the other Party (via facsimile or other means agreed between the Parties) within five (5) New York Banking Days after the Trade Date. If the other Party objects to any term(s) of such written Confirmation, it shall notify the Confirming Party in writing of such objection within ten (10) calendar days of the Party's receipt thereof. If the other Party fails to object within ten (10) calendar days, such failure shall be deemed acceptance of the terms, absent manifest error.

**19.**     **NEW OR CHANGED LAWS OR REGULATIONS**

**19.1**    **Material Adverse Effect**

If this Section 19.1 is specified as applicable in the Cover Sheet, then the following provision shall apply to Transactions under this Agreement:

It is understood by the Parties that each Party is entering into this Agreement in reliance on the Applicable Laws in effect on the date hereof. In the event that at any time, and from time to time, during the term of this Agreement any Applicable Laws are changed or new Applicable Laws are promulgated and have a material adverse economic effect upon either Party (such Party being the "Affected Party"), and such event does not constitute a Force Majeure, the Affected Party shall have the option (the "Renegotiation Option") to request renegotiation of the Price or other terms of the affected transaction(s) (the "Affected Transactions"). The Renegotiation Option may be exercised by the Affected Party within a commercially reasonable period of time after such changed or new Applicable Law is promulgated, by written notice of the Affected Party's desire to renegotiate, such notice to contain specific information about the new or changed Applicable Law and how it has a material adverse economic effect upon the Affected Party and the new Price or terms desired by the Affected Party to remedy or reverse such material adverse economic effect (the "Renegotiation Notice").

The issue as to whether the changed or new Applicable Law has a material adverse economic effect on the Affected Party shall be submitted promptly for resolution to an Expert, provided that the other Party shall have the option to agree that there has been a material adverse economic effect and waive its right to an Expert resolution at any time. The cost of the Expert shall be shared equally between the Parties. The Expert shall determine that the Applicable Law either has a material adverse economic effect or does not. The Expert's decision (the "Expert's Decision") shall be final and binding, absent fraud, and shall be provided to the Parties in the form of a report prepared by the Expert that contains facts and other data supporting the Expert's Decision. If the Expert's Decision concludes that the new or changed Applicable Law has a material adverse economic effect on the Affected Party, then the Parties shall in good faith renegotiate the Price or other terms in order to appropriately address the material adverse economic effects of the new or changed Applicable Laws.

If an Expert does not provide an Expert's Decision within thirty (30) days after receipt of the Renegotiation Notice by the other Party, or such other time period as agreed between the parties, the new or changed Applicable Law shall be deemed to have a material adverse economic effect on the Affected Party. If the Parties fail to agree upon a new Contract Price or terms satisfactory to both Parties within thirty (30) days after the other Party receives the Renegotiation Notice, or such other time period as agreed between the parties, the Affected Party shall have the right to terminate the Affected Transactions as of the end of the applicable thirty (30) day period (the "Termination Date") by giving written notice thereof to the other Party on or before such Termination Date in which case each Party shall make a determination of the Termination Value of the Affected Transactions within three (3) New York Banking Days of the Termination Date. The amount payable in settlement of the termination of the Affected Transactions (the "Settlement Amount") shall equal the sum of (i) one-half of the difference between the Termination Values calculated by the two Parties, and (ii) the lesser of such two Termination Values. If either Party disputes the resulting Settlement Amount as commercially unreasonable by written notice to the other Party within five (5) New York Banking Days of the Termination Date, each Party shall appoint one Independent Dealer to make a determination regarding whether the Settlement Amount is commercially reasonable. If both Independent Dealers agree that the Settlement Amount is commercially reasonable, then that value shall be final and binding and shall be paid promptly by the Party owing the Settlement Amount to the other Party. If one or more of the Independent Dealers determines that the Settlement Amount is not commercially reasonable, then each Independent Dealer will make an alternative determination of the Termination Value, and the amount payable between the Parties with respect to Affected Transactions (the "Alternative Settlement Amount") will be an amount equal to the sum of (i) one-half of the difference between the alternative Termination Values calculated by the two Independent Dealers, and (ii) the lesser of such two alternative Termination Values.

Each Party's and, if applicable, each Independent Dealer's, determination of the Termination Value shall not take into account changes to the economics of the Affected Transactions that would result from the new or changed Applicable Laws.

In the event that the first Independent Dealer approached by a Party refuses to act as Independent Dealer for purposes of dispute resolution hereunder, the Party will approach at least one additional Independent Dealer to assess whether it would be willing to act as Independent Dealer for purposes of dispute resolution hereunder. If either Party is unable to find an Independent Dealer willing to make a determination of the Termination Value for purposes of dispute resolution after approaching at least two Independent Dealers, then the originally determined Settlement Amount shall be deemed final and binding.

ERM_ORG_000211

Upon the successful appointment of an Independent Dealer, each of the Parties may submit written support for the Transaction Value determined by such Party to the Independent Dealer. Copies of all information submitted by a Party to any Independent Dealer shall be provided to the other Party.

Any CFP Credits Transferred within thirty (30) days of the Renegotiation Notice shall be provisionally invoiced and paid, but will be subject to adjustment based on the renegotiated price or terms, if agreement is reached on price or terms.

**19.2    Disrupted Transactions**

If this Section 19.2 is specified as applicable in the Schedule, then the following Provisions shall apply to Transactions under this Agreement:

If the price of a Transaction is based on an industry reference index (the "Original Index") that ceases to be published or is not published for any period applicable to calculation of the Reference Price of one or more Transactions (the "Disrupted Transactions"), the Parties shall in good faith (a) select an alternative index that reflects as nearly as possible the same information as published in the Original Index; or (b) negotiate an interim Reference Price for the Disrupted Transaction until the Original Index recommences publishing or an alternative index can be identified to replace the Original Index. In the event the Parties are unable to agree on an alternative index or otherwise agree on a price within ten (10) days after the Original Index ceases to be published or is not published for any period applicable to calculation of the Reference Price of a Disrupted Transaction, then the issue shall be promptly submitted to an Expert for resolution. The cost of the Expert shall be shared equally between the Parties.  Upon appointment of the Expert, each Party shall submit to the Expert its determination of the Price for the Disrupted Transaction. The Expert shall select from the two submissions the Price that it determines best reflects the Price that would have applied to the Disrupted Transaction based on the Original Index in the absence of its disruption. The Expert's decision shall be final and binding, absent fraud, and shall be provided to the Parties in the form of a report that contains the facts and other data supporting the Expert's decision. The Expert's decision shall be provided to the Parties within thirty (30) days after the Original Index ceases to be published or is not published for any period applicable to calculation of the Reference Price of a Disrupted Transaction.

**20.    MISCELLANEOUS**

**20.1    Severability**

If any Governmental Authority of competent jurisdiction declares any provision of this Agreement unlawful, void or unenforceable, such provision will not invalidate, void or make unenforceable any other provision of this Agreement.  The remaining terms and conditions shall remain in full force and effect, and the Parties will negotiate in good faith to reform this Agreement in order to give effect to the original intention of the Parties.

**20.2    Recording of Conversations**

Each Party hereby acknowledges to the other Party and consents that such other Party from time to time and without further notice and to the extent permitted by law:

(a)    may record and retain electronic transmissions (including telephone conversations, e-mail and instant messaging) between the Parties' respective commercial marketing traders, marketers, schedulers and operations personnel in connection with this Agreement or any Transaction on central and local databases for their respective legitimate business purposes;

(b)    may monitor electronic transmissions through their internal and external networks for purposes of security and compliance with Applicable Laws, regulations and internal policies for their other legitimate business purposes; and

(c)    will comply with all Applicable Laws relating to the recording of electronic transmissions.

Without limiting the foregoing, each Party will notify all of its respective commercial marketing traders, marketers, schedulers and operations personnel who engage in these electronic transmissions of such recording and shall obtain their prior consent to such recording.

**20.3    No Third Party Beneficiaries**

Nothing expressed or implied in this Agreement is intended to create any rights, interests, obligations or benefits under this Agreement in any person other than the Parties and their respective successors and permitted assigns.

**20.4    Ethics**

Each Party warrants that neither the Party nor its directors, employees, agents, or subcontractors have given commissions, rebates, payments, kickbacks, or lavish or expensive gifts, entertainments or other things of value (individually and collectively referred to as "Inappropriate Payments") to any director, employee, agent, or subcontractor of the other Party in connection with the Agreement and acknowledges that the giving of Inappropriate Payments may result in the cancellation of this and all other future Agreements. Each Party will notify the other Party of any such Inappropriate Payments by any of its directors, employees, agent or subcontractors.

**20.5    Counterparts**

ERM_ORG_000212

DocuSign Envelope ID: FF4FED1A-BE76-4AA9-B93A-7D2B4F54480D

This Agreement (including any Confirmation) may be executed in any number of counterparts and by different Parties in separate counterparts, any of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

**20.6    Confidentiality**

The contents of this Agreement, any Transaction, and all other documents relating to this Agreement, and any information made available by one Party or its Credit Support Provider to the other Party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either Party), except for such information:

(a)    as may become generally available to the public;

(b)    as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard;

(c)    as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing Party or its Credit Support Provider;

(d)    to the extent necessary to comply with a Governmental Authority's request or reporting requirements, but both Parties shall submit all information to a Governmental Authority as confidential business information; or

(e)    as may be furnished to a Party's Affiliates, partners, directors, officers, employees, agents, consultants, auditors, banks, attorneys, or advisors who are required to keep the information in confidence.

Notwithstanding the foregoing, a Party may disclose any one or more of the commercial terms of a Transaction to any industry price source for the purpose of aggregating and reporting such information in the form of a published energy price index, provided that such information does not include the identity of the other Party to a Transaction.

With respect to information provided with respect to a Transaction, this obligation shall survive for a period of one (1) year following the expiration or termination of such Transaction. With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the termination of this Agreement.

**21.    PRIOR TRANSACTIONS**

Any transaction entered into between the parties, now existing or hereafter, identified as a Transaction in this Agreement or the relevant Confirmation, whether before, on or after the effective date of this Agreement, is incorporated into this Agreement by reference, shall be a Transaction hereunder and shall be subject to the terms herein

**22.    TERMINATION**

**22.1**    This Agreement may be terminated by either Party upon thirty (30) days' prior written notice of a Party's decision to terminate; provided however, that this Agreement shall remain in effect with respect to any Transactions entered into prior to such termination. The obligations of either Party to make payment hereunder or with respect to any Transactions entered into prior to the effective date of such termination, including any related adjustments, shall survive the termination of this Agreement.

ERM_ORG_000213

DocuSign Envelope ID: F54FED1A-BE76-44A9-858A-7D2B4F54180B

**EXHIBIT 1**
**SAMPLE FORM OF CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | *** |
| **Attention:** | *** |
| **Phone Number:** | *** |
| **Facsimile Number:** | *** |
| **Email Address:** | *** |
| **Date:** | *** |
| **Reference:** | *** |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *LEAP Master Agreement for the Purchase  and Sale of  CFP Credits* dated as of_____, as amended and supplemented by agreement in writing from time to time (the **"LEAP CFP Agreement"**) between  Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the LEAP CFP Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the LEAP CFP Agreement.

**TRADE DATE: ***

**SELLER:** [Name and Address]

**BUYER:** [Name and Address]

**QUANTITY: *** CFP Credits.**

**TRANSFER PERIOD: ***

**CONTRACT PRICE: US$ ***/ CFP Credit**

**CONTRACT AMOUNT: US$ ***

**PAYMENT DUE DATE: ***

**SPECIAL CONDITIONS:**

………………………………… (Seller)                         ………………………………….(Buyer)

By:                                                                        By:

Name:                                                                    Name:

Title :                                                                     Title:

ERM_ORG_000214

**EXHIBIT 2**
**SAMPLE FORM OF INVOICE FOR CFP CREDITS TRANSACTION**

**To:**                           \*\*\*
**Attention:**                    \*\*\*
**Phone Number:**                 \*\*\*
**Facsimile Number:**             \*\*\*
**Email Address:**                \*\*\*
**Date:**                         \*\*\*
**Invoice Number**                \*\*\*
**Invoice Date:**                 \*\*\*

**TRADE DATE: \*\*\***

**SELLER:** [Name and Address]

**SELLER'S FEIN NUMBER:**
**BUYER:** [Name and Address]

**BUYER'S FEIN NUMBER:**
**QUANTITY:** \*\*\* CFP Credits.

**TRANSFER DATE: \*\*\***


**CONTRACT PRICE: \*\*\***

**CONTRACT AMOUNT: \*\*\***


**SELLER BANKING DETAILS: \*\*\***

**PAYMENT DUE DATE: \*\*\***

ERM_ORG_000215

# COMPOSITE
# EXHIBIT 2

DocuSign Envelope ID: 545FB1D3-FB0-463B-A091-BD53DCBDE6E

**EXHIBIT 1**
**CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | Thompson Technical Services LLC |
| **Attention:** | Merlin Thompson |
| **Phone Number:** | 541-300-7268 |
| **Facsimile Number:** | *** |
| **Email Address:** | merlin@ttscharging.com |
| **Date:** | May 19, 2022 |
| **Reference:** | ERM 130723 |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *LEAP Master Agreement for the Purchase and Sale of CFP Credits* dated as of May 19, 2022, as amended and supplemented by agreement in writing from time to time (the **"LEAP CFP Agreement"**) between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the LEAP CFP Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the LEAP CFP Agreement.

**TRADE DATE:** May 19, 2022

**SELLER:** Thompson Technical Services dba TTS Charging 2424 NE HWY 101 Lincoln City Or 97367

**BUYER:** Elbow River Marketing LTD 1500, 335-8th AVE SW, Calgary, AB T2P1C9

**QUANTITY:** 12,000 CFP Credits.

**TRANSFER PERIOD:** Q4 2022

**CONTRACT PRICE:** US$ 112.00/ CFP Credit

**CONTRACT AMOUNT:** US$1,344,000.00

**PAYMENT DUE DATE:** Net Five (5) Business Days from receipt of invoice

Payment terms are subject to financial review and credit approval by Seller. Buyer agrees to prepay or post a letter of credit if reasonably quested by Seller. Failure to do so may result in Seller suspending deliveries.

**SPECIAL CONDITIONS:**


| | |
|---|---|
| Thompson Technical Services LLC | Elbow River Marketing LTD (Buyer) |
| By: *Merlin Thompson* | By: *Randy Richard* |
| Name: Merlin Thompson | Name: Randy Richard |
| Title : CEO | Title: Trader |

ERM_ORG_000193

**EXHIBIT 1**
**CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | Thompson Technical Services LLC |
| **Attention:** | Merlin Thompson |
| **Phone Number:** | 541-300-7268 |
| **Email Address:** | merlin@ttscharging.com |
| **Date:** | June 27, 2022 |
| **Reference:** | ERM 131443 |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *LEAP Master Agreement for the Purchase and Sale of CFP Credits* dated as of May 19, 2022, as amended and supplemented by agreement in writing from time to time (the **"LEAP LCFS Agreement"**) between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the LEAP CFP Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the LEAP LCFS Agreement.

**TRADE DATE:** June 27, 2022

**SELLER:** Thompson Technical Services LLC, dba TTS Charging, 2424 NE HWY 101, Lincoln City, OR 97367, USA

**BUYER:** Elbow River Marketing LTD, 1500, 335-8th AVE SW, Calgary, AB T2P1C9, Canada

**QUANTITY:** 4,000 LCFS Credits

**TRANSFER PERIOD:** June 2022

**CONTRACT PRICE:** US$ 111.00 / LCFS Credit

**CONTRACT AMOUNT:** US$ 444,000.00

**PAYMENT DUE DATE:** Net five (5) Business Days from receipt of invoice

Payment terms are subject to financial review and credit approval by Seller.

**SPECIAL CONDITIONS:**

| **Thompson Technical Services LLC (Seller)** | **Elbow River Marketing LTD (Buyer)** |
|---|---|
| By: *Merlin Thompson* | By: *Chelsea Erhardt* |
| **Name:** Merlin Thompson | **Name:** Chelsea Erhardt |
| **Title:** CEO | **Title:** Trader, Compliance & Renewable Fuels |

Page **1** of **1**

ERM_ORG_000245

# EXHIBIT 3

**Oregon**

Kate Brown, Governor

**Department of Environmental Quality**
**Office of Compliance and Enforcement**
700 NE Multnomah Street, Suite 600
Portland, OR  97232-4100
(503) 229-5696
FAX (503) 229-5100
TTY 711

September 30, 2022

CERTIFIED MAIL: 7020 2450 0000 3349 5277

Elbow River Marketing USA Ltd
c/o CT Corporation System, Registered Agent
780 Commercial Street SE, Suite 100
Salem, OR 97301

Re:     Notice of Final Determination to Suspend Oregon Clean Fuels Program Credits, and Order
        Case No. AQ-CFP-HQ-2022-118

This letter is to inform you of DEQ's final determination and order to suspend Oregon Clean Fuels Program credits that were generated illegitimately by another registered party and purchased by you.

The credits were generated by Thompson Technical Services LLC (TTS), when TTS submitted false information to the Oregon Fuels Reporting System (OFRS) regarding the amount of electricity dispensed by TTS's electric vehicle chargers. In a separate action, DEQ is ordering TTS to purchase 16,000 legitimate credits by October 31, 2022. The order requires TTS to use an administrative process outside the OFRS to turn in those legitimate credits to replace the illegitimate credits that TTS generated and transferred to you. You are receiving the enclosed Notice of Final Determination to Suspend Oregon Clean Fuels Program Credits, and Order (Notice) because DEQ is suspending the 16,000 illegitimate credits currently held in your OFRS account, until TTS takes the action ordered by DEQ, or until DEQ determines that TTS is unlikely to replace the credits.

If DEQ determines that TTS is unlikely to replace the credits, then DEQ will initiate a new process under OAR 340-253-0670 to invalidate the 16,000 illegitimate credits in your OFRS account. You will have an opportunity to provide information to DEQ and a right to a contested case hearing regarding DEQ's determination and the removal of the credits from your OFRS account.

If you wish to appeal this matter, DEQ must receive a request for a hearing within 20 calendar days from your receipt of this letter. <u>The hearing request must be in writing</u>. Send your request to DEQ Office of Compliance and Enforcement:

> Via mail – 700 NE Multnomah Street, Suite 600, Portland, Oregon 97232
> Via email – DEQappeals@deq.oregon.gov
> Via fax – 503-229-6762

Once DEQ receives your request, we will arrange to meet with you to discuss this matter. If DEQ does not receive a timely written hearing request, the order will become final. The administrative hold on the 16,000 illegitimate credits in your OFRS account, communicated in DEQ's August 12, 2022, Initial Determination, will remain in effect until the order becomes final.

Elbow River Marketing USA Ltd
Case No. AQ-CFP-HQ-2022-118
Page 2

The attached Notice further details DEQ's reasons for issuing the final determination and order and provides further instructions on how to appeal. <u>Please review and refer to it when discussing this case with DEQ.</u>

DEQ's rules are available at http://www.oregon.gov/deq/Regulations/Pages/Statutes.aspx or by calling the number below.

If you have any questions, please contact Becka Puskas at 503-229-5058 or toll free in Oregon at 800-452-4011, extension 5058.

Sincerely,

Colin McConnaha, Manager
Office of Greenhouse Gas Programs

Enclosure

cc:     Tariq Remtulla, Attorney for Elbow River Marketing USA Ltd (Tariq.Remtulla@parkland.ca)
        Stephanie Summers, DEQ
        Bill Peters, DEQ
        Cory Ann Wind, DEQ
        Accounting, DEQ

BEFORE THE ENVIRONMENTAL QUALITY COMMISSION

OF THE STATE OF OREGON

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | NOTICE OF FINAL DETERMINATION |
| | ) | TO SUSPEND OREGON CLEAN FUELS |
| ELBOW RIVER MARKETING USA LTD, | ) | PROGRAM CREDITS, AND ORDER |
| an Delaware corporation, and | ) | |
| | ) | |
| Respondent. | ) | CASE NO. AQ-CFP-HQ-2022-118 |

## I. AUTHORITY

The Department of Environmental Quality (DEQ) issues this Notice of Final Determination to Suspend Oregon Clean Fuels Program Credits, and Order (Notice) pursuant to Oregon Revised Statutes (ORS) 468.100, ORS 468.126 through 468.140, 468A.265 through 468A.277, ORS Chapter 183 and Oregon Administrative Rules (OAR) Chapter 340, Divisions 011, 012, and 253.

## II. FINDINGS OF FACT

1.  Respondent Elbow River Marketing USA Ltd (Elbow River) is a registered party under the Oregon Clean Fuels Program. Elbow River is a marketing branch of Parkland Corporation, a supplier and marketer of fuels and petroleum products.

2.  Thompson Technical Services LLC (TTS) is a limited liability corporation registered to conduct business in Oregon. TTS operates under the assumed business name TTS Charging.

3.  Merlin Thompson (Thompson) is the owner, founder, Registered Agent, sole Member, and CEO of TTS.

4.  On June 14, 2021, TTS submitted to DEQ an application for registration as a credit generator under the Oregon Clean Fuels Program under the electricity fuel type. Thompson signed the application as the "Owner" and "Primary contact" for TTS. In the application, Thompson certified, "I understand that this information will be used by Oregon DEQ for purposes of compliance with OAR Chapter 340, Division 253."

\\\

5. On December 27 and 28, 2021, Thompson provided additional information to DEQ regarding three electric vehicle chargers located in Sheridan, Oregon.

6. On December 29, 2021, DEQ approved the application, and registered TTS as a credit generator under the Oregon Clean Fuels Program. The approval letter issued by DEQ states:

> This registration covers fuel dispensed for transportation use at your electric chargers located in Oregon. Individual chargers will need to be entered into the Oregon Fuels Reporting System (OFRS) using the Fuel Supply Equipment registration form prior to the electricity they dispense being reported.

> Effective the date of this registration approval, you are required to comply with the requirements under OAR 340 Division 253. Specifically, the requirements for:
> - Providers of electricity under OAR 340-253-0330.
> - Recordkeeping under OAR 340-253-0600
> - Reporting under OAR 340-253-0620, 0630 and 0650.

7. On February 6, 2022, TTS entered data regarding three non-residential electric vehicle chargers (the Three EV Chargers) into the Oregon Fuels Reporting System (OFRS) as follows:

    a. Facility Name: Valley Market (TTS-2325 Hwy 18)

    b. Address: 23325 HWY 18, Sheridan, OR, US 97378

    c. Charging Type: Non-Residential (DCFC-CCS and -CHAdeMO)

    d. Manufacturer: TPG 120KW

    e. Serial Nos: 20211260182, 20211260183, 20211260184

8. On May 19, 2022, a broker hired by TTS, and a broker for Elbow River arranged for the sale of 12,000 Oregon Clean Fuels program credits, at a price of $112 per credit, for delivery in the fourth calendar quarter of 2022.

9. On or about May 20, 2022, Thompson, on behalf of TTS, signed an agreement with Elbow River for the purchase and sale of the 12,000 credits described in Section II, paragraph 7, above. The agreement, which had an effective date of May 19, 2022, set the total sale price for the 12,000 credits at $1,344,000 (12,000 credits at $112/credit). The agreement includes a representation and warranty by the seller (TTS) that "each CFP Credit transferred to Buyer hereunder is valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a 'Credit' as defined by the Oregon

1    Clean Fuels Program Regulations."

2    10. On June 10, 2022, TTS submitted a quarterly Clean Fuels Program report to DEQ via the

3    OFRS for the time period from January 1, 2022, through March 31, 2022 (the Q1 2022 Report). In making

4    that submittal, Thompson, on behalf of TTS, certified as follows:

5

6    I, Merlin Thompson, as person with Signatory Authority, am submitting this report on behalf of Thompson Technical Services, LLC, with the understanding that the information contained in

7    this report is considered an official submission to Oregon Department of Environmental Quality for purposes of compliance with the Clean Fuels Program (CFP) regulation.

8

9    Furthermore, by submitting this report, I understand that I am bound by, and authenticate this record, and attest to the statements contained within. I also understand that submitting or

10    attesting to false statements may constitute a serious crime, punishable under the Oregon Penal Code, or other criminal offenses punishable under state, municipal, or federal law. I certify that

11    information supplied herein is correct and that I have the authority by the company identified herein to submit this report.

12

13    11. The Q1 2022 Report stated that TTS dispensed a total of 14,900,000 kilowatt hours (kWh) of

14    electricity to vehicles from the Three EV Chargers during Q1 2022.

15    12. The Three EV Chargers were not installed and operational during Q1 2022; they dispensed

16    zero kWh of electricity to vehicles during Q1 2022.

17    13. The amount of electricity reported by TTS for Q1 2022 exceeds what the Three EV

18    Chargers could dispense during a calendar quarter, even if they were actively charging EVs for every

19    hour of every day.

20    14. The Q1 2022 Report stated that the fuel pathway code for the Three EV Chargers is

21    ORELCCP22 (16.77), which corresponds to electricity provided by Consumers Power, Inc., with a carbon

22    intensity score of 16.77 grams of carbon dioxide equivalent per megajoule of energy (gCO2e/MJ).

23    15. Consumers Power, Inc. does not provide electricity to any customers in Sheridan, Oregon.

24    16. The electric utility serving Sheridan, Oregon, is PGE.

25    17. The correct fuel pathway code for electricity supplied by PGE is ORELC2002, with a carbon

26    intensity score of 146.02 gCO2e/MJ.

27    18.  TTS's submittal of the Q1 2022 Report in the OFRS generated 16,089 credits in the OFRS.

19. If TTS has used the PGE fuel pathway code described in Section II, paragraph 17, above, the submittal of the Q1 2022 Report would have generated 9,156 credits.

20. On June 24, 2022, Thompson emailed Elbow River and stated that TTS had 16,000 credits available to transfer. Elbow River responded that it would take 12,000 credits at the agreed to price of $112/credit, and would take the remaining 4,000 available credits at a price of $111/credit.

21. On June 25, 2022, Thompson signed a CFP Credit Transfer Form which stated that 4,000 credits would be transferred from TTS to Elbow River, at a price of $112/credit, on a proposed transfer date of June 26, 2022. Elbow River signed the CFP Credit Transfer Form and submitted it in the OFRS on June 27, 2022, with a note that the actual price of the transaction was $111/credit. The transaction was posted to the OFRS on June 27, 2022.

22. On June 26, 2022, Thompson signed a second CFP Credit Transfer Form which stated that 12,000 credits would be transferred from TTS to Elbow River, at a price of $112/credit, on a proposed transfer date of June 26, 2022. Elbow River signed the second CFP Credit Transfer Form and submitted it in the OFRS on June 27, 2022. The transaction was posted to the OFRS on June 27, 2022.

23. Both of the CFP Credit Transfer Forms described in Section II, paragraphs 21-22 above include a statement on the first page in red type as follows:

**Important:** This form must be used each time a credit transfer agreement has been made, regardless of the number of credits transferred and the price per unit credit. Only credits that have been generated and recognized in the CFP Online System can be traded, and transfers must be in compliance with the rules of OAR 340-253.

24. Both of the CFP Credit Transfer Forms described in Section II, paragraphs 21-22 above include the following certification: "By signing, each person below declares that all information provided herein are true and correct, and to the best of his/her knowledge and belief."

25. On or about June 27, 2022, Thompson, on behalf of TTS, and Elbow River signed a supplemental agreement to the agreement described in Section II, paragraph 9, above, for the purchase and sale of the 4,000 credits for a total sale price of $444,000 (4,000 credits at $111/credit).

\\\

1      26. On June 27, 2022, Thompson sent two invoices to Elbow River for the two transactions. The

2    first invoice, dated May 24, 2022, was in the amount of $1,344,000 for 12,000 Oregon CFP credits. The

3    second invoice, dated June 27, 2022, was in the amount of $444,000 for 4,000 Oregon CFP credits.

4      27. On July 4, 2022, Elbow River transferred $1,788,000 to TTS.

5      28. On August 12, 2022, pursuant to OAR 240-253-0670(3), DEQ issued a Notice of Initial

6    Determination and Placing of 16,000 credits on hold in your Clean Fuels Program Account (Notice of

7    Initial Determination) to Elbow River. The Notice of Initial Determination informed Elbow River that

8    DEQ was imposing a temporary administrative hold on the 16,000 credits that Elbow River had purchased

9    from TTS. The Notice of Initial Determination also requested information from Elbow River, to be

10   provided by no later than September 1, 2022.

11      29. On August 26, 2022, and September 27, 2022, Elbow River provided additional information in

12   response to DEQ's information request.

13               III. CONCLUSIONS

14      1.  TTS and Thompson submitted an inaccurate Clean Fuels Program quarterly report that

15   generated 16,089 illegitimate credits in violation of OAR 340-253-0330(9), OAR 340-253-0640(2)(b)

16   and OAR 340-253-1005(7)(a), as described in Section II, paragraphs 1-19, above. OAR 340-253-

17   0330(9) requires that credit generators, including owners or service providers of electric-charging

18   equipment, may generate clean fuel credits by complying with the registration, recordkeeping and

19   reporting requirements of OAR Chapter 340, division 253. OAR 340-253-0640(2)(b) requires that for

20   electricity, each public access charging station must report the amount of electricity dispensed in

21   kilowatt hours to vehicles. OAR 340-253-1005(7) requires registered parties to report accurately when

22   submitting information to the OFRS. In the Q1 2022 Report, TTS and Thompson reported to DEQ via

23   the OFRS that the Three EV Chargers had dispensed a total of 14,900,000 kWh of electricity to

24   vehicles in Q1 2022, when in fact the Three EV Chargers were not installed and operational and had

25   dispensed zero kWh of electricity to vehicles in Q1 2022. As described in Section II, paragraph 13,

26   above, the amount of electricity reported by TTS exceeds the physical capacity of the Three EV

27   Chargers. In addition, TTS and Thompson included an inaccurate fuel pathway code in the Q1 2022

1   Report. This inaccurate reporting resulted in the generation of 16,089 illegitimate credits, which are

2   invalid according to OAR 340-253-1005(7)(a).

3           2.   TTS and Thompson transferred 16,000 credits in violation of OAR 340-253-1005(8), as

4   described above in Section II, paragraphs 1-27, above. Specifically, TTS and Thompson used fraud to

5   transfer 16,000 credits to Elbow River in exchange for a total of $1,788,000, in violation of OAR 340-253-

6   1005(8)(a). On May 19, 2022, TTS and Thompson entered into an agreement with Elbow River to sell

7   12,000 credits to Elbow River in Q4 2022 for $112 per credit. After generating illegitimate credits in the

8   OFRS, on June 24, 2022, TTS and Thompson represented to the Elbow River that TTS had 16,000 credits

9   available to transfer, and that those credits were generated in compliance with the Clean Fuels Program

10  rules. In exchange for the two credit transfers on June 27, 2022, Elbow River paid TTS and Thompson

11  $1,788,000 on July 4, 2022. In fact, as described in Section III, paragraph 1 above, all of the credits

12  transferred to Elbow River on June 27, 2022, were illegitimate, invalid, and had no value. Alternatively,

13  TTS and Thompson completed two credit transfers involving a false report and untrue statements of

14  material fact related to the price of the credits, in violation of OAR 340-253-1005(8)(c). TTS and

15  Thompson represented to the Buyer that the credits in TTS's OFRS account were generated in compliance

16  with the Clean Fuels Program rules and presented Elbow River with two separate Credit Transfer Forms

17  listing the price of the credits as $112/credit, when in fact the credits sold to Elbow River were illegitimate,

18  invalid, and had no value.

19          3.   According to OAR 340-253-0670(1) and (5), DEQ hereby makes a final determination to

20  suspend the 16,000 illegitimate credits in the Elbow River OFRS account that were transferred from TTS

21  to Elbow River on June 27, 2022, until TTS replaces the credits as required under OAR 340-253-

22  1005(7)(a)(B) or DEQ determines, according to OAR 340-253-1005(7)(b)(A), that TTS is unlikely to

23  retire 16,000 legitimate credits to replace the 16,000 illegitimate credits that TTS transferred to Elbow

24  River.

25  \\\

26  \\\

27  \\\

4. The bases for the final determination in Section III, paragraph 3, above are follows:

    a. As described in Section III, paragraph 1, above, TTS reported incorrect fuel transaction data to the OFRS, which was used to calculate credits. According to OAR 340-253-0670(2)(d), this is a basis for the actions described in Section III, paragraph 3, above.

    b. As described in Section III, paragraphs 1 and 2, above, TTS generated and transferred credits to Elbow River in violation of the Oregon Clean Fuels Program Rules. According to OAR 340-253-0670(2)(e), this is a basis for the actions described in Section III, paragraph 3, above.

    c. As described in Section III, paragraphs 1 and 2, above, TTS submitted material information to DEQ and to Elbow River that was incorrect, in connection with a credit transaction. According to OAR 340-253-0670(2)(b), this is a basis for the actions described in Section III, paragraph 3, above.

## IV. ORDER SUSPENDING OREGON CLEAN FUELS PROGRAM CREDITS

Based upon the foregoing FINDINGS OF FACT AND CONCLUSIONS, it is hereby ORDERED that:

1. Effective on the date this Order becomes final by operation of law or on appeal, the 16,000 illegitimate credits in the Elbow River Marketing USA Ltd. OFRS account that were transferred from TTS to Elbow River on June 27, 2022, are suspended until TTS replaces the credits as required under OAR 340-253-1005(7)(a)(B) or DEQ determines, according to OAR 340-253-1005(7)(b)(A), that TTS is unlikely to retire 16,000 legitimate credits to replace the 16,000 illegitimate credits that TTS transferred to Elbow River.

## V. NOTICE OF RIGHT TO REQUEST A CONTESTED CASE HEARING

You have a right to a contested case hearing on this Notice, if you request one in writing. DEQ must receive your request for hearing **within 20 calendar days** from the date you receive this Notice. If you have any affirmative defenses or wish to dispute any allegations of fact in this Notice, you must do so in your request for hearing, as factual matters not denied will be considered admitted, and failure to

1  raise a defense will be a waiver of the defense.  (See OAR 340-011-0530 for further information about

2  requests for hearing.) You must send your request to:  **DEQ, Office of Compliance and Enforcement,**

3  **700 NE Multnomah Street, Suite 600, Portland, Oregon 97232**, fax it to **503-229-6762** or email it to

4  **DEQappeals@deq.oregon.gov**. An administrative law judge employed by the Office of

5  Administrative Hearings will conduct the hearing, according to ORS Chapter 183, OAR Chapter 340,

6  Division 011 and OAR 137-003-0501 to 0700. You have a right to be

7  represented by an attorney at the hearing, however you are not required to be.  If you are an individual,

8  you may represent yourself.  If you are a corporation, partnership, limited liability company,

9  unincorporated association, trust or government body, you must be represented by an attorney or a duly

10 authorized representative, as set forth in OAR 137-003-0555.

11        Active duty Service members have a right to stay proceedings under the federal Service

12 Members Civil Relief Act. For more information contact the Oregon State Bar at 1-800-

13 452-8260, the Oregon Military Department at 503-584-3571, or the nearest United States Armed

14 Forces Legal Assistance Office through http://legalassistance.law.af.mil. The Oregon Military

15 Department does not have a toll free telephone number.

16        If you fail to file a timely request for hearing, the Notice will become a final order by default

17 without further action by DEQ, as per OAR 340-011-0535(1). If you do request a hearing but later

18 withdraw your request, fail to attend the hearing or notify DEQ that you will not be attending the

19 hearing, DEQ will issue a final order by default pursuant to OAR 340-011-0535(3). DEQ designates

20 the relevant portions of its files, including information submitted by you, as the record for purposes of

21 proving a prima facie case.

22

23

24 _9/30/2022_ _____          _Colin McConnaha_ _____
    Date

25                              Colin McConnaha, Manager
                               Office of Greenhouse Gas Programs

26

27

EXHIBIT 4


**NELSON MULLINS**

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
ATTORNEYS AND COUNSELORS AT LAW

101 Constitution Ave, NW, Suite 900
Washington, DC 20001
T: 202.689.2800  F: 202.689.2860
**nelsonmullins.com**

Adam G. Safwat
T: 202.689.2872
**adam.safwat@nelsonmullins.com**

October 7, 2022

**<u>Via Certified Mail and E-Mail</u>**

Thompson Technical Services LLC
c/o Merlin Thompson
688 SE Quay Ave
Lincoln City, OR 97367
*merlin@ttscharging.com*

*RE: <u>TTS' Requirement Under LEAP Agreement to Issue Replacement Credits to ERM</u>*

Mr. Thompson:

We represent Elbow River Marketing USA Ltd. ("ERM"). As you know, ERM purchased 16,000 Oregon Clean Fuels Credits (the "Credits") from Thompson Technical Services, LLC ("TTS") under the terms of a LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits that both ERM and TTS executed (the "Agreement").

TTS represented and warranted in Section 3.2(b) that the Credits were "valid as contemplated by the Oregon Clean Fuels Program Regulations and is, indefeasibly, a 'Credit' as defined by the Oregon Clean Fuels Program Regulations." The Oregon Department of Environmental Quality ("DEQ"), however, recently made a final determination that the Credits are illegitimate, invalid, and have no value. The DEQ has ordered TTS to purchase 16,000 legitimate replacement credits by October 31, 2022.

Section 7.1 thus requires that TTS, at its sole cost and expense, initiate replacement credits within ten business days after becoming aware that the Credits are invalid. This contractual obligation is independent of any obligations TTS may have to the DEQ. Given that your LinkedIn page indicates that TTS knew of the DEQ's invalidation on September 30, 2022, ERM hereby demands that TTS initiate replacement credits no later than October 17, 2022.

Very truly yours,

Adam G. Safwat, Esq

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS
MINNESOTA | NEW YORK | NORTH CAROLINA | OHIO | SOUTH CAROLINA | TENNESSEE | TEXAS | VIRGINIA | WEST VIRGINIA

# EXHIBIT 5



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Adam G. Safwat
T: 202.689.2872
adam.safwat@nelsonmullins.com

101 Constitution Ave, NW, Suite 900
Washington, DC 20001
T: 202.689.2800  F: 202.689.2860
nelsonmullins.com

October 21, 2022

**Via Certified Mail and E-Mail**

Thompson Technical Services LLC
c/o Merlin Thompson
688 SE Quay Ave
Lincoln City, OR 97367
*merlin@ttscharging.com*

    *RE:* ***Notice of ERM's Election of Remedies Under Section 7.2 of LEAP Agreement***

Mr. Thompson:

  As you know, we represent Elbow River Marketing Ltd. ("ERM"). As set forth in my correspondence dated October 7, 2022, Section 7.1 of the LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits that both ERM and Thompson Technical Services, LLC ("TTS") executed (the "Agreement") required TTS to initiate 16,000 legitimate replacement credits no later than October 17, 2022. TTS did not.

  This letter shall serve as notice that pursuant to Section 7.2 of the Agreement, ERM hereby elects the remedy of replacement credits. ERM accordingly demands that TTS, at its sole cost and expense, initiate 16,000 legitimate replacement credits no later than October 31, 2022. This contractual obligation is independent of any obligations TTS may have to the DEQ.

    Very truly yours,

    Adam G. Safwat, Esq.

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS
MINNESOTA | NEW YORK | NORTH CAROLINA | OHIO | SOUTH CAROLINA | TENNESSEE | TEXAS | VIRGINIA | WEST VIRGINIA

# EXHIBIT 6


**NELSON MULLINS**

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
ATTORNEYS AND COUNSELORS AT LAW

101 Constitution Ave, NW, Suite 900
Washington, DC 20001
T: 202.689.2800  F: 202.689.2860
**nelsonmullins.com**

Adam G. Safwat
T: 202.689.2872
**adam.safwat@nelsonmullins.com**

November 15, 2022

**<u>Via Certified Mail and E-Mail</u>**
Thompson Technical Services, LLC
c/o Merlin Thompson
688 SE Quay Ave
Lincoln City, OR 97367
*merlin@ttscharging.com*

**RE: <u>*Notice of Breach Pursuant to Section 8.1(c) of LEAP Agreement*</u>**

Mr. Thompson:

On October 7, 2022, we requested on behalf of Elbow River Marketing Ltd. ("ERM") pursuant to Section 7.1 of the LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits (the "Agreement") between ERM and Thompson Technical Services, LLC ("TTS"), that TTS initiate 16,000 legitimate replacement credits no later than October 17, 2022. TTS failed to comply.

On October 21, 2022, we demanded on ERM's behalf pursuant to Section 7.2 of the Leap Agreement that TTS, "at its sole cost and expense, initiate 16,000 legitimate replacement credits no later than October 31, 2022." TTS again failed to comply.

Please accordingly take notice pursuant to Section 8.1(c) of the Agreement that TTS failed to perform material obligations to ERM under the Agreement. It must therefore take corrective action to replace the 16,000 Oregon Clean Fuels Program Credits. Though Section 8.1(c) requires only two (2) New York Banking Days following receipt of the foregoing notice to do so, ERM will afford TTS until close of business on December 31, 2022, to comply.

Very truly yours,

Adam G. Safwat, Esq.

Cc: Christopher Rich, Esq. (*via email*)
    Jeffrey Hunter, Esq. (*via email*)

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS
MINNESOTA | NEW YORK | NORTH CAROLINA | OHIO | SOUTH CAROLINA | TENNESSEE | TEXAS | VIRGINIA | WEST VIRGINIA

# EXHIBIT 7

**EXHIBIT 1**
**CONFIRMATION FOR CFP CREDITS TRANSACTION**

| | |
|---|---|
| **To:** | Thompson Technical Services LLC |
| **Attention:** | Merlin Thompson |
| **Phone Number:** | 541-300-7268 |
| **Email Address:** | merlin@ttscharging.com |
| **Date:** | July 19, 2022 |
| **Reference:** | ERM 131756 |

This Confirmation evidences the terms of the binding agreement between Seller and Buyer named below regarding the Transaction.

This Confirmation supplements, forms a part of, and is subject to the *Leap Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits* dated as of May 19, 2022, as amended and supplemented by agreement in writing from time to time (the **"OR LCFS Agreement"**) between Seller and Buyer. All provisions of the Agreement shall govern this Confirmation, except as expressly modified below.

In the event of any inconsistency between this Confirmation and the OR LCFS Agreement, this Confirmation will govern for purposes of the Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation shall have the respective meanings assigned in the OR LCFS Agreement.

**TRADE DATE:** July 19, 2022

**SELLER:** Thompson Technical Services LLC, dba TTS Charging, 2424 NE HWY 101, Lincoln City, OR 97367, USA

**BUYER:** Elbow River Marketing LTD, 1500, 335-8th AVE SW, Calgary, AB T2P1C9, Canada

**QUANTITY:** 36,000 LCFS Credits

**TRANSFER PERIOD:** On or before August 25, 2022

**CONTRACT PRICE:** US$ 101.00 / LCFS Credit

**CONTRACT AMOUNT:** US$ 3,636,000.00

**PAYMENT DUE DATE:** Net five (5) Business Days from receipt of invoice

Payment terms are subject to financial review and credit approval by Seller.

**SPECIAL CONDITIONS:**

| **Thompson Technical Services LLC (Seller)** | **Elbow River Marketing LTD (Buyer)** |
|---|---|
| By: *Merlin Thompson* | By: *Chelsea Erhardt* |
| **Name:** Merlin Thompson | **Name:** Chelsea Erhardt |
| **Title:** CEO | **Title:** Trader |

ERM_ORG_000249

EXHIBIT 8



NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

2 South Biscayne Blvd., 21st Floor
Miami, FL 33131
T 305.373.9400  F 305.373.9443
**nelsonmullins.com**

Justin B. Kaplan
T: 305.373.9436
**justin.kaplan@nelsonmullins.com**

February 3, 2023

<u>**Via Certified Mail and E-Mail**</u>
Thompson Technical Services, LLC
c/o Merlin Thompson
688 SE Quay Ave
Lincoln City, OR 97367
*merlin@ttscharging.com*

> ### RE: <u>*TTS' Requirement Under LEAP Agreement to Issue Replacement Credits to ERM*</u>

Mr. Thompson:

We represent Elbow River Marketing USA Ltd., and its parent company, Elbow River Marketing, Ltd. (collectively, "ERM"). On July 19, 2022, ERM agreed to purchase 36,000 Oregon Clean Fuels Credits (the "Credits") from Thompson Technical Services, LLC ("TTS") under the terms of a LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits that both ERM and TTS executed (the "Agreement"). TTS failed to timely transfer the Credits, however.

Section 7.1 of the Agreement thus requires that TTS, at its sole cost and expense, initiate replacement credits within three business days after TTS receives this notice. ERM accordingly hereby demands that TTS initiate replacement credits no later than February 8, 2023.

Very truly yours,

*/s/ Justin Kaplan*

Justin B. Kaplan, Esq.

Cc:  Christopher Rich, Esq. (*via email*)
     Jeffrey Hunter, Esq. (*via email*)

# EXHIBIT 9



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

2 South Biscayne Blvd., 21st Floor
Miami, FL 33131
T 305.373.9400  F 305.373.9443
**nelsonmullins.com**

Justin B. Kaplan
T: 305.373.9436
**justin.kaplan@nelsonmullins.com**

February 24, 2023

**Via Certified Mail and E-Mail**

Thompson Technical Services LLC
c/o Merlin Thompson
688 SE Quay Ave
Lincoln City, OR 97367
*merlin@ttscharging.com*
*merlin@ttsevc.com*

> RE: *Notice of ERM's Election of Remedies Under Section 7.2 of LEAP Agreement*

Mr. Thompson:

    As you know, we represent Elbow River Marketing Ltd. ("ERM"). As set forth in my correspondence dated February 3, 2023, Section 7.1 of the LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits that both ERM and Thompson Technical Services, LLC ("TTS") executed (the "Agreement") required TTS to initiate 36,000 legitimate replacement credits no later than February 8, 2023. TTS did not.

    This letter shall serve as notice that pursuant to Section 7.2 of the Agreement, ERM hereby elects the remedy of payment pursuant to the invoice attached hereto. ERM accordingly demands that TTS pay to ERM $351,175.00, no later than March 3, 2023.

                Very truly yours,

                */s/ Justin Kaplan*

                Justin B. Kaplan, Esq.

# INVOICE



Elbow River Marketing, Ltd.                    Date: February 24, 2023
240-4th Avenue SW
Calgary, AB T2P 4H4

**BILL TO:**

**Thompson Technical Services, LLC**
**688 SE Quay Ave.**
**Lincoln City, OR 97367**

| | |
|---|---|
| **Amount due and owing pursuant to Section 7.2(ii) of the LEAP Agreement Re: Failure to Deliver 36,000 Oregon CFP Credits on or before August 25, 2022** | $351,175.00[1] |

---

[1] Includes broker costs of $8,750.00.

# EXHIBIT 10



NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

2 South Biscayne Blvd., 21st Floor
Miami, FL 33131
T: 305.373.9400  F: 305.373.9443
nelsonmullins.com

Justin B. Kaplan
T: 305.373.9436
justin.kaplan@nelsonmullins.com

March 6, 2023

**<u>Via Certified Mail and E-Mail</u>**

Thompson Technical Services, LLC
c/o Merlin Thompson
688 SE Quay Ave
Lincoln City, OR 97367
*merlin@ttscharging.com*
*mthompson@ttsevc.com*

> **RE: <u>*Notice of Failure to Pay Pursuant to Section 8.1(a) of LEAP Agreement*</u>**

Mr. Thompson:

On February 3, 2023, we requested pursuant to Section 7.1 of the LEAP Master Agreement for Purchasing and Selling Oregon Clean Fuels Program Credits (the "Agreement") between Elbow River Marketing Ltd. ("ERM") and Thompson Technical Services, LLC ("TTS"), that TTS initiate 36,000 replacement credits no later than February 8, 2023. TTS failed to comply.

On February 24, 2023, we demanded pursuant to Section 7.2 of the Agreement that TTS pay ERM the invoiced amount of $351,175.00, no later than March 3, 2023. TTS again failed to comply.

Please accordingly take notice pursuant to Section 8.1(a) of the Agreement that TTS failed to timely make payment of the invoiced amount due, as required under the Agreement. ERM accordingly demands that TTS pay to ERM $351,175.00, no later than March 8, 2023.

Very truly yours,

*/s/ Justin Kaplan*

Justin B. Kaplan, Esq.

CALIFORNIA | COLORADO | DISTRICT OF COLUMBIA | FLORIDA | GEORGIA | MARYLAND | MASSACHUSETTS | MINNESOTA
NEW YORK | NORTH CAROLINA | OHIO | PENNSYLVANIA | SOUTH CAROLINA | TENNESSEE | TEXAS | VIRGINIA | WEST VIRGINIA

EXHIBIT 11

From:                        Charles J. Paternoster <CPaternoster@pfglaw.com>
Sent:    April 28, 2023 12:10 PM To:        Flanagan, Brien J.
Cc:                          merlin@ttscharging.com; mthompson@ttsevc.com
Subject:                     Elbow River Marketing, Ltd, et al. v. Thompson Technical Services, LLC, et al., USDC
                             (ORPDX) Case No. 3:23-cv-00356-MO
Attachments:                      2023-04-26 Plaintiffs' Motion for Entry of Default Against Defendants.pdf; 2023-04-26
                             Declaration of Justin Kaplan in Support of Plaintiffs' Motion for Entry of Default Against
                             Defendants.pdf; 2023-04-26 Proposed Order of Default.pdf

Brien (and Mr. Thompson),

I hope this email finds you well.

Attached please find courtesy copies of filings made this week in Elbow River Marketing, Ltd, et al. v. Thompson
Technical Services, LLC, et al., USDC (OR-PDX) Case No. 3:23-cv-00356-MO.

While Mr. Flanagan previously indicated that his firm does not represent TTS or Mr. Thompson in this litigation, we
wanted to nonetheless provide these pleadings as a courtesy.

If you have any questions, please do not hesitate to contact me.

Best,
Chip Paternoster

From: Flanagan, Brien J. <BFlanagan@SCHWABE.com>
Sent: Friday, March 24, 2023 11:13 AM
To: Charles J. Paternoster <CPaternoster@pfglaw.com>
Subject: Re: Elbow River Marketing, Ltd, et al. v. Thompson Technical Services, LLC, et al., USDC (OR-PDX) Case No.
3:23cv-00356-MO (PFG File No. 11375.001)


Apologies, Not sure what happened. I left you a voice message on Monday stating that Schwabe is not representing either
in any federal court litigation and can't accept service.

Sent from my iPhone

> On Mar 24, 2023, at 12:38 PM, Charles J. Paternoster
<CPaternoster@pfglaw.com<mailto:CPaternoster@pfglaw.com>> wrote:
>
> Brien,
>
> I reached out earlier to ask whether you will be representing Mr. Thompson and TTS with respect to a lawsuit Elbow
River has filed in District Court, but haven't heard back. Could you please advise on whether you will be representing
Mr. Thompson and Elbow River and whether you are willing to accept service? I have attached a copy of the Complaint
and supporting documents for your review. >

> Thanks,
> Chip

# EXHIBIT 12

| | |
|---|---|
| From: | Charles J. Paternoster <CPaternoster@pfglaw.com> |
| Sent: | May 24, 2023 2:19 PM |
| To: | Flanagan, Brien J.; merlin@ttscharging.com; mthompson@ttsevc.com |
| Subject: | Elbow River Marketing, Ltd, et al. v. Thompson Technical Services, LLC, et al., USDC (ORPDX) Case No. 3:23-cv-00356-MO |
| Attachments: | 5.23.23 Clerk's Entry of Default.pdf |

Brien (and Mr. Thompson),

Following up on my previous email, attached please find a courtesy copy of the Order of Default signed by Judge Michael Mosman on May 23, 2023.

As previously noted, while Mr. Flanagan has indicated his firm does not represent TTS or Mr. Thompson in this litigation, nonetheless we wanted to provide these pleadings as a courtesy.

If you have any questions, please do not hesitate to contact me.

Best,
Chip

---

From: Charles J. Paternoster
Sent: Friday, April 28, 2023 9:10 AM
To: Flanagan, Brien J. <BFlanagan@SCHWABE.com>
Cc: merlin@ttscharging.com; mthompson@ttsevc.com
Subject: Elbow River Marketing, Ltd, et al. v. Thompson Technical Services, LLC, et al., USDC (OR-PDX) Case No. 3:23-cv00356-MO

Brien (and Mr. Thompson),

I hope this email finds you well.

Attached please find courtesy copies of filings made this week in Elbow River Marketing, Ltd, et al. v. Thompson Technical Services, LLC, et al., USDC (OR-PDX) Case No. 3:23-cv-00356-MO.

While Mr. Flanagan previously indicated that his firm does not represent TTS or Mr. Thompson in this litigation, we wanted to nonetheless provide these pleadings as a courtesy.

If you have any questions, please do not hesitate to contact me.

Best,
Chip Paternoster

From: Flanagan, Brien J. <BFlanagan@SCHWABE.com>
Sent: Friday, March 24, 2023 11:13 AM
To: Charles J. Paternoster <CPaternoster@pfglaw.com>
Subject: Re: Elbow River Marketing, Ltd, et al. v. Thompson Technical Services, LLC, et al., USDC (OR-PDX) Case No. 3:23cv-00356-MO (PFG File No. 11375.001)

Apologies, Not sure what happened. I left you a voice message on Monday stating that Schwabe is not representing either in any federal court litigation and can't accept service.

Sent from my iPhone

> On Mar 24, 2023, at 12:38 PM, Charles J. Paternoster
<CPaternoster@pfglaw.com<mailto:CPaternoster@pfglaw.com>> wrote:
>
> Brien,
>
> I reached out earlier to ask whether you will be representing Mr. Thompson and TTS with respect to a lawsuit Elbow River has filed in District Court, but haven't heard back. Could you please advise on whether you will be representing Mr. Thompson and Elbow River and whether you are willing to accept service? I have attached a copy of the Complaint and supporting documents for your review.
>
> Thanks,
> Chip

COMPOSITE
EXHIBIT 13



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Parkland Corporation
ATTN:  Christy J. Elliott
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

September 20, 2022
Invoice 2406530  Page  1

Our Matter #            069607/01502                    For Services Through 08/31/22
Name of Matter:      ERM Civil Litigation Claims



08/16/22    ████████████████████████████        ████████

08/17/22    ████████████████████████████████████████
              ████████                              ████████

08/18/22    ████████████████████████████████████████
                                                    ████████s.

08/19/22    Review relevant background documents; preparation for conference re ████████████
              ████████; conference with A. Safwat & J. Rollins re: same.
              J.B. KAPLAN                                        4.00 hrs.

08/19/22    ████████████████████████████████████████
              ████████████████████████

08/19/22    Conference with Attorney J. Kaplan re: ████████████████████████.
              E.N. KUSSURELIS                                    0.20 hrs.

08/22/22    ████████████████████████████████████████

08/23/22    Preparation for conference with E. Kussurelis Re: ████████████;  conference with E.
              Kussurelis Re: same.
              J.B. KAPLAN                                        1.10 hrs.

08/23/22    ████████████████████████████████████████
              ████████████████████████                ████████

08/23/22    Conference with Attorney J. Kaplan re: ████████████████.
              E.N. KUSSURELIS                                    0.70 hrs.

Parkland Corporation

September 20, 2022
Invoice 2406530  Page 2

08/24/22    Review and analysis of Litigation Hold and comment on same; conference with E. Kussurelis
Re: ███████████████ .
J.B. KAPLAN                                                              0.60 hrs.

08/24/22    ████████████████████████████████████████████████████████
            ███████████████████████                    ██████████████

08/24/22    Conference with Attorney K. Hogan re: ████████████████ ; review documents including
            letter from Oregon Department of Environmental Quality, LEAP Agreement, draft internal
            chronology document, Oregon website re: Clean Fuel Program information, Oregon
            business search, and relevant Oregon Regulations re: Clean Fuel Program and third party
            verification to draft memorandum re: matter events and strategy. Conferences with Attorney
            J. Kaplan re: ████████████████████████████████████████████████████
            ████████████ .
            E.N. KUSSURELIS                                              4.90 hrs.

08/25/22    ████████████████████████████████████████████████████████

08/25/22    Review Letter from Oregon Department of Environmental Quality, LEAP Agreement,
            Confirmations, and applicable Oregon Regulations to draft memorandum on matter strategy;
            draft memorandum on matter strategy including explanation of LEAP Agreement and
            strategy for remedies pursuant to same.
            E.N. KUSSURELIS                                              5.30 hrs.

08/26/22    ████████████████████████████████████████████████████████

08/26/22    Draft memorandum on matter strategy including summary of applicable Oregon Regulations,
            potential causes of action, and strategy for remedies . Review documents and sources
            including Oregon DEQ letter, Confirmations, Oregon government CFP website, and LEAP
            Agreement to draft memorandum. Legal research re: potential causes of action including
            fraud, negligence and breach of fiduciary duty, and initial jurisdiction research. Draft litigation
            hold letter.
            E.N. KUSSURELIS                                              6.70 hrs.

08/29/22    Various conferences with E. Kussurelis Re: ██████████████ .
            J.B. KAPLAN                                                  0.80 hrs.

08/29/22    Revise Litigation Hold Letter. Various conferences with Attorney J. Kaplan re: ████████
            ████████ . Conference with Attorney K. Hogan re: ████████████████████
            Review law including relevant statute and regulations re: CFP and documents including
            messages between client trader and Evolution Markets broker, information re: CFP
            Reporting system, and Evolution Markets website to draft memorandum. Legal research re:
            enforceability of jurisdiction provision in LEAP Agreement. Draft memorandum. Revise
            memorandum.
            E.N. KUSSURELIS                                              5.50 hrs.

08/30/22    Edit Litigation Hold Letter to Client. Review ████████████████████████████████
            and conference with E. Kussurelis Re: Same.
            J.B. KAPLAN                                                  0.80 hrs.

08/30/22    ████████████████████████████████████████████████████

Parkland Corporation

September 20, 2022
Invoice 2406530  Page 3

| | | |
|---|---|---|
| 08/30/22 | Conference with Attorney J. Kaplan re: ██████████████ Email correspondence with Attorneys K. Hogan, A. Safwat, J. Rollins, and J. Kaplan re: ██████████████. Revise memorandum. Legal research re: negligence, negligent misrepresentation to include in revised memorandum. | |
| | E.N. KUSSURELIS | 4.30 hrs. |
| 08/31/22 | ████████████████████████████████████ | |

**Total Fees for Legal Services** ............................................................................ **$32,451.50**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 7.30 | $740.00 | $5,402.00 |
| J.S. ROLLINS | Partner | 15.30 | $875.00 | $13,387.50 |
| E.N. KUSSURELIS | Associate | 27.60 | $495.00 | $13,662.00 |
| TOTAL | | 50.20 | $646.44 | $32,451.50 |

**TOTAL FOR THIS INVOICE** .................................................................... **$32,451.50**

Parkland Corporation

September 20, 2022
Invoice 2406530  Page 4

## REMITTANCE COPY
### Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Parkland Corporation
ATTN:  Christy J. Elliott
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

| | | |
|---|---|---|
| Our Matter # | 069607/01502 | For Services Through 08/31/22 |
| Name of Matter: | ERM Civil Litigation Claims | |

| | | |
|---|---|---|
| Fees for Professional Services | $32,451.50 | |
| Charges for Other Services Provided/Expenses Incurred | 0.00 | |
| **TOTAL FOR THIS INVOICE** ................................................................................ | | **$32,451.50** |

| **Terms of Payment:**  Balance due within thirty days of invoice date |
|---|

### ELECTRONIC PAYMENT INSTRUCTIONS

_**Domestic Wire
And ACH Transfer**_

**Beneficiary:**
Nelson Mullins Riley &
Scarborough, LLP
1320 Main Street
Columbia, SC 29201
**Beneficiary Bank:**
Synovus Bank (formerly NBSC, a division of Synovus Bank)
1148 Broadway
Columbus, GA  31901
**ABA/Routing Number:**  061100606
**Beneficiary Account:**  ▓▓▓▓▓▓▓

_**Foreign Wire (USD)
Transfer**_

**Beneficiary:**
Nelson Mullins Riley &
Scarborough, LLP
1320 Main Street
Columbia, SC 29201
**Beneficiary Bank:**
Synovus Bank
Birmingham, Alabama, USA
**SWIFT Code:**  ▓▓▓▓▓▓
**Beneficiary Account:**  ▓▓▓▓▓▓▓

### _CREDIT CARD PAYMENTS_
http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

October 19, 2022
Invoice 2418765  Page  1

Our Matter #                    069607/01502                    For Services Through 09/30/22
Name of Matter:             ERM Civil Litigation Claims

| 09/07/22 | ███████████████████████████████████████████████████ |
| --- | --- |
| 09/07/22 | Edit Memo regarding Potential Claims.<br>J.B. KAPLAN                                    2.30 hrs. |
| 09/07/22 | ███████████████████████████████████████████████████ |
| 09/07/22 | Conference with Attorney J. Kaplan regarding ███████.<br>E.N. KUSSURELIS                          0.20 hrs. |
| 09/09/22 | Conference with Client regarding ████████████████;  Conference with<br>A. Safwat regarding ██████████.<br>J.B. KAPLAN                                    1.10 hrs. |
| 09/09/22 | ███████████████████████████████████████████████████ |
| 09/09/22 | Conference with Attorneys A. Safwat, K. Hogan, and J. Kaplan and client, T. Remtulla and<br>M. Crilly, regarding ██████████████████. Correspondence with Attorney K. Hogan<br>regarding ███████████████████.<br>E.N. KUSSURELIS                          0.90 hrs. |
| 09/15/22 | ███████████████████████████████████████████████ |
| 09/15/22 | Conference call with A. Safwat regarding █████████.<br>J.B. KAPLAN                                    0.60 hrs. |
| 09/15/22 | ███████████████████████████████████████████████████ |

Elbow River Marketing, Ltd.

October 19, 2022
Invoice 2418765  Page 2

09/16/22   Conference w/ Z. Weiss regarding ███████████████████████.
Conference w/ E. Kussurelis regarding ████████████████████.
J.B. KAPLAN                                                    0.80 hrs.

09/16/22   Conference with Attorney J. Kaplan regarding ████████████████████████
████████████████.
E.N. KUSSURELIS                                               0.40 hrs.

09/16/22   Case law research on Elements of Negligent Misrepresentation in New York.
Z.B. WEISS                                                    0.30 hrs.

09/16/22   Case law research on Negligent Mis rep claim where duty is created by entering contract.
Z.B. WEISS                                                    0.30 hrs.

09/16/22   Case law research on economic loss rule/independent tort doctrine precluding claim for neg
mis rep and breach of contract (NY Law).
Z.B. WEISS                                                    0.40 hrs.

09/16/22   Case law research on whether economic loss rule bars claim for fraud inducement (NY
Law).
Z.B. WEISS                                                    0.40 hrs.

09/16/22   Case law research on Fraud in Performance in NY Court.
Z.B. WEISS                                                    0.30 hrs.

09/20/22   Review and analysis of memo regarding Elements of Potential Claims.
J.B. KAPLAN                                                   0.30 hrs.

09/21/22   Review memorandum from Attorney Z. Weiss regarding Elbow River potential litigation
research issues and law cited therein ahead of drafting complaint. Additional legal research
regarding claims for negligent misrepresentation and fraud under New York law ahead of
drafting complaint.
E.N. KUSSURELIS                                               1.40 hrs.

09/21/22   Case law research on Derivative and individual claims being filed together.
Z.B. WEISS                                                    0.40 hrs.

09/22/22   Research regarding civil claims under New York law, jurisdiction, and venue to draft
Complaint. Draft Complaint. Review memorandum regarding ERM civil claims to draft
Complaint.
E.N. KUSSURELIS                                               3.80 hrs.

09/23/22   Draft email to Attorney J. Kaplan regarding ████████████████████.
E.N. KUSSURELIS                                               0.20 hrs.

09/27/22   Review background report for information relevant to potential litigation by Elbow River,
including assets of Merlin Thompson and TTS. Draft email correspondence to Attorney Z.
Weiss regarding ████████████████████████████████.
Conference with Attorney Z. Weiss regarding ██████████████████████████████
████████████████.
E.N. KUSSURELIS                                               1.70 hrs.

09/28/22   Research on negligent misrepresentation claim.
Z.B. WEISS                                                    0.80 hrs.

09/29/22   Draft Complaint. Review memoranda regarding ERM civil claims and legal research to draft
Complaint.

Elbow River Marketing, Ltd.

October 19, 2022
Invoice 2418765  Page 3

|  | E.N. KUSSURELIS | 3.00 hrs. |
|---|---|---|

09/30/22    Telephone conference w/ A. Safwat regarding ████████; review relevant documents.
J.B. KAPLAN                                                                          0.60 hrs.

09/30/22    Review summary and case provided by Z. Weiss of additional legal research findings regarding duty element of negligent misrepresentation claim under New York law and application to potential claim against TTS.
E.N. KUSSURELIS                                                            0.50 hrs.

**Total Fees for Legal Services** ............................................................................... **$17,609.50**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 5.70 | $740.00 | $4,218.00 |
| J.S. ROLLINS | Partner | 4.30 | $875.00 | $3,762.50 |
| A.G. SAFWAT | Partner | 2.90 | $880.00 | $2,552.00 |
| E.N. KUSSURELIS | Associate | 12.10 | $495.00 | $5,989.50 |
| Z.B. WEISS | Associate | 2.90 | $375.00 | $1,087.50 |
| TOTAL |  | 27.90 | $631.16 | $17,609.50 |

### CHARGES FOR OTHER SERVICES PROVIDED/EXPENSES INCURRED

09/19/2022    Westlaw                                                                                  40.85
**Total Charges for Other Services Provided/Expenses Incurred**.................................... **$40.85**

### DISBURSEMENT SUMMARY

| Description | Dollars |
|---|---|
| Westlaw | 40.85 |
| TOTAL | $40.85 |

**TOTAL FOR THIS INVOICE** .................................................................................... **$17,650.35**

Elbow River Marketing, Ltd.

October 19, 2022
Invoice 2418765  Page 4

### REMITTANCE COPY
Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

| | | |
|---|---|---|
| Our Matter # | 069607/01502 | For Services Through 09/30/22 |
| Name of Matter: | ERM Civil Litigation Claims | |

| | | |
|---|---|---|
| Fees for Professional Services | $17,609.50 | |
| Charges for Other Services Provided/Expenses Incurred | 40.85 | |
| **TOTAL FOR THIS INVOICE** ................................................................................. | | **$17,650.35** |

### ADDITIONAL INVOICES OUTSTANDING

| Invoice Number | Invoice Date | Invoice Amount | A/R Balance |
|---|---|---|---|
| 2406530 | 09/20/2022 | $32,451.50 | $32,451.50 |

**Total Additional Invoices ..........................................** __$32,451.50__

PLEASE DISREGARD IF PAYMENT IS IN TRANSIT

| |
|---|
| **Terms of Payment:**  Balance due within thirty days of invoice date |

#### *ELECTRONIC PAYMENT INSTRUCTIONS*

*Domestic Wire*
*And ACH Transfer*

**Beneficiary:**
 Nelson Mullins Riley &
 Scarborough, LLP
 1320 Main Street
 Columbia, SC 29201
**Beneficiary Bank:**
 Synovus Bank (formerly NBSC, a division of Synovus Bank)
 1148 Broadway
 Columbus, GA  31901
**ABA/Routing Number:**  061100606
**Beneficiary Account:** ██████████

*Foreign Wire (USD)*
*Transfer*

**Beneficiary:**
 Nelson Mullins Riley &
 Scarborough, LLP
 1320 Main Street
 Columbia, SC 29201
**Beneficiary Bank:**
 Synovus Bank
 Birmingham, Alabama, USA
**SWIFT Code:** ████████
**Beneficiary Account:** ██████████

#### *CREDIT CARD PAYMENTS*
http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Elbow River Marketing, Ltd.                                       February 2, 2023
C/o Parkland Corporation                          Invoice 2457740  Page  1
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada


Our Matter #            069607/01502                  For Services Through 12/31/22
Name of Matter:         ERM Civil Litigation Claims


10/03/22    Review DEQ letters to Elbow River, TTS, and Parkland and Order Suspending Clean Fuels
            Program Credits [1.5]. Revise Complaint [2.5]. Draft email correspondence regarding
            ██████████████████████████ [.5]. Review LEAP
            Agreement regarding steps to perfect claims against TTS under LEAP Agreement to draft
            email regarding same [.5]. Draft letter to TTS [1.0].
            E.N. KUSSURELIS                                                  6.00 hrs.

10/04/22    Conference w/ E. Kussurelis regarding ████████████████████████████
            ████████
            J.B. KAPLAN                                                      0.30 hrs.

10/04/22    Conference with Attorney J. Kaplan regarding █████████████████████████
            ███████████████ [.3]. Review LEAP Agreement to
            determine whether TTS had contractual or independent duty to certify information in Q1
            2022 Report and Credit Transfer Forms [.5]. Draft Complaint [.7].
            E.N. KUSSURELIS                                                  1.50 hrs.

10/05/22    Draft civil complaint, including adding numerous claims for fraudulent inducement, fraudulent
            misrepresentation, and negligent misrepresentation [2.5]. Review email correspondence
            from A. Safwat [.2]. Review M. Thompson LinkedIn Post [.2]. Update letter to M. Thompson
            regarding section 7.1 of LEAP Agreement [.3].
            E.N. KUSSURELIS                                                  3.20 hrs.

10/06/22    ████████████████████████████████████████████████████████████
            ████████████████████████████████████████████████████.
            ████████████████████████████████

10/06/22    Edit Default Notice [.6]. Conference regarding ██████████████ [.4].
            J.B. KAPLAN                                                      1.00 hrs.

10/06/22    Conference with Attorneys J. Kaplan, A. Safwat, and K. Hogan regarding ███████████
            ████████████████ [.4]. Revise notice of default letter
            [.1]. Draft email correspondence to Attorneys A. Safwat, J. Kaplan, and K. Hogan regarding
            ████████████ [.2].
            E.N. KUSSURELIS                                                  0.70 hrs.

Elbow River Marketing, Ltd.

February 2, 2023
Invoice 2457740  Page 2

10/07/22    Review, revise, and put letter to M. Thompson and TTS into final version for dissemination [.2]. Coordinate dissemination of letter to M. Thompson and TTS via post [.1]. Draft email correspondence disseminating letter to M. Thompson and TTS via electronic correspondence [.1].
             E.N. KUSSURELIS                                            0.40 hrs.

10/11/22    Conference with Attorney J. Kaplan regarding ███████████████████████████
             ████████████
             E.N. KUSSURELIS                                            0.10 hrs.

10/12/22    Legal research regarding requirement to exhaust administrative remedies.
             E.N. KUSSURELIS                                            3.40 hrs.

10/13/22    Conference with Attorney J. Kaplan regarding ███████████████████████
             ████████████████ [.3]. Legal research regarding requirement to exhaust administrative remedies [2.7]. Draft summary memorandum regarding research regarding requirement to exhaust administrative remedies [1].
             E.N. KUSSURELIS                                            4.00 hrs.

10/14/22    Conference w/ A. Safwat & E. Kussurelis regarding █████████████████████
             [.4]. Conference w/ E. Kussurelis regarding ████████████████████████████
             ████████████ [.2]. Review and analysis of  Memo addressing Exhaustion of Administrative Remedies [.4].
             J.B. KAPLAN                                                1.00 hrs.

10/14/22    Legal research regarding requirement to exhaust administrative remedies [2.6]. Draft summary memorandum regarding research regarding requirement to exhaust administrative remedies [2.0]. Telephone conference with Attorneys A. Safwat and J. Kaplan [.3]. Telephone conference with Attorney J. Kaplan [.1]. Revise summary memorandum regarding research regarding requirement to exhaust administrative remedies [.4].
             E.N. KUSSURELIS                                            5.40 hrs.

10/17/22    Conference w/ A. Safwat & K. Hogan regarding ███████████████ [.4]. Conference w/ A. Safwat, K. Hogan, & Client regarding ████████████ [.6].
             J.B. KAPLAN                                                1.00 hrs.

10/17/22    Draft email correspondence regarding █████████████████████████████████
             ██████████████████
             E.N. KUSSURELIS                                            0.30 hrs.

10/18/22    Conference w/ E. Kussurelis regarding ███████████████ [.4]. Telephone conference w/ A. Safwat regarding ██████ [.3].
             J.B. KAPLAN                                                0.70 hrs.

10/18/22    ████████████████████████████████████████████████████████████
             ████████████████████████████        █████████████

10/18/22    Draft email to client regarding ████████████████████████████████████
             ████ [1.0]. Review documents including first letter to TTS and LEAP Agreement regarding remedy options under LEAP Agreement to draft email to client and demand letter [.5]. Draft demand letter [.3]. Review LEAP Agreement for ambiguity regarding election of remedies [.5]. Draft email correspondence with Attorneys A. Safwat, K. Hogan, and J. Kaplan regarding ████████████████████████ [.4]. Conference with Attorney J. Kaplan regarding ██████████████████████████ [.4].
             E.N. KUSSURELIS                                            3.10 hrs.

Elbow River Marketing, Ltd.

February 2, 2023
Invoice 2457740  Page 3

10/19/22    Conference with Attorneys K. Kaplan, K. Hogan, and A. Safwat [.4]. Review LEAP
Agreement regarding sections related to affiliates and parent company [2.2]. Draft email
correspondence ███████████████ [.7].  Conference with Attorney J.
Kaplan regarding ███████████ [.3]. Revise demand letter to include elected remedy under
LEAP Agreement [.3]. Draft invoice to attach to demand letter [1.2].
E.N. KUSSURELIS                                                  5.10 hrs.

10/20/22    ████████████████████████████████████████████████████

10/20/22    Revise demand letter.
E.N. KUSSURELIS                                                  0.10 hrs.

10/21/22    ████████████████████████████████████████████████████

10/21/22    Revise and finalize demand letter to TTS and Merlin Thompson [.4]. Coordinate
dissemination of and disseminate demand letter by post and email [.3].
E.N. KUSSURELIS                                                  0.70 hrs.

11/01/22    Review email from counsel for TTS [.1]. Draft email to Attorneys A. Safwat, J. Kaplan, and K.
Hogan ████████████████████████████████████████████████
████████████████████████████████ [.8]. Review LEAP Agreement
regarding steps required to perfect ERM's breach of contract claim [.4]. Upload scanned
copy of October 21, 2022 letter to TTS and Merlin Thompson returned to sender to online
document storage platform [.1].
E.N. KUSSURELIS                                                  1.40 hrs.

11/04/22    Conference w/ Opposing counsel regarding Settlement [.8]. Conference w/ A. Safwat & C.
Paternoster regarding ████████████ [.5].
J.B. KAPLAN                                                      1.30 hrs.

11/04/22    ████████████████████████████████████████████████████

11/07/22    ████████████████████████████████████████████████████

11/07/22    Conference w/ Client, A. Safwat, and  C. Paternoster regarding ████████████.
J.B. KAPLAN                                                      0.70 hrs.

11/11/22    Telephone conference w/ A. Safwat ████████████████
J.B. KAPLAN                                                      0.20 hrs.

11/16/22    Draft and revise Notice of Breach of Leap Agreement.
J.B. KAPLAN                                                      0.50 hrs.

11/17/22    ████████████████████████████████████████████████████

Elbow River Marketing, Ltd.

February 2, 2023
Invoice 2457740  Page 4

**Total Fees for Legal Services** ............................................................................ **$29,433.00**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 6.70 | $740.00 | $4,958.00 |
| A.G. SAFWAT | Partner | 7.90 | $880.00 | $6,952.00 |
| E.N. KUSSURELIS | Associate | 35.40 | $495.00 | $17,523.00 |
| TOTAL | | 50.00 | $588.66 | $29,433.00 |

### <u>CHARGES FOR OTHER SERVICES PROVIDED/EXPENSES INCURRED</u>

11/16/2022     Vendor: Renaissance Associates, Ltd. Invoice#: 13058 Date:     1,658.12
11/10/2022   - CRINV -  - 11/10/22 - Professional Services
**Total Charges for Other Services Provided/Expenses Incurred**................................... **$1,658.12**

### DISBURSEMENT SUMMARY

| Description | Dollars |
|---|---|
| Outside Services | 1,658.12 |
| TOTAL | $1,658.12 |

**TOTAL FOR THIS INVOICE** ................................................................... **$31,091.12**

Elbow River Marketing, Ltd.

February 2, 2023
Invoice 2457740  Page 5

### REMITTANCE COPY
Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

Our Matter #              069607/01502                         For Services Through 12/31/22
Name of Matter:       ERM Civil Litigation Claims

| | |
|---|---|
| Fees for Professional Services | $29,433.00 |
| Charges for Other Services Provided/Expenses Incurred | 1,658.12 |
| **TOTAL FOR THIS INVOICE** ............................................................................ | **$31,091.12** |

**Terms of Payment:**  Balance due within thirty days of invoice date

#### ELECTRONIC PAYMENT INSTRUCTIONS

| _Domestic Wire_ <br> _And ACH Transfer_ | _Foreign Wire (USD)_ <br> _Transfer_ |
|---|---|
| **Beneficiary:** <br> Nelson Mullins Riley & <br> Scarborough, LLP <br> 1320 Main Street <br> Columbia, SC 29201 | **Beneficiary:** <br> Nelson Mullins Riley & <br> Scarborough, LLP <br> 1320 Main Street <br> Columbia, SC 29201 |
| **Beneficiary Bank:** <br> Synovus Bank (formerly NBSC, a division of Synovus Bank) <br> 1148 Broadway <br> Columbus, GA  31901 | **Beneficiary Bank:** <br> Synovus Bank <br> Birmingham, Alabama, USA |
| **ABA/Routing Number:**  061100606 | **SWIFT Code:** ▆▆▆▆▆ |
| **Beneficiary Account:** ▆▆▆▆ | **Beneficiary Account:** ▆▆▆▆ |

#### CREDIT CARD PAYMENTS
http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

February 7, 2023
Invoice 2460230  Page  1

Our Matter #              069607/01502                        For Services Through 01/31/23
Name of Matter:        ERM Civil Litigation Claims

| | | |
|---|---|---|
| 01/24/23 | Conference w/ E. Kussurelis regarding ███████████████.<br>J.B. KAPLAN | 0.40 hrs. |
| 01/24/23 | Review news articles regarding TTS and Merlin Thompson sent by local counsel [.4].<br>Conference with Attorney J. Kaplan regarding ████████████████████████<br>██████ [.4]. Revise Complaint including adding claims for fraudulent transfer and allegations<br>regarding same [3.8]. Legal research regarding fraudulent transfer in Oregon [.3].<br>E.N. KUSSURELIS | 4.90 hrs. |
| 01/25/23 | Revise Complaint.<br>E.N. KUSSURELIS | 0.50 hrs. |
| 01/29/23 | Review and edit Complaint.<br>J.B. KAPLAN | 0.90 hrs. |
| 01/30/23 | Conference w/ E. Kussurelis regarding █████████████ [.4]. Edit Complaint [2.8].<br>J.B. KAPLAN | 3.20 hrs. |
| 01/30/23 | Conference with J. Kaplan regarding █████████ [.4]. Research for Complaint including legal<br>research regarding fraudulent inducement and fraudulent misrepresentation, research<br>regarding Oregon Clean Fuels Program, and research regarding TTS/Merlin Thompson's<br>actions [3.0]. Draft various email correspondence to J. Kaplan regarding ███████████████<br>███████████████████████ [.6].<br>E.N. KUSSURELIS | 4.00 hrs. |
| 01/31/23 | Review and Edit Complaint [1.5]; conference with E. Kussurelis regarding ██████ [.4].<br>J.B. KAPLAN | 1.90 hrs. |
| 01/31/23 | ████████████████████████████ | ███████ |
| 01/31/23 | Review documents including CFP Transfer Forms to draft email correspondence with J.<br>Kaplan regarding █████████ and draft email to J. Kaplan [.5]. Conference with J. Kaplan<br>regarding ████████████████ [.4].<br>E.N. KUSSURELIS | 0.90 hrs. |

Elbow River Marketing, Ltd.

February 7, 2023
Invoice 2460230  Page 2

01/31/23     Review District of Oregon's motion for leave to appear pro hac vice form.
K.C. HOGAN                                                          0.10 hrs.

**Total Fees for Legal Services** ............................................................................................ **$10,079.50**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 6.40 | $740.00 | $4,736.00 |
| A.G. SAFWAT | Partner | 0.20 | $975.00 | $195.00 |
| E.N. KUSSURELIS | Associate | 10.30 | $495.00 | $5,098.50 |
| K.C. HOGAN | Sr Associate | 0.10 | $500.00 | $50.00 |
| TOTAL | | 17.00 | $592.91 | $10,079.50 |

**TOTAL FOR THIS INVOICE** .................................................................................... **$10,079.50**

Elbow River Marketing, Ltd.

February 7, 2023
Invoice 2460230  Page 3

### REMITTANCE COPY
Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

| | | |
|---|---|---|
| Our Matter # | 069607/01502 | For Services Through 01/31/23 |
| Name of Matter: | ERM Civil Litigation Claims | |

| | |
|---|---|
| Fees for Professional Services | $10,079.50 |
| Charges for Other Services Provided/Expenses Incurred | 0.00 |
| **TOTAL FOR THIS INVOICE** .............................................................................. | **$10,079.50** |

### ADDITIONAL INVOICES OUTSTANDING

| Invoice Number | Invoice Date | Invoice Amount | A/R Balance |
|---|---|---|---|
| 2457740 | 02/02/2023 | $31,091.12 | $31,091.12 |

**Total Additional Invoices** ........................................... **$31,091.12**

PLEASE DISREGARD IF PAYMENT IS IN TRANSIT

| |
|---|
| **Terms of Payment:**  Balance due within thirty days of invoice date |

### *ELECTRONIC PAYMENT INSTRUCTIONS*

| *Domestic Wire* *And ACH Transfer* | *Foreign Wire (USD)* *Transfer* |
|---|---|
| **Beneficiary:** | **Beneficiary:** |
| Nelson Mullins Riley & Scarborough, LLP | Nelson Mullins Riley & Scarborough, LLP |
| 1320 Main Street | 1320 Main Street |
| Columbia, SC 29201 | Columbia, SC 29201 |
| **Beneficiary Bank:** | **Beneficiary Bank:** |
| Synovus Bank (formerly NBSC, a division of Synovus Bank) | Synovus Bank |
| 1148 Broadway | Birmingham, Alabama, USA |
| Columbus, GA  31901 | **SWIFT Code:** |
| **ABA/Routing Number:**  061100606 | **Beneficiary Account:** |
| **Beneficiary Account:** ███████ | ███████████████ |

### *CREDIT CARD PAYMENTS*
http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Elbow River Marketing, Ltd.                                                      March 9, 2023
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW                              Invoice 2469286  Page  1
Calgary, AB  T2P 4H4
Canada

Our Matter #              069607/01502                    For Services Through 02/28/23
Name of Matter:           ERM Civil Litigation Claims

| | | |
|---|---|---|
| 02/03/23 | Review and revise draft Complaint.<br>J.B. KAPLAN | 5.80 hrs. |
| 02/03/23 | ████████████████████████████████████████<br>████████████ ████ | |
| 02/03/23 | Conference with J. Kaplan regarding ████████████████ [.1]. Draft, revise,<br>and send letter to TTS regarding replacement credits [.7]. Review credit transfer confirmation<br>and LEAP Agreement to draft letter to TTS regarding replacement credits [.2].<br>E.N. KUSSURELIS | 1.00 hrs. |
| 02/06/23 | Revise Complaint [1.1]. Draft email correspondence to J. Kaplan regarding ████████<br>████████████ [.2].<br>E.N. KUSSURELIS | 1.30 hrs. |
| 02/07/23 | ████████ and send email regarding same to A. Safwat and C. Paternoster.<br>J.B. KAPLAN | 0.60 hrs. |
| 02/07/23 | ████████████████████████████████████ | |
| 02/08/23 | Edit Complaint.<br>J.B. KAPLAN | 0.50 hrs. |
| 02/08/23 | ████████████████████████ ████ | |
| 02/08/23 | Communications with Attorneys Safwat, Kaplan and Paternoster about ██████.<br>K.C. HOGAN | 0.10 hrs. |
| 02/09/23 | Telephone conference w/ A. Safwat regarding ██████ [.3]. Finalize Complaint [.2].<br>J.B. KAPLAN | 0.50 hrs. |
| 02/09/23 | ██████████████████████████████ | |

Elbow River Marketing, Ltd.

March 9, 2023
Invoice 2469286  Page 2

███████████                                                    ██████████

02/09/23   Review ████████ and draft email correspondence to J. Kaplan regarding same; draft
           email correspondence to client regarding ██████████; draft email correspondence
           with A. Orozco and T. Anzalone regarding ████████
           ████████████████████; and draft email to A. Safwat ████████████████████
           ████████████ [1]. Review exhibits from T. Anzalone for accuracy [.2]. Review
           exhibits for ████████████████ and draft email to J. Kaplan, A. Safwat, and local
           counsel regarding same [1].
           E.N. KUSSURELIS                                      2.20 hrs.

02/09/23   Review communications and final draft of Complaint against Thompson Technical Services;
           Prepare compilation of exhibits supporting complaint, and prepare exhibit cover pages for
           filing with court.
           T. ANZALONE                                          1.10 hrs.

02/10/23   Draft/edit email correspondence to M. Thompson regarding Additional Breach of LEAP
           Agreement.
           J.B. KAPLAN                                          0.30 hrs.

02/10/23   Revise letter to M. Thompson and TTS to incorporate new mailing date, deadlines, and
           email address for M. Thompson and calendar relevant deadlines regarding same.
           E.N. KUSSURELIS                                      0.20 hrs.

02/14/23   ████████████████████████████████████████

02/15/23   Preparation for conference w/ Client regarding ████████ [.2]. Conference w/ Client
           regarding ████████ [.7]. Edit Corporate Disclosure Statements [.2].
           J.B. KAPLAN                                          1.10 hrs.

02/15/23   ████████████████████████████████████████
           ████████████████████             ████████

02/15/23   Review Federal Rule of Civil Procedure 7.1 and District of Oregon local rule 7.1-1 regarding
           disclosure statements [.3]. Draft disclosure statements for ERM and Elbow River [.3]. Draft
           email to J. Kaplan regarding ████████████████████████████
           ████████████████ [.4]. Conference with M. Crilly, T.
           Remtulla, C. Paternoster, A. Safwat, and J. Kaplan regarding ████████ [.7].
           E.N. KUSSURELIS                                      1.70 hrs.

02/17/23   Telephone conference w/ E. Kussurelis regarding ████████████. (No charge)
           J.B. KAPLAN                                          0.20 hrs.

02/17/23   Review email from M. Crilly regarding ████████████████ [.4], review LEAP
           Agreement and CFP Regulations, and draft emails to J. Kaplan regarding ████████████
           ████████████████████████████████████████ [.7].
           Telephone call with J. Kaplan regarding ████████████ [.2].
           E.N. KUSSURELIS                                      1.10 hrs.

02/20/23   Draft email correspondence with client regarding ████████████████████
           ████████████████.
           E.N. KUSSURELIS                                      0.20 hrs.

02/21/23   Edit Demand to TSS regarding Value of 36,000 additional Credits.

Elbow River Marketing, Ltd.

March 9, 2023
Invoice 2469286  Page 3



|  | J.B. KAPLAN | 0.30 hrs. |

02/21/23 ████████████████████████████████████

02/21/23 Review email correspondence from client regarding ████████████████ ████████████████, and draft email to client ████████████████ ██.
E.N. KUSSURELIS    0.90 hrs.

02/22/23 ████████████████████████████████████

02/22/23 Conference w. E. Kussurelis regarding ████████ [.2]. Draft/review email correspondence with A. Safwat re same [.3].
J.B. KAPLAN    0.50 hrs.

02/22/23 Email correspondence with Attorneys J. Kaplan and A. Safwat regarding ████████ [1.1]. Telephone conference with A. Safwat regarding ████████ [.2]. Conference with J. Kaplan regarding ████████ [.3].
E.N. KUSSURELIS    1.60 hrs.

02/23/23 ████████████████████████████████████

02/23/23 Draft email correspondence to client regarding ████████████.
E.N. KUSSURELIS    0.10 hrs.

02/24/23 ████████████████████████████████████

02/24/23 Prepare letter and invoice to TTS/M. Thompson regarding ERM's Notice of Election of Remedies in final, send to M. Thompson, and draft email ████████████████ ████████.
E.N. KUSSURELIS    0.80 hrs.

**Total Fees for Legal Services** ........................................................................... **$20,332.50**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 0.20 | $0.00 | $0.00 |
| J.B. KAPLAN | Partner | 9.60 | $850.00 | $8,160.00 |
| A.G. SAFWAT | Partner | 6.40 | $975.00 | $6,240.00 |
| E.N. KUSSURELIS | Associate | 11.10 | $500.00 | $5,550.00 |
| K.C. HOGAN | Sr Associate | 0.10 | $525.00 | $52.50 |
| T. ANZALONE | Paralegal | 1.10 | $300.00 | $330.00 |
| TOTAL | | 28.50 | $713.42 | $20,332.50 |

**CHARGES FOR OTHER SERVICES PROVIDED/EXPENSES INCURRED**

Elbow River Marketing, Ltd.

March 9, 2023
Invoice 2469286  Page 4

| | | |
|---|---|---:|
| 01/30/2023 | Westlaw | 81.70 |
| 01/31/2023 | EnCAP LLC - Hosting 13.291 GB @ $12.50 per GB | 166.14 |
| 01/31/2023 | EnCAP LLC - Pre-Review Hosting 41.27 GB @ $7.50 per GB | 309.53 |
| **Total Charges for Other Services Provided/Expenses Incurred**.................................... | | **$557.37** |

### DISBURSEMENT SUMMARY

| Description | Dollars |
|---|---:|
| EnCAP LLC - Hosting | 166.14 |
| EnCAP LLC - Pre-Review Hosting | 309.53 |
| Westlaw | 81.70 |
| TOTAL | $557.37 |

Advance payments applied  $(20,889.87)
**TOTAL FOR THIS INVOICE** ................................................................................... **$0.00**

Elbow River Marketing, Ltd.

March 9, 2023
Invoice 2469286  Page 5

### REMITTANCE COPY
Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

| | | |
|---|---|---|
| Our Matter # | 069607/01502 | For Services Through 02/28/23 |
| Name of Matter: | ERM Civil Litigation Claims | |

| | |
|---|---|
| Fees for Professional Services | $20,332.50 |
| Charges for Other Services Provided/Expenses Incurred | 557.37 |
| Advance Payments Applied | -20,889.87 |
| **TOTAL FOR THIS INVOICE** ................................................................................ | **$0.00** |

| |
|---|
| **Terms of Payment:**  Balance due within thirty days of invoice date |

#### ELECTRONIC PAYMENT INSTRUCTIONS

**Domestic Wire**
**And ACH Transfer**

**Beneficiary:**
 Nelson Mullins Riley &
 Scarborough, LLP
 1320 Main Street
 Columbia, SC 29201
**Beneficiary Bank:**
 Synovus Bank (formerly NBSC, a division of Synovus Bank)
 1148 Broadway
 Columbus, GA  31901
**ABA/Routing Number:**  061100606
**Beneficiary Account:** ▮▮▮▮▮▮

**Foreign Wire (USD)**
**Transfer**

**Beneficiary:**
 Nelson Mullins Riley &
 Scarborough, LLP
 1320 Main Street
 Columbia, SC 29201
**Beneficiary Bank:**
 Synovus Bank
 Birmingham, Alabama, USA
**SWIFT Code:** ▮▮▮▮▮▮
**Beneficiary Account:** ▮▮▮▮▮▮

#### CREDIT CARD PAYMENTS

http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Elbow River Marketing, Ltd.                                    April 12, 2023
C/o Parkland Corporation                          Invoice 2485282  Page  1
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

Our Matter #              069607/01502            For Services Through 03/31/23
Name of Matter:           ERM Civil Litigation Claims

03/03/23   Review LEAP Agreement to draft letter to TTS and draft letter to TTS regarding Notice of
           Failure to Pay Pursuant to Section 8.1(a) of LEAP Agreement.
           E.N. KUSSURELIS                              0.70 hrs.

03/06/23   Finalize Final Demand for Payment to TTS.
           J.B. KAPLAN                                  0.40 hrs.

03/06/23   Put letter to TTS Re Notice of Failure to Pay Pursuant to Section 8.1(a) of LEAP Agreement
           in final and send to Merlin Thompson.
           E.N. KUSSURELIS                              0.50 hrs.

03/09/23   ████████████████████████████████████████████████████████████████████

03/09/23   Draft email correspondence with Attorneys A. Safwat, J. Kaplan, and C. Paternoster and
           with client regarding ████████████████████████████████.
           E.N. KUSSURELIS                              0.50 hrs.

03/10/23   ████████████████████████████████████████████████████████████████████
           ██████████████████████████████████████        ████████

03/10/23   Review email correspondence from M. Crilly regarding ████████████████████████
           ██████████
           (.3); revise Complaint, and draft email correspondence to client ██████████████████
           (.4).
           E.N. KUSSURELIS                              0.70 hrs.

03/11/23   Review and approve final lawsuit package for filing.
           J.B. KAPLAN                                  0.60 hrs.

03/12/23   Final review of Complaint and Exhibits ahead of filing.
           E.N. KUSSURELIS                              0.50 hrs.

03/13/23   ████████████████████████████████████████████████████████

Elbow River Marketing, Ltd.

April 12, 2023
Invoice 2485282  Page 2

█████████                                    ████████

03/13/23    Draft email regarding f███████████████████████ [.2]. Review pro hac
            vice applications for myself and Attorney J. Kaplan and draft email to M. Armas regarding
            ████████████ [.4]. Telephone conference with Attorney A. Safwat regarding ███████████
            ████████████ [.1]. Research District of Oregon pro hac vice admission
            requirements [.2].
            E.N. KUSSURELIS                                    0.90 hrs.

03/14/23    Review pro hac vice applications.
            E.N. KUSSURELIS                                    0.10 hrs.

03/15/23    Review pro hac vice motions for myself and Attorneys J. Kaplan, K. Hogan, and A. Safwat
            and draft email correspondence with Attorney K. Hogan and to Attorneys J. Kaplan, K.
            Hogan, and A. Safwat regarding ████.
            E.N. KUSSURELIS                                    0.80 hrs.

03/15/23    Review, revise and edit motion for pro hac vice admission.
            K.C. HOGAN                                         0.30 hrs.

03/16/23    ██████████████████                                ████████

03/16/23    Revise motion to appear pro hac vice of Attorney J. Kaplan and draft email correspondence
            to Attorneys J. Kaplan, K. Hogan, and A. Safwat regarding ███████████████.
            E.N. KUSSURELIS                                    0.30 hrs.

03/20/23    Draft email correspondence with AA M. Armas and Attorney J. Kaplan regarding ████
            ████████████ and send final to Attorney J. Kaplan for signature.
            E.N. KUSSURELIS                                    0.20 hrs.

03/27/23    Review ███████████████████████ and draft email to local counsel
            regarding same.
            E.N. KUSSURELIS                                    0.30 hrs.

03/29/23    ██████████████                                    ████████

03/29/23    Draft email to local counsel regarding ████████████████████████████
            ████████████████.
            E.N. KUSSURELIS                                    0.20 hrs.

03/30/23    Draft Rule 26 Initial Disclosures and review relevant documents including LEAP Agreement,
            Credit Transfer Forms, and DEQ letters and Order to draft same.
            E.N. KUSSURELIS                                    2.50 hrs.

03/31/23    Revise Rule 26 Initial Disclosures [.5]. Review Federal Rule of Civil Procedure and local
            rules regarding scheduling reports and begin drafting same [.6].
            E.N. KUSSURELIS                                    1.10 hrs.

**Total Fees for Legal Services** ............................................................................    **$9,362.50**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 1.00 | $850.00 | $850.00 |

Elbow River Marketing, Ltd.

April 12, 2023
Invoice 2485282  Page 3

| | | | | |
|---|---|---|---|---|
| A.G. SAFWAT | Partner | 3.80 | $975.00 | $3,705.00 |
| E.N. KUSSURELIS | Associate | 9.30 | $500.00 | $4,650.00 |
| K.C. HOGAN | Sr Associate | 0.30 | $525.00 | $157.50 |
| TOTAL | | 14.40 | $650.17 | $9,362.50 |

### CHARGES FOR OTHER SERVICES PROVIDED/EXPENSES INCURRED

| | | |
|---|---|---|
| 02/28/2023 | EnCAP LLC - Hosting 13.324 GB @ $12.50 per GB | 166.55 |
| 02/28/2023 | EnCAP LLC - Pre-Review Hosting 41.27 GB @ $7.50 per GB | 309.53 |
| 02/28/2023 | EnCAP LLC - Pre-Review Hosting 1.23 GB @ $7.50 per GB | 9.23 |
| **Total Charges for Other Services Provided/Expenses Incurred**................................... | | **$485.31** |

### DISBURSEMENT SUMMARY

| Description | Dollars |
|---|---|
| EnCAP LLC - Hosting | 166.55 |
| EnCAP LLC - Pre-Review Hosting | 318.76 |
| TOTAL | $485.31 |

**TOTAL FOR THIS INVOICE** ................................................................................... **$9,847.81**

Elbow River Marketing, Ltd.

April 12, 2023
Invoice 2485282  Page 4

### REMITTANCE COPY
Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

| | | |
|---|---|---|
| Our Matter # | 069607/01502 | For Services Through 03/31/23 |
| Name of Matter: | ERM Civil Litigation Claims | |

| | | |
|---|---|---|
| Fees for Professional Services | $9,362.50 | |
| Charges for Other Services Provided/Expenses Incurred | 485.31 | |
| **TOTAL FOR THIS INVOICE** ............................................................................ | | **$9,847.81** |

**Terms of Payment:**  Balance due within thirty days of invoice date

#### *ELECTRONIC PAYMENT INSTRUCTIONS*

| *Domestic Wire* *And ACH Transfer* | *Foreign Wire (USD)* *Transfer* |
|---|---|
| **Beneficiary:** | **Beneficiary:** |
| Nelson Mullins Riley & | Nelson Mullins Riley & |
| Scarborough, LLP | Scarborough, LLP |
| 1320 Main Street | 1320 Main Street |
| Columbia, SC 29201 | Columbia, SC 29201 |
| **Beneficiary Bank:** | **Beneficiary Bank:** |
| Synovus Bank (formerly NBSC, a division of Synovus Bank) | Synovus Bank |
| 1148 Broadway | Birmingham, Alabama, USA |
| Columbus, GA  31901 | **SWIFT Code:** ███████ |
| **ABA/Routing Number:** 061100606 | **Beneficiary Account:** ███████ |
| **Beneficiary Account:** ███████ | |

#### *CREDIT CARD PAYMENTS*
http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Elbow River Marketing, Ltd.                                                    May 22, 2023
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW                                    Invoice 2494651  Page  1
Calgary, AB  T2P 4H4
Canada


Our Matter #                069607/01502                        For Services Through 04/30/23
Name of Matter:            ERM Civil Litigation Claims


04/03/23    Draft email correspondence with local counsel, A. Safwat, J. Kaplan, K. Hogan, and M.
            Armas regarding ███████████████████.
            E.N. KUSSURELIS                                              0.80 hrs.

04/03/23    Communications re ██████████████.
            K.C. HOGAN                                                   0.10 hrs.

04/10/23    ███████████████████████████████████████

04/10/23    Review date of service and Federal Rules of Civil Procedure regarding deadline to serve
            answer to determine Merlin and TTS' deadline to serve an answer and draft email
            correspondence to A. Safwat ██████████████████.
            E.N. KUSSURELIS                                              0.30 hrs.

04/11/23    ██████████████████████                          ████████

04/11/23    Draft email correspondence with Attorneys A. Safwat, J. Kaplan, and K. Hogan regarding
            ██████████████████████████████████████████
            ██████[.3]. Draft email correspondences with Attorneys A. Safwat and K. Hogan
            ██████[.2].
            E.N. KUSSURELIS                                              0.50 hrs.

04/11/23    Communications re ████████████████████.
            K.C. HOGAN                                                   0.10 hrs.

04/17/23    Communications re ██████████████████
            K.C. HOGAN                                                   0.10 hrs.

04/19/23    Edit Motion for Clerk's Default and related Declaration.
            J.B. KAPLAN                                                  0.40 hrs.

Elbow River Marketing, Ltd.

May 22, 2023
Invoice 2494651  Page 2

| 04/19/23 | Additional research regarding motions for entry of default including review of Motions for Entry of Default Judgment provided by C. Paternoster, Federal Rules of Civil Procedure 12 and 55, Local Rules 7-1 and 55-1, and docket entries for case provided by C. Paternoster [1.2]. Draft Motion for Entry of Clerk's Default Against Defendants, Declaration in Support of Motion for Entry of Default, and Proposed Order Granting Motion for Entry of Default [3.2]. Draft email correspondence to J. Kaplan ██████████████████████████████████████ [.4]. Revise Motion for Entry of Clerk's Default Against Defendants, Declaration in Support of Motion for Entry of Default, and Proposed Order Granting Motion for Entry of Default [.4]. Draft email correspondence to J. Kaplan, A. Safwat, K. Hogan, and local counsel ██████████ [.3]. |
|---|---|
| | E.N. KUSSURELIS                                                          5.50 hrs. |
| 04/21/23 | ██████████████████████████████████ |
| 04/21/23 | Draft email correspondence to client ████████████████████████████. |
| | E.N. KUSSURELIS                                                          0.40 hrs. |
| 04/24/23 | Draft email correspondence to client ████████████████████████████. |
| | E.N. KUSSURELIS                                                          0.70 hrs. |
| 04/26/23 | Update final executed version of Declaration of J. Kaplan in Support of Motion for Default, draft email ████████████████████████████, and draft email to client ████████████. |
| | E.N. KUSSURELIS                                                          0.50 hrs. |
| 04/28/23 | ██████████████████████ |

**Total Fees for Legal Services** ............................................................................................ **$6,115.00**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 0.40 | $850.00 | $340.00 |
| A.G. SAFWAT | Partner | 1.30 | $975.00 | $1,267.50 |
| E.N. KUSSURELIS | Associate | 8.70 | $500.00 | $4,350.00 |
| K.C. HOGAN | Sr Associate | 0.30 | $525.00 | $157.50 |
| TOTAL | | 10.70 | $571.50 | $6,115.00 |

### CHARGES FOR OTHER SERVICES PROVIDED/EXPENSES INCURRED

| 03/31/2023 | EnCAP LLC - Hosting 13.306 GB @ $12.50 per GB | 166.33 |
|---|---|---|
| 03/31/2023 | EnCAP LLC - Pre-Review Hosting 41.27 GB @ $7.50 per GB | 309.53 |
| 04/12/2023 | Vendor: Safwat, Adam G. Invoice#: 5838384404120206 Date: 4/11/2023   - CREXP Pro Hac Motion Court Filing Fee -  - Filing Fees 04/11/23 Pro Had Motion Court Filing Fee | 300.00 |
| 04/13/2023 | Vendor: Kaplan, Justin B. Invoice#: 5821326204130201 Date: 4/3/2023   - CREXP Parkland Corporation - Pro Hac Filing Fees -  - Court Costs 04/23/23 Justin Kaplan - Motion for Leave to Appear | 300.00 |

Elbow River Marketing, Ltd.

May 22, 2023
Invoice 2494651  Page 3

| | Pro Hac Filing Fee | |
|---|---|---:|
| 04/13/2023 | Vendor: Kaplan, Justin B. Invoice#: 5821326204130201 Date: 4/3/2023   - CREXP Parkland Corporation - Pro Hac Filing Fees -  - Court Costs 04/03/23 Elaine Kussurelis - Motion for Leave to Appear Pro Hac Filing Fee | 300.00 |
| 04/13/2023 | Vendor: Kaplan, Justin B. Invoice#: 5821326204130201 Date: 4/3/2023   - CREXP Parkland Corporation - Pro Hac Filing Fees -  - Court Costs 04/12/23 Kelly Hogan - Motion for Leave to Appear Pro Hac Filing Fee | 300.00 |
| 04/30/2023 | EnCAP LLC - Hosting 13.314 GB @ $12.50 per GB | 166.43 |
| 04/30/2023 | EnCAP LLC - Pre-Review Hosting 41.27 GB @ $7.50 per GB | 309.53 |
| **Total Charges for Other Services Provided/Expenses Incurred**.................................... | | **$2,151.82** |

## DISBURSEMENT SUMMARY

| Description | Dollars |
|---|---:|
| Court Fees | 900.00 |
| EnCAP LLC - Hosting | 332.76 |
| EnCAP LLC - Pre-Review Hosting | 619.06 |
| Filing Fee | 300.00 |
| TOTAL | $2,151.82 |

**TOTAL FOR THIS INVOICE** .................................................................................... **$8,266.82**

Elbow River Marketing, Ltd.

May 22, 2023
Invoice 2494651  Page 4

### REMITTANCE COPY
Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

Our Matter #             069607/01502                           For Services Through 04/30/23
Name of Matter:       ERM Civil Litigation Claims

| | | |
|---|---|---|
| Fees for Professional Services | $6,115.00 | |
| Charges for Other Services Provided/Expenses Incurred | 2,151.82 | |
| **TOTAL FOR THIS INVOICE** ............................................................................ | **$8,266.82** | |

| |
|---|
| **Terms of Payment:**  Balance due within thirty days of invoice date |

#### ELECTRONIC PAYMENT INSTRUCTIONS

**Domestic Wire**
**And ACH Transfer**

**Foreign Wire (USD)**
**Transfer**

**Beneficiary:**
Nelson Mullins Riley &
Scarborough, LLP
1320 Main Street
Columbia, SC 29201
**Beneficiary Bank:**
Synovus Bank (formerly NBSC, a division of Synovus Bank)
1148 Broadway
Columbus, GA  31901
**ABA/Routing Number:**  061100606
**Beneficiary Account:** ████████████

**Beneficiary:**
Nelson Mullins Riley &
Scarborough, LLP
1320 Main Street
Columbia, SC 29201
**Beneficiary Bank:**
Synovus Bank
Birmingham, Alabama, USA
**SWIFT Code:** ████████
**Beneficiary Account:** ████████████

#### CREDIT CARD PAYMENTS
http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.



**Nelson Mullins Riley & Scarborough LLP**
Attorneys and Counselors at Law
Tax ID No. 57-0215445
Post Office Box 11070 / Columbia, South Carolina 29211
Tel: 803.799.2000

Elbow River Marketing, Ltd.                                              June 12, 2023
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW                    Invoice 2510410  Page  1
Calgary, AB  T2P 4H4
Canada

Our Matter #          069607/01502                    For Services Through 05/31/23
Name of Matter:       ERM Civil Litigation Claims

| | | |
|---|---|---|
| 05/23/23 | Conference w/ E. Kussurelis Regarding ███████████ | |
| | J.B. KAPLAN | 0.20 hrs. |
| 05/23/23 | Draft email correspondence to client ███████████ ███████████ and email correspondence to local counsel ███████████ [.6]. Conference with J. Kaplan ███████████ [.2]. | |
| | E.N. KUSSURELIS | 0.80 hrs. |
| 05/30/23 | Legal research Regarding default judgment, review motion for entry of clerk's default, Complaint, and sample motions for default judgment ahead of drafting Motion for Entry of Default Judgment [2]. Draft Motion for Entry of Default Judgment [.4]. | |
| | E.N. KUSSURELIS | 2.40 hrs. |
| 05/31/23 | Conference w/ E. Kussurelis Regarding ███████████. | |
| | J.B. KAPLAN | 0.20 hrs. |
| 05/31/23 | Legal research Regarding default judgment and prejudgment interest [2.5]. Conference with J. Kaplan Regarding ███████████ [.2]. Draft Motion for Default Judgment [2.3]. | |
| | E.N. KUSSURELIS | 5.00 hrs. |

**Total Fees for Legal Services** ........................................................................................... **$4,440.00**

### BILLING SUMMARY

| Timekeeper | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| J.B. KAPLAN | Partner | 0.40 | $850.00 | $340.00 |
| E.N. KUSSURELIS | Associate | 8.20 | $500.00 | $4,100.00 |
| TOTAL | | 8.60 | $516.28 | $4,440.00 |

### CHARGES FOR OTHER SERVICES PROVIDED/EXPENSES INCURRED

| | | |
|---|---|---|
| 05/31/2023 | EnCAP LLC - Hosting 13.321 GB @ $12.50 per GB | 166.51 |
| 05/31/2023 | EnCAP LLC - Pre-Review Hosting 41.27 GB @ $7.50 per GB | 309.53 |

Elbow River Marketing, Ltd.

June 12, 2023
Invoice 2510410  Page 2

05/31/2023      Westlaw                                                          98.04
**Total Charges for Other Services Provided/Expenses Incurred**....................................  **$574.08**

### DISBURSEMENT SUMMARY

| Description | Dollars |
|---|---|
| EnCAP LLC - Hosting | 166.51 |
| EnCAP LLC - Pre-Review Hosting | 309.53 |
| Westlaw | 98.04 |
| TOTAL | $574.08 |

**TOTAL FOR THIS INVOICE** ...................................................................................  **$5,014.08**

Elbow River Marketing, Ltd.

June 12, 2023
Invoice 2510410  Page 3

### REMITTANCE COPY
Please Return With Your Payment To:

**ATTN:  Accounts Receivable**
**Nelson Mullins Riley & Scarborough LLP**
Post Office Drawer 11009
Columbia, South Carolina  29211
Telephone (803) 799-2000
accounts.receivable@nelsonmullins.com

Elbow River Marketing, Ltd.
C/o Parkland Corporation
Suite 1800, 240 - 4th Avenue, SW
Calgary, AB  T2P 4H4
Canada

| | | |
|---|---|---|
| Our Matter # | 069607/01502 | For Services Through 05/31/23 |
| Name of Matter: | ERM Civil Litigation Claims | |

| | |
|---|---|
| Fees for Professional Services | $4,440.00 |
| Charges for Other Services Provided/Expenses Incurred | 574.08 |
| **TOTAL FOR THIS INVOICE** ................................................................................ | **$5,014.08** |

| |
|---|
| **Terms of Payment:**  Balance due within thirty days of invoice date |

### *ELECTRONIC PAYMENT INSTRUCTIONS*

| *Domestic Wire*<br>*And ACH Transfer* | *Foreign Wire (USD)*<br>*Transfer* |
|---|---|
| **Beneficiary:**<br>  Nelson Mullins Riley &<br>  Scarborough, LLP<br>  1320 Main Street<br>  Columbia, SC 29201 | **Beneficiary:**<br>  Nelson Mullins Riley &<br>  Scarborough, LLP<br>  1320 Main Street<br>  Columbia, SC 29201 |
| **Beneficiary Bank:**<br>  Synovus Bank (formerly NBSC, a division of Synovus Bank)<br>  1148 Broadway<br>  Columbus, GA  31901 | **Beneficiary Bank:**<br>  Synovus Bank<br>  Birmingham, Alabama, USA |
| **ABA/Routing Number:**  061100606 | **SWIFT Code:** ▮▮▮▮▮ |
| **Beneficiary Account:** ▮▮▮▮▮ | **Beneficiary Account:** ▮▮▮▮▮ |

### *CREDIT CARD PAYMENTS*
http://www.nelsonmullins.com/pay

**Reference Field:**  Note the Nelson Mullins Invoice and Matter Number.

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

Case No.: 3:23-CV-00356-MO

ELBOW RIVER MARKETING, Ltd., a
Canadian corporation, ELBOW RIVER
MARKETING USA, LTD., a Delaware
corporation,

        Plaintiffs,

v.

THOMPSON TECHNICAL SERVICES,
LLC, an Oregon limited liability
company, and MERLIN THOMPSON, an
individual,

        Defendants.

_____/

## DECLARATION OF CHARLES J. PATERNOSTER IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT

I, Charles J. Paternoster, hereby declare as follows:

1.    I am an attorney with the law firm of Parsons Farnell & Grein, LLP ("**PFG**"), attorneys for Plaintiffs, Elbow River Marketing, Ltd., and Elbow River Marketing USA Ltd. (collectively, the "**Plaintiffs**"). I am familiar with the facts and circumstances of this case and have personal knowledge of the facts set forth herein.

2.    I submit this declaration in support of Plaintiffs' Motion for Entry of Default Judgment Against Defendants, Thompson Technical Services, LLC, and Merlin Thompson (collectively, the "**Defendants**").

3.      PFG expended a total of 25.2 hours and incurred $10,875.00 in attorneys' fees and $905.75 in costs in connection with enforcing the LEAP Agreement. *See* Composite Exhibit 1.[1]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August __29__, 2023.

CHARLES J. PATERNOSTER

---

[1] Redacted portions of the invoices included in Composite Exhibit 1 involve fees resultant from time incurred related to other matters and have not been included in Plaintiffs' calculations.

# COMPOSITE
# EXHIBIT 1

# PARSONS FARNELL & GREIN, LLP
## ATTORNEYS AT LAW

EMPLOYER # 41-2078136

1030 SW MORRISON STREET
PORTLAND, OREGON 97205
(503) 222-1812
FAX (503) 274-7979

ELBOW RIVER MARKETING, LTD. AND ELBOW
RIVER MARKETING, USA LTD.
NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
C/O ADAM G. SAFWAT,
adam.safwat@nelsonmullins.com
CC: TARIQ REMTULLA, tariq.remtulla@parkland.ca
CC: MORGAN CRILLY, Morgan.Crilly@parkland.ca

June 21, 2023

Client ID 11375-001 CJP

Statement for period through June 21, 2023

**LEGAL SERVICES REGARDING:**  ADMINISTRATIVE HEARING BEFORE OR DEQ

| Fees | | T.K. | Hours | Amount |
|---|---|---|---|---|
| 10/26/22 | CONFERENCE WITH COUNSEL AND REVIEW DOCUMENTS PROVIDED BY COUNSEL | CJP | 1.00 | $450.00 |
| 10/28/22 | █████████████████████████████ | ██ | ██ | ██ |
| 11/01/22 | CORRESPONDENCE TO AND FROM MR. SAFWAT RE ████████████ | CJP | 0.40 | $180.00 |
| 11/04/22 | CONFERENCE WITH MR. SAFWAT, MR. KAPLAN AND PERKINS COIE LAWYERS REPRESENTING TTS RE STATUS; CONFERENCE WITH MR. SAFWAT AND MR. MULLINS RE ███ ██████████████ | CJP | 1.50 | $675.00 |
| 11/07/22 | CONFERENCE CALL WITH CLIENT, MR. SAFWAT, MR. KAPLAN RE ████████████████ | CJP | 1.50 | $675.00 |
| 11/11/22 | ████████████████; CORRESPONDENCE TO AND FROM MR. SAFWAT AND MR. KAPLAN RE ████████ | CJP | 0.80 | $360.00 |
| 12/02/22 | ████████████████████████████ | ██ | ██ | ██ |
| 12/15/22 | ████████████████████; PREPARE CORRESPONDENCE TO CO-COUNSEL RE ████ | CJP | 1.10 | $495.00 |
| 12/16/22 | ███████████████████ | ██ | ██ | ██ |
| 12/22/22 | ████████████████████ | ██ | ██ | ██ |
| 12/27/22 | ██████████████████ | ██ | ██ | ██ |

PLEASE INCLUDE CLIENT OR INVOICE NUMBER ON YOUR PAYMENT
FINANCE CHARGE IMPOSED ON ALL BALANCES UNPAID OVER 30 DAYS – PLEASE SEE ATTACHED DISCLOSURE STATEMENT.
This statement may not include expenses or advances for items such as filing fees, experts etc., for which we have not yet been billed.
This statement only reflects the payments received, services rendered, and expenses/advances paid through the dates noted above.



| Date | Description | Atty | Hours | Amount |
|---|---|---|---|---|
| 01/10/23 | ███████ | | | ██████ |
| 01/11/23 | CORRESPONDENCE AND TELEPHONE CONFERENCE WITH MR. SAFWAT RE █████ | CJP | 0.80 | $400.00 |
| 01/31/23 | ████; REVIEW CORRESPONDENCE FROM MS. CRILLY RE ██████ | CJP | 0.70 | $350.00 |
| 02/03/23 | REVIEW DRAFT COMPLAINT | CJP | 0.80 | $400.00 |
| 02/07/23 | CORRESPONDENCE TO AND FROM MR. SAFWAT; REVIEW COMPLAINT | CJP | 0.40 | $200.00 |
| 02/08/23 | CORRESPONDENCE TO AND FROM MR. SAFWAT AND MR. KAPLAN RE █████ | CJP | 0.50 | $250.00 |
| 02/09/23 | CORRESPONDENCE TO AND FROM MR. SAFWAT AND MR. KAPLAN RE █████; RESEARCH RE 7.1 DISCLOSURE NOTICE; ███████ | CJP | 1.20 | $600.00 |
| 02/13/23 | ██████████ | ██ | ██ | ██████ |
| 02/15/23 | █████; CONFERENCE WITH TARIQ, MORGAN, ADAM AND JUSTIN RE █████; REVIEW DRAFT COMPLAINT | CJP | 1.40 | $700.00 |
| 02/20/23 | ██████████ | | | ██████ |
| 02/21/23 | REVIEW CORRESPONDENCE RE █████ | CJP | 0.50 | $250.00 |
| 02/23/23 | REVIEW DRAFT COMPLAINT; REVIEW CORRESPONDENCE FROM ELAINE RE █████ | CJP | 0.50 | $250.00 |
| 03/01/23 | CORRESPONDENCE TO AND FROM COUNSEL RE POSSIBLE NEW ATTORNEYS; ██████ | CJP | 1.10 | $550.00 |
| 03/09/23 | REVIEW AND REVISE COMPLAINT; PREPARE AND THEN REVISE RULE 7.1 DISCLOSURES, CONFERENCES WITH MR. SAFWAT AND MR. KAPLAN RE █████ REVIEW CORRESPONDENCE FROM MR. THOMPSON RE LEAP AGREEMENT | CJP | 1.50 | $750.00 |
| 03/10/23 | CORRESPONDENCE TO AND FROM MR. SAFWAT AND TELEPHONE CONFERENCE WITH MR SAFWAT RE █████; REVISE COMPLAINT FOR FILING | CJP | 1.00 | $500.00 |
| 03/11/23 | CORRESPONDENCE FROM MR. KAPLAN RE █████; FOLLOW UP RE THOMPSON AND SERVICE OF PROCESS | CJP | 0.50 | $250.00 |
| 03/13/23 | FINAL REVISIONS TO COMPLAINT; REVIEW CORRESPONDENCE TO COURT; CORRESPONDENCE TO COUNSEL AND CLIENT RE █████ | CJP | 1.30 | $650.00 |
| 03/20/23 | CORRESPONDENCE TO AND FROM CO-COUNSEL AND MS. CRILLY RE █████; FOLLOW UP WITH MR. FLANAGAN RE █████ | CJP | 0.70 | $350.00 |
| 03/29/23 | REVIEW CERTIFICATES OF SERVICE; CORRESPONDENCE TO AND FROM MR. SAFWAT AND MR. KAPLAN RE █████; █████ | CJP | 0.80 | $400.00 |
| 04/03/23 | REVIEW PRO HAC VICE MATERIALS; █████ | CJP | 1.00 | $500.00 |

PLEASE INCLUDE CLIENT OR INVOICE NUMBER ON YOUR PAYMENT
FINANCE CHARGE IMPOSED ON ALL BALANCES UNPAID OVER 30 DAYS – PLEASE SEE ATTACHED DISCLOSURE STATEMENT.
This statement may not include expenses or advances for items such as filing fees, experts etc., for which we have not yet been billed.
This statement only reflects the payments received, services rendered, and expenses/advances paid through the dates noted above.

| Date | Description | T.K. | Hours | Amount |
|---|---|---|---|---|
| 04/17/23 | CORRESPONDENCE TO AND FROM MR. KAPLAN RE ███████; REVIEW LOCAL RULES RE DEFAULT | CJP | 0.50 | $250.00 |
| | REVIEW INTERNAL FILES AND WESTLAW TO OBTAIN EXAMPLES OF PREVIOUSLY FILED RULE 55 DEFAULT JUDGMENT MOTIONS AND ORDERS IN PREPARATION FOR FILING SAME IN THIS CASE; CIRCULATE EXAMPLES TO C. PATERNOSTER AND INFORM OF FINDINGS; | RIC | 0.60 | $120.00 |
| 04/18/23 | FOLLOW UP RE DEFAULT MOTION AND DAMAGES PROOF REQUIRED | CJP | 0.50 | $250.00 |
| 04/19/23 | REVIEW CORRESPONDENCE FROM COUNSEL AND DRAFT MOTION FOR DEFAULT | CJP | 0.50 | $250.00 |
| 04/21/23 | CORRESPONDENCE TO AND FROM CO-COUNSEL RE ███████ | CJP | 0.40 | $200.00 |
| 04/24/23 | REVIEW MOTION FOR DEFAULT AND SUPPORTING DOCUMENTS | CJP | 0.50 | $250.00 |
| 04/26/23 | REVIEW CORRESPONDENCE FROM MR. KAPLAN RE ███████████; REVIEW AND FILE MOTION FOR DEFAULT AND SUPPORTING DOCUMENTS | CJP | 1.00 | $500.00 |
| | REVIEW LOCAL COURT RULES RELATING TO FILING A MOTION FOR DEFAULT ENTRY; PHONE CONFERENCE WITH JA REGARDING SPECIFIC FILING PROCEDURES REQUESTED BY THE PRESIDING JUDGE; FINALIZE MOTION FOR DEFAULT IN PREPARATION FOR FILING WITH THE COURT; | RIC | 0.60 | $120.00 |
| 04/28/23 | PREPARE CORRESPONDENCE TO MR. FLANAGAN AND MR. THOMPSON RE DEFAULT; CORRESPONDENCE WITH CO-COUNSEL RE ███████ | CJP | 0.50 | $250.00 |
| 05/11/23 | TELEPHONE CONFERENCE WITH JUDGE MOSMAN'S JUDICIAL ASSISTANT REGARDING STATUS OF ORDER ON DEFAULT JUDGMENT SUBMITTED TO THE COURT; NOTIFY C. PATERNOSTER ███████; | RIC | 0.20 | $40.00 |
| 05/23/23 | CORRESPONDENCE TO AND FROM COUNSEL RE ███████; REVIEW MINUTE ORDER OF COURT RE DEFAULT; RESEARCH RE FILING FOR ENTRY OF DEFAULT JUDGMENT | CJP | 0.80 | $400.00 |
| 05/24/23 | CORRESPONDENCE TO AND FROM COUNSEL RE ███████████; PREPARE CORRESPONDENCE TO MR. THOMPSON AND MR. FLANAGAN RE ENTRY OF DEFAULT ORDER | CJP | 0.80 | $400.00 |
| 05/31/23 | CORRESPONDENCE TO AND FROM MR. SAFWAT AND MR. KAPLAN; ███████████ | CJP | 0.70 | $350.00 |
| | ████████████████████ | ██ | ██ | ██ |
| 06/12/23 | REVIEW COURT RULES AND COMMUNICATE WITH JUDICIAL ASSISTANT VIA PHONE CORRESPONDENCE AND EMAIL TO OBTAIN INFORMATION RELATED TO FILING AN ORDER FOR DEFAULT FINAL JUDGMENT; NOTIFY C. PATERNOSTER ███████; | RIC | 0.30 | $60.00 |

### Timekeeper Recap

| T.K. | Name | Hours | Rate | Amount |
|---|---|---|---|---|
| CJP | CHARLES J PATERNOSTER | 10.40 | $450.00 | $4,680.00 |
| CJP | CHARLES J PATERNOSTER | 25.70 | $500.00 | $11,850.00 |
| RIC | RACHEL I. CRAW | 2.30 | $200.00 | $460.00 |

**TOTAL SERVICES**      **$16,990.00**

**COSTS ADVANCED & INCURRED**      **Amount**

| | | |
|---|---|---|
| 03/13/23 | OREGON DISTRICT COURT - FILING FEE | $402.00 |

PLEASE INCLUDE CLIENT OR INVOICE NUMBER ON YOUR PAYMENT
FINANCE CHARGE IMPOSED ON ALL BALANCES UNPAID OVER 30 DAYS – PLEASE SEE ATTACHED DISCLOSURE STATEMENT.
This statement may not include expenses or advances for items such as filing fees, experts etc., for which we have not yet been billed.
This statement only reflects the payments received, services rendered, and expenses/advances paid through the dates noted above.

| | | |
|---|---|---|
| 03/31/23 | MERCURYPDX LLC | $365.00 |
| | MESSENGER SERVICE | |
| | CLIENT DELIVERIES THROUGH MARCH 31, 2023 | |
| 04/30/23 | THOMSON REUTERS - WEST PAYMENT CENTER | $138.75 |
| | LEGAL RESEARCH - APRIL 2023 | |

**TOTAL COSTS**                                                          **$905.75**

**TOTAL FEES AND COSTS**                                        **$17,895.75**

PLEASE INCLUDE CLIENT OR INVOICE NUMBER ON YOUR PAYMENT
FINANCE CHARGE IMPOSED ON ALL BALANCES UNPAID OVER 30 DAYS – PLEASE SEE ATTACHED DISCLOSURE STATEMENT.
This statement may not include expenses or advances for items such as filing fees, experts etc., for which we have not yet been billed.
This statement only reflects the payments received, services rendered, and expenses/advances paid through the dates noted above.